1  Christopher S. Morris, Esq., SBN 163188
   Danielle R. Pena, Esq., SBN 286002
2  MORRIS LAW FIRM, APC
   401 West A Street, Suite 1820
3  San Diego, CA 92101
   Telephone: (619) 826-8060
4  Facsimile: (619) 826-8065
   cmorris@morrislawfirmapc.com
5
   Attorneys for Plaintiffs
6

7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

11 CHASSIDY NeSMITH, individually        Case No. 15-cv-0629-JLS (JMA)
   and as Guardian ad Litem on behalf of
12 SKYLER KRISTOPHER SCOTT
   NeSMITH, and as Successor in          **OPPOSITION TO DEFENDANTS'**
13 Interest to KRISTOPHER SCOTT          **MOTION TO DISMISS PLAINTIFFS'**
   NeSMITH,                              **SECOND AMENDED COMPLAINT,**
14                                       **AND DEFENDANT'S MOTION TO**
              Plaintiffs,                **STRIKE**
15
        v.                              Hon. Janis L. Sammartino
16
   COUNTY OF SAN DIEGO;                 NO ORAL ARGUMENT UNLESS
17 WILLIAM D. GORE, individually;       REQUESTED BY THE COURT
   and DOES 1-100, inclusive,
18
              Defendants.
19

20

21

22

23

24

25

26

27

28

# **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ....................................................................................... ii

I.    INTRODUCTION ........................................................................................... 1

II.   LEGAL STANDARD ..................................................................................... 2

III.  PLAINTIFFS' § 1983 CLAIMS ARE PLED WITH SUFFICIENCY ................................... 3

    *A.    Plaintiffs' § 1983 Allegations Focus on the County and its Policies, Customs and Training, Not VDF* ......................................................................... 3

    *B.    Plaintiffs' Evidence of a Pattern of Constitutional Violations is Properly Before This Court* ............................................................................................. 6

    *C.    Plaintiffs Are Not Required to Offer Verdicts as Evidence of a Pattern of Constitutional Violations* ...................................................................... 7

        *i.  Plaintiffs Allegations Support a Pattern of Similar Deputy Conduct* ........... 9

    *D.    Plaintiffs' Allegations Demonstrate that the County was on Notice of the Pattern of Constitutional Violations* .......................................................... 12

IV.   THE COUNTY'S INADEQUATE POLICIES AND FAILURE TO TRAIN WAS THE MOVING FORCE IN KRIS' CONSTITUTIONAL VIOLATIONS ..................................... 14

V.    THE COUNTY'S RELIANCE ON *TAYLOR V. BARKES* IS MISPLACED ....................... 14

VI.   PLAINTIFFS ALLEGED COUNTY STAFF WAS ON NOTICE THAT KRIS WAS SUICIDAL AND POSED AN IMMEDIATE DANGER TO HIMSELF ............................... 15

VII.  CONCLUSION ............................................................................................ 16

i

# TABLE OF AUTHORITIES

## STATUTES

Government Code § 845.6...................................................................................16, 17

## FEDERAL CASES

*Bell Atl. Corp., v. Twombly*, 550 U.S. 544, 555 (2007) ..........................................3

*Campbell v. Washington Dep't of Soc. Servs.,* 671 F.3d 837, 842 n.5

    (9th Cir. 2011) ....................................................................................................4

*Cervantes v. City of San Diego,* 5 F.3d 1273 (9th Cir. 1993) ................................3

*Connick v. Thompson, 563 U.S. 51, 62-63 (U.S. 2011)* ......................................7-8

*Dillman v. Tuolumne County*, 2013 U.S. Dist. LEXIS 103099

    (E.D. Cal. July 22, 2013) ....................................................................................9

*Epstein v. Washington Energy Co.,* 83 F.3d at 1140 (9th Cir. 1996.)....................3

*Fiacco v. Rensselaer*, 783 F. 2d 319, 327 (2nd Cir. 1986)....................................9

*Flores v. County of L.A.*, 758 F.3d 1154 (9th Cir. 2014) ......................................8

*In re Copper Mountain Secs. Litig.*, 311 F. Supp. 2d 857, 863-64

    (N.D. Cal. 2004) .................................................................................................7

*In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1157

    (C.D. Cal. 2007) .................................................................................................7

*Languirand v. Hay*den, 717 F. 2d 220, 227-228 (5th Cir. 1983) ..........................9

*Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ..............................3

*Patzner v. Burkett*, 779 F. 2d 1363 (8th Cir. 1985)..............................................9

*Smith v. Pacific Props. & Dev. Corp*., 358 F.3d 1097 (9th Cir. 2004) ..................3

*Tandel v. County of Sacramento*, 2012 U.S. Dist. LEXIS 21628

    (E.D. Cal. Feb. 17, 2012)..........................................................................8, 9, 10

*Turner v. San Diego Cnty.*, 2015 U.S. Dist. LEXIS 32155

    (S.D. Cal. Mar. 13, 2015) ...................................................................................4

ii

1  *Vance v. County of Santa Clara,* 928 F. Supp. 993, 996

2      (N.D. Cal. 1996) ..........................................................................3-4

3  *Wellington v. Daniels,* 717 F. 2d 932, 936 (4th Cir. 1983) ....................9

4                    **OTHER - PUBLICATIONS**

5  Maass, Dave & Davis, Kelly *"How Many Inmate Deaths is Too Many:*

6      *San Diego County's Incarceration Mortality Rate Leads*

7      *California's Largest Jail"* San Diego CityBeat 27 Mar. 2016,

8      Web. 8 Feb. 2016..........................................................................13

9  Davis, Kelly *"Law Enforcement Review Board Finds Deputy Error in*

10      *Inmate Suicidel"* San Diego CityBeat 12 June 2014,

11      Web. 8 Feb. 2016..........................................................................13

12  Davis, Kelly *"10 more dead inmates"* San Diego CityBeat 16 Oct. 13,

13      Web. 8 Feb. 2016..........................................................................13

14  Davis, Kelly *"San Diego County sets a dubious record for jail deaths"*

15      San Diego CityBeat 22 Dec. 2014, Web. 8 Feb. 2016....................13

16  Davis, Kelly *"Suicide in the cells"* San Diego CityBeat 24 April 2013,

17      Web. 8 Feb. 2016..........................................................................13

18  Burke, Megan; Cavanaugh, Maureen; St. John, Alison *"San Diego*

19      *County Jail Changing Medial Model for Needs of Long Term*

20      *Inmates"* KPBS  18, Feb. 2014, Web. 8 Feb. 2016.........................13

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND
AMENDED COMPLAINT AND DEFENDANT'S MOTION TO STRIKE
CASE NO. 15-CV-0629-JLS(JMA)

# I.     <u>INTRODUCTION</u>

The county's Motion to Dismiss primarily concentrates on Plaintiffs § 1983 claims by factually attacking the evidence on which the claims are premised. Rather than accepting the factual allegations as plead, the county deceptively attempts to create evidentiary based distractions not supported by the law or the Second Amended Complaint (herein "SAC") in order to circumvent the county's culpability. The county surreptitiously modifies both the quality and quantum of the evidence plead in the SAC. Specifically, the county does this by 1) unilaterally modifying Plaintiffs' *Monell* and *Canton* allegations to apply to only Vista Detention Facility (hereinafter, "VDF") rather than to the county as a whole, 2) requiring Plaintiffs to prove a pattern of *verdicts* constituting constitutional violations, and 3) disregarding news publications and the Citizens Law Enforcement Review Board's (herein "CLERB") findings – cited to evidence a known pattern of constitutional violations – because they are not "authenticated."

The county attempts to narrow Plaintiffs' factual allegations from county-wide suicides and policies to VDF suicides and policies in order to minimize the pattern of constitutional violations asserted against it. The county is well-aware that VDF is not a party. VDF is a county-jail, and its policies are county-wide policies authorized and implemented by the county, not by independent jails. As alleged, obvious suicidal ideations went ignored due to a county-wide custom and failure to train. Therefore, the statistics at-issue in this case are not isolated to suicides at VDF but, as alleged, take into account county-wide suicides.

Next, the county requests this Court to strike the news articles cited, attached and relied upon in Plaintiffs' SAC because they are not "authenticated." Authentication is an issue for trial, not a 12(b)(6) motion. Further, because all factual allegations set forth in the complaint are taken as true and construed in the light most favorable to plaintiffs, the county cannot escape the reality of the county-wide statistics relied upon by Plaintiffs. Plaintiffs have a good faith basis to allege

1

1   the pattern of suicide described in the publications that cite to reliable sources.

2   Once discovery is commenced, Plaintiffs will seek the official records regarding

3   suicide deaths in county jails. These records will either verify or discredit the

4   figures set forth in the SAC. However, at this state, Plaintiffs are entitled to rely on

5   the limited sources of information available to them. Further, each of the articles

6   cited and relied upon by Plaintiffs contain comments by county spokeswomen Jan

7   Caldwell; statements which buttress Plaintiffs' contention that the county was on

8   notice of its pattern of similar constitutional violations.

9       Lastly, the county attempts to create a standard not supported by this Court's

10  Order, nor is it found in any case law. The county contends that the CLERB's

11  findings, and the news publications cited and relied upon by Plaintiffs, should not

12  be considered because they are not proof of "constitutional violations." Apparently,

13  the county contends only verdicts can be used to show a pattern of preventable

14  inmate suicides. There is no burden on Plaintiffs to rely solely on verdicts in order

15  to prove a pattern of similar conduct, nor can the county properly cite any case

16  standing for that proposition. This court should deny Defendants invitation to

17  increase Plaintiffs burden of proof. As this Court is well aware, Plaintiffs burden is

18  already substantial.

19      Given the instruction from this Count in its January 27, 2016 Order (herein

20  "Order"), Plaintiffs have factually enhanced their initial complaint to show a pattern

21  of similar conduct by county deputies and medical staff. Based on Plaintiffs'

22  amendments, a reasonable inference can be made that staffs' pattern of ignoring

23  obvious suicidal ideations stems from a county-wide custom and practice to ignore

24  such signs; alternatively, this pattern is a result from the county's failure to train

25  deputies in identifying and responding to obvious suicidal ideations. As such, the

26  county's Motion to Dismiss should be denied.

## II.    LEGAL STANDARD

28  All factual allegations set forth in the complaint "are taken as true and

2

1    construed in the light most favorable to plaintiffs." *Epstein v. Washington Energy*

2    *Co.,* 83 F.3d at 1140 (9th Cir. 1996.) A claim is facially plausible when the facts

3    pleaded "allow the court to draw the reasonable inference that the defendant is

4    liable for the misconduct alleged." *Bell Atl. Corp., v. Twombly*, 550 U.S. 544, 555

5    (2007.) That is not to say that the claim must be probable, but there must be "more

6    than a sheer possibility that a defendant has acted unlawfully." *Id.* at 556. The Court

7    must also assume that "general allegations embrace those specific facts that are

8    necessary to support a claim." *Smith v. Pacific Props. & Dev. Corp*., 358 F.3d

9    1097, 1106 (9th Cir. 2004.)

10       When the legal sufficiency of a complaint's allegations is tested by a motion

11   under Rule 12(b)(6), "review is limited to the complaint." *Cervantes v. City of San*

12   *Diego,* 5 F.3d 1273, 1274 (9th Cir. 1993). Indeed, factual challenges to a plaintiff's

13   complaint have no bearing on the legal sufficiency of the allegations under Rule

14   12(b)(6). *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001.)

15   **III.    PLAINTIFFS' § 1983 CLAIMS ARE PLED WITH SUFFICIENCY**

16       Importantly, the county does not deny the facts as plead fail to show a

17   pattern, rather it side-steps this issue and argues the materials relied upon are

18   improper and ends its analysis there. However, the county's contentions are fatally

19   inconsistent with the law and the allegations as plead in Plaintiffs' SAC.

20   *A.  Plaintiffs' § 1983 Allegations Focus on the County and its Policies, Customs*

21       *and Training, Not VDF*

22       The county subtly attempts to obviate its exposure by limiting Plaintiffs'

23   allegations to only VDF suicides, rather than county-wide suicides.[1] However,

24   Plaintiffs' allegations are against the *county* not just VDF. In fact, VDF is not even

25   a party to this litigation, nor can it be.  *Vance v. County of Santa Clara,* 928 F.

26   _____

27   [1] "Even as to the number of suicides stated to have occurred from 2009 to date, the
     second amended complaint does not specify how many of the reported suicides
     occurred at VDF. Hence the new material referenced as allegations in the complaint

28   does not provide any notice of any pattern of suicides at VDF. " (Mtn to Dismiss;
     7:21-25.)

3

1  Supp. 993, 996 (N.D. Cal. 1996); *Campbell v. Washington Dep't of Soc. Servs.,* 671

2  F.3d 837, 842 n.5 (9th Cir. 2011) (citing *Ketchum v. Alameda Cnty.*, 811 F.2d 1243,

3  1245 (9th Cir. 1987); *Turner v. San Diego Cnty.*, 2015 U.S. Dist. LEXIS 32155

4  (S.D. Cal. Mar. 13, 2015) (A county jail or detention facility (like VDF) is not a

5  proper defendant under § 1983.)

6       Further, when analyzing Plaintiffs' § 1983 claims, other than the individuals'

7  deliberate indifference claim, the remaining § 1983 claims explicitly focus on

8  county policies, customs and training. The at-issue suicide and psychiatric policies

9  are county-wide policies, as is the training, or lack of training, thereon. VDF does

10 not implement its own policies, only the county can mandate, materialize and

11 enforce policy implementations. Further, policies are not implemented on a jail-by-

12 jail basis.

13      Further, the allegations set forth in the SAC are controlling:

14   a) "According to the U.S. Bureau of Justice Statistics, *San Diego* has the

15      second highest suicide rate among the state's largest jail systems: 54

16      suicides per 100,000 inmates, more than 60% higher than the national

17      average" (SAC, ¶9.) (*emphasis added.*)

18   b) "Further, and more disturbingly, based on public records requests for

19      official death investigation reports and coroner's reports, there have been

20      *18 suicides in San Diego County jails* since 2013." (SAC, ¶10.) (*emphasis*

21      *added.*)

22   c) "Unfortunately, Kris isn't the only one. There is a pattern of similar

23      constitutional violations due to the *County's* inadequate suicide

24      prevention policies and training programs." (SAC, ¶72.) (*emphasis*

25      *added.*)

26   d) "Kelly Davis is a local reporter who has dedicated her career to reporting

27      and investigating deaths in *San Diego County jails*. She began her series

28      of investigations into *San Diego jail* suicides in 2007. Since this time she

4

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND
AMENDED COMPLAINT AND DEFENDANT'S MOTION TO STRIKE

CASE NO. 15-CV-0629-JLS(JMA)

has published over a dozen articles highlighting the outrageous pattern of deaths and suicides in *San Diego County jails*. Not only do the underlying deaths and circumstances put the *County* and its policymakers on actual and constructive notice of a pattern of constitutional violations, but Kelly Davis' countless *CityBeat* publications – in which the *County* spokeswomen comments in every article –also puts the *county* on notice of a pattern of constitutional violations." (SAC, ¶73.) (*emphasis added.*)

e) "…based on public records requests for official death investigation reports and coroner's reports - there have been 18 suicides in *San Diego County jails* since 2013. The following incidents are just a few of the deaths in which inmates displayed obvious suicidal ideations prior to killing themselves." (SAC, ¶74.) (*emphasis added.*)

f) "…there were four suicides in 2009, one in 2010, five in 2011, two in 2012, five in 2013, six in 2014, and six in 2015. So far this year (2016) there has been one suicide.[2] In short, there have been 18 suicides since 2013. It is clear that Kris was part of an upward trend of suicides in *San Diego County jails*. (SAC, ¶85.) (*emphasis added.*)

g) "Further evidence that the *county* had notice of a pattern of suicides is its newly instituted "Matrix System." (SAC, ¶86.) (*emphasis added.*)

h) "Further, according to Dr. Alfred Joshua, Chief Medical Officer for San Diego County Sheriff's Department, "mental health issues are pretty prevalent in the *jail system* … in *our jails* 28% of the inmates are on psychotropic medications." Meaning roughly 30% of the suicides in *County jails* are likely achieved by inmates with mental health issues, if not higher." (SAC, ¶105.) (*emphasis added.*)

---

[2] Since drafting the SAC, there have been two more suicides in 2016, totaling three suicides in three months. Though these suicides occurred after Kris' death and do not themselves notify the county of a pattern prior to Kris' death, they are nerveless indicative of an on-going pattern of suicides in county jails.

i) "… *Defendants* set in motion a series of events regarding its policies or customs which failed to address Kris' serious medical needs." (SAC, ¶114.) (*emphasis added.*)

The county's pursuit to narrow the focus to only VDF suicides is a transparent attempt to minimize the instances of a pattern. It offers no authority for its contention to isolate the evidence to only one jail. The county should not be permitted to unilaterally re-write Plaintiffs' SAC. It is clear that Plaintiffs sued the county for its grossly inadequate county-wide policies, as well as its county-wide failure to train. At this stage of the litigation Plaintiffs' factual allegations *against the county* control. Further, interpreting and arguing Plaintiffs' factual allegations is not proper and carries no weight in 12(b)(6) motions.

B. *Plaintiffs' Evidence of a Pattern of Constitutional Violations is Properly Before This Court*

The county is premature in its attempt to use the rules of evidence against Plaintiffs at this stage in the litigation. It argues that "the information about inmate deaths and statistics in the editorials discussed in plaintiffs' allegations are not authenticated … and should be stricke[n]." It further argues, "contents of news articles are generally considered hearsay and not admissible." (Mtn to Dismiss, 10:13-26.)  However, the county's cases cited in support of this contention are entirely distinguishable, because none of those cases involved news articles cited and relied upon in the complaint.

Further, and more to the point, the county is well aware Plaintiffs do not have to meet evidence burdens at the 12(b)(6) stage. The county is also aware that all factual allegations set forth in the complaint are taken as true and construed in the light most favorable to plaintiffs. Discovery has not yet begun. Through the discovery process, Plaintiffs will seek to verify these figures by requesting the actual records; records that will either verify or discredit these alleged figures. But until then, Plaintiffs are entitled to rely on the limited sources of information

6

1   currently available. Time will tell if Plaintiffs allegations accurately reflect the

2   actual suicides and circumstances of those suicides in the San Diego County jail

3   system. Until then, Plaintiffs allegations should be taken as accurate.  As such,

4   Defendant's Motion to Strike should be denied.

5          However, if the court deems it necessary, Plaintiffs request judicial notice of

6   the news articles and the CLERB's findings as they are referenced, cited, attached

7   and relied upon in the SAC. *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148,

8   1157 (C.D. Cal. 2007) (finding a court may take judicial notice of documents such

9   as news articles where they are relied upon by the complaint); *In re Copper*

10  *Mountain Secs. Litig.*, 311 F. Supp. 2d 857, 863-64 (N.D. Cal. 2004) (the Court

11  may also take judicial notice of other matters of public record such as press

12  releases, analyst reports, news articles, and conference call transcripts in cases such

13  as this, where they are relied upon by the complaint.)[3]

14        C.  *Plaintiffs Are Not Required to Offer Verdicts as Evidence of a Pattern of*

15            *Constitutional Violations*

16         The county again creates a non-issue by asserting its flawed contention that

17  "Allegations of a pattern of constitutional violations, <u>without findings</u> of

18  constitutional violations, do not rise to the level of a *Monell* violation. See *Connick*,

19  563 U.S. at 63." (Mtn to Dismiss, 8:4-7.) Ostensibly, the county is arguing that the

20  only way Plaintiffs can show a pattern of constitutional violations is by offering

21  verdicts explicitly establishing a constitutional violation. This is not the law.

22  Ironically, the county relies on its attenuated extrapolation of *Connick* – a "single-

23  incident" liability case – to support its contention.  *Connick* was a § 1983 case in

24  which a potential pattern of *Brady* violations giving notice to the District Attorney's

25  office was briefly discussed. The court in *Connick* held:

26         "Although Thompson does not contend that he proved a pattern of
           similar Brady violations, he points out that, during the 10 years
           preceding his armed robbery trial, Louisiana courts had overturned
27         four convictions because of Brady violations by prosecutors in

28  _____

[3] Plaintiffs' request for Judicial Notice is attached hereto.

Connick's office. Those four reversals could not have put Connick on notice that the office's Brady training was inadequate with respect to the sort of Brady violation at issue here. None of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind. Because those incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation. *Connick v. Thompson*, 563 U.S. 51, 62-63 (U.S. 2011).

Somehow, the county relies on this to support its contention that Plaintiffs' failed to meet their burden because the CLERB report findings and news articles are not verdicts. First, *Connick* only briefly discusses a pattern of violations because this was a single-incident case. As this Court knows, *Brady* violations, by definition, require judicial findings. There is no basis upon which to fit this square peg (judicial findings of *Brady* violations) into this round hole (a pattern of suicide in county jails). Second, there is no reasonable interpretation in *Connick* to support creating such a significant burden. Lastly, case law tells a different story.

Since *Connick*, courts have further elaborated on the types of allegations necessary to show a pattern of constitutional violations.  In *Flores v. County of L.A.,* a recent Ninth circuit appellate decision, Plaintiff alleged she was sexually assaulted by a deputy sheriff. She sued the county claiming the deputies' conduct was a result of the county's failure to train. The court held, "in the absence of any pattern of sexual assaults by deputies, Flores has failed to allege facts sufficient to state a claim." *Flores v. County of L.A.*, 758 F.3d 1154, 1156 (9th Cir. 2014.) The *Flores* court, could have but did not state "absent a pattern of *convictions* of sexual assault by deputies…"

In *Tandel v. County of Sacramento*, the court found plaintiff established a pattern of similar misconduct solely from the alleged misconduct done to him because he plead "multiple acts of constitutional mistreatment from multiple personnel" over an extended time period.  *Tandel v. County of Sacramento*, 2012 U.S. Dist. LEXIS 21628. In *Tandel*, an inmate was allegedly subjected to a series of constitutional violations over a period of several weeks. The Plaintiff alleged that

8

over several weeks multiple deputies mistreated him (ignored complaints and failed to summon medical care). Based on those allegations, the court concluded a pattern of mistreatment was shown because the "incidents were distinct from one another, occurred several days apart, and involved different personnel." *Dillman v. Tuolumne County*, 2013 U.S. Dist. LEXIS 103099, (E.D. Cal. July 22, 2013); *Tandel v. County of Sacramento*, 2012 U.S. Dist. LEXIS 21628 (E.D. Cal. Feb. 17, 2012.)

In fact, courts in every circuit have systematically held similar misconduct – not verdicts or "findings of constitutional violations" – is sufficient to establish a pattern. (Mtn to Dismiss; 8:4-8.) The court in *Fiacco v. Rensselaer*, 783 F. 2d 319, 327 (2nd Cir. 1986) held "multiple incidents required for finding of deliberate indifference." The court in *Patzner v. Burkett*, 779 F. 2d 1363, 1367 (8th Cir. 1985) held "a municipality may be liable if it had notice of prior misbehavior by its officers and failed to take remedial steps amounting to deliberate indifference to the offensive acts" The court in *Languirand v. Hay*den, 717 F. 2d 220, 227-228 (5th Cir. 1983) held municipal liability for failure to train requires "evidence at least of a pattern of similar incidents in which citizens were injured or endangered." The court in *Wellington v. Daniels,* 717 F. 2d 932, 936 (4th Cir. 1983) held "a failure to supervise gives rise to § 1983 liability, however, only in those situations where there is a history of widespread abuse."

Based on the cases cited above, it is clear the courts' focus relating to a pattern of constitutional violations hinges on similar conduct and instances not verdicts and established findings. As such, there is absolutely no authority requiring such a burden in order to properly allege a "pattern of constitutional violations."

i.   *Plaintiffs Allegations Support a Pattern of Similar Deputy Conduct*

Below are allegations set forth in the SAC illustrating a pattern of ignored suicidal ideations resulting in inmates taking their own lives.

Plaintiffs have alleged "the Citizens Law Enforcement Review Board

9

1  (CLERB), the independent oversight body charged with investigating deaths-in-

2  custody and allegations of law-enforcement misconduct, has twice found that San

3  Diego County sheriff's deputies violated policy and procedure in instances of

4  inmate suicides." (SAC, ¶¶ 75.) Both of those incidents occurred prior to Kris'

5  preventable death. One of those instances involved two deputies observing an

6  "unauthorized laundry line and failed to take corrective action." (SAC, ¶ 77.)

7      Plaintiff also alleged in October 2013, although Mr. Lubsen was known to

8  have attempted suicide in a campus holding cell a day prior, was seen during intake

9  with ligature marks, and despite the jail being given a tip that Mr. Lubsen was a risk

10  to himself, deputies left him in gen pop and Mr. Lubsen killed himself the next day.

11  (SAC, ¶ 79.)

12      In 2014 Mr. Lleras told several nurses and deputies he was going to kill

13  himself. He was placed in a safety cell and released 24 hours later. Almost exactly

14  24 hours later he was found hanging in his cell. (SAC, ¶ 80.)

15      Sean Wallace, had been in and out of safety cells at the Central Jail because

16  of numerous suicide threats, including an attempt to slice his wrists with a butter

17  knife. On April 23, 2011, he was moved out of a psychiatric unit to a regular

18  administrative-segregation cell; 47 minutes later, during medicine call, a nurse

19  found Wallace hanging from a sheet tied to a bed bracket. (Ex. 3 to SAC.)

20      Similarly, Mr. Carrol scrawled a suicide note on his cell walls using his

21  blood. Prior to that he had urinated on the floor and stuck food and feces to his

22  ceiling, all of which went unnoticed prior to his hanging himself. (SAC, ¶ 81.)

23  Lastly, the SAC states there have been 18 county suicides since 2013. (SAC, ¶ 85.)[4]

24      Distinct from conduct prior to the inmate's death, courts have found a pattern

25  can be shown based solely on the various instances of mistreatment felt by the

26  inmate himself. According to *Tandel,* based on the alleged mistreatment suffered by

27

28  _____
[4] Notably, this statistic carries much more weight than 4 overturned convictions in a 10 year span such as the case in *Connick.*  10

Kris himself, Plaintiffs have sufficiently alleged a pattern of misconduct because the "incidents were distinct from one another, occurred several days apart, and involved different personnel." Here, Plaintiffs have alleged various deputies overheard Kris' daily conversations with Chasity in which he claimed he was going to kill himself. Yet not a single deputy took action. (SAC, ¶36.) Plaintiffs also allege there was at least one deputy that reached out to Kris' father saying he overheard some of the phone conversations and yet took no action. (SAC, ¶7.) Plaintiffs further allege that Kris' family called at least seven different county employees urging them to take Kris' threats seriously. As plead, only one of those county employees claimed to have informed VDF. (SAC, ¶35.) Further, because Kris was left in a gen-pop cell, it is clear that VDF deputies failed to share the family's concerns with a VDF housing classification deputy. (SAC, ¶8.) And, despite begging for psychiatric care, DOE mental health professional refused to treat Kris for his PTSD and paranoia. (SAC, ¶ 51.) Plaintiffs also claim a deputy saw Kris' noose hanging from a light fixture, commented, and simply walked away. (SAC, ¶¶ 39, 42.)

Based on 1) the aggregation of Kris' habitual mistreatment, 2) San Diego County's continuing statistic of an up-ward trend in annual suicides making it the second largest California county in suicide deaths, 3) the CLERBS finding that "twice … county sheriff's deputies violated policies in instances of inmate suicides" and 4) *CityBeats* countless articles spotlighting the pattern of similar preventable suicides, Plaintiffs have sufficiently established a known pattern of suicides stemming from a lack of suicide prevention policy and/or inadequate training.

/ / /

/ / /

/ / /

/ / /

11

D. _Plaintiffs' Allegations Demonstrate that the County was on Notice of the_
   _Pattern of Constitutional Violations_

Plaintiffs are correct in relying on the news publications, the CLERB report's findings and state and national statistics to show a known pattern. The statistics alone show an up-ward trend in suicides since 2009. A year prior to Kris' hanging, 2013, the county lost five inmates due to suicide. In 2014, the county lost six inmates due to suicide. This trend has continued to increase since then, as there were six suicides in 2015. And, as of this year, there have been three suicides in three months. The county's statistic of having the second highest suicide rate in California jails is arguably constructive notice on its own.

Further evidence that the county was on notice of a pattern of constitutional violations is its 2015 implementation of the "suicide matrix." Clearly, the county was aware of its inadequacies relating to its suicide and psychiatric policies because after Kris' death the county created a new suicide matrix which is used to help identify inmates at risk of killing themselves. Addressing some of the issues discussed in ¶¶ 65 and 120 in the SAC, Jan Caldwell, County Sheriff's Spokeswoman stated, "inmates fitting a profile such as first time in custody, high-profile cases, prominent in the community, history of suicide attempts, recently convicted or sentenced to lengthy terms in prison etc., are placed in what we are calling high observation units." Caldwell further states, "Such inmates are checked every half hour, and get a visit with the mental health staff at least daily." Most importantly she states, "Inmates in these units are not issued sheets or clothing but are instead given a safety blanket and safety cell garment, which is tear resistant and difficult to use as a hanging instrument." As plead, prior to this there were no guidelines on how to treat, classify or monitor inmates showing suicidal ideations after intake. Given the drastic change in policy, one may infer the county was well aware that its existing policies were inadequate in treating mental health inmates and preventing foreseeable suicides.

12

Further evidence the county was on notice of a pattern of constitutional violations is the series of *CityBeat* news publications cited in the SAC highlighting the pattern of suicides in county jails. It is fair to infer that deaths in county jails are political issues that generate great interest with local politicians and San Diegans alike, especially when the county and tax-payers could be liable for monetary damages. As such, when *CityBeat* realized there was 60 deaths in San Diego county jails between 2007 through 2012, it began its investigation. Since 2012, *CityBeat* has published articles entitled, "*How Many Inmate Deaths is Too Many: San Diego County's Incarceration Mortality Rate Leads California's Largest Jail*"; and "*Law Enforcement Review Board Finds Deputy Error in Inmate Suicide";* and "*10 More Dead: People are Losing and Taking Their Lives in San Diego County Jails*"; and "*San Diego County Sets a Dubious Record for Jail Deaths";* and lastly "*Suicide in the Cell: Inmates Kill Themselves at a High Rate After San Diego County Sheriff's Department Refuses to Revamp Policies."*

The seriousness of *CityBeats* public allegations could not be ignored, nor were they. County Sheriff's Spokeswomen, Jan Caldwell, commented in nearly all of the related articles.[5]  In fact, in a publication entitled, "*Suicide in the Cell,"* Caldwell "describes the department's medical screening and care as 'excellent'" and stated, "The sad reality is that a person who is determined to commit suicide will commit suicide, and by using everyday objects within their reach." (Ex. 7 to SAC, pg. 7.)

Thus, not only do the multiple deaths and the new matrix system raise the inference that the county was aware of a pattern of constitutional violations, it explicitly addressed and denied such allegations in several *CityBeat* publications. Thus, because there is a clear pattern by county deputies of ignoring obvious suicidal ideations and because the county was aware of this pattern and failed to

---

[5] Jan Caldwell stated, "Our Detention Services Bureau regularly meets to examine and review all inmate deaths to ascertain the circumstances of the death … " (Ex. 3 to SAC, pg. 4.)

13

take corrective action, the county is liable.

## IV.    THE COUNTY'S INADEQUATE POLICIES AND FAILURE TO TRAIN WAS THE MOVING FORCE IN KRIS' CONSTITUTIONAL VIOLATIONS

The Court's Order thoroughly addresses whether the county's policies and failure to train was a moving force in Kris' constitutional violations and, as such, Plaintiffs won't belabor their position entirely. As alleged, the county's suicide rate is 60% higher than the national average and the second largest in California. As the Order states, it can be reasonably inferred "that the abnormally high rate has to do with a failure to implement policies and conduct training on how to meet the constitutional requirements for responding to the mental health needs of inmates." (Order, 29:1-5.)

Further, it can be reasonably inferred that had deputies been trained to properly react to obvious suicidal ideations, upon Kris telling his wife, nearly on a daily basis, he wanted to kill himself during monitored phone conversations, (SAC, ¶ 7) Kris would have been "evaluated, treated and monitored." (SAC, ¶ 137.) Or, had Ms. Prior's warning that Kris was at risk to himself been properly passed-down to a VDF housing classification deputy, Kris would have been evaluated, treated, monitored and re-housed. (SAC, ¶ 120.) Or, had the deputy acknowledging Kris' noose hours before he killed himself been trained to remove the noose and have Kris evaluated, treated, monitored and re-housed, Kris would have not had the opportunity to kill himself. In short, Kris' death would have been avoided if proper policies and training had been implemented.

## V.    THE COUNTY'S RELIANCE ON *TAYLOR V. BARKES* IS MISPLACED

Despite this Court's acknowledgment otherwise, the county contends that *Taylor* stands for the proposition that "there is no constitutional right to the proper implementation of adequate suicide prevention protocols" and thus Plaintiffs'

14

claims "must fail." (Order, 22:2-4.) Again, this is a non-issue. *Taylor* clearly deals with qualified immunity, in fact municipal liability based on a policy or failure to train theory was not before the *Taylor* court. It is the principles of qualified immunity that requires an actor to violate a "clearly established right," not municipal liability. As such, because Gore is no longer a party to this litigation[6] and because this Court previously upheld Plaintiffs' individual deliberate indifference claim, *Taylor* does not apply in the present context of municipal liability.

## VI.   PLAINTIFFS ALLEGED COUNTY STAFF WAS ON NOTICE THAT KRIS WAS SUICIDAL AND POSED AN IMMEDIATE DANGER TO HIMSELF

Outrageously, the county contends "The second amended complaint does not allege any facts showing that some particular employee was aware that decedent was in need of immediate medical care proximate in time …" (Mtn to Dismiss; 13: 25 – 14:4.) However this Court's Order had an opposite finding:

> "VDF staff [had] an abundance of notice that Kris was suicidal and posed an immediate danger to himself.… Here Plaintiffs allege that Kris's family directly informed county officials that Kris was a high suicide risk, that at least one VDF Sheriff's deputy overheard Kris repeatedly telling Chassidy he would kill himself, and that a VDF Sheriff's deputy actually witnessed Kris fastening a makeshift noose to the light fixture in his cell but simply shrugged it off." (Order, 16:21 – 17:5.)

As to causation, it is reasonable to infer that had Kris' threats of suicide been taken seriously, he would have been evaluated and housed in a safety cell. It is also reasonable to infer that had the deputy followed protocol and removed the unauthorized noose, Kris would literally not have had the means to kill himself. And, had the deputy gone one step further, as any reasonable deputy would, Kris would have been taken immediately for psychiatric evaluation. All of which would had prevented Kris from killing himself that night. This negligent and egregious

---

[6] To the extent the county interprets the SAC to state a claim against Sheriff Gore, it is mistaken. Plaintiffs acknowledge there are no pending claims against Sheriff Gore. (Mtn to Dismiss, 12:6-27.)

15

1   conduct is a direct and proximate cause of Kris' death.

2       This Court also noted Plaintiffs' allegations may fit within the exception to

3   government immunity envisioned by Government Code § 845.6. It appears the

4   county agrees and stated "under the circumstances alleged in this case, the only

5   applicable exception to the blanket immunity … is under Government Code §

6   845.6."

7       Thus, § 845.6 is applicable and Plaintiffs sufficiently alleged Kris was seen

8   to be in need of immediate medical care, yet county staff failed to take corrective

9   action. Based on these allegations, Plaintiffs' seventh cause of action should

10  remain.

## VII.   CONCLUSION

12      Based on the proper allegations asserted in the SAC, Plaintiffs can show that,

13  prior to Kris's death, the county was on notice that inmates suffering from mental

14  health issues were killing themselves in ways that were known to and preventable

15  by deputies and medical staff. This contention is based on the CLERBs finding of

16  multiple wrong doings regarding deputy responses to obvious suicidal ideations and

17  the *CityBeats* series of publications highlighting – inmate-by-inmate – the

18  preventable suicides that took place inside county jails. Further inferences can be

19  made that the county was aware of a pattern of misconduct by having a *way* above

20  average suicide rate, 60% higher than the national average and the second largest in

21  California. In fact, when confronted with this statistic, the county responded, "the

22  medical screening and care [i]s 'excellent'" and stated, "a person who is determined

23  to commit suicide will commit suicide..." (Ex. 7 to SAC, pg. 7.)

24  / / /

25  / / /

26  / / /

27

28

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND
AMENDED COMPLAINT AND DEFENDANT'S MOTION TO STRIKE
CASE NO. 15-CV-0629-JLS(JMA)

1    Based on the factual enhancements in the SAC, Plaintiffs can show a known

2  pattern of similar conduct. Plaintiffs can also show that certain county employees'

3  actions fit within the exception envisioned by Government Code § 845.6. As such,

4  Plaintiffs' second, third, fourth and seventh causes of action should remain.

5

6                                      Respectfully submitted,
                                       **MORRIS LAW FIRM, APC**
7

8  Dated:  March 17, 2016              *s/Danielle R. Pena*
                                       Danielle R. Pena, Esq.
9                                      dpena@morrislawfirmapc.com
                                       Attorneys for Plaintiffs
10                                     CHASSIDY NeSMITH, Individually and as
                                       Guardian ad Litem on behalf of SKYLER
11                                     KRISTOPHER SCOTT NeSMITH, and as
                                       Successor in Interest to KRISTOPHER
12                                     SCOTT NeSMITH
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17