UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASSIDY NeSMITH, individually and as Guardian ad Litem on behalf of SKYLER KRISTOPHER SCOTT NeSMITH, and as Successor in Interest to Kristopher SCOTT NeSMITH,<br><br>                                       Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO; WILLIAM D. GORE, individually; and DOES 1 – 100, inclusive,<br><br>                                       Defendant. | Case No.: 15-cv-0629-JLS (JMA)<br><br>**ORDER DENYING MOTION TO DISMISS SECOND AMENDED COMPLAINT AND TO STRIKE PARTS OF THE SECOND AMENDED COMPLAINT**<br><br>(ECF No. 25) |

Presently before the Court is defendant County of San Diego (Defendant)[1] and William D. Gore's Motion to Dismiss Second Amended Complaint and to Strike Parts of the Second Amended Complaint (MTD). (ECF No. 20.) Also before the Court is Plaintiffs' Opposition to Defendant's Motion to Dismiss Second Amended Complaint,

---

[1] Although their SAC lists Sheriff Gore as a defendant, plaintiffs Chassidy NeSmith and Skyler Kristopher Scott NeSmith (Plaintiffs) make clear that they no longer seek relief against him. (Opp'n, ECF No. 22, at 15 n.6.) Accordingly, the County is the lone moving defendant, and the Court refers to it as both Defendant and the County. The clerk shall terminate Sheriff Gore from the docket in this matter.

1

(ECF No. 22), and Defendant's Reply in Support of Motion to Dismiss and Strike Parts of Complaint, (ECF No. 23).  The Court vacated the hearing on the MTD and took this matter under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1).

Having considered the parties' arguments and the law, the Court **DENIES** Defendant's Motion to Dismiss.

## BACKGROUND

Kristopher Scott NeSmith (Kris) was arrested on November 29, 2013, on suspicion of domestic violence.  (Second Am. Compl. (SAC), ECF No. 20, at ¶¶ 32–33.)  Several months later, while housed at Vista Detention Facility (VDF) and awaiting trial on a slew of charges, Kris committed suicide.  (*Id.* at ¶¶ 3–5.)

Kris was deeply troubled in his final months.

Kris joined the Marines in May 2010, after graduating high school, and became a rifleman.  (*Id.* at ¶ 20.)  He began to struggle with Post Traumatic Stress Disorder (PTSD) and other undiagnosed psychiatric problems, including borderline personality and antisocial behavior.  (*Id.* at ¶ 1.)  Kris's mental health took a turn for the worst in April 2013 after he was nearly shot in the head during a military training exercise at Camp Pendleton.  (*Id.*)  Kris then began hearing voices in his head and seeing visions of deceased individuals, including his aunt, grandmother, and military comrades.  (*Id.*)

A week after the training incident, Kris took leave to celebrate his 21st birthday.  (*Id.* at ¶ 22.)  While on leave, Kris decided not to return to the military, running away to Las Vegas to marry his then-girlfriend Chassidy Carlton, now Chassidy NeSmith.  (*Id.*)  Kris's mental health problems did not subside.  A month after marrying Chassidy, the couple got into an argument.  (*Id.* at ¶ 23.)  When Chassidy left the room, Kris attempted to hang himself using a dog leash.  (*Id.*)  Chassidy interceded and thwarted Kris's suicide attempt.  (*Id.*)  Two days later, Kris called the San Diego County Sheriff's Department to report domestic violence, although no physical violence occurred.  (*Id.*)  Knowing that he would be returned back to Camp Pendleton, Kris again attempted suicide, but Sheriff's deputies intervened then returned him to military custody.  (*Id.* at ¶¶ 22–23.)

A few weeks later, the couple got into another fight, this time while on base at Camp Pendleton. (*Id.* at ¶ 25.) Chassidy attempted to leave the base to de-escalate the situation, but needed assistance starting her car, so she enlisted the help of a nearby Regiment Officer. (*Id.*) When Kris realized the Regiment Officer was assisting Chassidy to leave the base, Kris attacked the Officer. (*Id.*) Soon after, Kris called Chassidy threatening to kill himself if she did not return. (*Id.*) Taking his threat seriously, Chassidy returned to the military base. (*Id.*) This pattern repeated itself for months. When Kris faced difficult situations, whether the result of arguments with Chassidy or military disciplinary actions, Kris would attempt or threaten suicide. (*Id.* at ¶ 26.) He was held in a jail brig on the military base, where he spent 102 days in solitary confinement and attempted suicide three more times. (*Id.*)

Things did not improve after Kris was released from the brig. He drank heavily and continued hearing voices and hallucinating. (*Id.* at ¶ 28.) Soon after his release, Kris turned the violence he had directed mostly toward himself outward. The day before Thanksgiving in 2013, again following an argument with Chassidy, Kris went for a walk, during which he beat and choked a stranger, causing injuries to the stranger's jaw, cheek, and left thigh. (*Id.* at ¶ 30.) When Kris returned to his mother-in-law's apartment, where he and Chassidy were staying at the time, he acted as though nothing had happened. (*Id.*)

The next day—Thanksgiving Day—Kris went for another walk. Again he attacked a stranger, this time stabbing the victim multiple times with a Bowie knife, causing life-threatening injuries. (*Id.* at ¶ 31.) Kris again returned to his mother-in-law's apartment and acted as though nothing had happened. (*Id.*)

Kris's erratic behavior continued the next day, however. He began calling Chassidy "Jennifer," a character who was a figment of his imagination, and chased her around a restaurant parking lot. (*Id.* at ¶ 32.) Kris eventually caught Chassidy and began to choke her. (*Id.*) Chassidy was able to break free and called her mom, Candy, who arrived minutes later. (*Id.*) Candy managed to stop Kris, and when Kris "came-to," he asked his mother-in-law why no one had told him that Jennifer was actually Chassidy; Kris simply told

Candy that he was trying to "release Chassidy's demon." (*Id.*) Sheriff's deputies arrived shortly thereafter, and quickly linked Kris to the attacks on the two strangers. (*Id.* at ¶ 33.)

Kris was arraigned on December 3, 2013, and learned the District Attorney would seek a life sentence. (*Id.* at ¶ 34.) The judge set Kris's bail at $2 million. (*Id.*) Kris asked his father, Scott NeSmith, to post his bail, and threatened to take his own life if he had to remain in custody. (*Id.*) His father desperately attempted to inform any officials with whom he had spoken at the arraignment that Kris was a suicide risk, calling an investigator at the District Attorney's Office, the lead detective and other detectives on Kris's case, a supervisor and other attorneys with the Office of Public Defenders, and a deputy District Attorney. (*Id.* at ¶ 35.)

Kris's preliminary hearing began on February 26, 2014, and lasted two days. (*Id.* at ¶ 37.) Kris heard the testimony against him, both from his victims' families and his mother-in-law. (*Id.*)

In the evening after the preliminary hearing, Sheriff's deputies were performing security checks. According to an inmate in a nearby cell, a deputy saw a braided sheet tied around a light fixture in Kris's cell, and said something to the effect of, "Nesmith, what are you trying to do? Kill Yourself? Take that thing down." (*Id.* at ¶ 38.) According to the inmate, the deputy then walked away without taking any further action. (*Id.*)

Hours after the alleged interaction, Kris was found dead. (*Id.* at ¶ 39.) He had hanged himself, but the sheet had torn, so VDF personnel discovered Kris on the floor of his cell. (*Id.*)

Plaintiffs allege that Defendant had ample notice of Kris's suicide risk, including notice from Kris's records from the brig, direct communications from Kris's father warning of this danger, and the deputy witnessing the noose in Kris's cell. (*Id.* at ¶¶ 40–42.) Further, according to Kris's father, Scott, a deputy responsible for monitoring inmate phone calls contacted him and said that when Kris spoke with Chassidy, "Kris *always* told Chassidy he was going to kill himself." (*Id.* at ¶ 43.)

///

Kris was housed in a cell by himself at the time of his suicide. At other times, however, he had a cellmate. (*Id.* at ¶ 45.) According to Plaintiffs' SAC, one cellmate states that Kris repeatedly sought psychiatric help. (*Id.*) However, Plaintiffs allege, there were no mental health professionals staffed at VDF on a permanent basis. (*Id.*) Instead, VDF provided mental health professionals on a "floating" basis. (*Id.*) Plaintiffs contend that where mental health services were provided at VDF:

> These psychiatrists are not available 24/7, they don't even have offices at the jail. If inmates need mental health treatment, they request a visit and will eventually be "seen" by the psychiatrist. The psychiatrist will often show up for the inmate's evaluation at the flap of the module door. In order to be "evaluated" by the psychiatrist, the inmate must kneel down and "confide" in the psychiatrist while the deputies and other inmates are in immediate earshot. During the inmate's "evaluation," the deputies often interrupt the inmate when he expresses feelings of depression or mistreatment.

(*Id.*) Plaintiffs allege this amounts to "inadequate and non-meaningful mental health treatment." (*Id.*) Plaintiffs further allege that the County never monitored or evaluated Kris or took measures to protect Kris from himself given his suicidal proclivity. (*See id.*) Plaintiffs suggest that placing Kris in a general population cell and passively monitoring him amounted to deliberate indifference to Kris's serious medical needs, and that Kris's story was representative of a larger pattern of inadequate responsiveness to suicidal ideations by inmates. (*Id.* at ¶¶ 45–48, 72–73.)

Plaintiffs filed their original Complaint on March 20, 2015, and an Amended Complaint on May 20, 2015. On January 27, 2016, the Court granted in part and denied in part the County and Sheriff Gore's Motion to Dismiss Amended Complaint (FAC Order). (ECF No. 18.) In particular, the Court granted their motion and dismissed all claims against Sheriff Gore and dismissed the municipal civil rights claims against the County, but denied their Motion with respect to Plaintiffs' cause of action for wrongful death. (*Id.*) On February 9, 2016, Plaintiffs filed the SAC listing seven causes of action: (1) a 42 U.S.C. § 1983 claim against Doe defendants for violating the Fourteenth Amendment based on deliberate indifference to a serious medical need; (2) a § 1983 claim against the County of

San Diego for violating the Fourteenth Amendment with its suicide prevention policy; (3) a § 1983 claim against the County of San Diego for violating the Fourteenth Amendment with its psychiatric evaluation policy; (4) a § 1983 claim against the County of San Diego for violating the Fourteenth Amendment by failing to properly train VDF and County staff; (5) a negligence claim against Doe defendants; (6) a medical malpractice claim against Doe defendants; and (7) a wrongful death claim against all defendants—the County of San Diego and Doe defendants. (*Id.* at ¶¶ 49–147.)

Defendant moves to dismiss Plaintiffs' Second, Third, Fourth, and Seventh causes of action, or all claims brought against the County. (MTD at 14.)

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), courts must dismiss complaints that "fail[] to state claim upon which relief can be granted." The Court evaluates whether a complaint supports a cognizable legal theory and states sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (alteration in original). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when the facts pleaded "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "[F]acts that are 'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id.* at 678–79 (citing *Twombly*, 550 U.S. at 555). This review requires "context-specific" analysis involving the Court's "judicial experience and common sense." *Id.* at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

In considering whether a complaint is sufficient to state a claim for relief, the court takes all material allegations as true and construes them in the light most favorable to the non-moving party. *Brodsky v. Yahoo! Inc.*, 630 F.Supp.2d 1104, 1111 (N.D. Cal. 2009). When the complaint refers to documents attached thereto, they may be incorporated into the complaint by reference. *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) ("The court may treat . . . a document [incorporated by reference] as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'") (citing *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[A] court may consider material which is properly submitted as part of the complaint on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment.") (citing *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994) (internal quotation marks omitted)).

## ANALYSIS

### I. Plaintiff's Municipal Civil Rights Claims

Defendant moves for dismissal of Plaintiffs' Second, Third, and Fourth Claims, which seek to hold the County liable under § 1983 for violating the Fourteenth Amendment. The Court dismissed these claims—although they were then styled as claims

///

for violation of the Eighth Amendment rather than the Fourteenth Amendment—without prejudice in its FAC Order.

To hold a government entity defendant liable under § 1983, a Plaintiff must show, as with individual defendants, that the government entity violated statutorily or constitutionally protected rights under color of state law. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978). The government entity may not be held vicariously liable for the actions of its employees, but instead is liable only for actions that may be attributed to the government entity itself. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). Obviously, government entities can only act through individuals. To attribute actions of individuals to the government entity itself without imposing vicarious liability, the individual's actions must be performed "pursuant to official municipal policy" or according to "practices so persistent and widespread as to practically have the force of law." *Id.* at 61; *Long v. Cnty of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) ("[I]t is only when execution of a government's policy or custom inflicts the injury that the municipality as an entity is responsible").

Relying on *Taylor v. Barkes*, 135 S. Ct. 2042 (2015), Defendant argues that there is no constitutional right to any particular suicide screening or prevention protocols, and the County therefore cannot be held liable for maintaining a policy violating a non-existent right. (*Id.*) The *Taylor* Court highlighted the difference between holding officials liable for acting with reckless indifference to a known vulnerability to suicide, on the one hand, and systematic implementation of suicide prevention policies, on the other. 135 S. Ct. at 2045. While the Constitution does not outline a detailed suicide prevention policy that government entities must implement, the Eighth and Fourteenth Amendments nonetheless require custodians of inmates to provide adequate mental health care. *Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994). A defendant is liable under § 1983 for violating that right if the defendant was deliberately indifferent to the incarcerated individual's serious medical or mental health care need. *See id.*; *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

To hold the County liable, Plaintiffs must show (1) that a County employee violated Kris's constitutional rights, (2) "that the [C]ounty has customs or policies that amount to deliberate indifference," and (3) "that these customs or policies were the moving force behind the employee's violation of constitutional rights." *Long*, 442 F.3d at 1186.

In its FAC Order, the Court concluded Plaintiffs failed to adequately plead a pattern of constitutional violations sufficient to give the County notice that failing to implement a policy or remedy a custom would lead to additional Eighth or Fourteenth Amendment violations through its employees' deliberate indifference to the serious mental health needs of inmates. (FAC Order at 26.) Even if Plaintiffs establish such a pattern however, it would not follow that every suicide that occurs on the County's watch is a result of deliberate indifference and amounts to a constitutional violation. Rather, a plaintiff would need to show that the absence of an appropriate policy or failure to rectify a custom was the moving force with respect to that particular incident. The Court concluded in section III.C of its FAC Order that Plaintiffs had adequately pleaded deliberate indifference by a County employee. (FAC Order at 22–23.) The Court incorporates by reference that analysis here and again concludes that Plaintiffs have adequately pleaded that a County employee violated Kris's constitutional rights. The Court addresses the other two elements below.

### A. *Absence of Policy or Presence of Custom*

To be deliberately indifferent, a party must first know of the thing they choose to be indifferent about. *See Connick*, 563 U.S. at 61. To attribute deliberate indifference to a government entity, a plaintiff must show that "policymakers are on actual or constructive notice that a particular omission in their training program causes [the government entity's] employees to violate citizens' constitutional rights." *Id.* When a plaintiff alleges that failing to properly train employees is the moving force behind a constitutional violation, it is "ordinarily necessary" to show a "pattern of similar constitutional violations by untrained employees" to establish the requisite notice. *See id.* at 62–63 (concluding that four reversals in ten years for prosecutors' *Brady* violations was insufficient to provide notice

of the need to train prosecutors about *Brady* requirements). A pattern of constitutional violations is also required when a plaintiff seeks to hold a government entity liable for failing to implement a policy. *See id.*; *Conn v. City of Reno*, 658 F.3d 897 (9th Cir. 2011) (leaving vacated the portions of its opinion pertaining to both failure to train and failure to implement policy based on *Connick*). In "rare" instances, "failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 63–64.[2]

In its FAC Order, the Court concluded that Plaintiffs had not adequately alleged a pattern of constitutional violations sufficient to establish liability for deliberate indifference by the County itself. (*See* FAC Order at 22, 28.) As the Court noted, the "pertinent question with respect to Defendant's Motion to Dismiss is whether the County had notice of a pattern of constitutional violations, such that failing to implement a policy or rectify a custom could amount to deliberate indifference." (FAC Order, at 26.) Plaintiffs argue that they state a plausible claim for government entity liability based on the County's "systematically inadequate policy, practice or custom at VDF to ignore suicidal ideations, signs, warnings and triggers during an inmate's incarceration because there are no guidelines, treatment or medical plans laid out for inmates that show or express a desire to kill themselves after the initial intake process." (SAC at ¶¶ 45, 65–70, 93–96, 112, 118–120.)

In the FAC Order, the Court could only consider the allegation that:

> [T]his policy, or lack thereof, has contributed to San Diego County's jail system having the highest mortality rate of the ten largest jail systems in California and the second highest suicide rate among the state's largest jail systems: 54 suicides per 100,000 inmates, more than 60% higher than the national average.

---

[2] The Court previously concluded and again concludes that, in accordance with Ninth Circuit precedent in *Conn*, "single-incident liability does not attach to inmate suicides." (*See* FAC Order at 25 (citing *Conn*, 658 F.3d at 897).)

(FAC Order at 26.)  The Court noted, "[a]lthough these allegations could provide a foundation upon which Plaintiffs could plausibly state claims for government entity liability if supplemented with additional facts, as it stands, this paragraph touching on the County's high suicide rate lacks sufficient 'factual enhancement.'"  (FAC Order, at 27) (citing *Iqbal*, 556 U.S. at 678).  Since not every suicide that occurs in jail is a result of a constitutional violation, "the pleaded facts would need to show not only a pattern of suicides, but a pattern of deliberate indifference to inmates' serious medical needs, in this case fairly obvious suicidal ideations."  (FAC Order at 28.)

Plaintiffs' SAC describes a number of previous suicides and events leading up to them in San Diego County jails, including VDF.[3]  (*See* SAC at ¶¶ 73–89.)  For instance, inmate Jose Sierra, who had been arrested in April 2013, was found hanging from a bedsheet in his single occupancy cell.  (*Id.* at ¶¶ 76–77.)  During the previous security check, Deputies had observed an unauthorized laundry line affixed to the top bunk of Mr. Sierra's cell but failed to take corrective action.  (*Id.*)  In another example, inmate Anna Wade was found hanging in her cell on April 28, 2013.  (*Id.* at ¶ 78.)  Deputies reported that they had performed an hourly security check, but had not actually done so.  (*Id.*)  Perhaps the most troubling is the story of inmate Robert Lubsen, who committed suicide on February 7, 2013.  (*Id.* at ¶ 79; *see also* SAC Ex. 5.)  Mr. Lubsen was arrested by campus police for a drug-related crime, and while being detained in a campus holding cell, attempted to commit suicide by hanging himself using his shoelaces.  (SAC ¶ 79.)  Mr. Lubsen was transferred the next day to VDF and the intake officer noted that he had ligature marks around his neck.  (*Id.*)  In addition to the ligature marks, VDF received a tip that Mr. Lubsen was a risk to himself.  (*Id.*)  Deputies determined the tip was not credible, however, despite the jail's policy that after intake "all reports of suicidal behavior shall be considered serious."

---

[3] Defendants argue that prior judicial adjudicative findings that inmate suicides were constitutional violations at VDF would be necessary to establish liability. (MTD at 12; Reply at 6–8.) The Court does not deduce that legal rule from the authority Defendant cites. Further, it is hard to see how the County could ever be held liable if liability in the first instance always depended on a prior adjudication.

(*Id.*)  The next morning, Mr. Lubsen walked out of his second story cell, climbed on the railing, and fell headfirst, nine feet to the floor below.  His family would later take him off of life support at the hospital.  The SAC also incorporates a series of news articles detailing instances of suicide in County jails and the County's overall high suicide rate, all of which, taken together with the County's actually confronting these suicides as they occurred, could plausibly have given policymaking County officials notice of a pattern of deliberate indifference to inmates' suicidal ideations by County employees, and that this deliberate indifference was a result of failure by the County to properly train or a widespread custom of responding to suicidal ideations apathetically.

Plaintiffs' SAC lists several additional suicides and statistics that are irrelevant to whether the County was deliberately indifferent because they occurred after Kris' suicide, and could not have therefore provided notice of a suicide problem as it pertains to Kris.  (*See* SAC at ¶¶ 81–87.)  However, the facts reiterated in the SAC along with news reports and anecdotal details of previous inmate suicides give context to the troubling statistics cited by Plaintiffs.  Taken as a whole, the SAC provides sufficient detail of circumstances predating Kris's suicide that, if proven, could plausibly have given the County notice that, absent corrective action, it would continue to inadvertently violate inmates' Eighth or Fourteenth Amendment rights by failing to provide adequate mental health care.

**B.**     *Moving Force in the Violation*

For an employee's deliberate indifference to a serious medical or mental health need to give rise to municipal liability based on the municipality's customs or policies, the plaintiff must show that the customs or policies were the "moving force" precipitating the constitutional violation.  *Long*, 442 F.3d at 1186.  That means "the identified deficiency in the policy must be 'closely related to the ultimate injury.'"  *Id.* at 1190.  The plaintiff must show that "the injury would have been avoided" if proper policies had been implemented.  *Id.*  In the FAC Order, the Court noted that, if Plaintiffs could plead a pattern of deliberate indifference, it would be plausible based on the other facts contained in the

/ / /

then-operative complaint that the County's policies and lack of training were a moving force. (FAC Order at 29.)

The news reports and anecdotes detailed above along with the alleged facts surrounding Kris's own suicide evidence the absence of an appropriate institutional level response to suicidal ideations by inmates entrusted to the County's care. The responses of particular correctional officers to Kris's behavior and the statements by Kris's family, if later proven, are a result of the absence of appropriate training or custom of apathy. It is plausible that if the County had reacted to the prior suicide incidents by implementing an appropriate suicide prevention policy or by remedying the alleged custom of indifference, Kris's suicidal ideations would not have been ignored, and Kris would have been placed in a setting where he could not harm himself. Thus, Plaintiffs adequately plead that the County's lack of training or the presence of a custom of indifference was the moving force in the alleged constitutional violation.

Because Plaintiffs have provided sufficient detail showing deliberate indifference by a County employee, that the County's customs or policies amount to deliberate indifference, and that these customs or policies were a moving force in the constitutional violation in this instance, Defendant's Motion to Dismiss Plaintiffs' Second, Third, and Fourth Causes of Action is **DENIED**.

## II.   Plaintiffs' Seventh Cause of Action, Wrongful Death

Defendant moves to dismiss Plaintiffs' Seventh Cause of Action, which is for wrongful death. In the FAC Order the Court rejected Defendant's argument for dismissal without prejudice but noted that Defendant did "not address the matter of causation in the context of the wrongful death claim, so the Court does not reach that issue." (FAC Order at 17.) The Court incorporates the analysis of section II of the SAC Order herein.

Defendant now urges that the SAC does not contain facts showing Kris was "in need of *immediate* medical care," and therefore does not show a causal link between a County employees' conduct and Kris's suicide. (MTD at 17.) The Court disagrees, and concludes that the facts pleaded show an adequate causal connection to survive dismissal on this

point. Accordingly, Defendant's Motion to Dismiss Plaintiffs' Seventh Cause of Action is **DENIED**.

## CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's MTD.

**IT IS SO ORDERED.**

Dated: September 12, 2016

Hon. Janis L. Sammartino
United States District Judge