UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASSIDY NeSMITH, individually and as Guardian ad Litem on behalf of SKYLER KRISTOPHER SCOTT NeSMITH, and as Successor in Interest to KRISTOPHER SCOTTT NeSMITH, <br><br>　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO; WILLIAM D. GORE, individually; and DOES 1 - 100, inclusive,<br><br>　　　　　　　　　　Defendants. | Case No.: 15cv629 JLS (JMA)<br><br>**ORDER DENYING MOTION FOR RECONSIDERATION**<br><br>(ECF No. 30) |

Presently before the Court is Defendant County of San Diego's Motion for Reconsideration ("Recon. Mot."). (ECF No. 30.) Also before the Court are Plaintiffs' Opposition to, (ECF No. 32), and Defendant's Reply in Support of, (ECF No. 33), Defendant's Reconsideration Motion. Having considered the Parties' arguments and the law, the Court **DENIES** Defendant's Motion for Reconsideration.

/ / /

/ / /

/ / /

/ / /

# ANALYSIS[1]

Plaintiffs bring an action alleging, among other things, that the County of San Diego is liable for an inmate death at Vista Detention Facility ("VDF") due to a systemic deficiency in the way VDF addresses inmates exhibiting suicidal ideations. (*See generally* Second Am. Compl. ("SAC), ECF No. 20.) After the Court initially dismissed in part Plaintiffs' First Amended Complaint, (ECF No. 18), Plaintiffs filed a Second Amended Complaint ("SAC"), (ECF No. 19), supporting their claim for municipal liability with a detailed accounting of VDF's allegedly deficient practices towards inmates with suicidal ideations. (SAC ¶¶ 1–138.) These details address the particular death giving rise to this lawsuit, as well as many other instances of inmate suicide recounted through prior violations found by an independent oversight body, news articles, and statistical analyses. (*Id.*) Defendants County of San Diego and Sheriff William D. Gore again moved to dismiss. (ECF No. 20.) The Court, however, denied Defendants' second Motion to Dismiss (the "Underlying Order"), (ECF No. 30), and it is that Order which Defendant County of San Diego now urges the Court to reconsider.

Specifically, Defendant argues the Underlying Order "erred as a matter of law; represents a departure from Supreme Court authority;" and is manifestly unjust because it "places the parties in the untenable position of having to litigate multiple trials within a trial" in order to determine whether prior inmate suicides in fact resulted from unconstitutional practices. (*See generally* Recon. Mot.) All these alleged errors in the Court's prior Order flow from Defendant's reading of Supreme Court precedent as requiring "prior adjudications that other inmates' constitutional rights were violated in the same manner as alleged [in this suit]" for a municipality to be liable under a theory that a municipal policy exhibited deliberate indifference to the decedent's constitutional rights.

---

[1] A comprehensive recounting of the facts relevant to this case are set forth in the Court's underlying Order, which the Court here incorporates by reference. (Order Den. Mot. to Dismiss Second Am. Compl. and to Strike Parts of the Second Am. Compl. 2–6, ECF No. 25.) Because Defendant's Reconsideration Motion almost solely turns on the applicable legal standard, the Court here only briefly recounts the underlying facts and relevant procedural background.

(*Id.* at 2 (emphasis added).) However, as the Court previously noted, "[t]he Court does not deduce that legal rule from the authority Defendant cites[,]" and "it is hard to see how the County could ever be held liable if liability in the first instance always depended on a prior adjudication." (Underlying Order 11 n.3.)

In support of its position, Defendant primarily argues that, "[c]iting to Supreme Court authority, defendants maintained that to satisfy the pattern of constitutional violations element, the SAC must plead that there have been prior adjudications that other inmates' constitutional rights were violated in the same manner as is alleged to have happened to NeSmith." (Recon. Mot. 2.) But, of course, merely making a statement and then citing a case afterwards does not automatically instill the statement with legal certainty. And Defendant is clearly aware of this fact, especially given that its sole "[c]it[ation] to Supreme Court authority," (*id.*), in the underlying briefing for a requirement of prior <u>adjudicated</u> constitutional violations is preceded by a *see* signal. (Mot. to Dismiss 8:4–7 ("Allegations of a pattern of constitutional violations, without findings of constitutional violations do not rise to the level of a *Monell* violation. See *Connick*, 563 U.S. at 63 . . . ." (roman type in original)), ECF No. 20; *see also* Mot. for Recon. 6–7 ("[T]he Supreme Court has instructed it is the past adjudications finding recurrent constitutional violations by employees under like circumstances that sets up how an inadequate program based municipal federal civil rights claim can be pursued against the municipality. See *Connick*, 563 U.S. at 62." (roman type in original)).) In point of fact, Supreme Court precedent states only that a pattern of prior constitutional violations is required to show liability, and no case uses the term adjudication. *E.g.*, *Canton v. Harris*, 489 U.S. 378, 397 (1989); *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407–08 (1997); *Connick v. Thompson*, 563 U.S 51, 62 (2011). And Defendant in its Reply even tacitly acknowledges this point, distinguishing one of Plaintiffs' cited cases by saying that although the plaintiff, Tandel, "<u>did not allege existence of prior adjudications</u>, Tandel supported his claim" by referring to his own personal experiences, and that therefore the Court could permissibly "infer that he stated a plausible claim that the county had a custom

of failing to provide medical care." (Reply in Supp. of Mot. to Dismiss 7 (emphasis added).)

The Court simply cannot agree that "for [P]laintiffs' to state such a claim in this case, they must plead that <u>prior judgments of liability</u> have been entered against employees for constitutional violations that caused other inmate suicides under the same circumstances as are alleged in the present action." (Recon. Mot. 2–3.) The crux of this argument turns on Defendant's contention that formal court judgments would be the only way in which the County could receive liability-creating "notice of a pattern of constitutional violations and the existence of a systemically inadequate program that is closely related to the cause of those violations . . . ." (*Id.* at 3.) But, aside from importing an additional requirement into Supreme Court precedent where there is none to be found in the relevant caselaw, this obscures the procedural posture of the underlying Motion. Effectively, Defendant asks the Court to require Plaintiffs at this initial stage of the proceeding to <u>prove</u> all elements of the policy or practice in deliberate indifference to decedent's constitutional rights. The result of accepting Defendant's argument would therefore mean that the only way a plaintiff could survive a Motion to Dismiss in a case such as this one is if the plaintiff either (1) lives long enough to suffer multiple constitutional violations at the hand of the state <u>and</u> later brings all claims for such violations in one suit, or (2) acquires a catalog of many, previous adjudications that <u>ran a long course of litigation</u> sufficient to result in an entry of judgment. However, the point of a Motion to Dismiss is to remove from our courts cases that are fundamentally without merit; Defendant's argued-for rule would instead require Plaintiffs to prove that there case is, in fact, meritorious, almost at the very start of litigation.[2]

---

[2] Additionally, Defendant misses the mark in its statement that "[t]he prejudice and injustice to the County presented by compelling defendants to litigate the merits of unrelated events and of the editorial articles referenced in the SAC would be unprecedented and irreparable." (Recon. Mot. 7.) To the contrary, the SAC contends that these events and news accounts <u>are, in fact, related</u>—together, they plausibly show a systemic deficiency in the way VDF treats (or fails to treat) inmates with a history of suicidal ideations. And the Court is called upon to adjudicate matters not directly at issue but nonetheless bearing on liability

In the present case, it is true the Court cannot inquire further of the person whom VDF's policies or customs allegedly harmed; that person died, allegedly in part due to the policies and practices here at issue. But Plaintiffs have explained in great detail the decedent's suicidal ideations and the alleged non-responsiveness of VDF staff to the same. (SAC ¶¶ 1–70.) Further, Plaintiff alleges that "the Citizens Law Enforcement Review Board (CLERB), the independent oversight body charged with investigating deaths-in-custody and allegations of law-enforcement misconduct, has twice found that San Diego County sheriff's deputies violated policy and procedure in instances of inmate suicides." (*Id.* ¶ 75.) And Plaintiff further alleges news reports and studies detailing "18 [inmate] suicides since 2013," (*id.* ¶¶ 76–87), and that the County had notice of the mounting problem given that "in January 2015, the County instituted a new policy whereby a 'suicide matrix' is used to help identify inmates at risk of killing themselves[,]" (*id.* ¶ 86). This evidence, taken together, supports the inference that the County was aware of deficient VDF policies and customs that were consistently resulting in unnecessary and preventable inmate deaths. And to require prior, formal adjudications regarding each death for Plaintiffs to proceed past a threshold 12(b)(6) motion is not a component of established Supreme Court jurisprudence.

## CONCLUSION

In short, Plaintiffs have pled specific suicides, statistics, and news articles that raise their right to relief above the speculative level, (Underlying Order 7–13); this unlocks the doors of discovery, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable

---

nearly every day. *See, e.g.*, *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008) ("The question whether evidence of discrimination by other supervisors [towards non-parties] is relevant in an individual [and distinct] ADEA case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case."); *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 888 (9th Cir. 2016) (classifying the plaintiff as a "public figure" for purposes of liability based on "interviews[,] . . . news coverage[,]" internet presence, and film appearances).

1 inference that the defendant is liable for the misconduct alleged."). Accordingly, Defendant's Motion for Reconsideration is **DENIED**.

 **IT IS SO ORDERED.**

Dated:  March 30, 2017

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge