THOMAS E. MONTGOMERY, County Counsel
County of San Diego
By MELISSA M. HOLMES, Senior Deputy (SBN 220961)
    FERNANDO KISH, Senior Deputy (SBN 236961)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531- 5836
E-mail: melissa.holmes@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Patrick Newlander and
Christopher Olsen

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASSIDY NeSMITH, individually and as Guardian ad Litem on behalf of SKYLER KRISTOPHER SCOTT NeSMITH, and as Successor in Interest to THE ESTATE OF KRISTOPHER SCOTT NeSMITH,<br><br>    Plaintiffs,<br><br>    v.<br><br>COUNTY OF SAN DIEGO, SAN DIEGO COUNTY SHERIFF'S DEPARTMENT; WILLIAM D. GORE, SAN DIEGO COUNTY SHERIFF; VISTA DETENTION FACILITY; and DOES 1 – 100 inclusive,<br><br>    Defendants. | No. 15cv00629-JLS (AGS)<br><br>NOTICE OF LODGMENT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>Date:  October 4, 2018<br>Time: 1:30 p.m.<br>Courtroom: 4D<br>Judge: Hon. Janis L. Sammartino<br><br>NO ORAL ARGUMENT UNLESS REQUESTED BY COURT |

Defendants County of San Diego, Patrick Newlander and Christopher Olsen lodge

the following exhibits in support of their motion for summary judgment:

Exhibit A – San Diego Sheriff's Department Follow-up Investigative Report included in

the In Custody Death Book;

Exhibit B – Excerpts of Kristopher NeSmith's medical and mental health records from

the San Diego Sheriff's Department; CSD00120 – 21; 00123 – 30;

Exhibit C – Excerpts of Deposition of Plaintiff Chassidy NeSmith taken on November

28, 2014;

Exhibit D – Photographs of scene;

Exhibit E – Excerpts from the October 5, 2017 deposition of Richard Berumen;

Exhibit F – Transcript of recorded interview of Richard Berumen taken on March 1, 2014;

Exhibit G – Audio recordings from May 7 and May 28, 2015 of Kelly Davis visiting Richard Berumen at the San Diego Central Jail;

Exhibit H – Excerpts of transcript of December 5, 2017 deposition of Deputy James Dailly;

Exhibit I – Experts from transcript of December 5, 2017 deposition of Steven Cerda;

Exhibit J – Excerpts of transcript of the audio recording of March 1, 2014 interview of inmate M. H., redacted to protect the inmate's privacy;

Exhibit K – Photograph of scene with notation by Deputy Newlander; and

Exhibit L – article by Plaintiff's expert psychiatrist, Dr. Anasseril E. Daniel titled "Preventing Suicide in Prison: A Collaborative Responsibility of Administrative, Custodial, and Clinical Staff", highlighted to reflect Dr. Daniel's determination that use of the ADP to determine suicide rate leads to a "miscalculation."

DATED: August 10, 2018                THOMAS E. MONTGOMERY, County Counsel


                                       By: s/MELISSA M. HOLMES, Senior Deputy
                                       Attorneys for Defendants County of San Diego,
                                       Patrick Newlander and Christopher Olsen

2

# EXHIBIT "A"

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation (ICD)  **Case Number: 14110861**
**Victim:** Nesmith, Kristopher Scott  **City:** Vista
**Location:** 325 South Melrose (VDF)
**Date:** March 1, 2014  **Page 1 of 1**

### Synopsis:

On November 29, 2013, Kristopher Scott Nesmith (05-04-1992) was arrested by the San Diego County Sheriff's Department for 664-187(a) PC, Attempted Murder; 148(a)(1) PC, Obstruction/Resist a Peace Officer; and 273.5(a) PC, Spousal Abuse. Nesmith was transported and booked into the Vista Detention Facility, located at 325 South Melrose in Vista. Nesmith was housed in Upper West Module 1, Cell 44. Nesmith was the only person assigned to the cell.

On February 27, 2014, Nesmith attended a preliminary hearing on the charges for which he was currently in custody. He was bound over for jury trail and remanded to Sheriff's custody. Nesmith's next court date was scheduled for March 13, 2014.

On March 1, 2014, at about 0658 hours, Deputy Cerda (5846) was conducting a security check in UW1. He found Nesmith motionless and wedged between the toilet and bunk. There was nobody else in the cell. Deputy Cerda and Deputy Rosillo (7542) entered the cell and found that Nesmith had a piece of torn white sheet wrapped tightly around his neck. Deputy Cerda cut the sheet and lifesaving measures were taken by deputies and jail medical staff. Vista Fire Department responded and took over medical aide. At about 0735 hours, Nesmith was pronounced deceased by Tri-City Hospital Doctor Fredericks.

Sheriff's Homicide Team 1 arrived and conducted an investigation. Several pieces of torn sheeting were found inside Nesmith's cell. One piece was hanging from the ceiling mounted light fixture. Emails from Nesmith's father stating that he needed to prepare himself for spending the rest of his life in prison were also found inside of the cell.

On Sunday, March 2, 2014, Dr. Bethann Schaber at the San Diego County Medical Examiner's Office conducted an autopsy. Dr. Schaber determined Nesmith's cause and manner of death to be suicide by hanging.

Reporting Officer: Det. John Buckley     ID# 4678     CID - HOMICIDE

Approved By:     Sgt. Scott Enyeart     ID# 2138     4/9/2014
CSD000001

EXHIBIT A

# EXHIBIT "B"

# SAN DIEGO SHERIFFS DEPARTMENT

## MEDICAL INTAKE QUESTIONS

**JIM:** 400319373  **Book #:** 13784410   **Book Dt/Tm:** 11-30-2013 0143

**Name(L,F,M,S):** NESMITH, KRISTOPHER, SCOTT

**DOB:** 05-04-1992  **Age:** 21   **Des.:** W   **Sex:** M  **SSN:** 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

**Created Dt/Tm:** 11-30-2013 0145           **Created By:** ARCE,RENE

---

N          **Have you been injured, hurt or in an accident in the last 72 hours?**

              **Explain:**

---

N          **During the time of arrest were you treated in a hospital?**

          **Name of hospital:**

              **Were you given any medications at the hospital?**

          **Name of medication:**

---

N          **During the time of arrest were you tasered/restrained with any device other than
              handcuffs?**

              **Explain:**

              **If tasered, were barbs removed in the hospital and which hospital?**

              **Explain:**

---

N          **Do you have any major medical problems?**

              **Explain:**

---

N          **Do you have any communicable diseases?**

              **Explain:**

---

N          **When was your last CXR?**

              **Explain:**

---

N          **Do you have any psychiatric problems?**

              **Explain:**

---

N          **Are you a client of the Regional Center for developmentally disabled?**

              **Which Center?**

---

N          **Are you feeling suicidal?**

              **Explain:**

---

Y          **Is the inmate/patient alert and oriented?**

              **Explain:**

---

Facility:910
370M MED

Page 1 of 2
EXHIBIT B

Printed: 03-03-2014 0744
CSD000120
Printed By: RRAPAISH, RAPAIDO

# SAN DIEGO SHERIFFS DEPARTMENT

## MEDICAL INTAKE QUESTIONS

---

**JIM:**   400319373   **Book #:** 13784410   **Book Dt/Tm:** 11-30-2013 0143

**Name(L,F,M,S):** NESMITH, KRISTOPHER, SCOTT

**DOB:** 05-04-1992   **Age:** 21   **Des.:** W   **Sex:** M   **SSN:** 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

**Created Dt/Tm:** 11-30-2013 0145          **Created By:** ARCE,RENE

---

N          **Breathalyzer result?**

               **Record result:**

---

Y          **Are vital signs indicated?**

          **Explain & Document:** see 2nd stage

---

Y          **Fit for Booking?**

               **Disposition:**

---

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400319373   **Book #:** 13784410   **Book Dt/Tm:** 11-30-2013 0143

**Name(L,F,M,S):** NESMITH, KRISTOPHER, SCOTT

**DOB:** 05-04-1992   **Age:** 21   **Des.:** W   **Sex:** M   **SSN:** 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

**Created Dt/Tm:** 11-30-2013 0146       **Created By:** ARCE,RENE

---

Y       **Vital signs?**

         **BP:** 115/75

        **TPR:** 96, 63, 18

   **Describe:** 6', 140#   RN9453   11/30/13   @0145

---

N       **Are you being seen by a physician?**

   **Physicians name:**
     **Psychiatrist:**

N       **Are you a client of the Regional Center for the developmentally disabled?**

   **Which Center:**

---

**Allergies**

N       **Medications?**

     **Describe:**

N       **Food?**

   **List Food & Reaction**

N       **Bee sting?**

     **Carry Kit:**
      **Swelling:**

---

     **Are you pregnant?**

       **LMP?**
       **EDC?**

   **Have you had a baby in the last 12 months?**

     **Explain:**

---

   **Have you had an abortion recently?**

     **Date:**

---

N       **Do you have health insurance?**

     **Explain:**

---

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

---

**JIM:**   400319373   **Book #:** 13784410    **Book Dt/Tm:** 11-30-2013 0143

**Name(L,F,M,S):**   NESMITH, KRISTOPHER, SCOTT

**DOB:** 05-04-1992  **Age:** 21   **Des.:** W   **Sex:** M   **SSN:** 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

**Created Dt/Tm:**  11-30-2013 0146        **Created By:**  ARCE,RENE

---

| | |
|---|---|
| N | **Do you use street drugs?** |
| | **Type:** |
| | **Amount:** |
| | **Last Used:** |
| N | **Do you have problems when you stop using them?** |
| | **Explain:** |
| N | **Do you use alcohol?** |
| | **Type:** |
| | **Amount:** |
| | **Last Used:** |
| N | **Do you have problems when you stop using it?** |
| | **Explain:** |
| N | **Do you have asthma?** |
| | **Explain:** |
| N | **Hypertension?** |
| | **Explain:** |
| N | **Infection?** |
| | **Explain:** |
| N | **Diabetes?** |
| | **Explain:** |
| | **Open wound or skin breakage on feet or legs?** |
| | **Describe:** |
| | **Assessment done?** |
| | **Picture taken?** |
| N | **Heart problems?** |
| | **Explain:** |

---

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400319373 **Book #:** 13784410 **Book Dt/Tm:** 11-30-2013 0143

**Name(L,F,M,S):** NESMITH, KRISTOPHER, SCOTT

**DOB:** 05-04-1992 **Age:** 21 **Des.:** W **Sex:** M **SSN:** 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

**Created Dt/Tm:** 11-30-2013 0146 **Created By:** ARCE,RENE

---

N       **Orthopedic?**

          **Explain:**

N       **Seizure?**

          **Explain:**

N       **On renal dialysis?**

        **Name of Clinic, MD:**

N       **Do you have any other medical problems?**

          **Explain:**

N       **Do you have any dental problems?**

          **Explain:**

N       **Do you have TB?**

          **Last x-ray:**
              **2 Rx:**
             **3+ Rx:**

N       **Hepatitis?**

          **Last date:**
              **Type:**
           **Rx Name:**

N       **Venereal disease?**

              **Type:**
         **Last Date:**
          **RX Name:**

N       **HIV tested?**

N       **HIV positive?**

            **MD Name:**
             **T-Cell:**
           **Rx Name:**

---

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:**  400319373  **Book #:** 13784410  **Book Dt/Tm:** 11-30-2013 0143

**Name(L,F,M,S):** NESMITH, KRISTOPHER, SCOTT

**DOB:** 05-04-1992  **Age:** 21  **Des.:** W  **Sex:** M  **SSN:** 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

**Created Dt/Tm:**  11-30-2013 0146        **Created By:**  ARCE,RENE

| | |
|---|---|
| N | **AIDS?** |
| | **MD Name:** |
| | **T-Cell:** |
| | **Rx Name:** |
| N | **Scabies?** |
| | **Explain:** |
| N | **Lice?** |
| | **Explain:** |
| N | **Crabs?** |
| | **Explain:** |
| N | **Rash on body?** |
| | **Explain:** |
| N | **Open sores on private parts?** |
| | **Explain:** |
| N | **Do you have any other communicable diseases?** |
| | **Explain:** |

**Mental Status**

| | |
|---|---|
| Y | **Alert and oriented person?** |
| | **Describe:** |
| Y | **Alert and oriented place?** |
| | **Describe:** |
| Y | **Alert and oriented time?** |
| | **Describe:** |
| Y | **Alert and oriented date?** |
| | **Describe:** |

**Level of Consciousness**

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

**JIM:** 400319373  **Book #:** 13784410  **Book Dt/Tm:** 11-30-2013 0143

**Name(L,F,M,S):** NESMITH, KRISTOPHER, SCOTT

**DOB:** 05-04-1992  **Age:** 21  **Des.:** W  **Sex:** M  **SSN:** 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

**Created Dt/Tm:** 11-30-2013 0146  **Created By:** ARCE,RENE

---

| Y | **Alert?** |
|---|---|
| | Describe: |
| N | **Lethargic?** |
| | Describe: |
| N | **Stuporous?** |
| | Describe: |
| N | **Other?** |
| | Describe: |

**Physical Appearance**

| Y | **Clean?** |
|---|---|
| N | **Malodorous?** |
| | Describe: |
| N | **Malnourished?** |
| | Describe: |
| N | **Alcohol breath?** |
| | Describe: |
| N | **Disheveled?** |
| | Describe: |

**Mobility**

| Y | **Ambulatory?** |
|---|---|
| | Explain: |
| N | **Limitations?** |
| | Describe: |
| N | **Prosthetics?** |
| | Describe: |

---

Facility: 910
161B MED

Page 5 of 7
EXHIBIT B

Printed: 03-03-2014 0745
CSD000127
Printed By: RRAPAISH, RAPAIDO

# SAN DIEGO SHERIFF'S DEPARTMENT

## Medical Questions

**JIM:** 400319373   **Book #:** 13784410   **Book Dt/Tm:** 11-30-2013 0143

**Name(L,F,M,S):** NESMITH, KRISTOPHER, SCOTT

**DOB:** 05-04-1992   **Age:** 21   **Des.:** W   **Sex:** M   **SSN:** 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

**Created Dt/Tm:** 11-30-2013 0146   **Created By:** ARCE,RENE

---

| | | |
|---|---|---|
| Y | **Normal speech?** | |
| | Describe: | |
| Y | **Normal thought process?** | |
| | Describe: | |
| Y | **Cooperative behavior?** | |
| | Describe: | |
| N | **Unusual affect / mood?** | |
| | Describe: | |
| N | **Visible signs of illness?** | |
| | Describe: | |
| N | **Sight limitation?** | |
| | Describe: | |
| N | **Hearing limitation?** | |
| | Describe: | |
| N | **Unusual skin color / temp. turgor?** | |
| | Describe: | |
| N | **Needle marks present?** | |
| | Describe: | |
| N | **Loss of bladder / bowel function?** | |
| | Describe: | |
| N | **SOB / persistent cough?** | |
| | Describe: | |
| N | **Have you ever served in the United States Military?** | |

Facility: 910
161B MED

Page 6 of 7
EXHIBIT B

Printed: 03-03-2014 0745
CSD000128
Printed By: RRAPAISH, RAPAIDO

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Questions

---

**JIM:** 400319373  **Book #:** 13784410  **Book Dt/Tm:** 11-30-2013 0143

**Name(L,F,M,S):** NESMITH, KRISTOPHER, SCOTT

**DOB:** 05-04-1992  **Age:** 21  **Des.:** W  **Sex:** M  **SSN:** 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

**Created Dt/Tm:** 11-30-2013 0146  **Created By:** ARCE,RENE

---

| | |
|---|---|
| Y | **Other** |

      **Describe:** None

      **Describe:** CXR needed

      **Describe:** not on exp. meds

---

| | |
|---|---|
| Y | **Explain sick call process?** |

      **Explain:**

| | |
|---|---|
| Y | **Scheduling clinic / provider appointment?** |

---

| | |
|---|---|
| N | **Are you currently taking any medications?** |

**Record in Med Screen**

---

Facility: 910
161B MED

Page 7 of 7

EXHIBIT B

Printed: 03-03-2014 0745
CSD000129
Printed By: RRAPAISH, RAPAIDO

# SAN DIEGO SHERIFFS DEPARTMENT

## PSYCHIATRIC QUESTIONS

**JIM:** 400319373   **Book #:** 13784410   **Book Dt/Tm:** 11-30-2013 0143

**Name(L,F,M,S):** NESMITH, KRISTOPHER, SCOTT

**DOB:** 05-04-1992   **Age:** 21   **Des.:** W   **Sex:** M   **SSN:** 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

**Created Dt/Tm:** 11-30-2013 0146          **Created By:** ARCE,RENE

---

N          **Do you have any current psychiatric / mental health problems?**

          **Explain:**

N          **Do you have any previous mental health history?**

          **Explain:**

N          Do you know your psychiatrist / clinic name?

          **Explain:**

N          **Any visual hallucinations?**

          **Explain:**

N          **Any auditory hallucinations?**

          **Explain:**

N          **Any suicidal ideation?**

          **Explain:**

N          **Any homicidal ideation?**

          **Explain:**

N          **Any prior suicide attempts?**

          **Explain:**

N          **Are you currently taking any psychiatric medications?**

          **Record in Med Screen**

Facility: 910
166B MED
Page 1 of 1
EXHIBIT B
Printed: 03-03-2014 0745
CSD000130
Printed By: RRAPAISH, RAPAIDO

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

| **JIM:** 400319373 | **Book#:** 13784410 | **Name (L,M,F,S):** NESMITH, KRISTOPHER, SCOTT |
|---|---|---|

## Encounter Detail

**Type:** Rnsc      **Reason:** Exam      **Date:** 12-04-2013 1722

**Resource:** Marquez, Jennifer Sh5380      **Cost:** $0.00

**Notes:**

## Objective

### Vitals

**Vitals Dt/Tm:** 12-04-2013 1722   **Temp (°F):** 97.4 **Pulse:** 63 **Respiration:** 18

**Blood Pressure:** 136/74   **Wgt:**   **Hgt:** 6´00" **Provider:** MARQUEZ , JENNIFER

     **SNP:**

     **Notes:**

## Orders

## Encounter Notes

**Entry Date:** 12-04-2013 1822      **Entered By:** JMARQ2SH,  MARQUEZ

addendum: scheduled psych sc 12/5/13 for f/u.

**Entry Date:** 12-04-2013 1723      **Entered By:** JMARQ2SH,  MARQUEZ

I/P escorted by deputy 3280 to medical tx rm 1 for eval. Per deputy 3280, I/P's dad called the DA then DA called Sgt 4760 because I/P told his dad that if his dad did not bail him out, he will kill himself.

S: "Thats not what I said to my dad. My dad can be over dramatic. I don't wanna kill myself". Denies psych hx. denies feeling depressed. Strongly denies SI/HI/AH/VH.

O: A/O x 4, speech clear, NAD. VSS. calm, cooperative, has good eye contact. affect appropriate. thought process intact. gait stable. No psych hx in JIMS.

A/P: contracted for safety. scheduled psych sc 11/5/13 for f/u. Advised I/P to notify staff for change in medical/psych condition, verbalized understanding.

## Med Alerts

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

| | | |
|---|---|---|
| **JIM:** 400319373 | **Book#:** 13784410 | **Name (L,M,F,S):** NESMITH, KRISTOPHER, SCOTT |

## Encounter Detail

**Type:** Psych Sc      **Reason:** Exam      **Date:** 12-04-2013 1825

**Resource:** Marquez, Jennifer Sh5380      **Cost:** $0.00

**Notes:** \*\*PRIORITY\*\*Per deputy 3280, I/P's dad called the DA then DA called Sgt 4760 because I/P told his dad that if his dad did not bail him out, he will kill himself. I/P strongly denies SI/HI/AH/VH. denies psych hx.

## Diagnosis

Persistnt D/o Init/mntain

Cannabis Dependence

## Objective

## Instructions

PSYCH HOLD          COMPLETE

## Orders

## Medications

**Type:** F      **Medication:** DESYREL (GEN.) 50MG TABLET      **Rx #:** 405900427

**Status:** DISCONTINUED      **Strength:** 50 MG

**Rte:** PO      **Freq:** QHS      **Start Dt/Tm:** 12-05-2013 1119      **End Dt/Tm:** 03-05-2014 1118

**SNP:**      **Provider:** CERCADO , VENICE

**Notes:**

## Encounter Notes

**Entry Date:** 12-05-2013 1340      **Entered By:** MAMBROSH, AMBROSIO

Seen @ Psych sc for eval, new med order noted.

Facility: RELS      Page 1 of 2      Printed: 03-03-14 0746
433M MED      EXHIBIT B      CSD000137
Printed By: RRAPAISH, RAPAIDO

## SAN DIEGO SHERIFFS DEPARTMENT
### Medical Chart

| | | |
|---|---|---|
| **JIM:** 400319373 | **Book#:** 13784410 | **Name (L,M,F,S):** NESMITH, KRISTOPHER, SCOTT |

## Encounter Detail
### Encounter Notes

**Entry Date:** 12-05-2013 1116          **Entered By:** VCERCANS,   CERCADO

```
psych eval:
21 yo MCM with thc abuse who complains about sleeping problems

admits to thc
psych op tx denies
psych hosp dneies
previous suicidal attempts dneies

pmh dneies
NKDA
denies sz hx

etoh in family

hs grad marine corp
married no kids

mse fair grooming goal oriented denies si hi avh pi ior engaged in
conversation euthymic mood and affect see j274

a 307.42 304.3
p trazodone 50 mg qhs
rtc in 4 weeks
```

## Med Alerts

Facility: RELS

433M MED

Page 2 of 2

EXHIBIT B

Printed: 03-03-14 0746

CSD000138

Printed By: RRAPAISH, RAPAIDO

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

**JIM:** 400319373     **Book#:** 13784410     **Name (L,M,F,S):** NESMITH, KRISTOPHER, SCOTT

## Encounter Detail

**Type:** Psych Sc     **Reason:** 01- Follow-up     **Date:** 12-10-2013 0730

**Resource:**     **Cost:**

**Notes:** I/P requests to see the psych. "PTSD, Depression".

## Objective

## Orders

### Medications

**Type:** F     **Medication:** PRAZOSIN 1 MG CAPSULE     **Rx #:** 405917047
**Status:** DISCONTINUED     **Strength:** 1 MG
**Rte:** PO     **Freq:** QHS     **Start Dt/Tm:** 12-12-2013 1016     **End Dt/Tm:** 03-12-2014 1015
**SNP:**     **Provider:** CERCADO , VENICE
**Notes:**

**Type:** F     **Medication:** DESYREL (GEN.) 100MG TABLET     **Rx #:** 405917050
**Status:** DISCONTINUED     **Strength:** 100 MG
**Rte:** PO     **Freq:** Q12H     **Start Dt/Tm:** 12-12-2013 1017     **End Dt/Tm:** 03-12-2014 1016
**SNP:**     **Provider:** CERCADO , VENICE
**Notes:**

**Type:** F     **Medication:** PROZAC(GEN)20MG CAPSULE     **Rx #:** 405917051
**Status:** DISCONTINUED     **Strength:** 20 MG
**Rte:** PO     **Freq:** QAM     **Start Dt/Tm:** 12-12-2013 1018     **End Dt/Tm:** 03-12-2014 1017
**SNP:**     **Provider:** CERCADO , VENICE
**Notes:**

Facility: RELS     Page 1 of 2     Printed: 03-03-14 0746
433M MED     EXHIBIT B     CSD000139
    Printed By: RRAPAISH, RAPAIDO

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

| | | | |
|---|---|---|---|
| **JIM:** 400319373 | **Book#:** 13784410 | **Name (L,M,F,S):** | NESMITH, KRISTOPHER, SCOTT |

## Encounter Detail

### Medications

| | | | |
|---|---|---|---|
| **Type:** F | **Medication:** DESYREL (GEN.) 100MG TABLET | **Rx #:** | 405925731 |
| **Status:** DISCONTINUED | **Strength:** 100 MG | | |
| **Rte:** PO | **Freq:** QHS | **Start Dt/Tm:** 12-15-2013 2315 | **End Dt/Tm:** 03-11-2014 2314 |
| **SNP:** Entry changed to QHS per note | | **Provider:** CERCADO , VENICE | |
| **Notes:** | | | |

## Encounter Notes

**Entry Date:** 12-12-2013 1213       **Entered By:** MAMBROSH,   AMBROSIO

```
Seen @ Psych sc for f/u, new med orders noted.
```

**Entry Date:** 12-12-2013 1013       **Entered By:** VCERCANS,   CERCADO

```
psych sc:
"Im still having problems with sleep and I'm worrying a lot at night. I'm
feeling depressed and overwhelmed , I'm waking up in the middle of night
because of nightmares."  denies s/e
mse goal oriented but endorses depression engaged in coversation no overt
psychotic or manic sx observed.
a 309.81  304.3
p start prozac 20 mg qam
increase trazodone 100mg qhs
prazosin 1mg qhs
rtc 4 weeks
```

## Med Alerts

Facility: RELS
433M MED
Page 2 of 2
EXHIBIT B
Printed: 03-03-14 0746
CSD000140
Printed By: RRAPAISH, RAPAIDO

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

| **JIM:** 400319373 | **Book#:** 13784410 | **Name (L,M,F,S):** | NESMITH, KRISTOPHER, SCOTT |
|---|---|---|---|

## Encounter Detail

**Type:** Psych Sc      **Reason:** Chart Check      **Date:** 12-23-2013 2125

**Resource:** Velez, Estella Sh6258      **Cost:**

     **Notes:** Requesting to DC medication. I/P refusing and not showing up at medication call.

## Objective

## Orders

### Encounter Notes

**Entry Date:** 12-24-2013 1046      **Entered By:** LMEND3SH,   MENDOZA

     `PsychCC done (see notes)`

**Entry Date:** 12-24-2013 1022      **Entered By:** KLANGHNS,   LANGHAM

`psych cc:`
`multiple refusals and not showing up at medication call. will d/c medications.`

## Med Alerts

# SAN DIEGO SHERIFFS DEPARTMENT
## Medical Chart

| **JIM:** 400319373 | **Book#:** 13784410 | **Name (L,M,F,S):** | NESMITH, KRISTOPHER, SCOTT |
|---|---|---|---|

## Encounter Detail

**Type:** Rnsc **Reason:** Exam **Date:** 01-03-2014 0247

**Resource:** Hernandez, Leticia Sh0307 **Cost:** $3.00

**Notes:** J212 1/3 " folow-up- ringing in ears"

## Diagnosis

Other Otitis Externa

## Objective

### Vitals

**Vitals Dt/Tm:** 01-03-2014 1920 **Temp (°F):** 97.8 **Pulse:** 72 **Respiration:** 16

**Blood Pressure:** 124/70 **Wgt:** 157 **Hgt:** 6´00" **Provider:** AQUISAP , DEMELZA

**SNP:**

**Notes:**

## Plan

**Provider:** SNP , ESTD JOSHUA **Plan Dt/Tm:** 01-03-2014 1922 **Completed By:** AQUISAP , DEMELZA

**Completed Dt/Tm:** 01-03-2014 1922 **Patient Education:** Y **Phone Order Status:**

**SNP:** OTITIS EXTERNA

**Entry Date:** **Entered By:** ESNPX2SH,  SNP

```
Per SNP OTITIS EXTERNA.  2. Cortisporin Otic Suspension
Neomycin/PolymixinB/Hydrocortisone) 4 drops to the affected ear 3 times a day X
5 days. (Give to I/P for self administration).
3. If  the ear canal is tight; refer to MDSC.
4. Advise I/P that if symptoms persist after the completion of the treatment,
to sign up for sick call.
```

Facility: RELS
433M MED
Page 1 of 2
EXHIBIT B
Printed: 03-03-14 0747
CSD000143
Printed By: RRAPAISH, RAPAIDO

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

**JIM:** 400319373    **Book#:** 13784410    **Name (L,M,F,S):** NESMITH, KRISTOPHER, SCOTT

## Encounter Detail

### Plan

**Provider:** SNP , ESTD JOSHUA    **Plan Dt/Tm:** 01-03-2014 1922    **Completed By:** AQUISAP , DEMELZA

**Completed Dt/Tm:** 01-03-2014 1922    **Patient Education:** Y    **Phone Order Status:**

**SNP:** OTITIS EXTERNA

**Entry Date:**    **Entered By:** ESNPX2SH, SNP

Per SNP OTITIS EXTERNA. 1.Cleanse ear of wax with ear irrigation using debrox
to clear additional wax, if necessary, using 5-10 gtts BID up to 4 days if
needed.

## Orders

### Medications

**Type:** F    **Medication:** CORTISPORIN OTIC SUSP    **Rx #:** 405968422

**Status:** DISCONTINUED    **Strength:** 4 DROPS

**Rte:** OT    **Freq:** TID    **Start Dt/Tm:** 01-03-2014 1922    **End Dt/Tm:** 01-08-2014 1921

**SNP:**    **Provider:** SNP , ESTD JOSHUA

**Notes:** Bottle of cortisporin Otic Sol. given to inmate with instructions.

## Encounter Notes

**Entry Date:** 01-03-2014 1924    **Entered By:** DAQUISSH, AQUISAP

S:" follow-up- ringing in ears"
O:Left and right ear canals with off white ear drainage.
A:Potential for infection
P:Cortisporin Otic sol given to inmate with instructions.
Advised inmate to notify medical if s/s worsen or if no improvement after tx.
is completed.
Inmate verbalized understanding.

## Med Alerts

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

| **JIM:** 400319373 | **Book#:** 13784410 | **Name (L,M,F,S):** NESMITH, KRISTOPHER, SCOTT |
|---|---|---|

## Encounter Detail

| **Type:** Psych Sc | **Reason:** 01- Follow-up | **Date:** 12-12-2013 1021 |
|---|---|---|
| **Resource:** Cercado, Venice Psychmd | | **Cost:** |

**Notes:** 4 weeks.  lds 12/12/13.
J212 12/29: "Trouble sleeping, depression, heavy ringing in ears."

## Objective

## Orders

### Medications

| **Type:** F | **Medication:** SINEQUAN (GEN.) 100MG CAPSULE | **Rx #:** 405981887 |
|---|---|---|
| **Status:** DISCONTINUED | **Strength:** 100 MG | |
| **Rte:** PO | **Freq:** QHS | **Start Dt/Tm:** 01-09-2014 1057 | **End Dt/Tm:** 05-09-2014 1056 |
| **SNP:** | **Provider:** CERCADO , VENICE | |
| **Notes:** | | |

## Encounter Notes

**Entry Date:** 01-09-2014 1242          **Entered By:** RLIZARSH,  LIZARDO

seen in Psyc s/c, scheduled f/u in 2 weeks.

**Entry Date:** 01-09-2014 1053          **Entered By:** VCERCANS,  CERCADO

was having problems with trazodone  that gave him anger problems.
mse goal oriented dneies si hi all else wnl
 a 307.42
p doxepin 100mg qhs
rtc in 2  weeks

**Entry Date:** 12-29-2013 0239          **Entered By:** RSALTESH,  SALTER

J212 request added to detail screen.

## Med Alerts

Facility: RELS
433M MED

Page 1 of 1
EXHIBIT B

Printed: 03-03-14 0747
CSD000145
Printed By: RRAPAISH, RAPAIDO

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

| **JIM:** 400319373 | **Book#:** 13784410 | **Name (L,M,F,S):** NESMITH, KRISTOPHER, SCOTT |
|---|---|---|

## Encounter Detail

**Type:** Psych Sc          **Reason:** Chart Check          **Date:** 01-20-2014 1841

**Resource:**                                                **Cost:** $0.00

  **Notes:** I/P continues to refuse Sinequan.  Requests to DC.

## Objective

## Orders

## Encounter Notes

**Entry Date:** 01-21-2014 1310          **Entered By:** EMORALSH,   MORALES

`cc completed  med d./c`

**Entry Date:** 01-21-2014 0937          **Entered By:** VCERCANS,   CERCADO

`refusing sinequan`
`plan`
`d/c sinequan`
`reeval at next sched psych sc`

## Med Alerts

# SAN DIEGO SHERIFFS DEPARTMENT
## Medical Chart

| **JIM:** 400319373 | **Book#:** 13784410 | **Name (L,M,F,S):** NESMITH, KRISTOPHER, SCOTT |
|---|---|---|

## Encounter Detail

**Type:** Psych Sc  **Reason:** 01- Follow-up  **Date:** 01-09-2014 1057

**Resource:** Cercado, Venice Psychmd  **Cost:**

**Notes:** 2 weeks..lds-1-09-14

## Objective

## Orders

### Medications

**Type:** F  **Medication:** DESYREL (GEN.) 50MG TABLET  **Rx #:** 406041975

**Status:** DISCONTINUED  **Strength:** 50 MG

**Rte:** PO  **Freq:** QHS  **Start Dt/Tm:** 02-02-2014 1224  **End Dt/Tm:** 06-02-2014 1223

**SNP:**  **Provider:** ENRIQUEZ , ROBERT

**Notes:** Please crush medcation in liquid before dispensing.

## Encounter Notes

**Entry Date:** 02-02-2014 1359  **Entered By:** HNGUY3SH,  NGUYEN

seen in Pscyh s/c with meds, scheduled f/u in 4 weeks.

Facility: RELS
433M MED
Page 1 of 2
EXHIBIT B
Printed: 03-03-14 0747
CSD000147
Printed By: RRAPAISH, RAPAIDO

# SAN DIEGO SHERIFFS DEPARTMENT

## Medical Chart

| | | | |
|---|---|---|---|
| **JIM:** 400319373 | **Book#:** 13784410 | **Name (L,M,F,S):** | NESMITH, KRISTOPHER, SCOTT |

## Encounter Detail

### Encounter Notes

**Entry Date:** 02-02-2014 1223          **Entered By:** RENRIQNS,   ENRIQUEZ

PSYCH FOLLOW UP

Pt is a 21 yo white male with 304.3 and 307.42 pt presents stating that he has default sleeping, and increasing anxiety and depression. He also describes isolative behavior stating that "Some days I don't want to come out of my cell" and states that he will ruminate about "I lert may family down". Pt stated that the sinequan was not helpful and has been refusing. Pt was somewhat guarded and stated that he wanted to be started on trazodne although he feigned not knowing what this medication was or denying that he had been on it in the past but when dosing it he sated "Can you start me on a 100?"

Past Psych care/Substance History: See JIMS.

MSE: See J 275. Denied suicidal ideation, homicidal ideations, auditory hallucinations, visual hallucinations and command auditory hallucinations. Pt was clam and cooperative. Pt did not appear to be responding to internal stimuli. Mood was " depressed " affect was euthymic and reactive.  Insight and judgment fair.

DX: 304.3 and 307.42

Plan:
- Pt denied SIHI AVH CAH and is not an acute risk to self or others at the time of the interview. No indication for inpatient hospitalization or placement on a 5150.
- Start Trazodone 50 mg po qhs please crush medication before dispensing.  Pt was advised on the risks, benefits and alternatives of this medication and he agreed to be compliant on the mediation. Consent signed and in chart.
- RTC in 4 weeks or PRN for evaluation of symptoms, side effects, and efficacy of medication is pt is still incarcerated.

## Med Alerts

Facility: RELS

433M MED

Page 2 of 2

EXHIBIT B

Printed: 03-03-14 0747

CSD000148

Printed By: RRAPAISH, RAPAIDO

# EXHIBIT "C"

Chassidy NeSmith  11/28/2017

```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4      CHASSIDY NeSMITH, individually  )
        and as Guardian ad Litem on     )
 5      behalf of SKYLER KRISTOPHER      )
        SCOTT NeSMITH, and as Successor  )
 6      in Interest to THE ESTATE OF     )
        KRISTOPHER SCOTT NeSMITH,        )
 7                                       )
                     Plaintiffs,         )
 8                                       )
              v.                         ) Case No.: 15-cv-00629-JLS (AGS)
 9                                       )
        COUNTY OF SAN DIEGO, SAN DIEGO   )
10      COUNTY SHERIFF'S DEPARTMENT;     )
        WILLIAM D. GORE, SAN DIEGO       )
11      COUNTY SHERIFF; VISTA DETENTION  )
        FACILITY; and DOES 1 - 100       )
12      inclusive,                       )
                                         )
13                   Defendants.         )
        _____)

14

15

16            VIDEOTAPED DEPOSITION OF CHASSIDY NeSMITH

17                 VOLUME I, PAGES 1 THROUGH 338

18                   SAN DIEGO, CALIFORNIA

19                    NOVEMBER 28, 2017

20

21

22      REPORTED BY CARLINE A. FONSECA, CSR NO. 8068

23

24

25
```

EXHIBIT C

Chassidy NeSmith  11/28/2017

1   **suicidal in the past?**

2      A     The way they asked me -- I answered it, like,

3   kind of vaguely.  Like, he didn't -- the way he asked me

4   was a certain time.  Like, "Did he point anything out?

5   Did you notice anything different?"

6           Like, no, "I didn't in the -- in the past,"

7   like, you know, "He was fine the past, like, month or

8   two."  You know, like, "I have just been trying to keep

9   him positive, same like always."

10     Q     Who -- did you tell the detectives that Kris

11  was in good spirits the night before when he called you?

12     A     Yes.

13     Q     Was that true?

14     A     I thought it was, until I found out that what

15  he was telling me was what his dad wrote in the letter.

16     Q     So there was nothing about his conversation

17  that at the time put you on notice that he was suicidal?

18     A     No.

19     Q     What happened after you spoke with the

20  sheriff's deputies in the jail?

21     A     I went and smoked a lot of cigarettes.

22     Q     Did you stay with Kris -- I mean, with Scott?

23     A     Yes.

24     Q     Did you view the body?

25     A     They wouldn't let me.  I wanted to.  They

EXHIBIT C

```
 1          I, Carline A. Fonseca, a Certified Shorthand

 2     Reporter of the State of California, do hereby certify:

 3          That the foregoing proceedings were taken before me

 4     at the time and place herein set forth; that any

 5     witnesses in the foregoing proceedings, prior to

 6     testifying, were placed under oath; that a verbatim

 7     record of the proceedings was made by me using machine

 8     shorthand which was thereafter transcribed under my

 9     direction; further, that the foregoing is an accurate

10     transcription thereof.

11

12

13     Dated:   This _____ day of ___December___, 2017,

14          at San Diego, California.

15

16

17

18

19

20     _____

21                 Carline A. Fonseca
                    CSR No. 8068

22

23

24

25
```

EXHIBIT C

# EXHIBIT "D"

EXHIBIT D



EXHIBIT D



EXHIBIT D



EXHIBIT D



EXHIBIT D

# EXHIBIT "E"

Richard Anthony Berumen  10/5/2017

```
1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4                                      )
      CHASSIDY NE SMITH, individually  )
5     and as Guardian ad Litem on behalf )
      of SKYLER KRISTOPHER SCOTT        )
6     NE SMITH, and as Successor in     )
      Interest to KRISTOPHER SCOTT      )
7     NE SMITH,                         )
                                        )
8                  Plaintiffs,          )
                                        )  CASE NO.
9                                       )    15-cv-0629-
                                        )    JLS (JMA)
10              vs.                     )
                                        )
11    COUNTY OF SAN DIEGO; WILLIAM D.   )
      GORE, individual, and DOES 1- 100, )
12    inclusive,                        )
                                        )
13                 Defendants.          )
      _____)

14

15

16

17      VIDEOTAPED DEPOSITION OF RICHARD ANTHONY BERUMEN

18                  BLYTHE, CALIFORNIA

19               THURSDAY, OCTOBER 5, 2017

20

21   REPORTED BY:  Carolyn Ann Peterson, CSR No. 3195

22

23

24

25
```

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    custody, and anything that may go to prison, that puts

2    you in the upper west.

3        Q    How did you meet with Mr. NeSmith on

4    November 24, 2013?

5        A    He was my neighbor in the same module.

6        Q    Did he have a cellmate?

7        A    At the time, I believe so.

8        Q    Did you introduce yourself to Mr. NeSmith, or

9    did he introduce himself to you?

10       A    I probably introduced myself to him.

11       Q    Now, Mr. NeSmith committed suicide on

12   March 1st, 2014, approximately three months after you

13   met him.  Can you describe your interactions with

14   Mr. NeSmith during that period?

15       A    I was pretty close with Kris.  Like I said, he

16   was my neighbor.  He wasn't what -- a normal jail inmate

17   like myself, who's been around jail.  He was a white

18   guy, ex-Marine, so I kind of attached myself to him, you

19   know, and we used to eat together, work out together.

20       Q    Other than his race, and that he was an

21   ex-Marine, is there anything else that made him not a

22   normal inmate?

23       A    Kris was a normal white guy.  He was from

24   Chicago, you know, he had some tattoos, but he was in

25   the Marines.  He was just a normal guy.

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1      Q      Do you know what his charges were?

2      A      No.  I saw something to do with his old lady.

3      I really don't know.

4      Q      Did he ever discuss his charges with you?

5      A      Not really.

6      Q      Did he discuss the likelihood of him being

7      convicted of his charges?

8      A      Just that he was looking at a lot of time.

9      Q      What does that mean?

10     A      A lot of time, 20 years.  I don't know, because

11     Kris never been in jail.  A lot of time to him may be 15

12     to 20 years, life.  I don't know.

13     Q      But he didn't tell you specifically?

14     A      He just tell me he was looking at a lot of

15     time.

16     Q      Where would you eat together?

17     A      In my cell or his cell.

18     Q      What meals would you eat together?

19     A      Breakfast, lunch and dinner.  At that time, I

20     was on a Kosher diet, and I used to share some of my

21     food, and he used to give me his milk.

22     Q      Was kind of diet was Mr. NeSmith on?

23     A      Just a normal diet.

24     Q      Were you Jewish?

25     A      I'm a Messianic Jew.

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1      Q      Are you still a Messianic Jew?

2      A      Yes, ma'am.

3      Q      Have you been a Messianic Jew all your life?

4      A      2012.

5      Q      Do you have a temple that you go to when you

6   are not in custody?

7      A      No, ma'am.

8      Q      Other than adhering to a Kosher diet, are there

9   any other Messianic Jewish traditions that you follow?

10     A      The old law.

11     Q      What is the old law?

12     A      All holidays.  We don't believe in Christmas --

13   you know, Christian holidays that everybody else

14   believes in.

15     Q      Do you do any fasting?

16     A      Oh, I fast, yes.

17     Q      In connection with your religion?

18     A      Yes.

19     Q      Have you officially converted -- had a Rabbi

20   officiate your conversion?

21     A      Those aren't Jews.  Messianic Jews are -- we

22   believe Jesus Christ is the Messiah.

23     Q      But did a Rabbi oversee your conversion?

24     A      No.  I write to Hosea -- Messianic Jews, they

25   are pastors.

EXHIBIT E

Richard Anthony Berumen  10/5/2017

```
1        Q    Jews -- what dietary restrictions follow being

2    a Messianic Jew?

3        A    We don't eat shellfish, meat with milk, the way

4    the food is processed.

5        Q    What about pork?

6        A    Oh, no.

7        Q    Since 2012, have you eaten pork?

8        A    Yeah.

9        Q    What portion?

10       A    Pork rinds.

11       Q    Okay.  You don't follow the diet?

12       A    I try my best.  I'm in prison.

13       Q    They are real popular?

14       A    Yeah.

15       Q    So you still eat chicharrones?

16       A    Sometimes.

17       Q    But otherwise you follow the Messianic Jewish

18   religion?

19       A    Yeah.  The holiday is a big thing for me.

20   Christmas and Easter and all these holidays that are

21   pagan, I don't know -- really believe in.

22       Q    You do Rosh Hashanah, and that's it?

23       A    Yeah, Passover.

24       Q    So what food would Mr. NeSmith share with you

25   when you were sharing your breakfast, lunch and dinner
```

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1   **together?**

2        A    He had milk.   I like milk.   I like to drink

3   milk.   I'm trying to get all my vitamins.

4        Q    **Would you share some of your food with**

5   **Mr. NeSmith?**

6        A    Yeah, some of the sweets, like pastries that I

7   would give him.

8        Q    **He liked pastries?**

9        A    Yes, ma'am.

10       Q    **Anything else that you like to eat?**

11       A    Whatever I had he wanted, I would give him

12   some.

13       Q    **Would you work out together every day?**

14       A    You know, we were on the top tier, and they

15   have bars there, and that's where people put their hands

16   on the bar and do like back arms.   We would work out

17   right there and do back arms there together and chop it

18   up.

19       Q    What do you mean "chop it up"?

20       A    He would talk and tell me about the Marines and

21   stuff like that.

22       Q    **Did he tell you about his relationship with**

23   **Miss NeSmith, Chassidy?**

24       A    Yeah.

25       Q    **What did he tell you?**

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1      A      She was pregnant, and they just got married.  I

2  think she was from Orange County.  She used to visit him

3  on base.

4      **Q      Did he describe their relationship?**

5      A      He just told me that he loved her.  She was

6  pregnant.

7      **Q      Were they having any difficulties while he was**

8  **incarcerated?**

9      A      No.  Sometimes they would argue, or Kris would

10  get upset when he was on the phone.  I think it was more

11  Kris.  He was really -- like I said, she was pregnant

12  and Kris never done no time in prison, and Kris would

13  be -- stressful for Kris about that situation.

14      **Q      What was stressful about it to him?**

15      A      He would be like me, he wouldn't be a father to

16  his kids, because he was in prison.

17      **Q      But this was the time he was in jail?**

18      A      Yeah.

19      **Q      Did he believe he was going to be convicted**

20  **then and sent to prison?**

21      A      He would say the possibility was there -- is

22  that he was going to go to prison.

23      **Q      Do you know how frequently Chassidy and**

24  **Mr. NeSmith would speak?**

25      A      I know he would be on the phone -- it might

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1       A     That may be confusing.

2       Q     Do understand my question?

3       A     No.

4       Q     Okay.  The inmate that told you that

5    Mr. NeSmith had a rope, was that the only individual

6    that told you Mr. NeSmith had a rope?

7       A     Yes.

8       Q     Is it correct that you testified that he told

9    you that either the day before or two days before

10   Mr. NeSmith committed suicide?

11      A     Two days before -- the most, two days before.

12      Q     But it's possible it was one day before?

13      A     I think it's better two days before I knew

14   about the rope -- I seen it.

15      Q     You saw the rope two days before?

16      A     Yeah.

17      Q     And do you know what time of day the inmate

18   told you that Mr. NeSmith had a rope?

19      A     He told me through the cell, because I could

20   see -- that little diagram -- I could talk to him, too,

21   and with sign language, American Sign Language, I could

22   talk to him, too.  He told me that he thought Kris was

23   trying to kill himself.

24      Q     He used American Sign Language?

25      A     Yeah, jail sign -- American Sign Language, a

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    little bit mixed up.

2         Q    What is it -- how did you come to show the

3    video camera what he used to describe it.

4         A    No, he said, "Kris was going to kill himself"

5    in sign language.

6         Q    Just like that?

7         A    Yes, letters spell it out.

8         Q    At the time, you were locked down in your cell?

9         A    I was in my cell, yeah.

10        Q    Did he use sign language to tell you that

11   you -- Mr. NeSmith had a rope?

12        A    I told him, "Why?  Why did he say that?"

13             "He is putting a rope around the light."

14             And I was like, "What the, f --?"

15        Q    Do you know what time of day he told you that?

16        A    It had to be the afternoon, because at 2:00

17   o'clock, we watch movies.  The jail puts a movie on.  So

18   most everybody was at their door.  I wouldn't be

19   standing at my door, if it wasn't something good, you

20   know.  Something about that time "Hey, Kris" -- what?

21        Q    Did you report the rope to anyone?

22        A    No, ma'am.

23        Q    What did you do next?

24        A    We came out for unlock, and I went, and I

25   talked to Kris.

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1        Q     Do you know what time the unlock was?  Was it

2   for dinner?

3        A     It was like the afternoon one, so maybe it

4   wasn't the morning one or it wasn't 7:00 or 8:00 o'clock

5   in the morning.  It was after -- after the movie time.

6        Q     So after the movie.  Did you observe the rope

7   in Mr. NeSmith's cell when you went into the cell?

8        A     Oh, yes.

9        Q     Can you describe what the rope looked like?

10       A     It was a -- white, made out of a sheet,

11   braided.

12       Q     How long was the rope?

13       A     I know it was just wrapped around the whole

14   light.  The lights are kind of like these ones, except

15   they only have two bulbs.

16       MS. HOLMES:  So for the record, the deponent is

17   referring to the -- they are -- it's a box light below

18   the ceiling.

19       THE VIDEOGRAPHER:  Counsel, would you like me --

20       MS. HOLMES:  Yes, that would be great.  The

21   videographer is going to go ahead and pan up to the

22   light.

23       THE WITNESS:  Instead of three bulbs, there's only

24   two bulbs in there, but they are smaller, same style.

25   ///

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    BY MS. HOLMES:

2         Q    **Florescent light fixture?**

3         A    Yes.

4         THE VIDEOGRAPHER:  I got it.

5    BY MS. HOLMES:

6         Q    **Did the rope blend in with the light?**

7         A    No.  It was like that thick (indicating).

8         Q    **So for the record, would you estimate that it**

9    **was a half an inch in thickness?**

10        A    Yes, ma'am, it was about that thick.

11        Q    **That looks like a half inch to you?**

12        A    I would be guessing.  It was about the size --

13        Q    **The size of a quarter?**

14        A    Yeah, about the size of a quarter.

15        Q    **How many times was it wrapped around the light?**

16        A    I only seen it hanging -- wrapped around once.

17   The lights kind of like -- they are not totally flush

18   against the ceiling.  Some of them had a little bit of a

19   gap like that, so you can get something -- a string or

20   whatever and pull them in there.

21        Q    **Wedge it in there?**

22        A    Yeah, pull it -- some of them got a bigger gap

23   between the ceiling and the light.

24        Q    **So it was approximately a quarter inch thick.**

25   **Was that uniform throughout the length of the rope, or**

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    just --

2        A    I couldn't see.  I just went in, and it looked

3    like it.

4        Q    Was any part of the rope hanging down from the

5    light to the floor?

6        A    No, not like that.  Not at all.

7        Q    Did you have to go inside of the cell to see

8    the rope?

9        A    Yeah.  I was at the door, yeah.

10       Q    Based on -- so at the door, you were able to

11   see the rope?

12       A    Yeah.

13       Q    Was any part, of it hanging down?

14       A    So the lights like that, it was hanging -- you

15   were able to see -- a deputy told him to take it down

16   that night or the day before that.  You were able to see

17   it like outside.

18       Q    When you said a little bit of it was hanging

19   down, how much of it was hanging down?

20       MS. PENA:  May call for speculation.

21   BY MS. HOLMES:

22       Q    I'm asking.  I'm not asking you to speculate.

23   I want you to testify about what you observed.

24       A    From the top of the light, about that much,

25   about.

Peterson Reporting Video & Litigation Services          100

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1        Q      **Three inches?**

2        A      Three or four inches.  It was visible -- I was

3    able to see it.

4        Q      Could you tell how long the rope was, based on

5    what you observed?

6        A      No.  I just know it was a rope wrapped around

7    the light.

8        Q      **And did you discuss the rope with Mr. NeSmith?**

9        A      **Yes.**

10       Q      **What did you discuss with him about the rope?**

11       A      **Obviously, we put ropes around lights in bunk**

12   **areas to hang our wet clothes when we wash.**

13       Q      **Did you just say, "bunk areas"?**

14       A      **Yes, so the bunk areas where your bunk beds**

15   **are, they'll put a little rope there or sometimes on the**

16   **light, but if the ropes are hung from the light, the**

17   **deputy -- they -- you can't have a rope around there.**

18   **You dry your laundry in the light.  You can dry your**

19   **laundry on the bunk, but you are not going to be having**

20   **your clothes hanging from the light.  It's called a**

21   **clothes line.**

22       Q      **What happens if there's a clothes -- let me**

23   **strike that and ask a better question.**

24              **In 2014 -- in March of 2014 at Vista in the**

25   **module you and Mr. NeSmith were housed in, what would**

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    **the Sheriff's deputy's do if you were found with a**

2    **clothesline in your cell?**

3         A    They take it down.   They have a little round

4    tool just for that, with a hook, and sometimes that's

5    what they do, they come and take out the lines -- all

6    the laundry lines, they just come and take them all

7    down.

8         Q    **Other than drying laundry, is there any other**

9    **purpose for placing a rope or a string around the**

10   **light -- strike that, and ask this again.**

11            In 2014 at Vista, in the module you were in,

12   **was there any other reason why inmates would put ropes**

13   **or strings around their lights?**

14        A    Other than your laundry?

15        Q    **Yes.**

16        A    No, ma'am.

17        Q    **Did they ever use them to block light out of a**

18   **cell?**

19        A    No.   Like I said, you can't have nothing around

20   the light, and the deputy's walk every hour, so in Vista

21   County Detention Center, the only light you can block --

22   they have a little window on top, you might be able to

23   block this during the day.   When the lights are on, you

24   can't have nothing to block the light.

25        Q    **So when you brought the rope to Mr. NeSmith's**

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1      attention, what did he say?

2          A    He said it was a laundry line.

3          Q    What was your response?

4          A    I didn't believe him.  It was like that thick,

5    if you make a laundry line and you are going to put it

6    up there, you don't know -- want it so the correction

7    officer can see it.  You want it to be real thin, you

8    know, so it can stay up there when you want to hang your

9    laundry.  They won't be able to see it -- it has a

10   little gap.  You don't want to make a big old rope, they

11   come and take it down.

12         Q    So he told you it was for laundry.  Did you

13   respond to his statement that he said it was a laundry

14   line?

15         A    I told him, "Come on, Kris.  That is too big.

16   Cut it down.  If you want a string up there to dry the

17   laundry, you will -- I'll put a thin one up there.

18   That's too big.  They are going to trip on it."

19         Q    What did he say?

20         A    "No, that was good.  Don't mess with it."

21         Q    Did you discuss the individual who was in the

22   cell across from you and Mr. NeSmith concern -- or that

23   inmate's concern that Mr. NeSmith was going to take his

24   own life by hanging himself?

25         MS. PENA:  Objection, may be confusing.

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1              If you understand, answer it.

2         THE WITNESS:  I think that individual approached

3    Kris himself.

4    BY MS. HOLMES:

5         Q    And we can get to that, but he told you that,

6    through sign language, that he thought Mr. NeSmith was

7    going to hang himself, correct?

8         A    Yes, ma'am.

9         Q    And it's my understanding that was one or two

10   days before Mr. NeSmith actually did?

11        A    Yes, when he was putting the rope up there.

12        Q    Did you talk to Mr. NeSmith about the rope,

13   other than to ask if it was a laundry line?

14        A    I asked him if he was trying to kill himself.

15        Q    Were those your exact words?

16        A    Yes, ma'am.

17        Q    What did he say?

18        A    He said, "No."

19        Q    Did you believe him that day?

20        A    I maybe wanted to believe him.  I don't know --

21   it was kind of a decision, because Kris was my friend,

22   you know.

23        Q    So you don't know if you believed him or not?

24        A    I don't know.  I don't know.  I know I didn't

25   want to believe that Kris would do something like that

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    without telling me.  In that environment, I was closest

2    to him, so it's my belief if something was going on with

3    Kris, out of everybody in that module, he would have

4    told me first.

5         Q    So after he said that he was fine, did you

6    discuss his mental health with him again before he

7    committed suicide?

8         A    The morning that he committed suicide, I was

9    the last one to talk to Kris.

10         Q    Okay.  So going back to the inmate that

11    informed you that Mr. NeSmith had a rope in this cell

12    and he thought he was going to hang himself, you said

13    you think that inmate also spoke with Mr. NeSmith?

14         A    Yes.

15         Q    This is approximately late 20s or early 30s

16    Caucasian individual?

17         A    Yes, ma'am.

18         Q    Is it possible his name was Anthony?

19         A    I don't recall, ma'am.

20         Q    Do you know if his last name was Lamoureux?

21         THE REPORTER:  I'm sorry?

22         MS. HOLMES:  Lamoureux, L-a-m-o-u-r-e-x -- r-e-u-x.

23         THE WITNESS:  I personally do not know his name.

24    BY MS. HOLMES:

25         Q    Do you remember your cellmate's name at the

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    time?

2        A    Yes.

3        Q    What was that?

4        A    Anthony Martinez.

5        Q    Have you discussed Mr. NeSmith's suicide with

6    Mr. Martinez since the day that Mr. NeSmith took his own

7    life?

8        A    No, ma'am.

9        Q    Have you been housed with Mr. Martinez in jail

10   or prison since Mr. NeSmith took his own life?

11       A    No, ma'am.

12       Q    Have you been housed with any of the inmates

13   that you were housed with Mr. NeSmith in Vista when

14   Mr. NeSmith took his own life -- since that time?

15       A    No, ma'am.

16       Q    How do you know that the inmate who saw

17   Mr. NeSmith with the rope that told you through sign

18   language that he thought Mr. NeSmith was going to take

19   his own life -- how do you know that he spoke with

20   Mr. NeSmith?

21       A    I believe I was standing there -- he came to

22   Kris's door.

23       Q    And what did he say?

24       A    He was standing there when I was talking to

25   Kris, and we were just playing, but we told Kris, "Hey,

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    do we have to put you on suicide watch?  Like do we --

2    not go to the police, but do we have to do it."

3          I thought the guy, "Hey, just watch him and

4    make sure he is all right.  And if need be, push the

5    button."  I didn't want to push the button.

6          Q    And that guy would have been able to see into

7    Mr. NeSmith's cell?

8          A    Yes.

9          Q    But you didn't think Mr. NeSmith was going to

10   go through with it, correct?

11         A    That first time I talked to him, I didn't know

12   what to think about that situation of Kris, you know.

13   Like I said, I asked him -- the morning that all this

14   happened, I was the last one to talk to him.  I think I

15   walked out with his milk that day.  I don't know.

16         Q    So going back to the rope, you said that a

17   deputy saw the rope?

18         A    Yes.

19         Q    When did the deputy see the rope?

20         A    I think it was the same day that I talked to

21   him.

22         Q    So either --

23         A    Two days before or --

24         Q    Or one day before?

25         A    Yeah, it was in that little time period.

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1       Q    Do you know what time of day it was?

2       A    In the afternoon, evening sometime.

3       Q    Do you know what the deputy's name was, that

4    talked to Mr. NeSmith about the rope?

5       A    I do not.

6       Q    Do you know what the deputy looked like?

7       A    I don't -- I don't want to guess.

8       Q    Do you have any recollection of -- do you know

9    if it was a man or a woman?

10      A    It was a man.

11      Q    Do you know if he was African American?

12      A    No, he wasn't.  He was not black.

13      Q    Do you know if he was Caucasian?

14      A    He might have been Hispanic.

15      Q    Is it possible that he was Caucasian?

16      A    No.  He was not Caucasian.  I think he was

17   Spanish.  I don't want to guess.

18      Q    Or Hispanic -- is it possible that he was

19   Asian.

20      A    I know he wasn't black.

21      Q    So he could have been Caucasian, could have

22   been Hispanic, or could have been Filipino?

23      A    He wasn't black, I just know that.

24      Q    But beyond that, you have know idea what his

25   race was?

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1      A    No.

2      Q    Do you remember his age?

3      A    I want to say it was Serta, but I don't want to

4    say it is, because Serta comes to my name, because he is

5    the one that tried to revive him, and he worked on the

6    floor.  But I don't want to say for sure it was him.

7      Q    Okay.  Was anyone with the deputy when he spoke

8    to Mr. NeSmith about the rope?

9      A    No.  There's one deputy on the bottom and one

10   deputy on top.

11     Q    Could you overhear the conversation between the

12   deputy and Mr. NeSmith about the rope?

13     A    Yeah.  Kris was next to me.  We were outside

14   our cells.  Like I say, all the doors have to be open --

15   when the modules is stable, you have to be in your cell,

16   but the door has to be open, or you are in the day room.

17   I was standing on the top tier with Chris, and the

18   deputy told him, "Take that thing down."  It was a big

19   old rope.  "What are you trying to do, kill yourself?"

20   It was unfortunate, but, you know --

21     Q    And the deputy didn't cut the rope down?

22     A    No, ma'am.

23     Q    So was this at the same time that you and the

24   other -- was this in the same period -- let me strike

25   that -- at the time that the deputy told him to cut the

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    rope down?

2        A    It might have been the same night I talked to

3    Kris.

4        Q    But you don't know?

5        A    No, ma'am.

6        Q    Do you know if the inmate who saw Mr. NeSmith

7    make the rope was with you when the deputy said that?

8        A    No.  It was just me and Kris.

9        Q    Were you surprised that the deputy didn't cut

10   the rope down himself?

11       A    I know he wasn't going to get on top of the

12   toilet and cut it down.  He would have to get on top of

13   the toilet and reach the light.

14       Q    Are you surprised that he didn't have

15   Mr. NeSmith do it in front of him?

16       A    Yeah.  He should have told Kris, "Hey, get up

17   there and take it down.  Give it to me."

18            Because, like I said prior, they come, and they

19   search and they take all the lines. They are not going

20   to cut the line down, they will do a cell search for

21   laundry lines, and they cutting them down, and take

22   them.

23       Q    Have you ever seen anyone use a rope as a

24   weapon in a jail or prison?

25       A    No, ma'am.

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1       Q     Have you ever heard of anyone using a rope as a

2    weapon in jail or prison?

3       A     I said I believe someone in Corcoran State

4    Prison strangled -- killed their celi with a rope.  I

5    just heard about it in passing.  I don't personally

6    know.

7       Q     Sure.  What was Mr. NeSmith's response when the

8    deputy said to him, "What are you trying to do, kill

9    yourself?"

10      A     He didn't have a response.  I thought Kris was

11   going to take it down, you know, the deputy was right

12   there, but the deputy kept on walking, so he kind of

13   brushed it off.

14      Q     That was the day before or two days before

15   Mr. NeSmith took his own life?

16      A     Yes, ma'am.

17      Q     When the deputy made that statement, did it

18   cause you concern that Mr. NeSmith might be using the

19   rope to harm himself?

20      A     I think I had -- I was concerned for Kris

21   regardless, but I don't want -- at that time, I didn't

22   want to believe that Kris would do something like that

23   without telling -- you know, sharing something like that

24   at least with me, you know.

25      Q     Do you remember any other interactions with

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1      Mr. NeSmith before the morning that he killed himself,

2      after the deputy had observed the rope in his cell?

3          A     With the deputies and Kris?

4          Q     Let me ask the question a better way.

5                So we know it was either one or two days before

6      Mr. NeSmith took his own life, and it was in the

7      afternoon or evening, according to your testimony, that

8      the deputy said, "What are you trying to do, kill

9      yourself?"

10         A     Yes, ma'am.

11         Q     Between that time and the morning that

12     Mr. NeSmith took his own life, which was March 1st,

13     2014, do you recall any interactions that you had with

14     Mr. NeSmith?

15         A     I just hung out with him, and that's it.  The

16     day before he killed himself, I hung out with him --

17     hung out with Kris every day.

18         Q     The day before he took his own life, you hung

19     out with him?

20         A     Yeah.  If he wasn't out, I would go in there

21     and check on him.

22         Q     Do you recall anything specifically that you

23     did with him the day before he took his own life?

24         A     I think I was in his cell hanging out with him.

25         Q     Do you know when?

EXHIBIT E

Richard Anthony Berumen  10/5/2017

```
1        Q      When you say "not cool with him."

2        A      That I was cool with him.

3        Q      Oh, okay.  Did you tell her about the deputy

4   walking by and asking Mr. NeSmith if he was going to

5   kill himself?

6        A      No, ma'am.

7        Q      Why not?

8        A      I think I was crying with my mom, and my mom

9   was trying to get me not to be in that way, you know.

10       Q      Other than your mother, did you talk to anyone

11  else outside of the facility about Mr. NeSmith's suicide

12  before you talked to Mr. Morris and Miss Pena?

13       A      No, ma'am.

14       Q      So earlier you testified that Mr. Frank Griffin

15  was your investigator from your previous case?

16       A      Yes, ma'am.

17       Q      Were you provided that by the court, or were

18  you paying out of your pocket?

19       A      It was provided by the Office of Assigned

20  Counsel.

21       THE REPORTER:  I'm sorry.  It was provided by --

22       THE WITNESS:  Office of Assigned Counsel.

23  BY MS. HOLMES:

24       Q      How long did Mr. Griffin work for you?

25       A      I was representing myself for maybe close to
```

Peterson Reporting Video & Litigation Services                    130

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    two years, so I would say maybe 18 months Frank had my

2    case.

3        Q      Did that case go to trial?

4        A      Yes, ma'am.

5        Q      How frequently would you speak with Mr. Griffin

6    during that period?

7        A      Well, when he was part of my case, once a month

8    he would come face to face to see me.

9        Q      Am I correct that he was the first person that

10   you talked to, other than your mother, who was outside

11   of the facility about the suicide?

12       A      Yes, ma'am.

13       Q      What did you specifically discuss with

14   Mr. Griffin?  When I say "the suicide," I'm talking

15   about Mr. NeSmith's suicide.

16       A      Just that I was there.  It came out in the

17   paper, I believe, and then about the Watch Dog, with

18   that situation with Kelly Davis that came out in the

19   newspaper, and I shared with Frank that I was there with

20   both of those people that killed themselves.

21       Q      What did Mr. Griffin say?

22       A      No.  I was more just getting it off of my

23   chest. I was pretty close to Frank.  That's crazy.  And

24   then I believe the situation with Chassidy came out in

25   the newspaper, and that's when I told Frank, "I was

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    there in that module when that happened."

2         Q    Where were you incarcerated when you had this

3    discussion with Mr. Griffin?

4         A    In Central Jail San Diego County.

5         Q    Was this during a visit?

6         A    Yes, ma'am.

7         Q    What was Mr. Griffin's response when you told

8    him you were there?

9         A    Nothing.  I was just telling him, "Frank, if

10   you could contact them -- Chassidy for me."

11        Q    Did you try to contact -- when you say "them,"

12   you are referring to plaintiffs' counsel, Ms. Pena and

13   Mr. Morris?

14        A    Yes, ma'am.

15        Q    Did you try to contact them directly?

16        A    I don't know if I had their address by then.

17        Q    Did you try to contact Miss NeSmith at -- Mrs.

18   NeSmith -- Chassidy --

19        A    No, ma'am.

20        Q    -- directly?

21        A    No, ma'am.

22        Q    Did you try to contact the newspaper reporter

23   directly?

24        A    I think after I got -- I think it was, I

25   believe, after you talked to their office that I talked

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    to Kelly Davis.

2         Q    Did you contact Miss Davis, or did Miss Davis

3    contact you?

4         A    She contacted me.

5         Q    What did you ask Mr. Griffin to tell

6    plaintiffs' counsel, Mr. Morris and Miss Pena?

7         A    Just that I was there in the module and that

8    Kris was my friend.

9         Q    Did you tell Mr. Griffin about the statement

10   the deputy made about Mr. NeSmith trying to kill himself

11   with the rope?

12        A    No, I don't think -- it wasn't really about the

13   whole -- how it went down.  It was Kris was my friend,

14   and it was kind of crazy -- the other guy killed

15   himself, Christopher Carroll.  It's more like towards

16   that kind of -- not specific clock by clock detail that

17   this happened.  It was more about what I was feeling.

18        Q    So prior to meeting with Miss Pena and

19   Mr. Morris, you hadn't told anyone about the deputy

20   seeing the rope in Mr. NeSmith's cell prior to

21   Mr. NeSmith --

22        A    No.

23        Q    -- killing himself?

24        A    No, ma'am.

25        Q    What happened -- do you know if Mr. Griffin

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    contacted Mr. Morris and Miss Pena?

2    A    Yes.

3    Q    How do you know that?

4    A    Because he told me he talked to them.

5    Q    How did he tell you?

6    A    I think it was a conversation on the phone.

7    Q    Do you know when you told Mr. Griffin about the

8    suicide and the request to contact Miss Pena and

9    Mr. Morris, if that was over the phone or in person?

10   A    It was in person, I believe.

11   Q    And so at some point, Mr. Griffin called you

12   back regarding the situation?

13   A    I called him.

14   Q    So you called him.  Some time elapsed --

15   A    Yes, ma'am.  About a week or so, yeah.

16   Q    What did Mr. Griffin tell you over the phone?

17   A    Just that he had contacted them, I believe, and

18   they were going to contact me.

19   Q    Did he tell you how he contacted them?

20   A    No, ma'am.

21   Q    Did he tell you what he discussed with them?

22   A    No, ma'am.

23   Q    Did he tell you how they would contact you?

24   A    I think he said they were going to come and see

25   me.

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1      Q     Did they come and see you?

2      A     Yes, ma'am.

3      Q     Did they ever e-mail you?

4      A     They might have.

5      Q     But you don't know?

6      A     Yeah, I think they might have.

7      Q     Do you still have a copy of that e-mail?

8      A     No.

9      Q     And this is while you were in Central Jail?

10     A     Yes, ma'am.

11     Q     How long after Mr. Griffin told you that

12  Miss Pena and Mr. Morris were going to come visit you,

13  was it before they actually came to visit you?

14     A     I would be guessing.

15     Q     I don't want you to guess.  Do you have an

16  estimate?

17     A     Yeah.  My estimate would be a guess.

18     Q     Do you know if it was more than a week?

19     A     Maybe a week, two weeks.

20     Q     Was it the same day -- is it possible it was

21  the same day?

22     A     No.

23     Q     Okay.  Did Miss Pena and Mr. Morris visit you

24  at the same time?

25     A     Yes, ma'am.

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1      Q      **How long did they meet with you?**

2      A      Maybe, tops, an hour.  I don't know.

3      Q      **Was it a legal visit?**

4      A      Professional visit, yes, ma'am.

5      Q      **Did they offer you any services?**

6      A      No, ma'am.

7      Q      **Did you list them as your attorneys?**

8      A      Oh, no, I was pro per.

9      Q      **So how were you able to characterize it as a**

10     **professional visit?**

11     A      That was something they did with the Sheriff's

12     Department.

13     Q      **Oh, they did it?**

14     A      Yeah.

15     Q      Okay.  Did you talk to your mother about

16     Miss Pena and Mr. Morris coming to visit you before

17     they visited you?

18     A      No.

19     Q      Do you know approximately what year it was when

20     Miss Pena and Mr. Morris came to visit you?

21     A      2014 or '15.

22     Q      So a couple years ago?

23     A      Yes, ma'am.

24     Q      Was it before you were with your fiancee?

25     A      Yes.

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    **observed, do you think Mr. NeSmith should have been on**

2    **suicide watch before he killed himself?**

3        A    I think the day --

4        MS. PENA:  Calls for expert opinion.

5            Go ahead.

6        THE WITNESS:  I think prior to all this happening,

7    Kris had got pulled out by a sergeant and another

8    deputy, and they had asked Kris if he wanted to kill

9    himself, and -- we were on lock down, and they pulled

10   Kris out, and they are down there talking to him.  It's

11   all plexiglass, and he is coming back up, and like I

12   say, he is my boy.  My celi was like, "What's up with

13   that Dude?  Why is talking to the sergeant for?"

14           You know, like our internal policies, there was

15   no reason for him to be out there to talk to the

16   sergeant, so when he comes back up the steps to our

17   cells right in front of me, I tell him, "Fool, what are

18   you doing out there?"  And he tells me the sergeant

19   asked him if he wanted to kill himself, and I think, if

20   the sergeant asked him that, he should have been on

21   suicide watch that day.

22   BY MS. HOLMES:

23       Q    **Do you know when that was in relation to when**

24   **he took his own life?**

25       A    I want to say within -- I would be guessing,

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1    ma'am.

2         Q    **Was it within a week?**

3         A    I would say within a month.  We can say that.

4         Q    **Within a month?**

5         A    Yeah.

6         Q    **Was it within a couple days?  Is it possible**

7    **that it was within a couple days?**

8         A    I don't know.

9         Q    **Do you know which sergeant he was speaking to?**

10        A    No, ma'am.

11        Q    **Can you describe the sergeant?**

12        A    I want to say Hispanic.

13        Q    **Older, younger?**

14        A    Older.

15        Q    **Hair.  No hair?**

16        A    Hair, I want to say hair.  I don't know.

17        Q    **Do you know what his build was?**

18        A    No, ma'am.

19        Q    **And Mr. NeSmith reported to you that they asked**

20   **him if he was suicidal?**

21        A    I can't say that's what he told me.  I don't

22   know what the conversation was, but that's what Kris

23   told me.

24        Q    **Do you know if there was a medical doctor with**

25   **him when they spoke?**

EXHIBIT E

Richard Anthony Berumen  10/5/2017

```
 1       A    No, ma'am.  It usually doesn't happen like

 2    that.  If I go tell the celi I'm suicidal, he was going

 3    to cut me up and he is -- they are not going to call the

 4    nurse.  He is going to deal with me and take me to a

 5    nurse.

 6       Q    Sure.  But do you know what prompted the

 7    sergeant and the deputy to talk to Mr. NeSmith --

 8       A    No, ma'am.

 9       Q    -- about his --

10       A    No, I do not.

11       Q    Do you know if anyone else witnessed this?

12       A    No, ma'am, I can't say for anybody else.

13       Q    Did you discuss it with your cellmate Mendoza?

14       A    Martinez.

15       Q    Martinez, sorry.

16       A    Yes.

17       Q    So other than Mr. Martinez, do you know if

18    anyone else -- do you know if Mr. Martinez observed it?

19       A    He seen it.  He is the one that said, "What is

20    that fool doing out there talking to the sergeant?"

21       Q    So other than the Mexican Mafia, are you

22    affiliated with any other gangs?

23       A    No, I'm no longer affiliated with no gangs.

24       Q    Have you ever been affiliated with the Aryan

25    Brotherhood?
```

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1      Q     And he seemed a little more secluded?

2      A     Because, like I said, he was my neighbor.  We

3   would try to get our workout together, so I worked out

4   with him.

5      Q     Got'cha.  As far as you not wanting to come

6   forward in the Carroll matter and in the Mr. NeSmith

7   matter, as far as I'm concerned, you listed two

8   reasons -- and correct me if I'm wrong -- one reason

9   being you don't want to tell Sheriff's deputies or

10  people associated with Sheriff's deputies, that a

11  Sheriff's deputy might have messed up, correct?

12     A     Yeah.

13     Q     And the other reason is because at that point,

14  you were affiliated with the Mexican Mafia?

15     A     At that point, I was in the hole and my little

16  politic thing I was doing.

17     Q     Okay.  And just so we understand, the concern

18  is -- is the concern that you ratting on another deputy

19  to another deputy would maybe target the association or

20  bring some sort of animosity that wasn't currently there

21  before?

22     A     Yeah.  You don't want -- I mean I ended up

23  doing -- this happened.  I ended up staying in the

24  County more than two years after that.  So for me, you

25  don't want to bring any more, you know, added attention

EXHIBIT E

Richard Anthony Berumen  10/5/2017

1     to yourself.

2          Q     And you said some names earlier.  I just want

3     to make sure I get them right.  We have one as Patrick

4     Hunter, who is affiliated with CLERB?

5          A     Yes, ma'am.

6          Q     And the other one was Kyle James, and he was a

7     fellow inmate?

8          A     Yes.

9          Q     The things that you were talking about in

10    relation to Kyle James, was that after Kristopher

11    NeSmith?

12         A     Oh, yes, way after.

13         Q     We talked about this for a second, as far as

14    your combined history of being incarcerated 15 years

15    approximately, correct?

16         A     I'm saying 15 years as a whole.

17         Q     Combined.

18         A     First I got arrested in 1989 as a juvenile,

19    then I was back and forth.  I went to prison, and I got

20    out and did some parole violations, and I went to

21    prison, again parole violations, and I was out for a

22    period.  When I was on probation, and I wasn't in

23    prison, I was sent to prison, but I didn't go, because

24    my time was so long on probation, so I had stayed up --

25    I had some more violations, I go to jail in L.A. County,

EXHIBIT E

Richard Berumen, 10/5/2017

181

```
1                    *    *    *
2          I, RICHARD ANTHONY BERUMEN, declare
3     under penalty of perjury that the
4     foregoing is an accurate transcription
5     of my testimony under the laws of the
6     State of California, executed on the
7     _____ day of _____, 2017.
8
9     _____
10              RICHARD ANTHONY BERUMEN
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Peterson Reporting Video & Litigation Services

EXHIBIT E

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, CAROLYN ANN PETERSON, CSR No. 3195, a

 4    Certified Shorthand Reporter for the State of

 5    California, do hereby certify;

 6          That prior to being examined, the witness in the

 7    foregoing proceeding was by me duly sworn to testify to

 8    the truth, the whole truth, and nothing but the truth.

 9          That said proceeding was taken before me at the

10    time and place therein set forth, and was taken down by

11    me in shorthand and thereafter transcribed into

12    typewriting under my direction and supervision, and I

13    hereby certify that the said proceeding is a full, true

14    and correct transcription of my shorthand notes so

15    taken;

16          I further certify that I am neither counsel for

17    nor related to any party to said action, nor in any way

18    interested in the outcome thereof.

19          IN WITNESS WHEREOF, I have hereunto subscribed my

20    name in blue ink this date: October 31, 2017.

21

22

23                   CAROLYN ANN PETERSON, CSR 3195

24

25
```

EXHIBIT E

# EXHIBIT "F"

```
 1
            DISTRICT COURT OF THE STATE OF CALIFORNIA
 2          SAN DIEGO
             Index No. 15-CV-0629-JLS-AGS
 3          County Case No. 15-90156
            - - - - - - - - - - - - - - - - - - - - - - -
 4

            CHASSIDY NESMITH,
 5                      Plaintiff,
 6                  - against -
 7          COUNTY OF SAN DIEGO et. al.,
                        Defendants.
 8          - - - - - - - - - -  - - - - - - - - - - - -
 9           INTERVIEWS OF INMATES AND MEDICAL STAFF
                 AT VISTA DETENTION CENTER 3/01/14
10
             PHONE CALL OF PERRY SCOTT NESMITH 3/04/14
11
               INTERVIEW OF PERRY SCOTT NESMITH AND
12           CHASSIDY NICOLE NESMITH ON 3/01/14
13
14
15
16
17
18
19
20
21
22
23
24
25
                                            Page  1
```

EXHIBIT F

1           DET. WILLIAMSON:   March 1st, 2014,
2    11:34 a.m.   Here talking with Richard
3    Berumen.   Date of birth 2/17/75, booking
4    number 13783773.
5           DET. TAYLOR:   All right, obviously,
6    we're here for a reason.   How long have
7    you been in the module, Richard?
8           MR. BERUMEN:   Since October 26th.
9           DET. TAYLOR:   All in the same
10   module?
11          MR. BERUMEN:   Yes.
12          DET. TAYLOR:   Upper West 1.   Same
13   cell and everything?
14          MR. BERUMEN:   Yes.
15          DET. TAYLOR:   What cell you in?
16          MR. BERUMEN:   43.
17          DET. TAYLOR:   43?
18          MR. BERUMEN:   Yes.
19          DET. TAYLOR:   So you guys are
20   neighbors.
21          MR. BERUMEN:   Yeah.
22          DET. TAYLOR:   You know this kid?
23          MR. BERUMEN:   Yeah.
24          DET. TAYLOR:   Do you remember his
25   name or anything like that?

                                        Page 268

1          MR. BERUMEN:  Kris.

2          DET. TAYLOR:  Kris?

3          MR. BERUMEN:  Yeah.

4          DET. TAYLOR:  When was the last time

5     you think you saw him?

6          MR. BERUMEN:  This morning.

7          DET. TAYLOR:  You saw him this

8     morning for breakfast?

9          MR. BERUMEN:  Yeah.

10         DET. TAYLOR:  Did he come out or was

11    he just in his cell?

12         MR. BERUMEN:  No.  He was in his

13    cell.

14         DET. TAYLOR:  He say anything to

15    you?

16         MR. BERUMEN:  No, bro.  I was the

17    last one to talk to him.

18         DET. TAYLOR:  Yeah?

19         MR. BERUMEN:  Yeah.

20         DET. WILLIAMSON:  Right before you

21    guys locked down?

22         MR. BERUMEN:  Yeah.  Yeah, I was.

23         DET. TAYLOR:  Do you remember what

24    you guys talked about?

25         MR. BERUMEN:  I thought he was going

                                    Page 269

1        to kill himself, bro.

2            DET. TAYLOR:  Really?

3            MR. BERUMEN:  Yeah.

4            DET. TAYLOR:  What made him say that

5        to you?

6            MR. BERUMEN:  I thought he was.  You

7        know?  Because he's my little friend, and

8        he never -- he hasn't talked to me for

9        like three days.

10            DET. TAYLOR:  Yeah.

11            MR. BERUMEN:  Yeah, bro.

12            DET. TAYLOR:  You think it's because

13        of his court case or?

14            MR. BERUMEN:  I don't know what it's

15        about, dude, but he talked to me every

16        day, man.  You know?

17            DET. TAYLOR:  What kind of set him

18        off, do you think?

19            MR. BERUMEN:  I think his girl or

20        something, man.

21            DET. TAYLOR:  So he talked to

22        somebody?

23            MR. BERUMEN:  Probably.  Yeah.

24            DET. TAYLOR:  But this morning, like

25        what was your conversation with him?

Page 270

1       Hey, how you doing, you know?

2         MR. BERUMEN:  Oh, I seen that shit

3     he was making up on his light.

4         DET. TAYLOR:  Oh, he was making a

5     noose or something like that?

6         MR. BERUMEN:  Yeah.  That thing he

7     was making, and sometimes we just tie

8     our -- use it to tie -- block our lights.

9     You know?

10        DET. TAYLOR:  Uh-huh.

11        MR. BERUMEN:  So I don't know if he

12    was -- you know, what was going on.  And

13    like I say, he always talks to me, dude.

14    Every fucking morning I eat breakfast

15    with him, everything.

16        DET. WILLIAMSON:  So you just

17    thought he was trying to black out his

18    room?

19        MR. BERUMEN:  But that's too much.

20    I know how to black out your room.  You

21    know, and then I told him Kris, you

22    better not be trying to kill yourself.

23        DET. TAYLOR:  And what did he say to

24    you?

25        MR. BERUMEN:  He says I wouldn't do

Page 271

1    that.  And then I told him man, what's

2    going on with you, man?  Man, I was

3    writing him a little note too, man,

4    because I -- I -- man, I been around a

5    long time.

6         DET. WILLIAMSON:  Um-hum.

7         MR. BERUMEN:  You know when you

8    know.  You know when a person's faking it

9    and you know when they're not.  You know

10   what I'm saying?

11        DET. WILLIAMSON:  The person that's

12   faking it about -- faking it's going to

13   talk about it.

14        MR. BERUMEN:  Yeah, you know.

15        DET. WILLIAMSON:  Try to get

16   attention.

17        MR. BERUMEN:  Yeah, you know, bro,

18   and he didn't want to -- he didn't want

19   to give it up, man.  And I was like Kris,

20   man, I'm going to come out right now and

21   in the morning I'm going to talk to you.

22   You know?  And he didn't want to --

23        DET. WILLIAMSON:  You've been around

24   long enough to -- this is probably not

25   the first time you've seen somebody --

                              Page 272

EXHIBIT F

```
 1              MR. BERUMEN:  No.  It's not the
 2         first time, so he didn't want to talk to
 3         me, man, and we couldn't get him a
 4         cellie.  We couldn't get -- we couldn't
 5         get through to him, man, and so you
 6         know -- but I heard that -- I was laying
 7         down and I heard it, bro.  You know, I
 8         know I heard it, man, you know.
 9              DET. WILLIAMSON:  What did you hear?
10              MR. BERUMEN:  I heard -- I heard
11         like the -- the thumping on the fucking
12         toilet, and I thought to myself man -- I
13         woke this dude up and I said, man, you
14         think he trying to kill himself over
15         there?  And then I heard that noise, and
16         I hesitated, bro, to push the button.
17         You know?
18              DET. WILLIAMSON:  Just because you
19         guys naturally hesitate.
20              MR. BERUMEN:  Yeah, bro, just you
21         know, yeah --
22              DET. WILLIAMSON:  You guys -- it's
23         in your nature not to alert staff and
24         talk to staff and everything like that.
25              MR. BERUMEN:  No.
```

Page  273

1          DET. TAYLOR:   How long between then
2     and the check?
3          MR. BERUMEN:   Fucking hour, dude.   I
4     was the first one -- I didn't see them
5     pull him out of his cell.   I fucking at
6     least (indiscernible) right after, man.
7     I heard that noise, you know, like when
8     you're in your cell and you drop a cup.
9     It echoes.
10          DET. TAYLOR:   Yeah.
11          MR. BERUMEN:   So I said oh, he's
12     just --
13          DET. TAYLOR:   So you think like
14     right after chow when all the deputies
15     walked through and then right after that?
16          MR. BERUMEN:   Yeah.   Fucking -- he
17     fucking waited, dog.   Yeah, he waited.
18     Fuck.
19          DET. WILLIAMSON:   Wanted to give
20     himself the time?
21          MR. BERUMEN:   He wanted to make sure
22     he was dead, bro.   I thought
23     maybe -- that maybe it was, you know,
24     like if you drop that shit it's going to
25     be making a lot of noise.   Thought maybe

Page  274

1       it just echoed.  You know, and my bunkie,

2       we thought it was a cup.

3            DET. TAYLOR:  Could you guys talk to

4       each other from where the cells are?

5            MR. BERUMEN:  Not really.

6            DET. TAYLOR:  But you could hear a

7       little bit?  Like, you could hear if

8       somebody's like making noise -- like you

9       said, you could hear --

10            MR. BERUMEN:  I put my -- I tried to

11       listen, but I -- you know, I didn't hear

12       that, like you know, that -- you know,

13       because you know, when they hang themself

14       they try to fucking still --

15            DET. TAYLOR:  Right.

16            MR. BERUMEN:  I didn't hear that, so

17       you know?

18            DET. TAYLOR:  I know you said you've

19       talked to him.  You guys were buddies.

20       What -- did he have any like

21       psychological problems that you could

22       tell?  Like was he like super depressed

23       about his case?

24            MR. BERUMEN:  Super depressed, bro,

25       like massive.  He'll go up and down, up

                                        Page 275

```
 1            and down.  It depends.  Get off the phone
 2            with the girlfriend, you know?
 3                 DET. TAYLOR:  Yeah, and what
 4            happens?  Does he just like go by himself
 5            in the cell, just kind of cool off a
 6            little bit?
 7                 MR. BERUMEN:  Yeah.  Yeah.
 8                 DET. TAYLOR:  Does he shoot the shit
 9            with you guys or?
10                 MR. BERUMEN:  He talks to -- like
11            about his girl, or just talk to me.  Hey,
12            that fucking bitch, she's cheating on me,
13            and all that shit.
14                 DET. TAYLOR:  Yeah, and he talked to
15            her last night?
16                 MR. BERUMEN:  I don't know if he
17            talked to her.  I know he went to court
18            or something.
19                 DET. TAYLOR:  Yeah.  He went to
20            court yesterday.
21                 MR. BERUMEN:  Yeah.
22                 DET. TAYLOR:  So but did you talk to
23            him last night, like --
24                 MR. BERUMEN:  No.  When he got back,
25            I told him Kris -- we were playing poker.
```

Page 276

1        And he usually plays with us

2        (indiscernible).  That's my little gig

3        (ph.).  Come down here, hang out with me,

4        let's play.  And he didn't want to play

5        me, and I was like what the fuck.  So

6        then last night I told him man, what's

7        up?  Last night he was doing that too.  I

8        was like what's the fuck's up with you

9        (indiscernible)?  I'm going to close my

10       (indiscernible).  I said Kris, you're

11       fucking lying.  You better not be trying

12       to kill yourself.  But then you know,

13       that cry for help?

14            DET. TAYLOR:  Uh-huh.

15            MR. BERUMEN:  Trying to fake it.  So

16       talk about it -- he didn't do none of

17       that, and then this morning, bro, I was

18       like --

19            DET. WILLIAMSON:  Was he giving any

20       of the other signs?

21            MR. BERUMEN: Nothing, bro.

22            DET. WILLIAMSON:  Was he giving away

23       his stores?

24            MR. BERUMEN:  Nothing.  Nothing.  He

25       just -- he wouldn't talk about nothing.

                                        Page 277

1          DET. TAYLOR:  Do you know if he had

2      any medical problems?  Was he taking meds

3      or anything like that?

4          MR. BERUMEN:  I think he was on

5      psych meds at night.

6          DET. TAYLOR:  That night?

7          MR. BERUMEN:  I -- he's supposed to

8      take psych meds in the nighttime, but I

9      think he stopped taking them.

10          DET. TAYLOR:  Has he ever had any

11      problems with anybody in the house?

12          MR. BERUMEN:  No.  Kris is cool,

13      boy -- ex-marine.

14          DET. TAYLOR:  Yeah.

15          MR. BERUMEN:  He was cool, bro.  He

16      was a cool -- I don't know what he was

17      busted for.  I don't know how he got

18      caught up in jail.  Fucking dude was

19      cool, though, man.

20          DET. WILLIAMSON:  He's a former

21      marine?

22          MR. BERUMEN:  Yeah.  He was a

23      marine, bro.

24          DET. WILLIAMSON:  Was he still a

25      marine when he got arrested?

                                    Page 278

1          MR. BERUMEN:  No, he was discharged.

2     He's from Chicago.  He moved -- he came

3     out here to be in Pendleton, and he got

4     into some shit, and then he left.  And

5     then he --

6          DET. WILLIAMSON:  So he got in some

7     trouble and got discharged from the

8     marine corps?

9          MR. BERUMEN:  Yeah.  Met some broad

10    out here.

11         DET. WILLIAMSON:  Think he got in

12    trouble because of the girl?

13         MR. BERUMEN:  Drugs, he started

14    doing drugs with this girl.

15         DET. WILLIAMSON:  Oh, yeah?

16         MR. BERUMEN:  Yeah.  It's his wife,

17    she's pregnant.

18         DET. WILLIAMSON:  Is he a -- I was

19    in the marine corps and I had a young

20    marine -- situation kind of broke my

21    heart, because he got caught up in dope,

22    all doped up on meth, started doing a

23    bunch of stupid stuff.  Got caught a

24    couple of times.  Yeah, it's rough.

25         DET. TAYLOR:  So he never had any

Page 279

1      problems with anybody in there?

2          MR. BERUMEN:  No.

3          DET. TAYLOR:  There's no like

4      tension in the quad or anything?

5          MR. BERUMEN:  No, fuck no.

6          DET. TAYLOR:  All right.  Is there

7      any dope going around in there right now?

8          MR. BERUMEN:  No.

9          DET. TAYLOR:  Like brown, or crystal

10     or anything like that?  He doesn't use

11     any of that stuff when it's in there?

12         MR. BERUMEN:  No.  Kris was cool,

13     bro.  No, Kris had too much going on

14     (indiscernible).  He was cool.

15         DET. TAYLOR:  Do you know if he took

16     anybody else's meds?

17         MR. BERUMEN:  No, he didn't.

18         DET. TAYLOR:  Somebody said he was

19     kind of not eating.

20         MR. BERUMEN:  Yeah.  He didn't eat

21     this morning.

22         DET. TAYLOR:  Okay, so he didn't eat

23     this morning, but had he been doing that

24     all week?  Like somebody said he'd

25     been -- he'd been eating -- he hadn't

Page 280

1        been eating all week.

2             MR. BERUMEN:  Yeah.  Tell you, we

3        used to eat together, and he stopped

4        eating.  Like I'm -- I take a kosher

5        meal, and he was supposed to be a

6        vegetarian.  And so this morning I told

7        him what happened, because we used to

8        trade.  I'll get his meat and I'll give

9        him some of my stuff.  And he had stopped

10       eating for like three -- four days.

11            DET. TAYLOR:  Was this -- did he

12       tell you why, like --

13            MR. BERUMEN:  Nothing, bro.  He

14       didn't say shit.

15            DET. TAYLOR:  Is he pretty like

16       religious dude?  Is he Christian?

17            MR. BERUMEN:  No, he's not

18       religious.

19            DET. TAYLOR:  So anything else that

20       you noticed about him that you think you

21       know, kind of put him on this path?  I

22       know you kind of stepped up a little bit

23       and had a chat with him.  I'm sure there

24       was other people in there, but is there

25       anything that like you kind of saw that

                                    Page 281

```
 1          was out of the ordinary, other than him
 2          playing with the light and you
 3          know -- did he ever bring up anything
 4          about his -- I know he didn't talk about
 5          his case.  But did he ever bring up
 6          anything other than his girl or, you
 7          know?
 8                MR. BERUMEN:  No.  Nothing.  I know
 9          all about his case, but nothing.  He
10          was -- he was -- there was -- I just
11          thought he was mainly depressed a little
12          bit, but not (indiscernible).  I don't
13          know.
14                DET. TAYLOR:  You think he was made
15          because -- or upset because he's looking
16          at some serious time?
17                MR. BERUMEN:  A lot of time, yeah.
18          I think that.  I think his girl fucking
19          around on him probably had a little bit
20          of play in it.
21                DET. WILLIAMSON:  I imagine that's
22          hard, you know.
23                MR. BERUMEN:  Yeah, but fuck, dude,
24          come on.
25                DET. WILLIAMSON:  In here, looking
```

Page 282

EXHIBIT F

1          at your first real big being in trouble,

2          and you know, his one -- you know, link

3          he had to his life back there on the

4          outside.

5              MR. BERUMEN:  California period,

6          because everybody else is out of state.

7              DET. WILLIAMSON:  Yeah.  I'm sure

8          you've seen a lot of other people in his

9          situation.

10             MR. BERUMEN:  Yeah, bro.

11             DET. WILLIAMSON:  It's not easy for

12         somebody to stay with somebody that's

13         going to be locked up for a while.

14             MR. BERUMEN:  No.

15             DET. TAYLOR:  Are you in on a -- you

16         don't have to tell me about your case,

17         but are you in on a new case or you in on

18         a violation or?

19             MR. BERUMEN:  I have a new case.

20             DET. TAYLOR:  You have a new case.

21             MR. BERUMEN:  Yeah.

22             DET. TAYLOR:  Okay.  Are you

23         sentenced yet or?

24             MR. BERUMEN:  No.

25             DET. TAYLOR:  No, okay.  Are you

                                        Page 283

```
 1        going to -- you think you're going to be

 2        going to state?  Are you going to get out

 3        soon?

 4             MR. BERUMEN:  Probably state, I

 5        don't know.  Just to a hit and run.

 6             DET. TAYLOR:  Okay.  Okay.

 7             DET. WILLIAMSON:  Okay.  End of

 8        interview, 11:44 hours.

 9             (End of Richard Berumen interview)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 284

EXHIBIT F

```
1          C E R T I F I C A T I O N

2

3       I, Tamara Bentzur, hereby certify that

4    the foregoing is a true and correct

5    transcription, to the best of my ability, of

6    the sound recorded proceedings submitted for

7    transcription.

8

9       I further certify that I am not employed

10   by nor related to any party to this action.

11

12       In witness whereof, I hereby sign this

13   date:

14   May 30, 2017

15

16

17   _____

18   Tamara Bentzur

19   AAERT Certified Electronic Transcriber

20   CET**D 824

21

22

23

24

25

                                   Page 388
```

EXHIBIT "G"



EXHIBIT G

EXHIBIT "H"

James Dailly  12/5/2017

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3     _____
       CHASSIDY NeSMITH, individually )
 4     and as Guardian ad Litem on    )
       behalf of SKYLER KRISTOPHER    )
 5     SCOTT NeSMITH, and as Successor)
       in Interest to THE ESTATE OF   )
 6     KRISTOPHER SCOTT NeSMITH,       )
                                      )
 7                  Plaintiffs,        )
                                      )
 8          vs.                       ) No. 15-cv-00629-JLS (AGS)
                                      )
 9     COUNTY OF SAN DIEGO, SAN DIEGO )
10     COUNTY SHERIFF'S DEPARTMENT;    )
       WILLIAM D. GORE, SAN DIEGO      )
11     COUNTY SHERIFF; VISTA DETENTION)
       FACILITY; and DOES 1-100       )
12     inclusive,                     )
                                      )
13                  Defendants.        )
       _____)
14

15

16                  DEPOSITION OF JAMES DAILLY

17                  San Diego, California

18                  December 5, 2017

19

20

21

22     REPORTED BY MANDY L. KERSH  CSR No. 10674

23

24

25
```

EXHIBIT H

James Dailly  12/5/2017

1    recollection of Mr. NeSmith other than the December 4th

2    incident?

3         A.   No.  None.

4         Q.   Do you know that he killed himself?

5         A.   Yes.

6         Q.   How did you learn that?

7         A.   I learned about it initially after we had -- the

8    next day when we came back on that there was a death in

9    custody.

10        Q.   And did you do any work in relation to

11   Mr. NeSmith's death when you came back on?

12             MS. HOLMES:  Objection.  Vague.

13             THE WITNESS:   No.

14   BY MS. PENA:

15        Q.   Do you know of an inmate called Richard Berrumen,

16   known also as "Wicked," who was housed in Upper West

17   around that same time, Upper West 1?

18        A.   No.

19        Q.   You've never heard of that inmate's name before?

20        A.   I've heard the name, but I don't recall what he

21   looks like or who he is.  There's so many inmates.

22        Q.   I'm sure.

23             Do you have any association as far as when you've

24   heard of that name, is there anything that comes up as far

25   as something you may have heard or learned about Richard

EXHIBIT H

James Dailly  12/5/2017

1    Wicked Berrumen?

2         A.    No.

3              MS. HOLMES:   Vague.

4    BY MS. PENA:

5         Q.    He testified, sir, when he was deposed in this

6    matter, that on the day before his death, which would be

7    February 28th, that there was a noose hanging from his

8    light fixture, and that he was in the cell next door and

9    that he overheard a deputy acknowledge that he saw the

10   noose hanging from the light fixture and said some snide

11   remark as to the effect of, "Hey.  What are you trying to

12   do?  Take that thing down," and then walked away.

13             Is this the first time you've ever heard that,

14   sir?

15             MS. HOLMES:   Objection.   Misstates Berrumen's

16   testimony.  Vague.

17   BY MS. PENA:

18        Q.    You can answer.

19        A.    Yes.  That's the first time I'm hearing this.

20        Q.    Would you have been one of those deputies that

21   performed cell checks in Upper West 1 on 2/28/14?

22             MS. HOLMES:   Objection.  Asked and answered.

23             THE WITNESS:  Yes.

24   BY MS. PENA:

25        Q.    Did you see a noose hanging in Cell No. 44 on

EXHIBIT H

James Dailly  12/5/2017

1   2/28/14?

2        A.   Not that I'm aware of.

3        Q.   Did you see a noose hanging in Cell 44 on the

4   night of February 27th, 2014?

5        A.   No.  Not that I'm aware of.

6        Q.   Mr. Berrumen also testified that a week or so

7   before Mr. NeSmith eventually killed himself that there

8   was an interaction between Mr. NeSmith and a deputy or

9   sergeant about a week or two before that in which the

10  deputy or sergeant came inside the module, asked NeSmith

11  to come downstairs, and then escorted NeSmith to the

12  housing bubble and asked Mr. NeSmith if he had an intent

13  on killing himself.

14            Have you ever heard of that before?

15            MS. HOLMES:  Objection.  Misstates Berrumen's

16  testimony.

17            THE WITNESS:  No, I haven't.

18  BY MS. PENA:

19       Q.   So you don't know of any interactions with

20  Mr. NeSmith prior to his death where he was asked by

21  deputies or sergeants if he was suicidal?

22            MS. HOLMES:  Same objections.

23            THE WITNESS:  No.

24  BY MS. PENA:

25       Q.   Have you, sir, ever had the need to walk into a

EXHIBIT H

James Dailly, 12/5/2017

1          Declaration Under Penalty of Perjury

2

3

4          I, JAMES DAILLY, the witness herein, declare

5    under penalty of perjury that I have read the foregoing in

6    its entirety; and that the testimony contained therein, as

7    corrected by me, is a true and accurate transcription of

8    my testimony elicited at said time and place.

9

10         Executed on this _29 TH_ day of _DECEMBER_,

11   2017, at _VISTA_ , _CALIFORNIA_ .

12              (City)              (State)

13

14         _____
                         JAMES DAILLY

15

16

17

18

19

20

21

22

23

24

25

**123**

Peterson Reporting Video & Litigation Services

EXHIBIT H

1   STATE OF CALIFORNIA

2   COUNTY OF SAN DIEGO

3

4        I, Mandy L. Kersh  Certified Shorthand Reporter,

5   in and for the State of California, Certificate No. 10674,

6   do hereby certify:

7        That the witness in the foregoing deposition was

8   by me first duly sworn to testify to the truth, the whole

9   truth and nothing but the truth in the foregoing cause;

10  that the deposition was then reported by me in shorthand

11  and transcribed, through computer-aided transcription,

12  under my direction; and that the above and foregoing

13  transcript, is a true record of the testimony elicited and

14  proceedings had at said deposition.

15       I do further certify that I am a disinterested

16  person and am in no way interested in the outcome of this

17  action or connection with or related to any of the parties

18  in this action or to their respective counsel.

19

20       In witness whereof, I have hereunto set my hand

21  this 18th day of December_____, 2017

22

23       MANDY L. KERSH, CSR No. 10674

24

25


EXHIBIT H

# EXHIBIT "I"

Steven Cerda  12/5/2017

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3    _____
      CHASSIDY NeSMITH, individually )
 4    and as Guardian ad Litem on    )
      behalf of SKYLER KRISTOPHER    )
 5    SCOTT NeSMITH, and as Successor)
      in Interest to THE ESTATE OF   )
 6    KRISTOPHER SCOTT NeSMITH,      )
                                     )
 7                    Plaintiffs,    )
                                     )
 8          vs.                      ) No. 15-cv-00629-JLS (AGS)
                                     )
 9    COUNTY OF SAN DIEGO, SAN DIEGO )
      COUNTY SHERIFF'S DEPARTMENT;   )
10    WILLIAM D. GORE, SAN DIEGO     )
      COUNTY SHERIFF; VISTA DETENTION)
11    FACILITY; and DOES 1-100       )
      inclusive,                     )
12                                   )
                      Defendants.    )
13    _____)

14

15

16              DEPOSITION OF STEVEN CERDA

17                 San Diego, California

18                 December 5, 2017

19

20

21

22    REPORTED BY MANDY L. KERSH  CSR No. 10674

23

24

25
```

EXHIBIT I

Steven Cerda  12/5/2017

1    just have them in the bubble, correct?

2        A.   I don't know what Vista does now.

3        Q.   Is that what Central does now, before you left?

4        A.   Central, some of the keysets have the 911 tools

5    on them.

6        Q.   Is there any distinction as to who or why?

7        A.   No.

8        Q.   Okay.  I'm going to ask you about the suicide

9    policy back at Vista at around February 2014.  Okay?

10       A.   Okay.

11       Q.   Do you have an understanding of the suicide

12   prevention policy in and around that time?

13            MS. HOLMES:  Objection.  Vague.

14            THE WITNESS:  I could answer to what I can

15   remember from that time, yes.

16   BY MS. PENA:

17       Q.   And what do you remember from that time?

18       A.   About the policy?

19       Q.   Uh-huh.  About the suicide prevention policy.

20       A.   We always treat suicide statements, take them

21   seriously.

22       Q.   Okay.  What else?

23       A.   And it is our responsibility, and we do try to --

24   or did try to identify characters that might -- might give

25   us indication that they're -- a person may be suicidal.

EXHIBIT I

Steven Cerda  12/5/2017

1       Q.   And what were you trained to do as far as

2   identifying indications that somebody may be suicidal?

3       A.   Monitoring the person.   Again, it comes down

4   to -- some things they train us on is to identify if it's

5   the first time -- the person's first time in jail, what

6   type of charges are they facing, is there any distress

7   with the person, and, you know, we straight-out ask them

8   if they are suicidal or if they have any intent to harm

9   themselves.

10      Q.   You were trained to do that, or is that what you

11  do?

12      A.   Yes.   It's something we were trained to do, yes.

13      Q.   How do you -- you have a lot of inmates come in

14  there.   So how do you keep track of whether or not it's

15  someone's first time in jail or the type of charges they

16  have?

17      A.   That's generally done through our classification,

18  how many times -- how often a person's been in jail.

19  And --

20      Q.   Is that -- I'm sorry.   Go ahead.

21      A.   -- and the charges is something we can look up

22  anytime.   We can look up their booking history.

23      Q.   Okay.   So when you said first time in jail, that

24  can be done by the classification deputy.   That's what you

25  said, correct?

EXHIBIT I

Steven Cerda  12/5/2017

1    A.    Well, yes.  They do an interview with them to get

2    their -- the -- the -- the classification level, basically

3    what their experience is, you know --

4        Q.    In jail?

5        A.    In jail.

6        Q.    Okay.

7        A.    Yeah.

8        Q.    That's done at the beginning of incarceration,

9    like, at the intake time, right?

10       A.    Yes.

11       Q.    Okay.  What else are you -- what else do you

12   remember about the policy?  You said, take statements --

13   suicidal statement seriously.  And then you said identify

14   indications that someone may be suicidal such as the first

15   time in jail, the types of charges they're facing, and any

16   type of distress.  So what else do you remember from the

17   suicide policy?

18       A.    Can you be a little more specific about your

19   question?  I'm not quite clear on it.

20       Q.    Sure.  We can go over the policy.  I, at this

21   point, just want to know what you may remember from the

22   policy.  So I'm just trying to see, you know -- I mean,

23   you've got a good start here.  I'm just trying to see if

24   you remember anything else that specifically comes out at

25   you.  Did you do maybe excessive training on it, or where,

EXHIBIT I

Steven Cerda  12/5/2017

1    you know, someone said, "Hey, this might be a hot-button

2    issue.  Let's talk about it during a briefing."  I'm just

3    trying to get what you might remember from the suicide

4    policy in 2014 in Vista.

5         A.   Again, like I said, we treat all -- any suicidal

6    threats seriously.  We always -- we make sure we get them

7    the proper help that they need.

8         Q.   Okay.  Were you trained on how to identify

9    inmates that have a present risk of suicide?  Aside from

10   the first time in jail, that's pretty much done by the

11   classification deputy during intake, and then you said

12   types of charges and distress, other than those things,

13   were you trained on anything else as far as maybe warning

14   signs or triggers on how to identify an inmate who maybe

15   presents a risk of suicide?

16           MS. HOLMES:  Objection.  Compound.  Vague.

17           THE WITNESS:  Yes.  We do get ongoing training

18   for that.

19   BY MS. PENA:

20        Q.   Okay.  And what do you remember from that

21   training as far as what they trained you to look for?

22        A.   Whether a person may become isolated, they become

23   distant, they become disheveled, they're not acting

24   themselves or being -- not the norm.  They may not be

25   eating.  They may -- you know, I said disheveled.  They

EXHIBIT I

Steven Cerda  12/5/2017

1    may not be showering.  They may not be taking care of

2    themselves.

3         Q.   Anything else?

4         A.   Statements they may make as well.

5         Q.   Okay.  Anything else?

6         A.   That's what I can remember right now.  Yes.

7         Q.   Okay.  How about, like, if you see signs of

8    depression or sadness?

9              MS. HOLMES:  Objection.  Vague.  Calls for

10   medical opinion.  Incomplete hypothetical.

11   BY MS. PENA:

12        Q.   If you see signs of depression and sadness, are

13   you trained to do anything about it or follow up on that?

14             MS. HOLMES:  Same objections.

15             THE WITNESS:  That's where I think I covered with

16   the distancing.  When they distance themselves, they tend

17   to become more isolated and it's signs of depression, yes.

18   BY MS. PENA:

19        Q.   Okay.  And then I wonder what the training is in

20   the sense of, okay, you see a guy who's become more

21   distant, right, and they look depressed or they look sad,

22   and those might be identifiers of an inmate having a

23   suicidal thoughts, correct?

24        A.   Yes.

25        Q.   Maybe?  But it may just be an inmate that's sad

EXHIBIT I

Steven Cerda  12/5/2017

1      A.   That's correct.

2      **Q.   Which I'm sure you're not trained to do?**

3           MS. HOLMES:  Objection.  Vague.  Incomplete

4    hypothetical.

5    BY MS. PENA:

6      **Q.   Correct?  They can't train you to talk to every**

7    **single inmate that looks sad, unless they do -- if that's**

8    **what they do?**

9           MS. HOLMES:  Same objections.

10          THE WITNESS:  We are trained to have interaction

11   with all our -- the inmates that we can and identify.

12          Now are we able to talk to every single person?

13   That's almost impossible to --

14   BY MS. PENA:

15     **Q.   Sure.**

16     A.   -- in a daily basis.

17     **Q.   Sure.  So I'm just trying to figure out, you**

18   **know, what you -- what you, Deputy Dailly, would have done**

19   **if you saw someone that's sad.  If you saw an inmate that,**

20   **in your opinion, was, you know, distant, sad, or**

21   **depressed, what would you do?**

22          MS. HOLMES:  Objection.  Incomplete hypothetical.

23          THE WITNESS:  Well, you're asking me or what

24   Deputy Dailly would say?  Because you said Deputy Dailly.

25   ///

EXHIBIT I

Steven Cerda  12/5/2017

1    BY MS. PENA:

2        Q.    I'm so sorry.    I'm so sorry.    Deputy Cerda.    I

3    apologize.    I'm asking what you would do.

4        A.    I -- in the past when someone has been depressed

5    or had an issue, they will tell me, and I will see if they

6    need to see a psychiatrist or talk to -- talk to somebody,

7    you know, sometimes just a counselor.    Sometimes they just

8    need their own time alone just to get their mind -- their

9    thoughts going.    But I will talk to them and see what

10    they -- what I could do to help them.

11        Q.    And that's admirable.    I appreciate that.

12            What if they don't tell you?    I think that's the

13    hard part.

14            MS. HOLMES:    Objection.

15    BY MS. PENA:

16        Q.    So what if they don't tell you, "Hey.    I'm

17    feeling this"?    Because I'd imagine you got a lot of guys

18    in there that gang-related, doing a lot of, you know,

19    heavy-duty crimes that don't necessarily want to say,

20    "Hey.    I'm feeling depressed."    So assuming that, what do

21    you do when they don't tell you?

22            MS. HOLMES:    Objection.    Incomplete hypothetical.

23    Vague.    Calls for speculation.

24            THE WITNESS:    Not everybody comes up and tells us

25    that they're feeling a certain way.

EXHIBIT I

Steven Cerda  12/5/2017

1    BY MS. PENA:

2         Q.    Sure.

3         A.    And not everybody will admit to us they're

4    feeling a certain way.  If I feel that it may be something

5    of concern, I will take the step and have them seen by our

6    medical staff or by the psychiatrist or counselor at the

7    very least.

8         Q.    Okay.  And what do you have to see -- assuming

9    they don't tell you and they don't admit to it, what do

10   you have to see in order to advance it to medical as far

11   as when you at least acknowledge someone is sad and

12   distant but they don't admit it and they don't tell you,

13   what are you looking for in order to kind of elevate the

14   situation to medical?

15            MS. HOLMES:  Objection.  Vague.  Incomplete

16   hypothetical.

17            THE WITNESS:  I'm looking for anyone that is

18   obviously -- you can look at -- you can look at a booking

19   photo and you can see what their -- any changes from their

20   photo from what they -- they've gone through.  And like I

21   said, many people become unkept.  They don't shower.  They

22   don't take care of themselves as they should.  So that's

23   what I'm trying to keep an eye out for.

24        Q.    That's something you do?

25        A.    Yes.

EXHIBIT I

Steven Cerda  12/5/2017

1   BY MS. PENA:

2       **Q.   Well, you know more than most people as far as**

3   **those triggers and signs, just so you know that.**

4           **Okay.   As far as your understanding of the**

5   **suicide policy, do you know if there's an explicit**

6   **requirement to remove nooses if you see one hanging from a**

7   **light fixture or hanging from a bed or a sink?**

8       **A.   Well, yeah.   Yes.**

9       Q.   You know that's in the policy, or is that your

10  understanding of what to do?

11      A.   It's my understanding, because they fall in line

12  of removing clothing lines.

13      **Q.   Okay.  So that would be in your understanding of**

14  **removing clothing lines, not necessarily as part of the**

15  **suicide policy?  Am I right?**

16          MS. HOLMES:  Objection.  Calls for legal

17  semantics.

18          THE WITNESS:  So you ask if I know that that's in

19  the policy -- that that's in the policy?  No, I did not

20  know that that was written in the policy.

21  BY MS. PENA:

22      **Q.   It's common sense to you?**

23      A.   That's correct.

24      **Q.   Okay.  And if you were to place a policy on it,**

25  **you would be inclined to place it as far as removing**

EXHIBIT I

Steven Cerda  12/5/2017

1    Mr. NeSmith that morning?

2             MS. HOLMES:  Objection.  Vague.

3    BY MS. PENA:

4        Q.   Anything about him?

5        A.   No.  I do not recall.

6        Q.   Did anyone tell you that there was an anonymous

7    note put inside the white mailbox regarding Mr. NeSmith

8    not eating for the last couple of days?

9        A.   No.  I do not recall that.

10       Q.   Did you know about that, or is this the first

11   time that you've heard that?

12       A.   This is the first time.

13       Q.   You heard that there -- there -- that an inmate

14   said there was an anonymous note about him not eating?

15       A.   Yes.

16       Q.   So no briefing pertaining to Mr. NeSmith on the

17   morning of March 1st, 2014?

18       A.   No.

19       Q.   If a deputy found an anonymous note from an

20   inmate about another inmate, would that typically be

21   passed-down information, or would it depend on what that

22   note said?

23            MS. HOLMES:  Objection.  Vague.  Incomplete

24   hypothetical.  Calls for speculation.

25   ///

EXHIBIT I

Steven Cerda  12/5/2017

1    BY MS. PENA:

2        Q.   You can answer.

3        A.   I can answer as to what I would do if it were me.

4        Q.   Okay.

5        A.   Depending on what was in the note, I would do my

6    own investigation into it.   And if I felt that it was

7    something that was -- that I needed to pass on to my next

8    shift, I would pass it on or I would make a status report,

9    ISR.

10       Q.   Okay.   So thank you for that.

11            So if you got an anonymous letter from an inmate

12   about another inmate, you would conduct your own little

13   investigation.   And then depending on what that turned

14   out, you may pass that information down; is that correct?

15            MS. HOLMES:   Objection.   Vague.   Incomplete

16   hypothetical.

17            THE WITNESS:   That's correct.   We get all kinds

18   of notes from inmates.

19   BY MS. PENA:

20       Q.   I couldn't imagine.   I don't think you could have

21   a whole -- you know, way of dealing with that, but I have

22   to ask the questions.

23            So you said earlier that there was no policy on

24   how to handle an anonymous letter from an inmate about

25   another inmate but that's what you would do.   You would

EXHIBIT I

Steven Cerda, 12/5/2017

1          Declaration Under Penalty of Perjury

2

3

4          I, STEVEN CERDA, the witness herein, declare

5    under penalty of perjury that I have read the foregoing in

6    its entirety; and that the testimony contained therein, as

7    corrected by me, is a true and accurate transcription of

8    my testimony elicited at said time and place.

9

10          Executed on this ___4___ day of __JANUARY__,

11    201⁊, at __SAN DIEGO__, __CALIFORNIA__.

12                    (City)              (State)

13

14          _____

                        STEVEN CERDA

15

16

17

18

19

20

21

22

23

24

25

191

EXHIBIT I

1   STATE OF CALIFORNIA

2   COUNTY OF SAN DIEGO

3

4         I, Mandy L. Kersh  Certified Shorthand Reporter,

5   in and for the State of California, Certificate No. 10674,

6   do hereby certify:

7         That the witness in the foregoing deposition was

8   by me first duly sworn to testify to the truth, the whole

9   truth and nothing but the truth in the foregoing cause;

10  that the deposition was then reported by me in shorthand

11  and transcribed, through computer-aided transcription,

12  under my direction; and that the above and foregoing

13  transcript, is a true record of the testimony elicited and

14  proceedings had at said deposition.

15        I do further certify that I am a disinterested

16  person and am in no way interested in the outcome of this

17  action or connection with or related to any of the parties

18  in this action or to their respective counsel.

19

20        In witness whereof, I have hereunto set my hand

21  this 18th day of December            , 2017

22

23                              MANDY L. KERSH, CSR No. 10674

24

25


EXHIBIT I

# EXHIBIT "J"

1

    DISTRICT COURT OF THE STATE OF CALIFORNIA

2    SAN DIEGO

    Index No. 15-CV-0629-JLS-AGS

3    County Case No. 15-90156

    - - - - - - - - - - - - - - - - - - - - - -

4

    CHASSIDY NESMITH,

5               Plaintiff,

6          - against -

7    COUNTY OF SAN DIEGO et. al.,

               Defendants.

8    - - - - - - - - - -  - - - - - - - - - - -

9    INTERVIEWS OF INMATES AND MEDICAL STAFF

       AT VISTA DETENTION CENTER 3/01/14

10

    PHONE CALL OF PERRY SCOTT NESMITH 3/04/14

11

     INTERVIEW OF PERRY SCOTT NESMITH AND

12    CHASSIDY NICOLE NESMITH ON 3/01/14

13

14

15

16

17

18

19

20

21

22

23

24

25

                              Page 1

EXHIBIT J

```
 1              DET. BRAYMAN: All right.  This is
 2       Det. Brayman ARGIS 4790.  It is 3/1/2014
 3       at approximately 12:05 hours.  This is
 4       involving case number 14110861.  I'm here
 5       with Det. Lucadini 4666.
 6              And what is your name?
 7              MR. H██████: M███████ H██████,
 8       H-O-D --
 9              DET. BRAYMAN: Do you go by █████ or
10       ████████?
11              MR. H██████: M██████.
12              DET. BRAYMAN: Okay, and then H████?
13              MR. H██████: H████.
14              DET. BRAYMAN: Oh, sorry.  H██████ --
15              MR. H██████: ██████.
16              DET. BRAYMAN: Okay.  And M██████,
17       what's your date of birth?
18              MR. H██████: ██████.
19              DET. BRAYMAN: And your cell number,
20       the number that you're living in?
21              MR. H█████: 38.
22              DET. BRAYMAN: And your booking
23       number?
24              MR. H████N: ███████.
25              DET. BRAYMAN: ██████?
```

                                        Page 123

EXHIBIT J

1    call yourself friends or just --

2     MR. H█████: Yeah.  We talked about

3   he was having -- his wife's pregnant

4   because I got a little daughter, and I

5   was just telling him what an experience

6   it was, stuff.  Just like two days before

7   this, you know, and he kept going to

8   court, and he wasn't eating his food, and

9   everybody was kind of concerned about it,

10   you know what I mean?  But I didn't think

11   he'd go this far.  You know what I mean?

12    DET. BRAYMAN:  Did he ever tell you,

13   talk about suicide, tell you he was going

14   to kill himself?

15    MR. H█████:  Nope.  He said he was

16   fasting.

17    DET. BRAYMAN:  He was fasting?

18    MR. H█████:  Yeah.

19    DET. BRAYMAN:  Is that religious?

20   Did he say why he was fasting?

21    MR. H█████:  No.

22    DET. BRAYMAN:  He just said he was

23   fasting.

24    MR. H█████:  Right, and last night

25   he asked me if I had some chocolate, and

Page 126

1    I gave him a brownie and some peanut
2    butter.  He ate that, and he was just
3    acting weird.  You know?
4         DET. BRAYMAN:  Okay.  Did you see
5    him eat this morning?
6         MR. H███████:  No.  We took his food
7    actually to the cell and I said hey,
8    what's going on, because we had Bings
9    (ph.) kind of like watching him.  You
10   know what I mean?  Make sure he wasn't
11   going to do anything stupid.
12        DET. BRAYMAN:  And Bings to you is
13   who?
14        MR. H██████:  He's Pike's cellie.  I
15   don't know him by his first name.
16        DET. BRAYMAN:  Okay.  And you said
17   he was watching him?
18        MR. H██████:  Well, he was supposed
19   to like just look out his window, because
20   he's like kind of kitty-corner (sic) to
21   it, so he can kind of see in there.
22        DET. BRAYMAN:  Okay.
23        MR. H██████:  So --
24        DET. BRAYMAN:  Can you see his cell
25   from yours?

                                    Page 127

```
 1          psych meds in here just to sleep, you
 2          know what I mean?
 3               DET. BRAYMAN:  Sure.
 4               MR. H█████:  So it's -- everybody
 5          like passes them out (indiscernible),
 6          whatever you want to do and stuff, but --
 7               DET. BRAYMAN:  Did he ever talk
 8          about like PTSD with the marines?  Did he
 9          have any of those issues?
10               MR. H█████:  I'm sure the kid seen
11          some dead bodies.  You know what I mean?
12          So I'm sure --
13               DET. BRAYMAN:  Okay.
14               MR. H█████:  -- it has issues with
15          everybody.  I mean, I've seen dead bodies
16          and it still fucks with me so.
17               DET. BRAYMAN:  Okay.  Is there any
18          drugs going around in the module right
19          now, any illegal stuff going on?
20               MR. H█████:  No
21               DET. BRAYMAN:  Is he on any that
22          you're aware of?
23               MR. H█████:  Not that I'm aware of.
24               DET. BRAYMAN:  When's the last time
25          you saw him up and -- up and around?
```

Page 130

```
 1                    MR. H_____:  This morning I saw him
 2          awake.  He was laying in bed, and I said
 3          hey, you need to eat some of your
 4          breakfast.  You know what I mean?  And
 5          then I'll see you at lunchtime and
 6          then --
 7                    DET. BRAYMAN:  What time was that
 8          about?
 9                    MR. H_____:  We eat chow about 4,
10          4:30 in the morning.
11                    DET. BRAYMAN:  Okay.  So you
12          actually saw him in bed and awake?
13                    MR. H_____:  Yeah.
14                    DET. BRAYMAN:  Okay.  And his
15          breakfast had been delivered but he
16          didn't touch it?
17                    MR. H_____:  Right.  I mean, you can
18          see in the module camera when you walk
19          up -- right up to his room and stuff,
20          so --
21                    DET. BRAYMAN:  Okay.
22                    DET. LUCADINI:  Well, you actually
23          brought him his breakfast?
24                    MR. H_____:  I brought him his food,
25          yeah.
```

Page 131

EXHIBIT J

1        DET. BRAYMAN:  And did he tell you

2    anything?  Did he say no, I'm not going

3    to eat it?  What did --

4        MR. H████:  I asked him -- I go

5    hey, are you all right, and stuff, and he

6    assured me -- a couple little chuckle,

7    giggles, you know what I mean, that hey,

8    he's all right.  That everybody was

9    tripping and whatever, and I go well,

10   just eat some of your breakfast and I'll

11   see you at lunch.  You know what I

12   mean -- at chow.  Left him at that.  And

13   everybody said that we should put

14   somebody up there in the cell with him,

15   you know what I mean, but it's kind of

16   hard to just get the cops to do stuff,

17   you know what I mean, for certain

18   reasons, whatever.

19       DET. BRAYMAN:  Did you say -- did

20   you tell someone hey, we should put a

21   watch on him?

22       MR. H████:  I'm not supposed to

23   like say this stuff, but I -- I put in an

24   inmate request last night that said hey,

25   he hasn't aten (sic) food.

Page 132

1    DET. BRAYMAN:   Okay.

2    MR. H███████:   Left it blank, just

3    cell 44 hadn't aten any food.  You know

4    what I mean?   And -- because I mean, I

5    can get -- I can get in a lot of trouble,

6    get stabbed, beat up, you know, so --

7    DET. BRAYMAN:   I appreciate you

8    telling us that.   And that was turned in?

9    You did --

10   MR. H███████:   I put that in the

11   little mailbox, you know what I mean?

12   DET. BRAYMAN:   Okay.

13   MR. H███████:   But I mean, as you can

14   see on the phone, sometimes they don't

15   get around to doing a lot of stuff, you

16   know.   And then to get a cop to move

17   another prisoner from downstairs

18   upstairs, just because you want him

19   to -- forget about it.   You know what I

20   mean?

21   DET. BRAYMAN:   Did -- were your

22   concerns with him because he wasn't

23   eating or was there other concerns

24   that --

25   MR. HODSON:   Just because he wasn't

Page 133

1 eating.  You know, he's a little skinny
2 kid as it is.  You know what I mean?  And
3 he just kept giving his breakfast away
4 for a little while, and then for three
5 days it seemed like I didn't see him
6 because he had to go to court, I think.
7 I don't know if he goes down to San Diego
8 or what, but it's a all-day trip usually,
9 you know.  He didn't get back until 7, so
10 I don't know if he ate down there or
11 what.
12       DET. BRAYMAN:  Okay.  So the only
13 medical problem you know is possibly on
14 psych meds.  Do you know anything else
15 medically that's going on with him?
16       MR. H███████:  No.
17       DET. BRAYMAN:  Okay.  And he didn't
18 tell you anything?
19       MR. H███████:  No.  His wife came to
20 visit him, you know, twice a week.  He's
21 got a baby on the way.
22       DET. BRAYMAN:  Does he have any kids
23 currently?
24       MR. H███████:  Not that I know of.
25       DET. BRAYMAN:  That you're aware

                                    Page 134

```
 1        were thinking?  Because we understand

 2        that maybe there was some talk that they

 3        were concerned that he might kill

 4        himself, or that he might do something to

 5        hurt himself within the mod.

 6            MR. H██████:  I didn't think he'd do

 7        that, but, you know what I mean?  I

 8        didn't even think he'd go to that fucking

 9        extreme.

10            DET. LUCADINI:  Um-hum.

11            MR. H██████:  I know he was

12        depressed, not eating, fasting

13        (indiscernible), whatever you call it.

14        You know what I mean?

15            DET. LUCADINI:  So most of the

16        concern was because he just wasn't caring

17        for himself properly?

18            MR. H██████:  Right.  And the kid

19        looked like he was malnourished anyways.

20        You know what I mean?  And --

21            DET. BRAYMAN:  Well, I think we're

22        suggesting too is there any other

23        indication, other than him not eating,

24        that gave you some kind of gut feeling

25        that you were telling ██████ hey, we
```

Page 140

1    should watch him, or --

2         MR. H███: No, because he came

3    down to talk to me. He talked to me after

4    he got off the phone, because my cell's

5    right there.  He got off the phone with

6    his wife last night and everything seemed

7    fine.  Asked me if I had any chocolate,

8    and I brought him a brownie and some

9    peanut butter (indiscernible).

10       DET. LUCADINI:  Did -- I know you

11    put in an inmate request saying that he

12    hadn't been eating anonymously.

13       MR. H███:  Um-hum.

14       DET. LUCADINI:  Do you know if

15    anybody expressed any other concerns

16    through an inmate request to the deputies

17    that hey, he should have a cellie or I

18    don't think he's doing okay mentally, or

19    even like that he's going through some

20    type of depression?

21       MR. H███:  I don't know what any

22    of the other guys did.  I just know what

23    I did.  You know, so --

24       DET. LUCADINI:  And yours was just

25    that one, and that was last night?

Page 141

EXHIBIT J

```
 1              MR. H████:  Yeah.  Yeah.
 2              DET. LUCADINI:  How often do you
 3       know them to check those?
 4              MR. H████:  I don't know.  I mean,
 5       the grievances, they're supposed to
 6       actually give you the little yellow copy
 7       receipt that says that you put it in.
 8       The inmate request, sometimes -- it just
 9       depends.  You know, if -- the cop's just
10       here to do his job and stuff like that.
11       They're pretty much on it, but they
12       like -- they got like a grudge against
13       criminals or whatever, then I think they
14       just throw it away to be honest, but I
15       can't --
16              DET. LUCADINI:  Do you think any of
17       them -- or anybody had a grudge against
18       Kris?
19              MR. H████:  No.
20              DET. LUCADINI:  Okay.  When we ask
21       ████ -- what's -- what's his
22       name -- ████?  (Indiscernible).  When
23       you asked him to watch him, does he
24       report to anybody to say hey, he looked
25       okay last night or I saw him eat or --
```

                                        Page 142

1          DET. BRAYMAN:  I should say ▆▆▆▆▆.

2          DET. LUCADINI:  -- ▆▆▆▆▆▆?

3          DET. BRAYMAN:  Sorry.

4          MR. H▆▆▆▆:  No.  I already spent

5     too much time with you guys as it.  I got

6     to go, so --

7          DET. LUCADINI:  I understand.  Is

8     there anything that we didn't ask you

9     that's important that we should know for

10    him?

11         MR. H▆▆▆▆:  You guys know where I'm

12    at if you got any more questions.

13         DET. LUCADINI:  Okay.  All right.

14    Let me get somebody to walk you back.

15         MR. H▆▆▆▆:  All right.

16         DET. LUCADINI:  What time do you

17    have?

18         DET. BRAYMAN:  I have 12:18.

19         DET. LUCADINI:  Okay.

20         (End of M▆▆▆▆  H▆▆▆▆  interview)

21

22

23

24

25

Page 143

```
 1              C E R T I F I C A T I O N

 2

 3        I, Tamara Bentzur, hereby certify that

 4    the foregoing is a true and correct

 5    transcription, to the best of my ability, of

 6    the sound recorded proceedings submitted for

 7    transcription.

 8

 9        I further certify that I am not employed

10    by nor related to any party to this action.

11

12        In witness whereof, I hereby sign this

13    date:

14    May 30, 2017

15

16

17    _____

18    Tamara Bentzur

19    AAERT Certified Electronic Transcriber

20    CET**D 824

21

22

23

24

25

                                       Page 388
```

# EXHIBIT "K"



EXHIBIT K

# EXHIBIT "L"

REGULAR ARTICLE

# Preventing Suicide in Prison: A Collaborative Responsibility of Administrative, Custodial, and Clinical Staff

Anasseril E. Daniel, MD

Suicide is a sentinel event in prison, and preventive efforts reflect the adequacy and comprehensiveness of mental health, psychiatric, custodial, and administrative services in a correctional system. This article reviews the literature on suicide in prison during the past three decades and identifies the pattern and occurrence of risk factors. These risk factors are classified as demographic, institutional, and clinical. Based on this review, the author outlines specific administrative, custodial, and clinical steps and procedures that form the basis of a comprehensive suicide-prevention program that can be implemented in small and large systems. The author recognizes the limitations of staff availability, the budget constraints, and the ineffectiveness of efforts to prevent suicides that occur without any warning. Ultimately, a prevention program is the collective responsibility of administrative, custodial, and clinical staff.

J Am Acad Psychiatry Law 34:165–75, 2006

The study of suicide in prisons has increased dramatically since the 1980s. Factors contributing to this increase include the rising frequency of suicide in prisons; class action lawsuits related to suicide; deinstitutionalization of the mentally ill; and lack of community-based programs for mentally ill criminals.[1–6] Legal reforms, prison diversionary programs, and regional differences in suicide rates[7] have also influenced the research.

## Suicide Rate: Problems and Controversies

Suicide is the third leading cause of death in U.S. prisons and the second in jails.[1] The suicide rate in prisons ranged from 18 to 40 per 100,000 during the past three decades.[8–11] Populous urban jails such as those in New York,[12] Atlanta,[13] and Miami[14] have higher suicide rates than do non-urban jails. A study

Dr. Daniel is Director of Psychiatric Services for the Missouri Department of Corrections by contract, Jefferson City, MO, and Clinical Professor of Psychiatry, University of Missouri, Columbia, MO. Address correspondence to: Anasseril E. Daniel, MD, Daniel Correctional Psychiatric Services, 33 E. Broadway, Suite 115, Columbia, MO 65203.

of six Midwestern jails from 1966 to 1971 showed a rate of 58 per 100,000 inmates per year.[15] The jail suicide rate is nine times that of the general population, with a range of 107 to 187.5 per 100,000.[16] The rate of 10 to 17 per 100,000 in federal prisons is slightly lower than the rates in state prisons.[3] The highest rate in a prison is noted among death row inmates with 146.5 per 100,000.[17]

The suicide rate in prison is usually compared with the commonly accepted national general population rate of 12 per 100,000; however, the comparison is inaccurate because of the disparity in the distribution of men and women in prison. When this general population rate of 12 per 100,000 is broken down by gender, the rate for men is 18 and 6 for women. Therefore, a prison rate of 18 to 20 is comparable with the rate in males in the general population.[3]

Underreporting of suicide seems to be a problem. If a suicide victim is found and rushed to the hospital, only to die there, records may not show that the victim committed suicide in prison. Also, if the facility chooses to report some deaths as suicides—but

EXHIBIT L

Prevention of Suicide in Prison

not others, for fear of litigation—suicide rates could be inaccurate.[5] Prison staff are more likely to report white inmate suicide, accounting for possible under-representation of suicides of black inmates.[18] Risk factors such as drug abuse, unemployment, interpersonal conflicts, and mental illness are common to both the general public and prison. How different would the prison rate be if these factors were controlled?[17]

The suicide rate is calculated on the basis of average daily population (ADP) in jails and prisons, which does not factor in the admissions, leading to miscalculation of the actual rate.[1] Furthermore, the immediate post-release suicides noted among inmates who serve long sentences for violent crimes (such as homicide) and those who are heavy drug users before incarceration are generally left uncounted.[19,20]

## Suicide Attempters Versus Suicide Completers

Although a suicide attempt in prison is generally categorized as a type of non-lethal self-injury similar to self-mutilation, it is fundamentally different.[21] All self-harming acts may be seen on a continuum of severity, not as distinct problems, since the motivation for self-injurious behavior is the same for both attempters and completers, and many attempt suicide before they are successful.[22] Some inmates attempt suicide with no intention of ever completing the act, while others persist, using more lethal methods until they are successful. According to Schaller *et al.*[23] and Green *et al.,*[24] both suicide attempters and completers are generally younger than 25, have previously attempted suicide, have a history of psychiatric treatment, and are likely to be addicted to opiates or other substances.[23,24] Most suicide attempters slash their wrists, as opposed to hanging or overdosing on medication, which are common methods used by completers.[25]

In general, prior suicide attempts increase the risk of suicide. From 45 to 63 percent of inmates who commit suicide have attempted it before.[26–30] Of those with a history of prior attempts who complete suicide, two-thirds used lethal methods (i.e., hanging, burning, swallowing a razor blade, strangulation, throat cutting, and drug overdose) during their prior attempts. Although Durand *et al.*[31] found a much lower rate of previous attempts (33 percent) among those who commit suicide, based on the lit-

erature, at least half of the individuals attempt suicide before completing the act.

### Risk Factors

Because suicide research is retrospective, a definitive cause-and-effect relationship between risk factors and suicidal death cannot be established. Usually, what appears to be causative is reported as associated factors.

#### Demographic Factors

Generally, more than half of all inmates who commit suicide in prison are between 25 and 34 years of age.[27–29,32] They are often single with no job or family support. Very young prisoners (below age 21) are especially at risk.[22] In fact, the suicide rate among juvenile offenders placed in adult detention facilities is almost eight times greater than the rate in juveniles housed in juvenile detention facilities.[33] Although blacks are overrepresented in prisons, they are underrepresented among suicide completers as well as attempters.[11,27,29] Toch[34] found that blacks were also underrepresented in the self-mutilation group, whereas whites and Hispanics were overrepresented. Some researchers suggest that the differences among black, white, and Hispanic suicide rates can be explained by sociocultural factors such as better preparation for prison life by blacks as opposed to that of whites and Hispanics.[35] Haycock[5] disputes this theory, indicating that the factors that lead to inmate suicide are complex and personal and do not simply depend on sociocultural background.

Upper socioeconomic status and high degree of social and family integration before incarceration increase the risk of suicide in prison.[36] Suicides in prison fall into two groups: egoistic and fatalistic (Durkheim typology). Egoistic suicide occurs when an individual has a low level of integration into society, while fatalistic suicide occurs in a highly regulated, social environment where the individual sees no possible way to improve his or her life. Accordingly, most suicides in prison are egoistic, whereas those by death row inmates may be both egoistic and fatalistic, because they are socially isolated and heavily regulated, and at the same time, weakly integrated.[17]

#### Clinical Factors

Psychiatric Disorders: Eight to 15 percent of prisoners have a serious and persistent mental illness,[12,18] and the proportion is even higher in max-

EXHIBIT L

Daniel

imum-security prisons.[1] Many prisoners have multiple psychiatric disorders with co-morbid substance abuse.[37,38] Using the NIMH Diagnostic Interview Schedule (DIS) III–R, Teplin et al.[39] studied a randomly selected stratified sample of 1272 female arrestees in Cook County and found that 80 percent had one or more lifetime psychiatric disorders. Using similar methodology, Daniel et al.[40] found that 90 percent of consecutively admitted female prisoners had an Axis I disorder and 67 percent had more than one disorder. As far as the prevalence of psychiatric disorders among suicidal inmates is concerned, studies show a wide range from 33 to 95 percent.[3,22,28–30,41,42]

Although mood,[3,43] psychotic,[29] and personality disorders dominate diagnoses[30] among mentally ill prisoners, depressive disorders are more often linked to suicide than is any other psychiatric illness.[3,43] The onset of the mental disorder may be either before or during incarceration with most having a preincarceration diagnosis with onset before age 18. Other commonly found characteristics of suicidal inmates include a family history of mental illness, substance abuse, incarceration, suicide, psychiatric care, and medication treatment, though such factors are not uncommon among other inmates or the mentally ill in the community.

Depression, Hopelessness, and Anxiety: Depression and hopelessness seem to be the two most common psychological states at the time of a suicidal act.[44] Although depression and suicide are co-occurring phenomena, hopelessness and suicide have a stronger correlation than do depression and suicide. Ivanoff and Jang[45] developed a multivariate model to predict suicide by inmates studying the relationship between depression, hopelessness, suicidality, social desirability and other factors. Although age and visitors have no significant effect on suicidality, juvenile delinquency and violent crime directly increase it, as does higher education and income levels. Negative life events and sentence length indirectly impact suicidality by affecting depression. Both violent crime and previous income level affect hopelessness. Inmates with higher social desirability had lower levels of depression; thus, they had lower levels of suicidality.

Anxiety experienced by inmates at various times of incarceration, particularly on entry into the prison or just before release, may act as a risk factor. Anxiety symptoms mixed with agitation, depression, and hopelessness increase the risk further.

Personality Traits and Disorders: Although antisocial personality disorder is "endemic to correctional settings,"[46] the relationship between antisocial personality disorder and suicide risk seems to be somewhat complex. Verona et al.[47] used the Psychopathy Checklist-Revised (PCL-R) to study 313 male inmates in a federal institution in Florida and found a positive correlation between antisocial deviance (Factor 2) and suicidal tendencies in male inmates. Borderline Personality Disorder (BPD) increases the risk for suicide attempts and completions due to poor interpersonal skills, impulsivity, and affective instability. Impulsive suicide attempts under intoxication are more common among arrestees[48] and therefore intoxication is a significant factor in jails. In prison, impulsivity can be a factor in young prisoners with personality and depressive disorders and those who are victims of cluster suicides. Although a direct link between impulsivity and suicide cannot be established, only a few prepare to attempt suicide during the days preceding the act.[25]

Psychosocial Stressors: Institutional stressors such as undesired unit placement, work assignment, disciplinary confinement, interpersonal conflicts, legal processes, parole setbacks, and chronic medical conditions may act as precipitators of suicidal behavior. Nearly 50 percent of those who commit suicide experience acute stressors at the time of the suicide, whereas most suffer from chronic stressors.[3,27] Institutional conflict is seen as the most common acute stressor, whereas interpersonal conflict and chronic medical conditions are the most common chronic stressors.

The severity and type of crime seem to act as risk factors in certain prisoners, though not universally. Perhaps the guilt, shame, and stigma associated with the offenses may be the determining factor. Marital separation,[30] divorce,[49] or death of a loved one may precipitate serious suicide attempts. A prisoner is not usually able to participate in rituals associated with the funeral of a loved one. Mourning is difficult to accomplish[50] and expression of grief is likely to be viewed by others as a sign of weakness and vulnerability.

Loss or absence of one or both parents for more than 12 months before the age of 15 is correlated with attempted suicide.[51] Other risk factors include losing contact with one's children,[27] inability to

EXHIBIT L

Prevention of Suicide in Prison

communicate due to language barriers,[25,28] or learning disability.[22] Mental retardation *per se* is not correlated with increased risk.

Substance Abuse as a Risk Factor: Being under the influence of an illegal drug heightens the risk of self-harm.[52] Inmates who suffer from Antisocial Personality Disorder, Schizophrenia, or Bipolar Disorder[53] are more likely to abuse substances. The risk of suicide is highest among opiate dependents who also have psychiatric disorders.[54] Opiate users are 10 times more likely to die from suicide than are non-users of the same age and gender.[55] Weitzel and Blount[56] did not find any significant difference between the type of drug and risk of suicide, and non-users were not significantly different from heavy users in the number of suicidal thoughts or attempts. However, when drug abusers are incarcerated, the ensuing forced abstinence and not having developed coping skills due to years of dependency may precipitate suicidal thinking.[25]

Medical Condition and Its Relation to Suicide: Salive *et al.*[11] found an increased risk of suicide among inmates with AIDS due to potential hopelessness, victimization, and threats by other inmates. No studies have been found that link hepatitis C and suicide, although interferon treatment is associated with depression and possible suicidal behavior. If a medical condition is chronic and causes intractable pain, it can be a risk factor. Prisoners with epilepsy are more likely than their non-epileptic peers to have depression and suicidal ideation.[57]

*Institutional Factors*

Stages and Setting of Confinement: In jails, the high-risk period is the first 24 to 48 hours. While there is no such period in prison, the first 30 days at reception centers are generally deemed to be critical for those with a history of suicide attempts.[29,48] Interfacility transfer of mentally disordered offenders seems to raise suicide risk, which may be related to the inmate's adjustment difficulties at the new site. Findings regarding length of incarceration and suicide risk are contradictory—some indicating a positive correlation,[36,58] whereas others indicate none[11] after 180 days of incarceration.

With regard to setting, most inmate suicides occur in maximum-security facilities, in single cells[11,28] or in isolation. Special treatment centers for addiction and sexually dangerous persons have a lower rate than in the general community, whereas it is much greater at inpatient hospitals for the "criminally insane"[18] and in supermaximum-security facilities.[17]

Time of the Day, Month, and Season: Contrary to general belief, suicides are not more likely to occur on weekends, religious holidays, or during holiday seasons.[42] However, the time of day seems to have some significance, in that most suicides occur between 7:00 p.m. and 7:00 a.m.,[27,31] possibly due to lower staff supervision during the night.[25] For unknown reasons, the most common time of year to commit suicide is between July and September.[22,30,59]

Prison Condition and Experience: Almost all departments of corrections in the United States have recorded an increase of prisoners in recent years, possibly due to the dramatic influx of drug offenders.[52] An overcrowded and short-staffed prison is likely to increase suicide risk due to lack of access to medical care, increase in assaults, lower staff-offender ratio, lack of opportunity for activity, lack of food and clothing, unwanted interactions, and rapidly changing social structures within the prison. As prisons become more crowded, the number of inmates who reside in single cells may decrease, a fact often cited as preventive, since the chance of committing suicide in multiple-occupant cells is limited.

Understandably, the transition from the outside world leads to loss of individual autonomy. As a result, inmates often engage in conflict with the prison staff as well as fellow inmates. Inmates of all ages with mental disorders and youthful inmates are at greater risk of abuse and victimization by other inmates. Threats and attacks may make a younger inmate act impulsively to take his or her life. A study of sexual coercion in prison noted that approximately 20 percent of inmates are reportedly pressured or forced into sexual contact with another person. One third of the male targets (36 percent of those subjected to sexual coercion) experience thoughts of suicide.[60]

## Method of Suicide

Over 80 percent of suicides are completed by hanging. The feet of the hanging victim need not be off the floor for the attempt to end in fatality. Only 2 kg of pressure has to be applied to the neck to cut off blood flow to the brain. Hanging can be accomplished while kneeling, sitting, standing, or lying down. The fastening anchor can be close to the floor, such as a window bar, window crank, air duct vent, handrail on the wall, bedrail, cell bar, or lock box, or higher points such as light fixtures or shower heads.

EXHIBIT L

Death occurs in five to seven minutes, but permanent brain damage takes as little as three minutes. Bed sheets, shoelaces, jump ropes, belts, socks, elastic waist bands, and wound bandages can all be used as a ligature. Asphyxia is the most common cause of death in hanging.[30] Although hanging does not always communicate a serious intent to die, the effectiveness of the method yields a high mortality rate.

Overdose of psychotropic drugs, especially tricyclic antidepressants, is the next most common method, followed by antihypertensives and over-the-counter pain medications.[28,29] Self-immolation is uncommon, yet it has a mortality rate of 33 percent in the groups studied. Victims tend to be female and to have severe psychopathology.[61] Other uncommon methods include hunger strike, swallowing sharp objects, and jumping from a height. Occasionally, homicidal hanging may masquerade as suicide.[62]

In summary, studies confirm that the most significant risk factors of suicide among prisoners consist of mental illness—particularly depressive disorder, psychological states of depression and hopelessness, prior suicide attempts, a preincarceration history of psychiatric disorder and substance abuse, and a recent psychosocial stressor acting as a precipitant. These findings are consistent with those reported recently by Kovasznay *et al.*[63] Other risk factors include being a young white male, placement in a maximum security prison, single-cell living or isolation, and interfacility transfer. These factors and the methods used should be taken into account in planning suicide-prevention strategies.

## Suicide-Prevention Strategies

Suicide prevention must be the collaborative responsibility of administrative, custodial, and clinical staff and should be a top administrative and clinical priority in every prison. A comprehensive mental health and psychiatric service delivery system[64,65] supported by the administration forms the foundation of preventive efforts. A well-designed suicide-prevention program incorporates all aspects of identification, assessment, evaluation, treatment, preventive intervention, and training of all medical, mental health, and correctional staff.[64,65] Comprehensive mental health services in prisons are slowly being established in departments of corrections, largely due to successful class-action suits, legislative actions, and progressive-thinking administrators and clinicians. Fully trained mental health and correctional staff in prisons are rare because of lack of qualified professional pools, budgetary constraints, National Guard deployment, and the nature of correctional work. Creation of a specific division of administration dedicated to offender rehabilitation that oversees and coordinates medical, mental health, vocational, and educational services is important to ensure an adequate staff-patient ratio, a multidisciplinary treatment team approach, timely treatment planning, staff training, and overall rehabilitative services.

## Administrative Steps

### Policy Development and Implementation

Legally sound and defensible policies and procedures that are rigorously and systematically implemented form the basis of appropriate administrative and clinical practice. Key policies ensuring good clinical care and suicide prevention include those covering (1) suicide assessment, observation, and intervention; (2) psychotropic medication use; (3) involuntary/forced medication and involuntary medical treatment; and (4) inpatient hospitalization of the mentally ill. The policies must be reviewed with all medical, mental health, and correctional staff.

### Implementation of Suicide Risk Rating Program

If properly implemented, a suicide risk rating program can capture high-risk individuals. A commonly used risk rating instrument is the Multi-Dimensional Risk Assessment.[66] The goal of this program is to identify suicidal inmates (on their arrival) and to monitor them as they move through the system. Inmates are given a Suicide Risk Rating score of 1, 2, or 3, indicating the severity of suicide potential. Visible placement of the SR score in the medical record and registering the high-risk inmates in chronic care clinics enable systematic tracking of them. An inmate is registered in a clinic at a specific facility, and the generated database follows him/her, even when the inmate is transferred to another facility, making data available for future mental health and psychiatric contacts. Many prisons have established a clinical/administrative-level committee consisting of medical director, psychiatrist, health services administrator, and assistant superintendent of administration, to discuss high-risk inmates.

EXHIBIT L

Prevention of Suicide in Prison

### Procedures for Administration of Psychotropic Medication

Policies and procedures covering the length and quantity of prescriptions, medication renewal, and nursing practices must address the type and mode of administration to avoid opportunities for hoarding of medications with lethal potential. Medications with non-lethal potential should be preferentially prescribed, reducing the frequency of overdose with such medications. The watch-take policy for administration of psychotropic medication instituted in many correctional systems is an effort to cut back on the instances of "cheeking" or hoarding. However, the watch-take practice does not eliminate fatal overdoses of somatic medications—an occurrence that is not uncommon in prisons. As an alternative, crushing of medications or administration in liquid form has been implemented. Although crushing medications seems to be a good addition to any psychotropic medication practice, in reality, this method is full of pitfalls. For example, some medications are in capsule or time-release form and cannot be crushed before ingestion. Furthermore, there is no guarantee that every granule of a crushed pill makes it into the inmate's mouth, which may alter the dosages.

A structured protocol for dealing with medication of noncompliant offenders and those who consistently refuse medications is a significant step in preventing suicide. Furthermore, if a suicidal inmate is incompetent to make a rational decision regarding medication and if he or she is gravely disabled, involuntary administration of medication may be implemented.

### Administrative Management of Institutions

Four concerns relevant to suicide prevention deal directly with management of individual institutions and the correctional system as a whole. These include (1) segregation monitoring; (2) offender assignment; (3) out count and interfacility movement; and (4) cell design.

As a suicide-prevention measure, suicidal inmates should not be placed in segregation units, because such placement does not promote improved mental health. The National Commission of Correctional Health Care Prison Standards stipulate that suicidal inmates should not be housed or left alone unless constant supervision can be maintained.[64] If it is necessary to house an inmate alone, provision should be made for uninterrupted supervision and human con-

tact. In addition, regular rounds in the segregation area to screen inmates for suicidal intent and mental illness should be a standard procedure.

Offenders must also be given housing assignments that are appropriate for the level of threat they present to themselves and/or others. Careful placement of younger inmates in appropriate facilities where their security and mental health needs can be met has the potential to lower the suicide rate in this group.

Inmates on "out count" for a court hearing may be temporarily placed in a county jail. The potentially suicidal inmate may find in the transfer a golden opportunity for self-harm, because of the laxity of supervision in jails. Vulnerability to suicide increases if the court hearing results in an unexpected outcome such as an additional long sentence. As a preventive measure, a copy of relevant records must always accompany the inmate with a history of suicidal ideation or attempt when placed on out count. Suicidal inmates should be treated in county jails just as they would be treated in prison (i.e., increased monitoring, evaluation by mental health staff, no access to harmful objects, and a watch-take medication policy).

A formal procedure to seek input or clearance from mental health staff before a mentally ill prisoner is transferred to another facility must be established. If the system does not have an electronic medical record system, the inmate's mental health records should be transferred promptly to the receiving facility. The transferred prisoner must be seen by a mental health professional within 24 hours and by a psychiatrist within 72 hours and, thereafter, on a regular basis. Finally, as a precautionary step, no prisoner on suicide watch should be transferred.

Designing a protrusion-free cell or a cell window-frame in a way that does not permit fastening a ligature band would help decrease suicides, although in practice such a design would be difficult to achieve. However, with a little planning the number of obvious anchors can be drastically reduced. Air vents can be designed with holes too small to permit threading of a sheet. Use of break-away shower heads and raised concrete slabs that hold mattresses off the floor are helpful. Many efforts to create suicide-proof cells have proven inadequate for the clever inmate seeking a way to kill himself. While a perfectly designed suicide-proof cell is unlikely, it is important that the entire interior of each cell be visible from the walkway. Frequent monitoring of inmates in their cells is

EXHIBIT L

Daniel

more important than any cell design. Nothing can replace human supervision as a deterrent to suicide.

### Training and Education

Training correctional officers and mental health and medical staff to deal with suicidal inmates is crucial. If prison staff are given adequate training in recognizing, dealing with, and understanding the motivations behind suicidal behavior, they are less likely to feel that suicidal inmates are being manipulative. Training topics must include (1) identification of high-risk offenders; (2) how to identify signs and symptoms of mental illness; and (3) how to handle communication of intent. Training must occur regularly. Any staff can be trained to spot certain "warning signs" of suicide. Correctional officers and clinicians may observe slightly different warning signs, simply because these two groups deal with the inmate in different situations. With regard to clinicians, the training must also include steps to complete the Multidimensional Risk Assessment Form, modalities of intervention, and referral to appropriate professionals including the psychiatrist. It is helpful for correctional officers and mental health professionals to be familiar with the general profile of a suicidal inmate, although there are exceptions to every situation and this "profile" should be used with discretion. New York State has developed a model training program for identifying suicidal inmates[67] that uses a video, handbook, and tests to teach and evaluate the correctional officers. Any successful training program must emphasize good communication between correctional officers and mental health staff. Individuals from mental health staff and ranking administrative personnel should participate in the training. Also, having a corrections officer serve as a trainer makes other correctional officers feel that the training is worthwhile and applicable to their jobs.

### Peer Groups and Inmate Training

Correctional facilities have attempted to create peer groups for populations who are often targeted for victimization, such as child sex offenders. When inmates are surrounded by those who have had similar experiences, they may be less likely to feel suicidal. Having a trained inmate to work with high-risk inmates may drastically reduce the likelihood of suicide.[29] The effectiveness of peer support groups and inmate training programs have not been properly studied, and anecdotal information questions the usefulness of these programs.

### Handling Inmate Communication of Intent

Approximately 60 percent of inmates may communicate their intent to kill themselves either verbally or nonverbally. Verbal communication is either spoken or written but nonverbal communication can be much more ambiguous, such as giving away important possessions, refusing medication or asking for more medication, and cutting off contact with family members. An inmate may communicate his or her intent to a corrections officer, mental health staff, a friend, family member, judge, or cell-mate. It is often difficult to learn of communications to outsiders, because the recipient may not report it. If an inmate commits suicide after such a communication, the friend or family member usually denies knowing that the inmate was serious about committing suicide. It is not easy to convince other inmates to report communications; however, a confidential system for reporting, preferably in written form, must be established so that inmates do not feel they are putting themselves in danger when making a report. In view of the fact that correctional officers and clinicians have a higher degree of responsibility than do other recipients, they should make a report of the communication and forward it to a mental health professional, who in turn should confer with prison administration. The report should be added to the inmate's file and appropriate steps taken to ensure that the inmate is not at risk of self-harm.

## Clinical Procedures

The primary focus up to this point has been administrative and custody staff responsibility. Suicide prevention must be a clinical priority as well.

Mandatory screening of all inmates for suicidal intentions has been instituted in almost all reception centers. Metzner *et al.*[2] proposed three different types of mental health screenings and evaluations that include initial screening at reception, mental health and medical evaluation within 7 days, and psychiatric evaluation on referral by a mental health professional. The screening ensures triaging of inmates for proper treatment and placement. Screening, a crucial step in the identification of suicidal inmates, involves face-to-face contact by intake staff. The screening tool must be a comprehensive and standardized measure that is valid and reliable. The

EXHIBIT L

screening process must capture a complete history of any suicidal behavior, including all prior suicide attempts and/or periods of suicidal ideation, even if the inmate is not suicidal at the time of intake. After screening, if an inmate evidences suicidal ideation or behavior, a Multidimensional Suicide Risk Assessment form, modified for application in corrections, is completed to obtain a Suicide Rating (SR) score. Suicide risk assessment is a continual process performed by all mental health and psychiatric staff and should be performed at every clinical encounter. Such an assessment will allow the psychiatrist and other clinicians to take specific intervention steps, which may include placing the patient on suicide watch, modifying medications, and arranging to have one-to-one sessions, and will also alert correctional officers to keep an eye on the prisoner.

Those who are identified to be at some risk of suicide, as noted by an SR score, require intensive clinical monitoring. Since many inmates who commit suicide have contact with mental health staff before the suicide, warning signs and behavioral changes suggestive of self-harm must translate into increased watchfulness, careful monitoring, and intervention. Regular contacts by the clinician and systematic counseling can help the inmate with problems that may contribute to suicidal thoughts and/or attempts. Furthermore, the clinician is able to recognize normal patterns of behavior for that inmate and will be more closely attuned to any future changes than other staff members who interact with the inmate only sporadically.

Based on suicide risk assessment, a prisoner may be placed on suicide watch—a heightened state of observation where he/she is subjected to frequent checks by correctional staff. Documentation must include the reason for the suicide watch, details of what the prisoner is allowed to have in his or her cell during suicide watch, frequency of cell checks (for instance, every 15 minutes), and a procedure for termination of the watch. Records become critical from a forensic point of view in the event of suicide and possible litigation. Though video monitoring is an excellent tool for ensuring uninterrupted observation, it may not be as effective as the direct personal observation by staff (author's observation).

### Treatment of Psychiatric Disorders and Substance Abuse

Prisoners with psychiatric problems must be placed in a proper treatment program.[12] Diagnostic specificity and accuracy and clarity of Axis I and II disorders are critical in determining appropriate psychotropic medications. Psychiatric manpower resources are very limited in corrections, and therefore reliance on psychotropic drugs as the sole suicide-prevention strategy is common.[66] Psychiatrists occasionally use suicide-prevention contracts as opposed to taking time to develop a therapeutic alliance. These contracts should be used as only a part of a greater treatment plan and not in lieu of suicide risk assessment and intervention. Specific procedures must be in place to facilitate the admission to a psychiatric hospital administered by the State Department of Mental Health of acutely mentally ill offenders, civil commitment of those who are likely to pose a danger to themselves or others to the Department of Mental Health on release,[68] and transition of mentally ill prisoners to community-based treatment programs.

Although detoxification programs are crucial in jails, a comprehensive substance abuse treatment program is important in the care of suicidal prisoners with a history of substance abuse. Most substance abusers undergo forced abstinence while incarcerated but on release may relapse due to "rekindling" resulting from exposure to personal triggers. Therefore, systematic treatment while incarcerated may reduce immediate post-release suicides.

### Information Management System

The administrative and clinical aspects of a sound suicide-prevention program should be linked by an effective information-management system. Screening instruments, risk assessment forms, suicide watch reports, classification files, medical records, mental health records, psychiatric evaluations and progress notes, medication entries, the medication administration record, Suicide Risk Rating level 3 (SR 3) debriefing reports, and suicide debriefing and mortality reports all form essential components of the program for effective communication. A uniform system of documentation will assure seamless communication between staff and facilities. Forms provide a simple way to insure that certain pieces of information are documented every time. Some correctional departments use computerized systems that provide easy but confidential access to information from any location. Last but not least is the willingness of all staff to document observations, decisions, and actions adequately and thoroughly.

EXHIBIT L

Daniel

## Psychological Autopsy and Mortality Review

Suicide prevention is an area that is constantly evolving. Following a suicide, a complete mental health debriefing (psychological autopsy) must be completed. This process involves drawing together pieces of information from the inmate's medical and mental health records, classification files, toxicology reports, and autopsy. The psychological autopsy should include basic demographic information, life history before incarceration (including family, mental health, and medical histories), criminal history, mental health contacts within the correctional facility, psychotropic drugs used, and pattern of prescriptions and other health concerns while in the facility. The psychological autopsy should be reviewed to highlight any patterns or areas of concern for prison staff. Policy and procedure changes may result from this process. Unlike the psychological autopsy, which is written primarily by mental health and correctional representatives, a mortality review is undertaken by a committee consisting of physicians, psychiatrists, and administrators. The committee discusses the incidents leading up to and including the suicide. The report includes a brief history of the inmate's psychological history, but most of it is focused on the suicidal act itself. The mortality review reports the last time the inmate was seen alive, the time that the inmate was found, who found the inmate, efforts that were made to resuscitate the inmate, when additional help arrived, whether the inmate was taken to a hospital, heroic measures taken at the hospital, and time of death. Every person who was involved in the suicide—from the discovery of the inmate until the inmate was pronounced dead—is interviewed so that a complete scene can be described. The mortality review is often used to evaluate the system's response to the suicide. Any difficulties that arise with prison staff response can be addressed so that similar situations are handled more effectively in the future. A detailed description of cause of death is completed as well.

## Continuous Program Evaluation

It is difficult to determine whether specific suicide-prevention strategies actually decrease the number of suicides.[48] Empirical research cannot be conducted on suicide in prison, simply because it would be unethical to withhold certain preventive strategies from suicidal individuals for the sake of research. However, after implementation, the suicide-prevention program must be evaluated continually by standardized auditing, which allows necessary adjustments to be made in a timely manner. Both administration and service providers must evaluate individual components as well as the system as a whole. Therefore, a systematic program evaluation and quality-assurance plan should be developed and implemented. Indirectly, lower mental health scores, fewer incidents of suicidal behavior, or use of less psychiatric medication may denote improvement in the program. Of course, it would be necessary to perform a well-designed study to make sure that the improvements were not connected with other similarly timed events. Although studies of suicide in prisons are retrospective, prospective studies using comparison groups of non-suicidal inmates are needed. Women who commit suicide in prison should be studied extensively,[69] because data on that topic are minimal. Another area of research is to determine the effectiveness of timely medical intervention with serious suicide attempters.

## Conclusion

When fully operational, the comprehensive suicide-prevention program outlined herein may not only save lives but also may reflect adequacy and thoroughness of overall mental health and psychiatric services delivery systems as well as correctional practices. Nearly 30 percent of inmates who commit suicide have no psychiatric illness and provide no warning signs. Mental health and correctional service providers may fail to identify this population. The program described is also a roadmap to avoid any malpractice or deliberate-indifference claims by a third party.

## References

1. Metzner JL: Class action litigation in correctional psychiatry. J Am Acad Psychiatry Law 30:19–29, 2002
2. Metzner JL, Miller RD, Kleinsasser D: Mental health screening and evaluation within prisons. Bull Am Acad Psychiatry Law 22:451–7, 1994
3. White TW, Schimmel DJ, Frickey R: A comprehensive analysis of suicide in federal prisons: a fifteen-year review. J Correct Health Care 9:321–45, 2002
4. Bonner RL: Correctional suicide prevention in the year 2000 and beyond. Suicide Life Threat Behav 30:370–6, 2000
5. Haycock J: Capital crimes: suicides in jail. Death Stud 15:417–33, 1991
6. Leff J, Trieman N, Gooch C: Team for the Assessment of Psychiatric Services (TAPS) project 33: prospective follow-up study of

EXHIBIT L

Prevention of Suicide in Prison

long-stay patients discharged from two psychiatric hospitals. Am J Psychiatry 153:1318–24, 1996

7. Skegg K, Cox B: Contagious suicide in prisons and police cells. J Epidemiol Community Health 47:69–72, 1993

8. Hayes LM: National study of jail suicides. Psychiatr Q 60:7–29, 1989

9. Lester D: Prison suicide rates by state from 1984–1993. Psychol Rep 83:514, 1998

10. Anno BJ: Patterns of suicide in the Texas Department of Corrections. J Prison Jail Health 5:82–93, 1985

11. Salive ME, Smith GS, Brewer TF: Death in prison: changing mortality patterns among male prisoners in Maryland, 1979–87. Am J Public Health 80:1479–80, 1990

12. Malcom BJ: Today's problems in penology. NY State J Med 75:1812–14, 1975

13. Frost R, Hanzlick P: Deaths in custody. Am J Forensic Med Pathol 9:207–11, 1988

14. Copeland A: Fatal suicidal hangings among prisoners in jail. Med Sci Law 29:341–5, 1989

15. Esparaza R: Attempted and committed suicide in county jails, in Jailhouse Blues. Edited by Danto B. Orchard Lake, MI: Epic, 1973, pp 27–46

16. Winfree LT: Rethinking American jail death rates. Policy Stud Rev 7:641–89, 1988

17. Lester D, Danto BL: Suicide Behind Bars: Prediction and Prevention. Philadelphia: The Charles Press, 1993, pp 18–21

18. Haycock J: Race and suicide in jails and prisons. J Natl Med Assoc 81:405–11, 1989

19. Gottlib P, Gabrielsen G: The future of homicide offenders: results from a homicide project in Copenhagen. Int J Law Psychiatry 13:191–206, 1990

20. Jones R, Gruer L, Gilchrist G, et al: Recent contact with health and social services by drug misusers in Glasgow who died of a fatal overdose in 1999. Addiction 97:1517–22, 2002

21. Fulwiler C, Forbes C, Santangelo SL, et al: Self-mutilation and suicide attempt: distinguishing features in prisoners. J Am Acad Psychiatry Law 25:69–77, 1997

22. Liebling A: Suicides in young prisoners: a summary. Death Stud 17:381–409, 1993

23. Schaller G, Zimmermann C, Raymond L: Risk factors in self-injurious behavior in a Swiss prison (in French). Sozial Preventivmedizin 41:249–56, 1996

24. Green C, Kendall K, Andre G, et al: A study of 133 suicides among Canadian federal prisoners. Med Sci Law 33:121–7, 1993

25. Kerkhof AJ, Bernasco W: Suicidal behavior in jails and prisons in the Netherlands: incidence, characteristics and prevention. Suicide Life Threat Behav 20:123–37, 1990

26. Fruehwald S, Eher R, Frottier P: What was the relevance of previous suicidal behavior in prison suicides? Can J Psychiatry 46:763, 2001

27. He XY, Felthous AR, Holzer CE, et al: Factors in prison suicide: one year study in Texas. J Forensic Sci 46:896–901, 2001

28. Daniel AE, Flemming J: Suicides in a state correctional system 1992–2002. J Correct Health Care 12:24–35, 2006

29. Marcus P, Alcabes P: Characteristics of suicides by inmates in an urban jail. Hosp Community Psychiatry 44:256–61, 1993

30. Topp DO: Suicide in prison. Br J Psychiatry 134:24–7, 1979

31. DuRand CJ, Burtka GJ, Federman EJ, et al: A quarter century of suicide in a major urban jail: implications for community psychiatry. Am J Psychiatry 152:1077–80, 1995

32. Novick LF, Remmlinger E: A study of 128 deaths in New York City correctional facilities (1971–1976): implications for prisoner health care. Med Care 16:749–56, 1978

33. Flaherty MG: An assessment of the national incidence of juvenile suicide in adult jails, lockups and juvenile detention centers.

Community Research forum, prepared for the U.S. Department of Justice. Urbana-Champaign, IL: University of Illinois, 1980

34. Toch H: Men in Crises. Chicago: Aldine, 1975

35. Johnson R: Culture and Crisis in Confinement. Lexington, MA: Lexington Books, 1976, p XVII

36. Bourgoin N: Mortality due to suicide in prison (in French). Rev Epidemiol Sante Publique 41:146–54, 1993

37. Cote G, Hodgins S: Co-occurring mental disorders. Bull Am Acad Psychiatry Law 18:271–81, 1990

38. Bland RC, Newman SC, Dyck RJ, et al: Prevalence of psychiatric disorders and suicide attempts in a prison population. Can J Psychiatry 35:407–13, 1990

39. Teplin LA, Abram KM, McCeland GM: Prevalence of psychiatric disorders among incarcerated women: pretrial jail detainees. Arch Gen Psychiatry 53:505–12, 1996

40. Daniel AE, Robins AJ, Reid JC, et al: Lifetime and six month prevalence of psychiatric disorders among sentenced female offenders. Bull Am Acad Psychiatry Law 16:333–42, 1988

41. Liebling A, Krarup H: Suicide attempts in male prisons. Report submitted to the Home Office, London, 1993

42. Joukamaa M: Prison suicide in Finland, 1969–1992. Forensic Sci Int 89:167–74, 1997

43. Hurley W: Suicides by prisoners. Med J Aust 151:188–90, 1989

44. Redding RE: Depression in jailed women defendants and its relationship to their adjudicative competence. J Am Acad Psychiatry Law 25:105–19, 1997

45. Ivanoff A, Jang SJ: The role of hopelessness and social desirability in predicting suicidal behavior: a study of prison inmates. J Consult Clin Psychol 59:394–9, 1991

46. Trestman RL: Mourning in prison: mission impossible? J Am Acad Psychiatry Law 28:232–5, 2000

47. Verona E, Patrick CJ, Joiner TE: Psychopathy, antisocial personality, and suicide risk. J Abnorm Psychol 110:462–70, 2001

48. Felthous AR: Preventing jailhouse suicide. Bull Am Acad Psychiatry Law 22:477–88, 1994

49. Rieger W: Suicide attempts in a federal prison. Arch Gen Psychiatry 24:532–5, 1971

50. Schetky DH: Mourning in prison: mission impossible? J Am Acad Psychiatry Law 26:383–91, 1998

51. Koller KM, Castanos JN: Parental deprivation and attempted suicide in prison populations. Med J Aust 1:858–61, 1969

52. Sinha R, Easton C: Substance abuse and criminality. J Am Acad Psychiatry Law 27:513–26, 1999

53. Metzner JL: An introduction to correctional psychiatry: part II. J Am Acad Psychiatry Law 25:571–9, 1997

54. Kekkevi A, Stefanis C: Drug abuse and psychiatric comorbidity. Comp Psychiatry 36:329–37, 1995

55. Gore SM: Suicide in prisons: reflection of the communities served, or exacerbated risk? Br J Psychiatry 175:50–5, 1999

56. Weitzel SL, Blount WR: Incarcerated female felons and substance abuse. J Drug Issues 12:259–73, 1982

57. Gunn J: Social factors and epileptics in prison. Br J Psychiatry 124:509–17, 1974

58. Fruehwald S, Frottier P, Eher R, et al: Prison suicides in Austria, 1975–1997. Suicide Life Threat Behav 30:360–9, 2000

59. Dooley E: Prison suicide in England and Wales, 1972–87. Br J Psychiatry 156:40–5, 1990

60. Struckman-Johnson C, Struckman-Johnson D, Rucker L, et al: Sexual coercion reported by men and women in prison. J Sex Res 33: 67–76, 1996

61. O'Donoghue JM, Panchal JL, O'Sullivan ST, et al: A study of suicide and attempted suicide by self immolation in an Irish psychiatric population: an increasing problem. Burns 24:144–6, 1998

EXHIBIT L

**Daniel**

62. Leth P, Vesterby A: Homicidal hanging masquerading as suicide. Forensic Sci Int 85:65–71, 1997

63. Kovasznay B, Miraglia R, Beer R, Way B: Reducing suicides in New York correctional settings. Psychiatry Q 75:61–70, 2004

64. Correctional Mental Health Care, Standards and Guidelines for Delivering Services. Chicago, IL: National Commission on Correctional Health Care (NCCHC), 2003

65. American Psychiatric Association: APA Guidelines: Psychiatric Services in Jails and Prisons. Washington, DC: American Psychiatric Association, 1999

66. Simon RI: The suicide prevention contract: clinical, legal and risk management issues. J Am Acad Psychiatry Law 27:445–50, 1999

67. Sovronsky HR, Shapiro I: The New York State Model Suicide Prevention Training Program for local corrections officers. Psychiatry Q 60:139–49, 1989

68. Fox F, Ruby JR, Siska K, *et al*: A descriptive study of emergency admissions to Fairview State Hospital. Bull Am Acad Psychiatry Law 24:403–10, 1998

69. McDonald D, Thomson NJ: Australian deaths in custody, 1980–1989. Med J Aust 159:581–5, 1993

EXHIBIT L