THOMAS E. MONTGOMERY, County Counsel
County of San Diego
By MELISSA M. HOLMES, Senior Deputy (SBN 220961)
    FERNANDO KISH, Senior Deputy (SBN 236961)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531- 5836
E-mail: melissa.holmes@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Patrick Newlander and
Christopher Olsen

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASSIDY NeSMITH, individually and as Guardian ad Litem on behalf of SKYLER KRISTOPHER SCOTT NeSMITH, and as Successor in Interest to THE ESTATE OF KRISTOPHER SCOTT NeSMITH,<br><br>    Plaintiffs,<br><br>    v.<br><br>COUNTY OF SAN DIEGO, SAN DIEGO COUNTY SHERIFF'S DEPARTMENT; WILLIAM D. GORE, SAN DIEGO COUNTY SHERIFF; VISTA DETENTION FACILITY; and DOES 1 – 100 inclusive,<br><br>    Defendants. | No. 15cv00629-JLS (AGS)<br><br>DECLARATION OF ALFRED JOSHUA, M.D., IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

I, Alfred Joshua, M.D., declare:

1.     I have knowledge of the matters set forth herein and could competently testify thereto if called upon.

2.     I was the Chief Medical Officer for the San Diego Sheriff's Department and oversaw all of the medical and mental health care provided in the County detention facilities from November 2013- June 2018.

///

1       3.     I earned my Bachelor of Science at Sophie Davis School of Biomedical

2    Education, MD from Upstate University at Syracuse, and earned an MBA in Healthcare

3    Administration from UC Irvine.  I am also a board certified Emergency Medicine

4    Physician.  I have received a Certification for Certified Correctional Health Professional

5    (CCHP) from the National Commission on Correctional Healthcare.  I have also received

6    the CCHP physician specialty certification (CCHP-P).  As of November 2017, there are

7    only around 70 correctional physicians across the country who has received that

8    designation.

9       4.     The County maintains electronic medical records and paper records for all

10    inmates incarcerated in County detention facilities.  The medical staff and contract

11    physicians that treat inmates in the County detention facilities make notations at the time

12    of treatment, or shortly thereafter.  Those records are maintained electronically in the

13    normal course of business of the County.  True and correct copies of excerpts from

14    Kristopher NeSmith's medical records from treatment he received while incarcerated in

15    County of San Diego jails are attached to the notice of lodgment filed herewith as Exhibit

16    B.

17       5.     The policies, procedures, and training at Vista Detention Facility where Mr.

18    NeSmith was incarcerated met the applicable state standards for providing medical and

19    mental health care when it passed Title 15 regulations, including the regulations

20    involving the provisions of mental health treatment and treating suicidal inmates.  It also

21    met the California Department of Corrections and Rehabilitation Bi-Annual Review

22    which is a mandated comprehensive inspection conducted by the California Standard

23    Authority to ensure the County jails meet the minimum standards for detentions services.

24       6.     On November 30, 2013 at 1:43 a.m., Mr. NeSmith was medically screened

25    by a registered nurse upon intake to the Vista Detention Facility.  He denied having

26    psychiatric/mental health problems, being treated by a physician or a psychiatrist, that he

27    was feeling suicidal or that he had attempted suicide in the past.  When asked, Mr.

28    NeSmith responded that he had not served in the military.  During the intake medical

1  screening, per County policy, procedure, and training the intake nurse evaluates the

2  inmate's physical and psychological condition based on the inmate's statements as well

3  the inmate's appearance.

4      7.      On December 4, 2013 at 5:23 p.m., Mr. NeSmith was escorted by a deputy

5  to the RN Sick Call because Mr. NeSmith's father had contacted the DA reporting that

6  Mr. NeSmith threatened to kill himself if his father did not bail him out.  Mr. NeSmith

7  told the nurse "That's not what I said to my dad.  My dad can be over dramatic. I don't

8  wanna kill myself."  Mr. NeSmith denied a psychiatric history or that he was feeling

9  depressed.  He "strongly" denied suicidal ideations, homicidal ideations, audio

10  hallucinations, and visual hallucinations.  The nurse noted that Mr. NeSmith was alert

11  and oriented, spoke clearly, was calm and cooperative, had good eye contact, the

12  appropriate affect, his thought process was intact.  The nurse checked the medical chart

13  and noted there was not a record of a psychiatric history.  Determining that Mr. NeSmith

14  did not present an immediate threat of suicide, the nurse had Mr. NeSmith contract for

15  safety (agree not to harm himself and ask for help if he felt like he might harm himself)

16  and the nurse advised Mr. NeSmith to notify staff if there was a change in his medical or

17  psychiatric condition.  Because of the time of the day, there was no psychiatrist on duty.

18  The nurse scheduled Mr. NeSmith to see a psychiatrist on December 5, 2013 for a follow

19  up.

20      8.      On December 5, 2013, Mr. NeSmith was evaluated by a psychiatrist, Dr.

21  Venice Cercado.  Dr. Cercado was not a County of San Diego employee.  All

22  psychiatrists working in the jail at the time were contract employees.  Mr. NeSmith again

23  denied suicidal ideation, a psychiatric history or previous suicide attempts.  He was

24  diagnosed as suffering from insomnia and cannabis dependence.  Dr. Cercado prescribed

25  Trazodone, an antidepressant.

26      9.      On December 10, 2013, Mr. NeSmith requested to see the psychiatrist

27  complaining he was suffering from depression and PTSD.  On December 12, 2013, Dr.

28  Cercado, a psychiatrist, noted that Mr. NeSmith complained of depression and sleep

1   issues.  Dr. Cercado's assessment was PTSD and cannabis dependence – both of the
2   conditions were self-reported to the psychiatrist.  Dr. Cercado started Prozac
3   (antidepressant) and Prazosin (drug to help with nightmares associated with PTSD) as
4   well as increasing the dose of Trazodone.

5        10.   On December 24, 2013, Dr. Kathryn Langham, a psychiatrist, discontinued
6   Mr. NeSmith's medications after he had multiple medication refusals and was not
7   showing up at medical call.

8        11.   On January 3, 2014, Mr. NeSmith was treated for a complaint of ringing in
9   his ears.

10        12.   On January 9, 2014, Dr. Cercado completed a follow-up psychiatric
11   evaluation of Mr. NeSmith.  Mr. NeSmith reported problems with Trazodone, stating it
12   gave him anger problems.  Mr. NeSmith denied suicidal ideations.  Dr. Cercado
13   prescribed Doxepin (Sinequan) an antidepressant that assists with insomnia.

14        13.   On January 21, 2014, during a psychiatric chart check, Dr. Cercado stopped
15   the Sinequan because Mr. NeSmith was refusing the medication.

16        14.   On February 2, 2014, Mr. NeSmith was seen for a follow up appointment
17   with psychiatrist, Dr. Robert Enriquez.  Mr. NeSmith reported problems sleeping,
18   increased anxiety, and depression.  He request to be started on Trazodone and Dr.
19   Enriquez prescribed that medication.  Mr. NeSmith again denied suicidal ideation.  Dr.
20   Enriquez instructed Mr. NeSmith to return in four weeks to evaluate his symptoms.

21        15.   On March 1, 2014 at 7:35 a.m., Mr. NeSmith was pronounced dead at 7:35
22   a.m.

23        16.   Inmates in San Diego County jails have access to medical and mental health
24   care if they request it, or if they display symptoms/behaviors warning staff that the
25   inmates require care.  Inmates can submit a medical request slip and they will be
26   scheduled to be seen by the appropriate provider.  Additionally, if there is a medical or
27   mental health emergency, an inmate can request that correctional or medical staff help
28   them get immediate medical treatment.  When inmates are in their cells, there are call

4

1  buttons the inmates can press to speak directly to a deputy if they have an urgent need for

2  treatment.

3       17.    The County nursing staff were provided with appropriate in custody

4  behavior training, including on how to identify, treat, and elevate mental health concerns.

5  At the time of Mr. NeSmith's suicide, the medical staff were trained to identify inmates

6  presenting with suicidal ideations and to provide immediate, appropriate care to those

7  inmates.  The contract psychiatrists who treated Mr. NeSmith were oriented to the

8  County's policies and practices.

9       18.    While suicide risks can be mitigated, it cannot be entirely eliminated.

10  Clinical staff is only able to work with the information provided by the patient, family,

11  and other sources to make decisions that do not deviate from the standard of care.

12       19.    For acutely suicidal individuals, the jail has safety cells (padded rooms with

13  no furniture, a hole in the floor with a grate for a toilet and safety garments that cannot be

14  torn).  It is not the within the standard of care to indiscriminately place an inmate in a

15  safety cell indefinitely or inpatient psychiatric hospitalizations.  If that were the standard

16  of care, it would create an environment where patients were afraid to access mental

17  health services for fear of punitive measures and would create a more dangerous

18  environment for all patients.  The psychiatrists who treated Mr. NeSmith determined that

19  his risk of suicide was not acute in December of 2013, and followed him accordingly.  It

20  would have been an unacceptable practice and violated Mr. NeSmith's rights as a patient

21  to place Mr. Nesmith from December 2013 to his likely prison transfer date into a safety

22  cell or inpatient psychiatric unit.

23       20.    Mr. NeSmith's suicidal statement in December of 2013 was taken seriously.

24  He was assessed by a nurse and then referred to a psychiatrist (the highest level of mental

25  health treatment available) who also assessed him and he was followed by psychiatrists

26  over the months while in the jail.  Mr. NeSmith was reassessed for mental health issues

27  and for suicide again in December, January, and February.  If the treating psychiatrists

28  had determined that he was an acute risk, they had the ability to place Mr. NeSmith into a

No. 15cv0629-JLS (AGS)

1  safety cell or admit him into an acute inpatient psychiatric bed at San Diego Central Jail.

2  The clinical judgment of the psychiatrist makes this determination and the nurse

3  appropriately elevated this concern to the highest level of expertise.  The nurses were also

4  trained on the Policies and Procedures for Safety Cell placement and Psychiatric

5  Stabilization Unit (PSU) although a physician order is required for PSU placement based

6  on a 5150 order.  Even with the new Inmate Safety Program established in February of

7  2015, Mr. NeSmith might have initially been placed in the Inmate Safety Program, but he

8  would not have been indefinitely placed in the Inmate Safety Program based on his

9  presentation when examined by the medical providers in the jail and would not have been

10 housed in the Inmate Safety Program in February or March 2014 because the

11 psychiatrists who evaluated him did not determine he was acutely suicidal.  Nor would he

12 have been sent to the Psychiatric Stabilization Unit (5150) as Mr. Mr. NeSmith did not

13 meet the criteria for Welfare and Institutions Code to place Mr. NeSmith on 5150 for

14 danger to self, others, or grave disability as noted by the assessment by the psychiatrists

15 who evaluated him. Thus, based on the available clinical information and Mr. NeSmith's

16 presentation, he would not have been sent to special mental health housing nor would he

17 have been seen by clinical staff prior to his unfortunate actions to commit suicide.

18        21.    There is no indication that any records of Mr. NeSmith's prior suicide

19 attempts or mental health treatment were provided to the Sheriff's department.  When

20 asked at intake, and during his subsequent mental health examinations with the

21 psychiatrists, he denied prior mental health treatment or a history of suicide.  Moreover,

22 the family did not notify the jail of Mr. NeSmith's mental health history.  There is not a

23 national database for a patient's mental health records.  Before prior mental health

24 records can be obtained, a provider needs to 1) know of their existence; and 2) needs to

25 get a HIPPA release to obtain those records.  Based on HIPPA, there is no current central

26 repository of mental health records that jails would have access to, in order to determine

27 prior mental health care received.  In the event that Mr. NeSmith or his family stated he

28 had prior mental health records, Mr. NeSmith would have to sign a consent form to

6

1   release those records to the San Diego County Jail medical staff.  Without both

2   notification about prior mental health history and the patient signing consent to obtain the

3   records, the jails are unable to access those private medical records.

4        22.    One year after Mr. NeSmith took his own life, an inmate reported that a

5   deputy saw a rope tied to Mr. NeSmith's light fixture but failed to remove it. There is no

6   evidence for this event to have taken place and the investigative reports after the death,

7   failed to show any evidence that a noose was inside the cell nor reports from other

8   inmates about interactions about the noose between Mr. NeSmith and the deputy the

9   hours prior to his suicide.  Even if that had actually occurred, the County policies,

10   trainings, and procedures in place would have addressed that threat of suicide because

11   they provide for a threat of suicide to be taken seriously and for the inmate to be brought

12   to medical for an evaluation if there is a concern of suicidal ideation.

13        23.    At the time of Mr. NeSmith's death, I was aware of a series of articles

14   contending that San Diego County had a disproportionately high suicide rate when

15   compared with other counties in the state.  My understanding at the time, as is my

16   understanding now, is that the calculations in the articles were not accurate because they

17   were based on the average daily population of the jails in each county instead of on the

18   annual bookings when determining suicide rate.  This is because each new booking has

19   the potential of committing suicide.  (Inmates are much more likely to attempt suicide

20   during the initial period after they are booked into jail.)

21        I declare under penalty of perjury under the laws of the State of California that the

22   foregoing is true and correct and that this Declaration was executed on August 10, 2018

23   at San Diego, California.

24

25   _____
                   ALFRED JOSHUA, M.D.

26

27

28