UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| CHASSIDY NESMITH, individually and as Guardian ad Litem on behalf of S.K.S.N., and as Successor in Interest to KRISTOPHER SCOTT NESMITH, | Case No.: 15-CV-629 JLS (AGS) |
|---|---|
| Plaintiffs, | **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| COUNTY OF SAN DIEGO; WILLIAM D. GORE, individually; and DOES 1–100, inclusive, | (ECF No. 119) |
| Defendants. | |

Presently before the Court are Defendants' Patrick Newlander, Christopher Olsen (together, the "Deputy Defendants") and the County of San Diego's Motion for Summary Judgment ("Mot.," ECF No. 119). Also before the Court are Plaintiffs Chassidy NeSmith and S.K.S.N.'s[1] Opposition to ("Opp'n," ECF No. 122) and Defendants' Reply in support of ("Reply," ECF No. 123) the Motion. Having considered the parties' arguments, the evidence, and the law, the Court **DENIES** the Motion.

---

[1] Pursuant to Southern District of California General Order 514-C (May 5, 2003), only the initials of a minor child may be used.

## I.    The Arrest of Kristopher NeSmith

On November 29, 2013, Detective Andy Julian arrested Mr. NeSmith for attempted murder, spousal abuse, and resisting arrest. Pls.' Ex. 8 at 23.[3] There were three incidences for which Mr. NeSmith was arrested. *Id.* On November 27, 2013, a man was punched, choked, and pinned against the ground by a man resembling Mr. NeSmith. *Id.* On November 28, 2013, another man was stabbed by a man identified as Mr. NeSmith, *id.*, whom the victim described as "crazy," *id.* at 32, and "not all there." *Id.* at 33. Finally, on November 29, 2013, Mr. NeSmith was arrested for felony domestic abuse of his wife and resisting arrest outside a gas station. *Id.* at 23. Mr. NeSmith's mother-in-law told deputies that she believed Mr. NeSmith had been involved in the November 28, 2013 stabbing incident. *Id.*; *see also id.* at 36.

The arrest report, dated November 30, 2013, noted that Mr. NeSmith "was in the Marine Corps for the past two years" and "was in the military jail from August to November 2013 for fighting." *Id.* at 23; *see also id.* at 36, 39; *see also* Pls.' Ex. 10 at 8 (Dec. 3, 2013 follow-up report). It also noted that he "ha[d] one prior domestic violence arrest in Orange County in which the charges were dropped" and "an active misdemeanor warrant for a vandalism arrest by the San Diego State University Police Department." Pls.' Ex. 8 at 23.

In a follow-up report dated December 3, 2013, Mr. NeSmith's mother-in-law recounted that, on November 27, 2013, she told Mr. NeSmith that "he was going to get into trouble and go to jail where he just came from and did he want to go to the brig again." Pls.' Ex. 10 at 10. According to his mother-in-law, Mr. NeSmith replied that "he did not care and he did not care if he died." *Id.* Mr. NeSmith was also reported to have said that

---

[2] To the Court's disappointment and despite the nearly 1000 pages of evidence presented, neither party filed a Separate Statement of Material Facts. *See* Civ. L.R. 7.1(f)(1).

[3] Citations to exhibits lacking unambiguous, independent pagination refer to the CM/ECF page numbers electronically stamped at the top of each page.

he was trying "to choke the demon out of [his wife]," that his wife "was not the person he loved," and that she "was an escort for spirits." *Id.* at 13–14. He kept calling his wife by the wrong name, *id.*; *see also id.* at 18; *see also* Pls.' Ex. 9 at 155:1–14, and she thought he was "acting crazy." Pls.' Ex. 10 at 18, 19; *see also* Pls.' Ex. 9 at 155:1–14 (testimony from Mr. NeSmith's mother-in-law at his preliminary hearing that Mr. NeSmith "wasn't himself" during the domestic abuse incident, and that he "was upset and kind of, like, had, like, a crazy look in his eye"). Mr. NeSmith's wife and mother-in-law believed he needed "help." Pls.' Ex. 10 at 13–14, 19–20. His wife told Detective Julian that Mr. NeSmith "would definitely kill himself and he was going to do that in there (in jail)" and that the Sheriff "needed to have someone help him in there because he was not mentally stable" and he "had already tried it at the brig."[4] *Id.* at 21.

## II.    Booking and Intake Screening

On November 30, 2013 at 1:43 p.m., Mr. NeSmith was booked into the Vista Detention Facility ("VDF"). Defs.' Ex. B at 6. No records of Mr. NeSmith's prior suicide attempts or mental health treatment were provided to the Sheriff's Department. Declaration of Alfred Joshua, M.D. ("Joshua Decl."), ECF No. 119-4, ¶ 21. Mr. NeSmith's family also did not notify VDF of Mr. NeSmith's mental health history. *Id.*

As part of the intake process, a nurse went through several questionnaires, including an intake questionnaire, a medical questionnaire, and a psychiatric questionnaire. *See generally* Defs.' Ex. B at 6–15; *see also* Joshua Decl. ¶ 6. In addition to evaluating the inmate's statements, the nurse also is to evaluate the inmate's appearance during the intake process. Joshua Decl. ¶ 6. Mr. NeSmith specifically denied that he had been "feeling

---

[4] A health record from Camp Pendleton dated October 2, 2013, indicates the staff psychologist's belief that Mr. NeSmith "continue[d] to be a moderate acute risk for suicide given his impulsive nature" and "should have ongoing monitoring due to history of gestures of harm to self and others." Pls.' Ex. 7. Mr. NeSmith was diagnosed with a "Personality Disorder, Not otherwise specified (Borderline and Antisocial features)." *Id.* Although Detective Julian obtained some of Mr. NeSmith's records from the Marines as part of his investigation into Mr. NeSmith's alleged crimes, Detective Julian attests that he did not obtain any records indicating that Mr. NeSmith attempted suicide while in the Marines. Declaration of Andy Julian ("Julian Decl."), ECF No. 119-6, ¶ 5.

suicidal," Defs.' Ex. B at 6; that he had ever served in the United States Military, *id.* at 13; that he had current psychiatric/mental health problems, previous mental health history, suicidal ideation, prior suicide attempts, or was currently taking any psychiatric medications. *Id.* at 15; *see also* Joshua Decl. ¶ 6. Following intake, Mr. Nesmith was housed without a cellmate in Upper West Module 1, Cell 44. Defs.' Ex. A at 1; *see also* Declaration of John Ingrassia ("Ingrassia Decl."), ECF No. 119-3, ¶ 4.

Plaintiffs' expert, Dr. A. E. Daniel, a physician specializing in psychiatry, Pls.' Ex. 16 at 222, who served as the Director of Psychiatric Services for the Missouri Department of Corrections between 2001 and 2007, *id.* at 223, has criticized the County's intake process. According to Dr. Daniel, "[a]ll the[ County] did was going through the ten questions in a cursory manner and [Mr. NeSmith] denied suicidal ideation." Pls.' Ex. 11 at 86:18–20. Dr. Daniels notes that "[t]aking 'no' as an answer to questions on suicidal ideation at face value is a significant flaw in the execution of a comprehensive suicide prevention program in a jail setting" because "[m]any seriously suicidal inmates hide their true intent to harm [the]msel[ves]. It is the role of the custodial and mental health staff to consider all the factors in determining the risk of a given inmate." Pls.' Ex. 16 at 232.

Dr. Daniel concludes that Mr. NeSmith "posed a significant suicide risk at the time he was booked and placed in the custody of . . . VDF[], given the history of multiple suicide attempts since May 2013," *id.* at 228, and that "VDF should have known that Mr. NeSmith was of substantial suicide risk." *Id.* at 229. According to Dr. Daniel, there were several factors that should have placed the jail on notice that Mr. NeSmith "had a significant suicide risk at the time he was booked," including "his young age, he's white, he's basically coming into the jail first time and having to face a violent offense charge." Pls.' Ex. 11 at 85:22–86:7. Based on those factors, the prison "should have . . . documented" the risk "and alerted the rest of the staff [as to the] possibility of [a] potential suicide." *Id.* at 86:9–13.

### III. Mr. NeSmith's December 4, 2013 Suicide Threat and the County's Response

Mr. NeSmith's father testified that, when he saw his son at his arraignment on December 4, 2013, "he looked drained. He looked like he hadn't eaten. He looked thin,

circles under his eyes. . . . [H]e didn't look like [his] son." Pls.' Ex. 12 at 99:8–13. After the arraignment, Mr. NeSmith called his father, *id.* at 99:22–24, and threatened to "kill himself." *Id.* at 99:25–100:3; *see also id.* at 102:2–3.

Mr. NeSmith's father took the threat "[v]ery serious[ly]." *Id.* at 102:8–10. He called the public defender's office, telling them that he had "really fe[lt] something [wa]s wrong with [his] son, that he need[ed] help and that he need[ed] to be watched." *Id.* at 102:18–25. Mr. NeSmith's father told them that he had believed his son was being "serious" with the threat. *Id.* at 102:25–103:1. The public defender notified the District Attorney's office, requesting that they "contact the appropriate authorities at the jail for safety and housing of [Mr. NeSmith]." Pls.' Ex. 14.

Detective Julian, who was assigned to investigate the crimes with which Mr. NeSmith had been charged, Julian Decl. ¶ 3, monitored recordings of Mr. NeSmith's telephone calls and non-attorney visits while he was incarcerated in VDF as part of the criminal investigation. *Id.* ¶ 4. After having listened to the recording of Mr. NeSmith's phone call with his father, Detective Julian relayed the threat to a sergeant, who informed Detective Julian that "they would check on [Mr. NeSmith]." *Id.*

Approximately two hours after Mr. NeSmith's threat, he was escorted to a medical treatment room for evaluation. Pls.' Ex. 15 at 218; Defs.' Ex. B at 16. His medical chart indicates that the exam had been a "**PRIORITY**." Defs.' Ex. B at 17. Because of the time of day, there had been no psychiatrist on duty. Joshua Decl. ¶ 7. Mr. NeSmith therefore saw a nurse. *Id.*; *see also* Pls.' Ex. 15 at 218; Defs.' Ex. B at 16. Mr. NeSmith denied that he had threatened to kill himself, saying that his "dad c[ould] be over dramatic" and that "[he had]n't wan[ted to] kill [him]self." Pls.' Ex. 15 at 218; Defs.' Ex. B at 16. He had "denie[d] feeling depressed" and had "[s]trongly denie[d] S[uicidal ideation]/H[omicidal ideation]/V[isual hallucinations]/A[uditory hallucinations]." *Id.*; *see also* Joshua Decl. ¶ 7. The nurse noted that there had been "[n]o psych[iatric] h[istory] in JIMS," the Jail Inmate Management System, and scheduled Mr. NeSmith for a psychiatric follow-up the next day. Pls.' Ex. 15 at 218; Defs.' Ex. B at 16. The nurse told Mr. NeSmith

"to notify staff for change in medical/psych condition," and noted that Mr. NeSmith had "verbalized understanding." *Id.*

The following day, Mr. NeSmith saw Dr. Venice Cercado for a psychiatric evaluation. Pls.' Ex. 15 at 220; Defs.' Ex. B at 18; *see also* Joshua Decl. ¶ 8. Like all of the psychiatrists working in the jail at that time, Dr. Cercado had been a contract employee, not an employee of the County of San Diego. Joshua Decl. ¶ 8. Dr. Cercado noted that Mr. NeSmith had been a "21 yo MCM with [tetrahydrocannabinol] abuse who complain[ed] about sleeping problems." Pls.' Ex. 15 at 220; Defs.' Ex. B at 18; *see also* Pls.' Ex. 18 at 240 (noting that "[c]hief complaint and/or reason for referral" was "sleep"). Dr. Cercado also noted that Mr. NeSmith had denied psychiatric treatment, hospitalization, or previous suicidal attempts. Pls.' Ex. 15 at 220; Defs.' Ex. B at 18. Dr. Cercado noted in Mr. NeSmith's file that he had served in the "marine corp." *Id.* Dr. Cercado prescribed Mr. NeSmith Trazodone, an antidepressant, 50mg qhs. *Id.*; *see also* Joshua Decl. ¶ 8.

## IV. Mr. NeSmith's Subsequent Psychiatric Care[5]

On December 10, 2013, Mr. NeSmith requested to see a psychiatrist for "PTSD, Depression." Pls.' Ex. 17 at 235; Defs.' Ex. B at 19. Two days later, Mr. NeSmith saw Dr. Cercado for the second time. Pls.' Ex. 17 at 236; Defs.' Ex. B at 20; *see also* Pls.' Ex. 33 at 393. Mr. NeSmith reported that he had "still [been] having problems with sleep and [he had been] worrying a lot more at night" and that he had been "waking up in the middle of the night because of nightmares." *Id.* Mr. NeSmith also reported that he had been "feeling depressed and overwhelmed." *Id.*

Dr. Cercado noted that Mr. NeSmith had reported "depression," but had not exhibited any "psychotic of manic s[ymptoms]." *Id.* He prescribed Mr. NeSmith Prozac (an antidepressant) 20 mg qam and Prasosin (a drug to help with nightmares associated with PTDS) 1 mg qhs, and increased his dosage of Trazodone from 50 mg qhs to 100 mg

---

[5] Mr. NeSmith also went to the medical clinic for "ringing in [his] ears" on January 3, 2014, for which he was prescribed an otic suspension. Pls.' Ex. 33 at 396; Defs.' Ex. B at 22; *see also* Joshua Decl. ¶ 11.

15-CV-629 JLS (AGS)

qhs. *Id.*; *see also* Joshua Decl. ¶ 9. Dr. Cercado scheduled Mr. NeSmith for a follow-up in four weeks. Pls.' Ex. 17 at 236; Defs.' Ex. B at 20; *see also* Pls.' Ex. 33 at 393.

On December 24, 2013, Dr. Kathryn Langham, a psychiatrist, discontinued Mr. NeSmith's medications because he had made "multiple refusals" and had "not show[n] up at medication call." Pls.' Ex. 33 at 394; Defs.' Ex. B at 21; *see also* Joshua Decl. ¶ 10.

On January 9, 2014, Mr. NeSmith followed up with Dr. Cercado in the psychiatric clinic. Pls.' Ex. 33 at 398; Defs.' Ex. B at 24. Mr. NeSmith again denied suicidal ideation. *Id.* He reported that the Trazodone had given him "anger problems," so Dr. Cercado prescribed doxepin (Sinequan), an antidepressant, 100 mg qhs. *Id.*; *see also* Joshua Decl. ¶ 12. Because Mr. NeSmith had refused to take the Sinequan, Dr. Cercado discontinued it on January 21, 2014.[6] Pls.' Ex. 33 at 399; Defs.' Ex. B at 25; *see also* Joshua Decl. ¶ 13.

On February 2, 2014, Mr. NeSmith saw Dr. Robert Enriquez for another psychiatric follow-up. Pls.' Ex. 18 at 239; Defs.' Ex. B at 27; *see also* Pls.' Ex. 33 at 401. Mr. NeSmith told Dr. Enriquez that he had been having "d[ifficulty] sleeping, and [had] increasing anxiety and depression." *Id.* Dr. Enriquez also noted that Mr. NeSmith had been "guarded" and had "describe[d] isolative behavior[,] stating that 'Some days [he] do[es]n't want to come out of [his] cell' and . . . he will ruminate about '[how he] le[]t [his] family down.'" *Id.* Dr. Enriquez indicated that Mr. NeSmith's "[m]ood [had been] 'depressed,'" although Mr. NeSmith had "[d]enied suicidal ideation." *Id.* At Mr. NeSmith's request, Dr. Enriquez prescribed 50 mg qha of Trazodone and scheduled another follow-up in four weeks. *Id.*

## V. Mr. NeSmith's Suicide

On March 1, 2014, at approximately 6:58 a.m., Deputy Steven Cerda found Mr. NeSmith unresponsive in his cell during a security check. Pls.' Ex. 23 at 1; Defs.' Ex. A; *see also* Pls.' Ex. 24 at 1. Deputies Cerda and Francisco Rosillo entered Mr. NeSmith's

---

[6] The medications Mr. NeSmith had been prescribed are long-acting, however, meaning that they were effective for two to four weeks. Declaration of Domminick Addario, M.D. ("Addario Decl.") ¶ 7.

15-CV-629 JLS (AGS)

cell and found that Mr. NeSmith had a piece of torn sheet wrapped tightly around his neck. Defs.' Ex. A. Deputy Cerda cut the sheet, and the deputies and jail medical staff took lifesaving measures. *Id.* The Vista Fire Department arrived and took over medical aide. *Id.*

Dr. Fredricks from Tri-City Hospital pronounced Mr. NeSmith deceased at approximately 7:35 a.m. Pls.' Ex. 23 at 1; Pls.' Ex. 24 at 1; Defs.' Ex. A; Joshua Decl. ¶ 15. Dr. Bethann Schaber from the San Diego County Medical Examiner's Office conducted an autopsy on March 2, 2014, and determined Mr. NeSmith's cause of death to be suicide by hanging. Defs.' Ex. A; *see also* Ingrassia Decl. ¶ 4.

### A.    *Testimony of Deputy Patrick Newlander*

Deputy Newlander had been working as a housing rover deputy in the Upper West area of the VDF between 6 p.m. on February 28, 2014, and 6:30 a.m. on March 1, 2014. Declaration of Deputy Patrick Newlander ("Newlander Decl.") ¶ 3. As part of his duties, he had performed hourly security checks with Deputy Christopher Olsen in the Upper West Module 1, where Mr. NeSmith had been housed. *Id.* ¶ 4.

Deputy Newlander is certain that he did not observe a rope affixed to the light in Mr. NeSmith's cell in the days before Mr. NeSmith committed suicide and that Deputy Newlander did not ask Mr. NeSmith whether Mr. NeSmith was going to kill himself. *Id.* ¶¶ 6–7. Although he does not recall seeing a clothesline in Mr. NeSmith's cell, he does recall seeing a "towel hanging." Pls.' Ex. 30 at 63:5–20; Newlander Decl. ¶ 10; *see also* Defs.' Ex. K. Deputy Newlander had assumed that the towel was being held up by a makeshift clothesline. Newlander Decl. ¶ 10. Deputy Newlander would not have left a rope affixed to a light fixture in a cell or have questioned whether an inmate had been suicidal without having taken the inmate to medical for evaluation. Newlander Decl. ¶ 6. It was his practice at the time, however, to leave any clothesline that was not larger than necessary to affix a towel to the end of a bunk. *Id.* ¶ 10; *see also* Pls.' Ex. 30 at 37:4–11. Mr. Newlander considered a clothing line to be "a half inch or less," or "about a nickel," in diameter. Pls.' Ex. 30 at 119:6–17.

Deputy Newlander's last security check of Mr. NeSmith's module had been at approximately 6 a.m. on March 1, 2014, and he specifically recalls having seen Mr. NeSmith during that check. Newlander Decl. ¶ 9. Mr. NeSmith had been standing inches away from his cell window during the check. *Id.* Deputy Newlander remembers Mr. NeSmith having acknowledged him with a nod, which Deputy Newlander had returned. *Id.*; Pls.' Ex. 30 at 63:21–25. Mr. NeSmith did not request medical help.[7] *See* Newlander Decl. ¶ 9.

Deputy Newlander did not receive a note or inmate complaint that Mr. NeSmith had not been eating during his shift. *Id.* ¶ 11. Had he received such a report, he would have followed up on it. *Id.*

### B. Testimony of Deputy Christopher Olsen

Deputy Olsen had worked the night shift as a housing rover deputy in the Upper West House of VDF beginning at 6 p.m. on February 28, 2014, and concluding at 6:30 a.m. on March 1, 2014. Declaration of Deputy Christopher Olsen ("Olsen Decl."), ECF No. 119-5, ¶ 3. As a housing rover, Deputy Olsen had performed hourly security checks of the module in which Mr. NeSmith had been housed, although Deputy Olsen has no independent recollection of Mr. NeSmith. *Id.* ¶ 4; *see also id.* ¶ 7.

Deputy Olsen did not observe a rope attached to Mr. NeSmith's light fixture the night before Mr. NeSmith committed suicide. *Id.* ¶ 7. Had Deputy Olsen seen a rope, he would have had Mr. NeSmith take it down, or Deputy Olsen would have taken it down himself and confiscated it. *Id.* Further, Deputy Olsen would never have made a statement about an inmate potentially committing suicide without having elevated the concern to a medical professional. *Id.*

---

[7] Plaintiffs' expert, Mr. Lichten, opines that Deputy Newlander's 6 a.m. check—and the preceding 5 a.m. security check—of Mr. NeSmith's module was "improperly conducted" because Deputy Newlander did not "stop at or enter [the] cell/holding area, to properly observe the inmate(s)." Pls.' Ex. 55 at 17–18, 20–21. Commander Ingrassia, however, testified that the security checks had been conducted "in compliance with the policy that was in place." Pls.' Ex. 5 at 286:17–23.

No one reported to Deputy Olsen during his shift that Mr. NeSmith had not been eating. *Id.* ¶ 8. Had Deputy Olsen received such a report, he would have followed up on it. *Id.*

### C.    Testimony of Deputy James Dailly

Deputy Dailly had been on duty between 6 p.m. February 28, 2014, and 6:30 a.m. on March 1, 2014. Pls.' Ex. 37 at 499. He did not see a noose hanging in Mr. NeSmith's cell that evening. Defs.' Ex. H at 105:5–106:5.

### D.    Testimony of Inmate Richard Anthony Berumen

Mr. Berumen had been one of Mr. NeSmith's neighbors. Pls.' Ex. 22 & Defs.' Ex. E at 69:3–5. They had been "pretty close" in the three months that they had known each other and had "used to eat together[ and] work out together." *Id.* at 69:11–19; *see also* Defs.' Ex. E at 72:24–73:18. Mr. Berumen had "attached [him]self to [Mr. NeSmith]" because Mr. NeSmith had not been "a normal jail inmate," but "just a normal guy." Pls.' Ex. 22 & Defs.' Ex. E at 69:11–25.

Although they never discussed the charges against Mr. NeSmith, Mr. NeSmith had told Mr. Berumen that he "was looking at a lot of time." *Id.* at 70:6–15; *see also* Defs.' Ex. F at 282:14–20. At one point within a month of Mr. NeSmith's suicide, a sergeant and a deputy had pulled Mr. NeSmith out behind the plexiglass of the module and had asked him whether he wanted to kill himself. Pls.' Ex. 22 & Defs.' Ex. E at 156:6–157:5. There is no prison record of this communication. Ingrassia Decl. ¶ 20.

Mr. Berumen had known that Mr. NeSmith was "going to court" in the week before he committed suicide. Pls.' Ex. 22 at 163:11–17. Mr. Berumen had thought Mr. NeSmith had seemed "[a] little stressed out" and had been "going through it" during these court proceedings. *Id.* at 163:18–22. During this time, Mr. NeSmith had not been eating, *id.* at 163:23–25; Defs.' Ex. F at 280:18–281:14, and had "seemed a little more secluded." Pls.' Ex. 22 & Defs.' Ex. E at 164:1–4. Mr. Berumen knew that Mr. NeSmith had been taking psychiatric medication in the evening, but that he had stopped taking it at some point. Defs.' Ex. F at 278:1–9.

Mr. Berumen testified that, in the days leading up to Mr. NeSmith's suicide, he had been "kind of secluded" and "depressed." Pls.' Ex. 22 at 84:15–21. In the afternoon one or two days before Mr. NeSmith committed suicide, one of the prisoners a few cells over had told Mr. Berumen, "I think Kris is trying to kill himself." *Id.* at 90:16–24, 91:10–14, 97:2–5. When Mr. Berumen had asked why, the inmate had said that Mr. NeSmith was "putting a rope around the light." *Id.* at 91:15–16, 97:10–14; Defs.' Ex. E at 97:10–14.

Mr. Berumen had gone into Mr. NeSmith's cell and had seen the rope. Pls.' Ex. 22 at 91:17–22, 98:6–8; Defs.' Ex. E at 98:6–8; Defs.' Ex. F at 271:2–22. The rope had been "white, made out of a sheet, braided," "wrapped around the whole light," and "about the size of a quarter" in thickness. Pls.' Ex. 22 & Defs.' Ex. E at 98:9–15, 99:8–14. The rope had hung about three or four inches from the top of the light, *id.* at 100:18–101:3, and had been visible from the door to Mr. NeSmith's cell. *Id.* at 100:7–12. Mr. NeSmith had told Mr. Berumen that the rope was a laundry line, but Mr. Berumen had not believed Mr. NeSmith. Defs.' Ex. E at 102:25–103:20. Mr. Berumen and the other inmate who had informed him about the rope had asked Mr. NeSmith whether they would "have to put [him] on a suicide watch." Pls.' Ex. 22 & Defs.' Ex. E at 106:16–107:2; *see also* Defs.' Ex. F at 271:19–22. Mr. Berumen had asked the other inmate to watch out for Mr. NeSmith and to push the button if necessary.[8] Pls.' Ex. 22 & Defs.' Ex. E at 107:3–5.

Mr. Berumen did not report the rope to anybody. *Id.* at 97:21–22. A year after Mr. NeSmith's suicide, *see* Ingrassia Decl. ¶ 14, Mr. Berumen reported for the first time that an unidentified "deputy [had] told [Mr. NeSmith] to take [the rope] down th[e] night [before Mr. NeSmith's suicide] or the day before that." Pls.' Ex. 22 & Defs.' Ex. E at 100:15–17, 107:16–25. Mr. Berumen could recall only that the deputy had been male and not African American. *Id.* at 108:6–109:6. The deputy had told Mr. NeSmith to "[t]ake that thing down" and had asked, "Why are you trying to do, kill yourself?" *Id.* at 109:11–

---

[8] There is a call button in each cell that the inmates can press to speak directly with a deputy in the event of an emergency. *See, e.g.*, Joshua Decl. ¶ 16.

15-CV-629 JLS (AGS)

20. Mr. NeSmith did not respond. *Id.* at 111: 7–13. The deputy did not cut the rope down. *Id.* at 109:21–22. Although Mr. Berumen was not surprised that the deputy had not climbed on top of the toilet to cut the line down himself, Mr. Berumen was surprised that the deputy had not asked Mr. NeSmith to cut the rope down. Defs.' Ex. E at 110:9–22.

Mr. Berumen saw Mr. NeSmith at breakfast on March 1, 2014. Pls.' Ex. 22 at 116:6–9. At that time, Mr. Berumen did not believe that Mr. NeSmith was going to kill himself. *Id.* Mr. Berumen did not look for the rope that morning. *Id.* at 116:10–20.

After breakfast, the prisoners returned to their cells. *Id.* at 118:15–17. Approximately an hour before the next security check, Defs.' Ex. F at 274:1–9, Mr. Berumen thought he may have heard a thumping on the toilet in Mr. NeSmith's cell. *Id.* at 273:6–17. Mr. Berumen asked his cellmate whether they should push the button but his cellmate said "no." Pls.' Ex. 22 at 118:15–25. Mr. Berumen did not want to tell the deputies about Mr. NeSmith because he was worried about retaliation and because he was affiliated with the Mexican Mafia.[9] Pls.' Ex. 22 & Defs.' Ex. E at 164:5–25.

Approximately one year after Mr. NeSmith's suicide, and after a newspaper article came out about the instant litigation, Mr. Berumen told his investigator, Frank Griffin, that he had been in VDF when Mr. NeSmith and Christopher Carroll, who had taken his life a month after Mr. NeSmith, had committed suicide. Defs.' Ex. E at 130:14–131:20. Mr. Berumen asked Mr. Griffin to put Mr. Berumen in contact with Mr. NeSmith's wife's counsel. *Id.* at 132:7–21. Plaintiffs' counsel, Mr. Christopher Morris and Ms. Danielle Pena, visited Mr. Berumen in the San Diego Central Jail on April 16, 2015, and Mr. Morris again visited Mr. Berumen on April 29, 2015. Ingrassia Decl. ¶ 18. The first visit lasted approximately an hour. Defs.' Ex. E at 136:1–2. At the request of Mr. Morris and Ms. Pena, neither meeting was recorded. Ingrassia Decl. ¶ 18; *see also* Defs.' Ex. E at

---

[9] Commander Ingrassia notes that "[t]he same jail politics that would allegedly have prevented Mr. Berumen from warning of Mr. NeSmith's potential suicidal ideations would also have prohibited him from associating with Mr. NeSmith to the extent he testified to" and "[i]t is unusual for a career criminal, such as Mr. Berumen, with the same gang affiliations he had, to have had the type of relationship with Mr. NeSmith that he described in his statement and deposition." Ingrassia Decl. ¶ 15.

136:3–14. Prior to meeting with Mr. Morris and Ms. Pena, Mr. Berumen had never told anyone about the deputy seeing the rope in Mr. NeSmith's cell before Mr. NeSmith's suicide. Defs.' Ex. E at 133:18–22.

After meeting with Plaintiffs' counsel, a local reporter, Kelly Davis, contacted Mr. Berumen. *Id.* at 132:22–133:4. Ms. Davis visited Mr. Berumen on May 7, 2015. Ingrassia Decl. ¶ 19; *see also* Defs.' Ex. F. Mr. Berumen asked whether Ms. Davis would be "writing another article about this" and whether she would be "using his name." Defs.' Ex. F, File 10.99.31.13-554bd6b7553d76.58208811, at 17:25–32. Mr. Berumen gave his permission, but raised his concern about "jail politics." *Id.* at 17:33–18:04. He asked Ms. Davis to "give [him] a heads up" before publishing the article. *Id.* at 21:38–47.

### E. *Testimony of Inmate Michael Hodson[10]*

Michael Hodson had been housed in the Upper West Module of VDF in February 2014, and had been "budd[ies]" with Mr. NeSmith. Declaration of Michael Hodson ("Hodson Decl."), ECF No. 122-2, ¶¶ 1–2. Mr. Hodson noted that, "[a]bout a week prior to his death, Kris [had] stopped eating." *Id.* ¶ 4. Mr. NeSmith told Mr. Hodson that Mr. NeSmith had been "fasting." Defs.' Ex. J at 126:12–24.

Mr. Hodson also remarked that Mr. NeSmith had "had multiple court hearings on the week of his death" and, "[w]hen he would come back from court, Kris [had] looked super depressed and would isolate himself from the other guys." Hodson Decl. ¶ 5. Additionally, "[d]uring this time, Kris [had] stopped taking his medications, which [Mr. Hodson had seen] as a red flag." *Id.* ¶ 6.

The evening of February 28, 2014, Mr. NeSmith had asked Mr. Hodson for some chocolate. Defs.' Ex. J at 126:24–25. Mr. Hodson gave Mr. NeSmith a brownie and some peanut butter, but Mr. Hodson thought Mr. NeSmith had been "just acting weird." *Id.* at 127:1–5. Because he was "so concerned about Kris' welfare, [Mr. Hodson] anonymously

---

[10] Defendants introduced the investigative interview of an inmate identified as M.H. *See generally* Defs.' Ex. J. Due to similarity between the accounts contained in the investigative interview of M.H. and the Declaration of Michael Hodson submitted by Plaintiff, it appears that M.H. is Michael Hodson.

submitted an inmate request stating that 'cell 44 ha[d] not eaten any food'" the night before Mr. NeSmith committed suicide. Hodson Decl. ¶ 7; *see also* Defs.' Ex. J at 132:22–133:12, 133:21–134:11. Although the mailbox was checked after Mr. NeSmith committed suicide, Mr. Hodson's inmate request was never found. Ingrassia Decl. ¶ 13.

Mr. Hodson also had asked Mr. Lamoureux "to watch Kris because [Mr. Hodson had] thought Kris was going to hurt himself" and had been "acting so weird and unlike himself." Hodson Decl. ¶ 8; *see also* Defs.' Ex. J at 127:7–11. Although Mr. Hodson "[had not] know[n whether] Kris was going to kill himself," he had "kn[own Mr. NeSmith] was depressed and [had] not [been] caring for himself properly by not eating." Hodson Decl. ¶ 9; *see also* Defs.' Ex. J at 140:6–20.

At 4 a.m. on March 1, 2014, Mr. Hodson went inside Mr. NeSmith's cell to tell him that he needed to eat his breakfast. *Id.* ¶ 10; *see also* Defs.' Ex. J at 127:4–8, 130:24–131:25. When Mr. Hodson asked whether Mr. NeSmith was OK, Mr. NeSmith "giggled." Hodson Decl. ¶ 10; *see also* Defs.' Ex. J at 128:1–8.

## F. Testimony of Inmate Anthony Lamoureux

Mr. Lamoureux had been housed in the same module as Mr. NeSmith in December 2013. Declaration of Anthony Lamoureux ("Lamoureux Decl."), ECF No. 122-3, ¶ 1. During that time, he had "formed a friendship with" Mr. NeSmith. *Id.* ¶ 2. He and Mr. NeSmith had "eat[en], pray[ed] and spen[t] recreational time together." *Id.*

Mr. Lamoureux noticed that Mr. NeSmith had "started to change" about a week before his death. *Id.* ¶ 3. "Multiple inmates" noticed that Mr. NeSmith "had not eaten in six or seven days." *Id.* Mr. Lamoureux notes that Mr. NeSmith, who had been facing a life sentence, had been going to court the week of his death and "would come back from court more upset every day." *Id.* ¶ 4. "During this time, Kris [had] seemed very depressed an isolated." *Id.*

Because Mr. Lamoureux's cell had been across the hallway from Mr. NeSmith's, allowing Mr. Lamoureux to see inside Mr. NeSmith's cell, *id.* ¶ 5, Mr. Hodson had asked Mr. Lamoureux to keep an eye on Mr. NeSmith on February 28, 2014, "to make sure Kris

didn't do anything stupid." *Id.* ¶ 6. Mr. Lamoureux recounted that "[m]ultiple inmates [had been] concerned for Kris' safety" and that "[i]t [had been] obvious, given his demeanor, not eating and bad days in court that Kris [had been] thinking about doing something stupid." *Id.*

Mr. Lamoureux saw Mr. NeSmith pacing in his cell and holding a sheet around 11 p.m. on February 28, 2014. *Id.* ¶ 7. Mr. NeSmith told Mr. Lamoureux that he was fine, then sat on his bed and stopped pacing. *Id.* Mr. Lamoureux again saw Mr. NeSmith pacing in his cell on the morning of March 1, 2014. *Id.* ¶ 8. According to Mr. Lamoureux, Mr. NeSmith had a "blank look on his face all night and all morning." *Id.*

Mr. Lamoureux says he "feel[s] very guilty about Kris's death because [he] and others knew Kris might do something stupid and though [Mr. Lamoureux] was trying to be very careful and tried to keep an eye on Kris, [he] did not see when he hung himself." *Id.* ¶ 10.

## VI. The Post-Suicide Investigation and the County's Response

Every death in the prison is reviewed by a death review committee comprising three area commanders and the assistant sheriff. Pls.' Ex. 5 at 186:4–13. Additionally, Detectives were called to investigate Mr. NeSmith's suicide. *See generally* Pls.' Exs. 23 & 24. Detectives Brayman and Licudine interviewed eight inmates, Pls.' Ex. 23 at 1–2; Detectives Taylor and Detective Williamson interviewed seven inmates, Pls.' Ex. 24 at 2; and Detectives Brown and Binsfield interviewed six inmates. Pls.' Ex. 25 at 3–4. Ms. NeSmith told the detectives that her husband had been "in good spirits" when she had spoken with him on the phone the night before his death and that "there [had been] nothing about his conversation that . . . [had] put [her] on notice that he [had been] suicidal." Defs.' Ex. C at 237:10–18.

Less than two hours after Mr. NeSmith's death, Liza Macatula from the Sheriff's Department circulated an email concerning Mr. NeSmith's suicide and providing his demographics. Pls.' Ex. 42 at 540. Barbara Lee responded, "This inmate fit the suicide profile – young, white male on serious criminal charges. I'm wondering why he wasn't on

our radar." *Id.* Ms. Lee later noted that "we need to do a better job in putting mental health staff in screening areas." Pls.' Ex. 50.

## VII.   The Relevant Policies and Training

### A.   *The Medical Services Policy (MSD.S.10)*

#### 1.   *March 9, 2011 Version*

A five-page Suicide Prevention & Precaution Program dated March 9, 2011 was in effect as of the date of Mr. NeSmith's suicide. *See* Pls.' Ex. 27. It was disseminated to the Medical Service Division "[t]o delineate procedures designed to identify, monitor and provide treatment to those [inmate/patient]s who present a suicide risk." *Id.* at 1. The policy indicates that "[a]ll staff are responsible for recognizing and observing potential suicidal feelings and behaviors exhibited by an [inmate/patient], reporting the same to appropriate staff, and acting within the limits of their job description to protect the [inmate/patient] and provide treatment." *Id.* Further, "[s]taff are expected to intervene when an [inmate/patient] is mentally impaired, . . . presents as a potential danger to self, danger to others, or unable to care for self." *Id.*

The policy requires that all arrestees "be screened for any prior history of suicide attempts, previous psychiatric treatment, and current thoughts or feelings to harm him/herself, unusual/odd behaviors, and current psychiatric treatment." *Id.* The medical screening nurses are also advised to "assess and observe [the] arrestee for suicide potential during intake" by watching for "[w]arning signs and symptoms," including "[d]epression" (such as "[s]adness/crying," "[w]ithdrawal or silence," "[s]udden loss or gain in appetite," "[i]nsomnia," "[m]ood variations," or "[l]ethargy"); "[i]ntoxication/withdrawal"; "[t]alking about or threatening suicide"; "[p]revious suicide attempts"; "[h]istory of mental illness"; "[p]rojecting hopelessness or helplessness"; "[s]peaking unrealistically about the future and getting out of jail"; "[i]ncreasing difficulty relating to others"; "[n]ot effectively dealing with present, is preoccupied with past"; "[g]iving away possessions, packing belongings"; "[s]evere aggressiveness"; "[p]aranoid delusions or hallucinations"; "[f]irst time in custody/spousal abuse"; and "[y]oung white male." *Id.* at 2. The policy also

identifies several "high risk suicide periods," including "[t]he first 24 hours of confinement"; "[i]ntoxication/withdrawal"; "[t]rial and sentencing hearings; severe sentences"; "[i]mpending release"; "[d]ecreased staff supervision"; "[w]eekends and holidays"; and "[b]ad news from home." *Id.* at 2–3.

The Board of State and Community Corrections ("BSCC") reviewed the policy and determined that it complied with Title 15. Ingrassia Decl. ¶ 8. Dr. Joshua testified that nurses "are trained to basically recognize symptoms of people who might pose a risk as well as the sworn staff could come to them with information." Pls.' Ex. 28 at 247:18–21. He added, however, that "they are not actively in the housing modules 24/7 looking at each individual one-on-one." *Id.* at 247:21–23. Mr. Ingrassia never directed sworn staff to review the medical suicide policy. Pls.' Ex. 5 at 95:19–96:4.

### 2. December 10, 2015 Version

An amended policy was issued December 10, 2015. *See generally* Pls.' Ex. 19 at 247–53. Among other things, the amended policy provides, like the former version, that "[a]ll staff are responsible for recognizing and observing potential suicidal feelings and behaviors exhibits by an [inmate/patient], reporting the same to appropriate staff, and acting within the limits of their job description to protect the [inmate/patient] and provide treatment." *Id.* at 247. The policy enumerates several risk factors. *Id.* at 249–50. The amended policy, however, identifies several "High Risk" factors, including "[h]igh publicity case . . . with serious felony charges"; "Severe, Life, or Death Sentence"; "[inmate/patient] states he/she is suicidal and/or made suicidal statement to sworn staff, medical, family, etc."; "[p]revious suicide attempts (within the past five years)"; "[s]taff observation of depressed/emotional turmoil." *Id.* at 249. "Other Risk Factors" include "History of Psychiatric Illness (Determined by Medical)"; "[f]irst time offender"; "[p]hysical signs of depression such as sadness/crying, hopelessness, withdrawal/silence, sudden loss or gain in appetite, insomnia, mood variation or lethargy"; "Intoxication/Withdrawal Symptoms"; "[t]alking about or threatening suicide"; "[d]istant history of previous suicide attempts"; "[h]istory of mental illness"; "[s]peaking

unrealistically about the future and getting out of jail"; "[i]ncreasing difficulty relating to others"; "[n]ot effectively dealing with present, is preoccupied with past"; "[g]iving away possessions, packing belongings"; "[s]evere aggressiveness"; "[p]aranoid delusions or hallucination"; and "[y]oung white male." *Id.* at 249–50.

### B. The San Diego County Sheriff's Department Detention Services Bureau's Manual of Policies and Procedures on Inmate Suicide Prevention Practices & Inmate Safety Program (J.5)

#### 1. September 1, 2010 Version

The two-page J.5 manual on "Inmate Suicide Prevention" effective during Mr. NeSmith's incarceration provides that "[s]worn staff shall immediately notify medical staff and keep any inmate under close observation when that inmate presents a potential danger to self, danger to others or [is] unable to care for self. The nature and extent of the problem shall be described and documented." Pls.' Ex. 3 at 1. It further provides that, during intake, "[e]very inmate . . . shall be screened for history of attempted suicides, suicidal thoughts or feelings, previous treatment, or hospitalization for suicidal actions" and that, after intake, "[a]ll reports of suicidal behavior shall be considered serious." *Id.*

Plaintiffs' expert, Dr. Daniels, notes that "[t]he suicide policy at San Diego County Jail offers no guidance on identifying inmates who potentially would be suicidal, which may include anxiety, agitation, depression, self-isolation, sleep difficulties, refusing medication, change in eating habits, distressing or bad news from the family or court and phases in criminal proceedings." Pls.' Ex. 16 at 230. Further, "[t]he San Diego jail policy does not address different levels of suicide watch." *Id.*

#### 2. November 20, 2015 Version

The J.5 policy was amended to November 20, 2015. *See generally* Pls.' Ex. 19. It now identifies several "risk factors for consideration of placement into an [Inmate Safety Program ("ISP")] housing." *Id.* at 1. Factors requiring placement into ISP housing include "[h]igh publicity case . . . with serious felony charges"; "[s]evere, life or death sentences"; "[t]he inmate states he/she is suicidal and/or made suicidal statements to sworn staff,

medical, family, etc."; "[p]revious suicide attempts (within past five years)"; and "[s]taff observation of depressed/emotional turmoil." *Id.* at 1–2. Additional factors that may warrant consideration of placement into ISP housing include "[h]istory of psychiatric illness"; "[f]irst time offender"; and "[a]dditional warning signs and symptoms," including "[p]hysical signs of depression (sadness, crying, withdrawal or silence, sudden loss or gain in appetite, insomnia, mood variations, lethargy, etc.)," "[i]ntoxication/withdrawal," and "[s]evere aggressiveness." *Id.* at 2.

### C.    *Clotheslines*

There is no "policy . . . [that] specifically mentions clotheslines," Pls.' Ex. 5 at 193:18–24, although deputies are required to conduct security checks on an hourly basis. Ingrassia Decl. ¶ 11. During such checks, deputies are responsible for looking for security issues. *Id.* "A rope or a rope with a noose wrapped around a light fixture . . . is an inmate safety issue as well as a security concern that require[s] the immediate attention of the deputies, per the training and practice." *Id.* Consequently, deputies performing security checks are supposed to take clotheslines down, although in practice this "var[ies] from deputy to deputy." Pls.' Ex. 5 at 194:10–17; *see also* 193:5–17. Deputy Cerda, for example, testified that it was his understanding that he should remove clotheslines. Defs.' Ex. I at 136:2–23. Deputy Newlander, on the other hand, testified that it had been his practice to leave any clothesline that was less than half-an-inch in diameter. *See* Newlander Decl. ¶ 10; Pls.' Ex. 30 at 37:4–11, 119:6–17.

### D.    *Training on Suicide Prevention*

Commander Ingrassia notes that, "[f]rom the onset of a San Diego Sheriff's Department detention deput[y's] career, training related to suicide awareness and prevention is provided." Ingrassia Decl. ¶ 6. For example, "Module 15.2 of the Sheriff's Detention Academy consists of a 2.5 hour block titled 'Mental Health Issues.'" *Id.* "Instructional objectives of the block include, but are not limited to, identifying signs of mental health issues in inmates, signs and symptoms of inmates posing a suicide risk, and deputies' responsibilities when dealing with at-risk inmates." *Id.* "Deputies are also issued

15-CV-629 JLS (AGS)

a deputy[] notebook that includes suicide prevention information for quick reference." *Id.* Further, "[a]fter completing the Academy, deputies receive ongoing training and education related to mental health issues and suicide prevention practices." *Id.*

Briefing Training Topic #21: Suicide Prevention and Awareness for Inmates was prepared by the Detention Training Unit and revised on December 18, 2013, although it is unclear from the record to whom, if anyone, this training was provided. Pls.' Ex. 41. According to the handout, "[t]he purpose of this training [wa]s to familiarize staff with the policy and procedures regarding an inmate who exhibits psychiatric behavior issues and possible intervention for suicide." *Id.* at 1. The handout notes that "[e]very inmate arriving at intake shall be screened for history of attempted suicides, suicidal thoughts or feelings, previous treatment or hospitalization for suicidal actions." *Id.* After intake, "**[a]ll reports of suicidal behavior shall be considered serious**," although "[p]otential[ly] suicidal inmates generally shall not be isolated except upon the order of the medical or psychiatric staff." *Id.* at 2 (emphasis in original).

Section IV of the handout discusses "SUICIDE AWARENESS." *Id.* at 3. The purpose of this section was "[t]o familiarize staff with those who are at risk for suicide and possible characteristics of suicidal inmates." *Id.* The handout cautions that "[s]uicide is the leading cause of death in U.S. Jails," and provides a list of characteristics of "[i]nmates who are at risk for suicide," including "First Offense," "Facing Long Sentence," "violent History," "Family Suicide," "Drugs/Alcohol," "[c]ulture considers suicide honorable," "[f]irst 24 hours of being in custody," "Personal Tragedy," "Suicidal History," "Mentally Ill," and "Pillar of Society." *Id.* The handout also notes that "[a] suicidal inmate will portray some or many of the following characteristics," including "[l]ook sad," "[n]ot able to sleep," "[f]eel hopeless," "[w]ill be withdrawn," "[g]ives things away," "[s]uddenly '[i]mprove,'" "[l]ook and feel tired," "[n]ot eating," "[f]eel worthless," "[r]efuse treatment," "[w]rite a will," and "[n]o plan for the future." *Id.*

Deputy Olsen testified that there had been "annual training and [a] plan" that "include[d]" the identification of potential suicide risks. Pls.' Ex. 36 at 17:7–13. Deputy

Newlander similarly testified that deputies had "received training on suicide in the jail regularly," including "warning signs of suicide and inmates in mental distress." Newlander Decl. ¶ 8. Deputy Cerda understood that it had been deputies' "responsibility . . . to identify characters that might -- might give us indication that they're -- a person may be suicidal." Defs.' Ex. I at 116:22–25. He testified that he had been trained to identify indications that somebody might have been suicidal, such as whether it had been the inmate's "first time in jail, what type of charges are they facing, is there any distress with the person," "[w]hether a person may become isolated, they become distant, they become disheveled, they're not acting themselves or . . . not the norm. They may not be eating. . . . They may not be showering. They may not be taking care of themselves." *Id.* at 117:1–12, 119:8–120:6.

Plaintiffs' expert, Dr. Daniels, however, opines that suicide prevention "[t]raining topics must include: (1) identification of high-risk offenders; (2) how to identify signs and symptoms of mental illness; and (3) how to handle communication of intent. Training must occur regularly."[11] Pls.' Ex. 16 at 231. He concludes, "[b]ased on the available

---

[11] Similarly, a 2007 World Health Organization report entitled *Preventing Suicide in Jails and Prisons* notes that because, "[a]s a group, inmates have higher suicide rates than their community counterparts," Pls.' Ex. 29 at 3, "[a] first important step towards reducing inmate suicide is to develop suicide profiles that can be used to target high-risk groups and situations." *Id.* at 5. For example, "[p]re-trial inmates who commit suicide in custody are generally male, young (20-25 years), unmarried, and first time offenders who have been arrested for minor . . . offences." *Id.* "They . . . commit suicide at an early stage of their confinement, often within the first few hours." *Id.* (footnote omitted). "A second period of risk for pre-trial inmates is near the time of a court appearance, especially when a guilty verdict and harsh sentencing may be anticipated." *Id.* "A great deal of all jail suicides occurred within three days of a court appearance." *Id.*

The publication notes that "[t]he essential component to any suicide prevention programme is properly trained correctional staff, who form the backbone of any jail, prison, or juvenile facility." *Id.* at 9. Indeed, "[v]ery few suicides are actually prevented by mental health, health care or other professional staff because suicides are usually attempted in inmate housing units, and often during late evening hours or on weekends when they are generally outside the purview of programme staff." *Id.* Consequently, "[a]ll correctional staff, as well as health care and mental health personnel, should receive initial suicide prevention training, followed by refresher training every year." *Id.* "At a minimum, initial suicide prevention training should include, but not be limited to, the following: why correctional environments are conducive to suicidal behaviour, staff attitudes about suicide, potential predisposing factors to suicide, high-risk suicide periods,

15-CV-629 JLS (AGS)

information, the San Diego County Jail does not provide adequate and continuing training for its officers and mental health staff." *Id.*

Deputy Dailly testified that the operative policy had provided no guidance as to what to do before a suicide takes place. Pls.' Ex. 35 at 46:3–17. He also testified that he had not been "trained . . . on how to identify inmates with a present risk of suicide." *Id.* at 48:22–49:5.

## VIII. The *CityBeat* Articles and the County's Response

### A. The March 27, 2013 Article

On March 27, 2013, *San Diego CityBeat* published the first article in an investigative series called *60 Dead Inmates*, addressing the high incarceration mortality rate in San Diego County jails. *See* Pls.' Ex. 38. The article was entitled "How Many Inmate Deaths Is Too Many?," and was authored by Dave Maass and Ms. Davis. *Id.* The article noted that, as of September 2012, 60 inmates had died in the custody of the San Diego County jail system since 2007. *Id.* at 2. *CityBeat* reported that 29 of those deaths had been suicides, with 16 by hanging. *Id.* at 5.

The article also compared the mortality rate of the San Diego County jail system against those of California's other large jail systems. *Id.* at 9. Between 2000 and 2007, San Diego County jails had reported 195 deaths per 100,000 inmates, the second highest rate.[12] *Id.* San Diego County's rate had increased between 2007 and 2012, increasing to 202 deaths per 100,000 inmates. *Id.* Between 2000 and 2012, San Diego County had reported the highest rate among California's jail systems at 218 deaths per 100,000 inmates. *Id.* The article noted that "[t]he San Diego County Sheriff's Department [had] challenged the mortality-rate method of measuring deaths, specifically with suicides, claiming that it [had] produce[d] 'mathematically exaggerated' numbers." *Id.* at 10. Sheriff's

---

warning signs and symptoms, recent suicides and/or serious suicide attempts within the facility/agency, and components of the facility/agency's suicide prevention policy." *Id.* at 9–10.

[12] Dr. Daniel, Plaintiffs' expert, testified that "when you have a higher suicide rate, that rings a bell to the providers, both the jail staff and the medical mental health staff and the administrators to do something to decrease [it]." Pls.' Ex. 11 at 147:12–15.

spokesperson Jan Caldwell commented that the "Detentions Services Bureau regularly [had met] to examine and review all inmate deaths to ascertain the circumstances of death and ensure all of our policies and procedures [had been] followed. The objectives of this assessment [had been] to thoroughly review and learn from the events, make any necessary changes based on these events and ascertain if the events [had been] preventable." *Id.* at 11.

The article also reported that, in 2008, the San Diego County Citizens' Law Enforcement Review Board's ("CLERB") then-chair had written to the Sheriff to express the CLERB's concern about a breakdown in communication during shift changes, recommending that "[b]riefings at shift changes . . . should routinely include information about inmates identified as suicide risks" and that "[a] checklist that includes the status of at-risk inmates . . . would enhance continuity of care." *Id.* at 12–13; *see also* Pls.' Ex. 40. The Sheriff's medical director had rejected the recommendation, noting only four suicides during the fiscal years between July 1, 2007, and June 30, 2009,[13] and indicating that "it [wa]s not practical to add these systems to the current program." Pls.' Ex. 38 at 13; *see also* Pls.' Ex. 41.

Following the publication of the March 27, 2013 *CityBeat* article, Commander Ingrassia held "discussions with [the Sheriff's] media relationship person[,] Jan Caldwell." Pls.' Ex. 5 at 77:13–24, 79:3–9. One of the things Commander Ingrassia had discussed with Ms. Caldwell was "the method[ology] . . . for the calculations." *Id.*; *see also id.* at 80:21–81:3. At this time, Mr. Ingrassia came up with the idea that it might be more accurate to look at the total number of bookings rather than the average daily population. *Id.* at 81:18–22. Mr. Ingrassia believed that, due to "very liberal acceptance criteria . . . , a lot more people at risk" had been booked into his facilities. *Id.* at 83:4–12.

/ / /

---

[13] There actually had been six suicides during this period, with a seventh occurring on July 3, 2009, three days into the next fiscal year. *Id.*

## B.     The April 24, 2013 Article

*CityBeat* published the second article in its series, "Suicide in the Cell," on April 24, 2013.  Pls.' Ex. 39.  The byline noted that "[i]nmates kill themselves at a high rate after San Diego County Sheriff's Department refuses to revamp policies."  *Id.* at 1.  The article reported that the San Diego County Sheriff's Department had recorded sixteen inmate suicides between 2007 and 2012, and that only Los Angeles County—which had had a jail system approximately four times the size of San Diego's—had recorded more suicides during that period.  *Id.* at 2.  Lindsey Hayes, a suicide-prevention expert with the National Center on Institutions and Alternatives, commented that "[w]hen [he] investigate[s] a jail system that's had [16] suicides in a six-year period, [he] tend[s] to find that there were either bad practices or preventable deaths in many of the cases."  *Id.* at 3 (fourth alteration in original).

*CityBeat* reported that "San Diego [had] had the second-highest suicide rate among the state's large jail systems:  54 suicides per 100,000 inmates, more than 60 percent higher than the average."  *Id.* at 2–3.  The Sheriff's Department spokesperson, Ms. Caldwell, described the statistics as "mathematically exaggerated," *id.* at 3, and "the department's medical screening and care as 'excellent.'"  *Id.* at 4.  She also commented that "[t]he sad reality is that a person who is determined to commit suicide will commit suicide, and by using the everyday objects within their reach."  *Id.* at 2.

The April 24, 2013 article also noted that "[t]he jail system's written suicide-prevention policies [had been] brief."  *Id.* at 7.  During intake, every inmate had been asked whether he or she had considered suicide, attempted suicide, or been hospitalized for suicidal thoughts.  *Id.*  "After intake, '[a]ll reports of suicidal behavior [were to] be considered serious,' the policy says."  *Id.* (alteration in original).

Following publication of the article, Michael Glick forwarded the article, cc'ing Commander Ingrassia, with the subject line "Inmate Suicide Prevention."  Pls.' Ex. 51.  He noted that "[o]ur command began a review of our inmate suicide prevention practices to determine if there were any other precautions we could take to reduce the number of in-

custody suicides" and that "[i]t was determined JPMU could provide an extra layer of protection in this regard by considering certain factors during the inmate classification interview," although, "[i]n most cases, no additional scrutiny is required on our part." *Id.* He added that, "in cases of high publicity arrests or very serious crimes, you should consider the possibility of the inmate contemplating taking his or her own life." *Id.* He cautioned that, "[j]ust because an inmate states they are not suicidal during the intake process does not mean that will not change once the gravity of the situation and/or sobriety sinks in" and to "try not to house them alone if at all possible" because "[h]aving a cellmate could prevent an inmate from committing suicide or at least provide a warning to staff by the cellmate." *Id.*

## C.    *The October 16, 2013 Article*

On October 16, 2013, *CityBeat* published an article entitled "10 More Dead Inmates." Pls.' Ex. 45 at 547. The article reported that there had been four suicides to date in San Diego County jails in 2013, as compared to a six-year average of just under three per year. *Id.*

On October 18, 2013, Captain Frank Clamser of the San Diego County Sheriff's Department sent the article to several others in the Department, including Commander Ingrassia. *Id.* at 546. Mark Elvin forwarded the article more broadly, noting that "[w]e will be discussing [this] further at our next Captain/Manager meeting." *Id.* Michael Glick then forwarded the article to Greg Rose and Luis Navarro, saying, "I'm sure the command will want to know where we are in terms of our suicide reduction strategies." *Id.*

On October 21, 2013, Lieutenant Robert Mitchell separately forwarded the article, asking that it be "read . . . at your next briefing." Pls.' Ex. 52 at 572. He added that "A/S Elvin is planning to speak to all Detentions Managers about this article at the next DSB meeting, which will undoubtedly cover department liability, 11-53 quality and timeliness, and overall supervision." *Id.* He also requested that the recipients "remind everyone . . . to be diligent and thorough in the way they conduct security checks, as well as place close attention to those occasional high risk inmates that are a potential suicide risk." *Id.*

### D.    Subsequent Developments

In November 2013, an email went out about "October 2013 Statistical Reports." Pls.' Ex. 53 at 576.  Lieutenant Paul Lewis told staff at VDF to "review these stats" and "[n]ote the increase in suicide attempts . . . as compared to last year." *Id.*  For year-to-date in 2013, there had been 70 suicide attempts, up from 56 in 2012.  *Id.* at 577.  In October 2013 alone, there had been 11 attempted suicides.  *Id.*

In December 2013, Commander Rich Miller emailed Ms. Lee and Dr. Joshua Alfred about "In-Custody Death Numbers," noting:

> It appears we still have a problem with reporting in-custody death numbers.  I have to be perfectly honest, I don't understand how the Medical division doesn't know how many inmates committed suicide this year????  How is it possible that we report 3 and we had 5??

> I want this fixed and I want it fixed ASAP!!  This has reached the point of being embarrassing. . . .  [W]e should be able to accurately report in-custody deaths.

Pls.' Ex. 46.

In February 2014, Dr. Alfred circulated a "100 day report."  Pls.' Ex. 54 at 580.  Ms. Lee forwarded the report "to give . . . an idea of the direction [the Mental Services Division is going" because "[t]imes have changed and we have to elevate our game."[14]  *Id.* at 579.

In January 2015, the county "implemented a 'suicide matrix' to help identify inmates at risk of killing themselves," pursuant to which "[s]uch inmates [we]re [to be] checked every half hour, and get a visit with mental health staff at least daily."  Pls.' Ex. 6 at 2.

---

[14] As a comparison point, on April 30, 2012, for example, Captain Edna S. Milloy of VDF sent an email about "VDF Psychiatric Services," noting that, "[a]t the most recent meeting with medical staff[,] discussion was raised regarding expanding psych services at VDF."  Pls.' Ex. 43.  She expressed concern that psychiatric patients "are deteriorating while housed at VDF because[,] unlike SDCJ[,] we don't offer anything extra in the way of psych services."  *Id.*  The Captain noted several programs proposed by Dr. Goldstein, including a "Mobile Psych Team" and supplemental mental health services, including a 6-week group program.  *Id.*

15-CV-629 JLS (AGS)

## IX. Suicides in the Vista Detention Facility Between 2012 and 2013

### A. March 3, 2012[15]

On November 25, 2011, the day the inmate had been booked into VDF, he tried to hang himself in an intake holding cell. Pls.' Ex. 32 at 366. He had been diagnosed with major depression and housed in the Psychiatric Security Unit for the next month. *Id.* On January 31, 2012, he was returned to the Vista Detention Facility and housed in an administrative segregation unit. *Id.* He was prescribed psychotropic medication and seen by a psychiatrist on February 26, 2012. *Id.* On March 3, 2012, the inmate was given breakfast at 4:25 a.m. *Id.* Nothing unusual was found during a security check conducted at 5:09 a.m. *Id.* At 6:05 a.m., a deputy found the inmate hanging in his cell. *Id.*

During the investigation that followed, one inmate noted that he had been "aware that [the deceased inmate had been] suicidal because [the deceased inmate had] asked [the other inmate] for advice on how to commit suicide." *Id.* at 367. The witness had informed an officer about the conversation about five weeks before the suicide occurred. *Id.* Another inmate reported that he had heard the deceased inmate yell out, "Help, come help me," at approximately 4:30 that morning. *Id.* at 368.

### B. February 7, 2013

The inmate had been booked at VDF on February 6, 2013 at 3:01 p.m. *Id.* at 370. At 10:12 a.m. on February 7, 2013, the inmate jumped head first from the second tier railing of the module. *Id.* at 369. The inmate passed away on February 12, 2013. *Id.*

The inmate's cellmate had stopped the inmate from hanging himself after breakfast that morning. *Id.* at 371–72. It had been noted during pre-booking that the inmate had had an abrasion on his left wrist, although the inmate had denied being suicidal. *Id.* at 370. The booking photograph also had shown a narrow red mark across the front of the inmate's neck. *Id.* The inmate had been scheduled for a court hearing on February 8, 2013. *Id.*

---

[15] There was one prior suicide in 2012 for which Defendants refused to turn over records to Plaintiffs. *See* Declaration of Daniell R. Pena ("Pena Decl."), ECF No. 122-1, ¶ 9.

### C. April 17, 2013

Shortly before noon on April 17, 2013, two deputies conducted a security check of the inmate's cell. *Id.* at 373. The deputies entered the cell as part of the security check and found a laundry line. *Id.* One of the deputies attempted to remove the laundry line but had been unable to do so. *Id.* The deputies completed the security check, intending to inform the inmate to remove the laundry line after he had been locked down.[16] *Id.* At approximately 1:24 p.m., during the next security check, the inmate was discovered hanging in his cell. *Id.*

### D. April 28, 2013

During a security check on April 28, 2013, an inmate at the Las Colinas Detention Facility was found hanging by a sheet from her bunk at 2:09 p.m. *Id.* at 374. A security check had been completed at 12:16 p.m., *id.* at 376, but the deputies did not perform a security check at 1 p.m.[17] *Id.* at 374. The inmate had had a court appearance scheduled for the following day, *id.*, with jury selection to begin the following week. *Id.* at 376. She also had had a court appearance on April 26, 2013. *Id.* After returning from court on April 26, 2013, the inmate had refused recreation yard, shower, and dayroom time. *Id.*

The inmate had had a "long and documented history of psychiatric problems." *Id.* at 375. She had only recently returned from Patton State Hospital, where she was being treated so she could be found mentally competent to stand trial; nonetheless, she denied any history of suicidal behavior. *Id.*

### E. August 29, 2013

The inmate had been booked into VDF on August 22, 2013. *Id.* at 377. He had disclosed to medical staff that he had been suffering from alcohol withdrawal;

---

[16] The CLERB later recommended that the Sheriff "take appropriate disciplinary action" because the deputies had failed to remove the unauthorized laundry line or confront the inmate to direct its removal. *Id.* at 383.

[17] The CLERB later recommended that the Sheriff "take appropriate disciplinary action" because the deputy incorrectly had logged the hourly security check scheduled for 1 p.m. as being complete. *Id.* at 384.

15-CV-629 JLS (AGS)

consequently, he had been housed in the medical section of the facility for monitoring. *Id.* For "safety reasons," the inmate had asked to be moved out of the medical ward on August 26, 2013. *Id.* at 378. Although another inmate had informed the deputy that the inmate in question had been "weird" and "always talking to himself," the inmate had been cleared for mainline housing on August 27, 2013. *Id.* at 377, 378. The inmate had requested a psychiatric appointment the next day. *Id.*

The inmate hanged himself on August 29, 2013. *Id.* at 379, 381. One inmate informed investigators that the deceased inmate had been "strange" and had not "appear[ed] to be of good health or mental stability." *Id.* at 379. Another inmate reported that the deceased inmate had "seemed depressed and [had been] staring at the ceiling," "[had] always [been] by himself[,] and [had] never really spoke[n] with anyone." *Id.* at 380.

### F. *November 18, 2013*

During booking, the inmate had denied any psychological or medical problems, although a prior JIMS entry indicated that the inmate had had psychological issues. *Id.* at 382. The inmate had denied being depressed or suicidal or any past suicide attempts but had been scheduled for the next psychiatric sick call. *Id.* The inmate had been seen at psychiatric sick call on November 3, 2013, at which time he had denied depression, mania, or delusions. *Id.*

On November 16, 2013, at 9:45 p.m., the deputy conducting the security check noticed the inmate had been pacing in his cell. *Id.* The inmate had appeared visibly upset. *Id.* When the deputy asked what was wrong, the inmate had responded, "Go the fuck away, they're gonna kill me tomorrow." *Id.* The inmate had had a shank in his hand. *Id.* The deputy had taken the shank and had asked whether the inmate would like to see the medical staff. *Id.* The inmate had refused. *Id.* The deputy had conducted an additional security check and had spoken with the inmate throughout the deputy's shift. *Id.* The inmate had denied being suicidal. *Id.* Nonetheless, the deputy had contacted medical staff and had requested that the inmate be scheduled for psychiatric sick call. *Id.*

On November 17, 2013, a nurse met with the inmate in his cell. *Id.* The inmate had been standing on his bed facing the wall, and had told the nurse that he had been "ok" and had been "doing [his] spiritual cleansing." *Id.* The nurse noted that he had "smiled and laughed inappropriately." *Id.* The inmate again denied being suicidal, but was signed up for psychiatric sick call. *Id.* Although the report does not indicate the date or manner of death, an autopsy conducted on November 26, 2013, indicated that the inmate had not suffered any trauma. *Id.*

## X.  The Instant Litigation

Mr. NeSmith's wife, suing individually, as guardian ad litem on behalf of her daughter, and as successor in interest to Mr. NeSmith's estate, filed the instant action on March 20, 2015, against the County, the San Diego County Sheriff's Department, Sheriff William D. Gore, and VDF, alleging three causes of action under 42 U.S.C. § 1983 for deliberate indifference to Mr. NeSmith's serious medical needs, failure to train, and failure to implement suicide policies; negligence; and wrongful death. *See generally* ECF No. 1. Plaintiffs filed an amended complaint against only the County and Sheriff Gore, adding a cause of action for medical malpractice. *See* ECF No. 10.

### A.  The First Motion to Dismiss

Defendants moved to dismiss, *see generally* ECF No. 12, a motion the Court granted in part and denied in part. *See generally* ECF No. 18. First, the Court dismissed Plaintiffs' claims against Sheriff Gore on the grounds that he was entitled to qualified immunity because his "failure to implement a superior suicide policy [did not] violate[] clearly established law." *Id.* at 14 (citing *Conn v. City of Reno*, 572 F.3d 1047, 1085–91 (9th Cir. 2007), *vacated*, 131 S. Ct. 1812, *reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011)).

Second, the Court denied Defendants' motion as to Plaintiffs' wrongful death cause of action, concluding that, "[t]aking the factual allegations in the Amended Complaint as true . . . , VDF staff in this case had an abundance of notice that Kris was suicidal and posed an immediate danger to himself," *id.* at 16, and therefore Defendants were not entitled to immunity under California Government Code section 845.6. *Id.* at 15–17.

Finally, the Court dismissed without prejudice the Section 1983 claims against the County. *See id.* at 17–29. The Court first determined that Plaintiffs adequately had alleged that a County employee was deliberately indifferent to Mr. NeSmith's serious medical need because a "deputy saw Kris fastening an object to a light fixture and appreciated the fact that it was a makeshift noose" but had "failed to appropriately respond" and "a deputy overheard Kris stating repeatedly that he intended to kill himself and took no action"; however, "Plaintiff[s] ha[d] not pleaded facts showing an individual employee involved in the psychiatric evaluation process, such as a mental health professional, acted with deliberate indifference." *Id.* at 22–23.

The Court next determined that Plaintiffs had failed to allege a custom or policy amounting to deliberate indifference under either a single-incident theory of liability, *see id.* at 24–25, or under a theory of a pattern of constitutional violations. *See id.* at 26–28. As for single-incident liability, the Court concluded that Plaintiffs' allegations "m[ight] show independent acts of deliberate indifference by individual deputies, but they [we]re not a highly predictable consequence of failing to train deputies on the finer points of suicide prevention or failing to have explicit policies." *Id.* at 25. "In any event, the County actually had a suicide policy . . . [and a] Psychiatric Evaluation Policy, [which, a]lthough the[y] . . . m[ight] not reflect the best practices in the jail and prison industries, it d[id] not follow that failure to have better policies or the particular training alleged to be absent here deliberately disregard[ed] an obvious risk of a constitutional violation." *Id.* Regarding liability based on a pattern of constitutional violations, the Court noted that the statistics alleged that showed a high mortality rate "could go toward showing the pattern of violations required to plausibly state claims" under Section 1983, *see id.* at 26, but were "too vague" because "[t]he Amended Complaint d[id] not plausibly show that the County had notice of a pattern of suicides, such that failing to change its policies or provide additional training would [have] le[]d to violations of constitutional rights." *Id.* at 27.

Lastly, the Court determined that, "if Plaintiffs c[ould] plead specific facts showing a pattern of deliberate indifference toward inmates' suicidal tendencies in the relevant time

period, it would be plausible that the policies and lack of training were a moving force in that pattern." *Id.* at 29.  The Court therefore granted Plaintiffs leave to amend.  *See id.* at 30.

### B.    The Second Motion to Dismiss

On February 9, 2016, Plaintiffs filed their second amended complaint ("SAC"), *see generally* ECF No. 19, which Defendants again moved to dismiss.  *See* ECF No. 20.  The Court denied Defendants' second motion to dismiss in its entirety.  *See generally* ECF No. 25.

Regarding Plaintiffs' municipal civil rights claims, the Court again concluded that "Plaintiffs had adequately pleaded deliberate indifference by a County employee."  *Id.* at 9 (citing ECF No. 18 at 22–23).  As for the absence of a policy or presence of a custom, the Court noted that "Plaintiffs' SAC describe[d] a number of previous suicides and events leading up to them in San Diego County jails, including VDF," *id.* at 11, and also "incorporate[d] a series of news articles detailing instances of suicide in County jails and the County's overall high suicide rate," *id.* at 12, which, "taken together with the County's actually confronting these suicides as they occurred, could plausibly have given policymaking County officials notice of a pattern of deliberate indifference to inmates' suicidal ideations by County employees, and that this deliberate indifference was a result of failure by the County to properly train or a widespread custom of responding to suicidal ideations apathetically."  *Id.*  Consequently, the Court concluded that, "[t]aken as a whole, the SAC provide[d] sufficient detail of circumstances predating Kris's suicide that, if proven, could plausibly have given the County notice that, absent corrective action, it would continue to inadvertently violate inmates' Eighth or Fourteenth Amendment rights by failing to provide adequate mental health care."  *Id.*  Finally, the Court concluded that "Plaintiffs adequately plead[ed] that the County's lack of training or the presence of a custom of indifference was the moving force in the alleged constitutional violation."  *Id.* at 13.

/ / /

As for Plaintiffs' wrongful death cause of action, "[t]he Court . . . conclude[d] that the facts pleaded show[ed] an adequate causal connection [between the County employees' conduct and Mr. NeSmith's suicide] to survive dismissal." *Id.* at 14.

### C.    *Defendants' Motion for Reconsideration*

Defendants sought reconsideration of the Court's Order denying their second motion to dismiss "on the grounds that the order [wa]s erroneous as a matter of law and [wa]s manifestly unjust to [D]efendants." *See generally* ECF No. 30. The Court denied reconsideration, rejecting Defendants' argument that, "for [P]laintiffs[] to state . . . a claim [based on a pattern of constitutional violations] in this case, they must [have] plead[ed] that prior judgments of liability ha[d] been entered against employees for constitutional violations that [had] caused other inmate suicides under the same circumstances as [we]re alleged in the present action." ECF No. 36 at 4 (emphasis in original) (quoting ECF No. 30 at 2–3). The Court rejected Defendants' argument as unsupported by the authorities they cited and noted that Plaintiffs' allegations "support[ed] the inference that the County [had been] aware of deficient VDF policies and customs that [had been] consistently resulting in unnecessary and preventable inmate deaths." *Id.* at 5.

### D.    *Subsequent Pleadings and the Instant Motion*

After the Court denied their motion for reconsideration, Defendants answered the Second Amended Complaint on April 12, 2017. *See generally* ECF No. 37. Plaintiffs moved to amend their complaint on January 4, 2018, to substitute the names of previously unidentified Doe Defendants. *See generally* ECF No. 58.

While the motion to amend was pending, Defendants moved for summary judgment, *see generally* ECF No. 73, and Plaintiffs moved for sanctions for failure to produce documents. *See generally* ECF No. 92. Because of the pending motion for sanctions, the Court suspended the briefing schedule on Defendants' motion for summary judgment, *see* ECF No. 96, and vacated all pretrial deadlines. *See* ECF No. 103.

On April 23, 2018, the Court granted Plaintiffs leave to file the operative Third Amended Complaint ("TAC") naming the Deputy Defendants, *see generally* ECF No. 104,

which was filed on May 4, 2018. *See* ECF No. 111. In the operative complaint, Ms. NeSmith, as successor in interest to Mr. NeSmith, alleges four causes of action under Section 1983, including one against the Deputy Defendants in their individual capacity, *see* TAC ¶¶ 59–67, and three against the County for a constitutionally inadequate suicide prevention policy, *see id.* ¶¶ 68–94; psychiatric evaluation policy, *see id.* ¶¶ 95–119; and failure to train. *See id.* ¶¶ 120–41. Ms. NeSmith, as successor in interest to Mr. NeSmith, also alleges one cause of action against the Deputy Defendants for negligence. *See id.* ¶¶ 142–44. Finally, on behalf of herself, as guardian ad litem on behalf of S.K.S.N., and as successor in interest to Mr. NeSmith, Ms. NeSmith alleges a cause of action for wrongful death against all Defendants. *See id.* ¶¶ 145–47.

The County answered on May 21, 2018, *see generally* ECF No. 113, and the Deputy Defendants answered on July 20, 2018. *See generally* ECF No. 118. The instant Motion followed on August 10, 2018. *See generally* ECF No. 119.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense. Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute

regarding a material fact. *Id.* When a plaintiff seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

## ANALYSIS

Defendants seek summary judgment in their favor as to all six of Plaintiffs' causes of action. *See* Not. of Mot. at 1–2.

### I. Evidentiary Objections

Each party objects to evidence filed by the other. *See generally* ECF Nos. 119-4, 119-5, 119-6, 126-1, 126-2. "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and, therefore, are "superfluous" in the summary judgment context, as a "court can award summary judgment only when there is no genuine dispute of material fact." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *see also Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an

admissible form at trial.'") (quoting *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003)); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1551 (9th Cir. 1990) (holding trial court's consideration of unauthenticated document on summary judgment was harmless error where a "competent witness with personal knowledge could authenticate the document"); *Burch*, 433 F. Supp. 2d at 1120–21 (noting even if a document is not properly authenticated, it is improper to raise an objection on that ground "if the party nevertheless knows that the document is authentic") (quoting *Fenje v. Feld*, 301 F. Supp. 2d 781, 789 (N.D. Ill. 2003)). As to the objections that are directed towards the weight of the evidence, this is an improper consideration on summary judgment. *See Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046 (9th Cir. 2013) ("[T]he weight of the evidence is an issue for trial, not summary judgment."). The Court therefore **DENIES WITHOUT PREJUDICE** all evidentiary objections. The Parties are **GRANTED LEAVE** to reassert their objections at a later stage in the proceedings. *See Madrigal v. Allstate Indem. Co.*, No. CV 14-4242 SS, 2015 WL 12747906, at *8 (C.D. Cal. Sept. 30, 2015).

## II. Claims Against the Deputy Defendants[18]

As successor-in-interest to Mr. NeSmith, Ms. NeSmith asserts two causes of action against the Deputy Defendants: her first cause of action under section 1983 for violation of Mr. NeSmith's Fourteenth Amendment rights, *see* FAC ¶¶ 59–67, and her fifth cause of action for negligence. *See id.* ¶¶ 142–44. Ms. NeSmith, as successor-in-interest to Mr. NeSmith and on behalf of herself and as guardian ad litem to S.K.S.N., also asserts a sixth cause of action against the Deputy Defendants for wrongful death. *See id.* ¶¶ 145–47. The Deputy Defendants move for summary adjudication as to all three causes of action, *see generally* Mot. at 13–16, 21–24, also arguing that they are entitled to qualified immunity as to the Section 1983 cause of action. *See id.* at 19–20.

/ / /

---

[18] Although Plaintiffs' causes of action against the County have been subjected to rigorous motion practice, the Deputy Defendants were not yet parties to this action at that time.

*A.    Section 1983*

The Deputy Defendants contend that "Plaintiffs cannot meet their burden of establishing that the Defendant Deputies, or any other County employee, were deliberately indifferent by failing to provide Mr. NeSmith medical care that could have prevented him from taking his own life." Mot. at 16. Further, even if the Deputy Defendants were deliberately indifferent, they are entitled to qualified immunity because "[i]t is Plaintiffs' burden to establish that the Defendant Deputies actions violated clearly established laws and . . . there is no authority on point that would have put the Defendant Deputies on notice that they were deliberately indifferent to Mr. NeSmith's serious medical needs." *Id.* at 20.

*1.    Deliberate Indifference*

As the Court has previously explained, *see* ECF No. 18 at 8, Section 1983 holds liable "every person" who under color of state law deprives another of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Eighth and Fourteenth Amendments give inmates and detainees the right to "adequate" mental health care. *Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994). A defendant is liable for violating a prisoner's or pretrial detainee's constitutional right to adequate mental health care if the defendant was deliberately indifferent to the individual's "serious medical need." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). The plaintiff, thus, must show both that the incarcerated individual had a serious medical need and that the defendant's response was deliberately indifferent. *Id.* To show a serious medical need, the plaintiff must demonstrate that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* (quoting *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1059 (9th Cir. 1997)). The Ninth Circuit has held that a suicide risk or an attempted suicide is a serious medical need. *Conn*, 591 F.3d at 1095 (citing *Doty*, 37 F.3d at 546).

The standard for deliberate indifference has changed since the Court's prior Orders. The Ninth Circuit recently held that "claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth

Amendment' must be evaluated under an objective deliberate indifference standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)), *cert. denied*, 139 S. Ct. 794 (2019).

> [T]he elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125.

"With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Id.* (alteration in original) (quoting *Castro*, 833 F.3d at 1071). "The mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id.* (internal quotation marks omitted) (quoting *Castro*, 833 F.3d at 1071). "Thus, the plaintiff must 'prove more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id*. (quoting *Castro*, 833 F.3d at 1071).

The Deputy Defendants contend that "Plaintiffs cannot meet their burden of establishing that the Defendant Deputies, or any other County employee, were deliberately indifferent by failing to provide Mr. NeSmith medical care that could have prevented him from taking his own life" because "[t]here is no evidence establishing that the rope [in Mr. NeSmith's cell] was visible to the Defendant Deputies or that they were on notice that Mr. NeSmith was acutely suicidal and required immediate medical care the evening before

his suicide." Mot. at 16. Plaintiffs counter that "there is disputed evidence as to whether 1) one or both deputy defendants saw the noose and failed to properly react, 2) one of both deputy defendants were explicitly informed NeSmith stopped eating due to depression and failed to properly react, and 3) the cell checks that occurred the two hours preceding NeSmith's suicide were proper; and, if not, did they cause further injury." Opp'n at 43. The Deputy Defendants rejoin that "Plaintiffs take significant liberties with the recitation of the facts in an attempt to create a triable issue of material fact," Reply at 1, and "[t]here is no disputed evidence that creates a triable issue of material fact to survive summary judgment that a reasonable deputy presented with the same circumstances as the Defendant Deputies would have been on notice that Mr. NeSmith was acutely suicidal thereby needing immediate medical care." *Id.* at 2.

The record is replete with factual disputes, *see supra* pages 2–30, many of which are material. For example, it is disputed whether Deputy Newlander and/or Deputy Olsen saw a rope hanging in Mr. NeSmith's cell during their security checks during the night of February 28 to March 1, 2014. Although Deputies Newlander and Olsen both have attested that they did not see a rope hanging in Mr. NeSmith's cell, *see* Newlander Decl. ¶¶ 6–7; Olsen Decl. ¶ 7, Mr. Berumen testified that he and another inmate could see from the door a three- or four-inch rope hanging from Mr. NeSmith's light fixture in the days before his death.[19] *See, e.g.*, Pls.' Ex. 22 at 91:15–22, 97:10–14, 98:6–15, 99:8–14, 100:18–101:3; Defs.' Ex. E at 97:10–14, 98:6–15, 99:8–14, 100:18–101:3. This is not inconsistent with Deputy Newlander's account, as Deputy Newlander testified that he saw a towel hanging from the end of Mr. NeSmith's bunk, which he assumed was hanging from a clothesline. *See* Pls.' Ex. 30 at 63:5–20. Deputy Newlander's practice was to allow inmates to have a clothesline, *see id.* at 37:4–11, so long as it did not exceed a half inch, or about the size of a nickel, in diameter. *See id.* at 119:6–17. Mr. Berumen testified that the rope hanging

---

[19] Plaintiffs note that Defendants arguments as to Mr. Berumen's credibility are "not appropriate in an MSJ," *see, e.g.*, ECF No. 122-6 at 6 (citing *Coronel v. Paul*, 316 F. Supp. 2d 868, 869 (2004)), and the Court must agree: Mr. Berumen's credibility is a question for the jury.

15-CV-629 JLS (AGS)

from Mr. NeSmith's light fixture was about a half inch, or the size of a quarter, in diameter. *See* Pls.' Ex. 22 at 99:5–14. Indeed, Mr. Berumen even testified that an unidentified deputy had seen and commented on the rope either the night before Mr. NeSmith's suicide "or the day before that." Pls.' Ex. 22 & Defs.' Ex. E at 100:15–17, 107:16–25. Despite their testimony to the contrary, *see* Newlander Decl. ¶ 6; Olsen Decl. ¶ 7, it is possible that the unidentified deputy was either Deputy Newlander or Deputy Olsen, given that they were the only deputies making rounds in the Upper West module on the night of Mr. NeSmith's suicide. *See* Pls.' Ex. 37. In the end, the jury must determine whether to credit the testimony of Mr. Berumen or that of Deputies Newlander and Olsen. For purposes of this Motion, however, there exist material factual disputes concerning whether Deputy Newlander and/or Deputy Olsen saw the rope in Mr. NeSmith's cell the night before Mr. NeSmith committed suicide and failed to act appropriately by either removing the rope or escorting Mr. NeSmith to medical for evaluation.

There also exist material factual disputes concerning Mr. NeSmith's demeanor and whether he exhibited signs that he was suicidal and in need of immediate medical assistance the evening before his death. Mr. NeSmith may not have "requested medical help" from the Deputy Defendants, *see* Newlander Decl. ¶ 9, but "[m]ultiple inmates were concerned for Kris' safety" and, to them, "[i]t [had been] obvious, given his demeanor, not eating and bad days in court that Kris [had been] thinking about doing something stupid," *i.e.*, taking his own life. Lamoureux Decl. ¶ 6. Mr. Berumen, for example, testified that Mr. NeSmith had been "kind of secluded" and "depressed" in the days leading up to his suicide. Pls.' Ex. 22 at 84:15–21. Mr. Hodson testified that Mr. NeSmith had "looked super depressed," Hodson Decl. ¶ 5, had "isolate[d] himself," *id.*, had "stopped taking his medications," *id.* ¶ 6, and had "stopped eating" in the week prior to his death. *Id.* ¶ 4. Mr. Hodson also claimed to have been "so concerned about Kris' welfare[ that he had] anonymously submitted an inmate request," *id.* ¶ 7, although the Deputy Defendants claim not to have received the complaint. *See* Newlander Decl. ¶ 11; Olsen Decl. ¶ 8. In fact, Mr. NeSmith had been "acting so weird and unlike himself" on the day before he

committed suicide that Mr. Hodson had asked Mr. "Lamoureux to watch Kris because [Mr. Hodson] though Kris was going to hurt himself." Hodson Decl. ¶ 8. Mr. Lamoureux also had noticed changes in Mr. NeSmith in the week before his death, *see* Lamoureux Decl. ¶ 3, including that he "had not eaten in six or seven days," *id.*, and had "seemed very depressed and isolated." *Id.* ¶ 4. On the evening of February 28, 2014, and in the morning on March 1, 2014, Mr. Lamoureux had observed Mr. NeSmith pacing in his cell and holding a sheet with a "blank look on his face." *Id.* ¶ 8.

The Deputy Defendants claim that they would have escorted Mr. NeSmith to medical evaluation had they determined that he was at risk of being suicidal. *See* Newlander Decl. ¶¶ 6, 8; Olsen Decl. ¶ 6. Deputy Olsen claimed to have received training "to identify inmates who might be suicidal," Olsen Decl. ¶ 6, and Deputy Newlander attested that he had "received training on suicide in the jail regularly, . . . includ[ing] warning signs of suicide and inmates in mental distress." Newlander Decl. ¶ 8. A briefing on Suicide Prevention and Awareness for Inmates revised on December 18, 2013, for example, purports "[t]o familiarize staff with those who are at risk for suicide and possible characteristics of suicidal inmates." Pls.' Ex. 41 at 3. The handout cautions that "[i]nmates who are at risk for suicide" may include those jailed with a "First Offense," "Facing Long Sentence," "Violent History," or "Suicidal History." *Id.* The handout also notes that "[a] suicidal inmate will portray some or many of the following characteristics," including "[l]ook[ing] sad," "[n]ot [being] able to sleep," "[f]eel[ing] hopeless," "be[ing] withdrawn," "[n]ot eating," or "[r]efus[ing] treatment." *Id.* According to his fellow inmates, Mr. NeSmith had exhibited many of these characteristics and it had been "obvious" that he had posed a risk to himself, as should have been clear to the Deputy Defendants based on the training they claimed to have received, and therefore required medical attention.

Ultimately, a jury must conclude which of the many narratives of the events transpiring on the evening of February 28 to March 1, 2014, to credit. Because "[a]n objective juror could certainly conclude that[,] in light of all the circumstances[,]

[Mr. NeSmith]'s actions evidenced a serious medical need," *see Conn*, 591 F.3d at 1096, and that the Deputy Defendants failed to respond appropriately by failing to take Mr. NeSmith to medical for evaluation and/or to remove the rope hanging from his light fixture, thereby causing Mr. NeSmith's suicide, summary judgment is inappropriate.

### 2. *Qualified Immunity*

The Deputy Defendants argue that, "even if they were deliberately indifferent, [they] are entitled to qualified immunity." Mot. at 19 (emphasis omitted). Qualified immunity shields certain government officials from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The point of shielding officials from liability except when they violate "clearly established" rights is to "ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Nonetheless, officials who violate statutory or constitutional rights knowingly or through plain incompetence are not shielded from liability. *Taylor v. Barkes*, 575 U.S. ___, 135 S. Ct. 2042, 2044 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Thus, if "every 'reasonable official would have understood that what he is doing violates that right,'" then the right is clearly established, and qualified immunity does not provide a defense. *See al-Kidd*, 563 U.S. at 741. For a constitutional or statutory right to be clearly established, there does not need to be a factually indistinguishable case spelling out liability, but existing precedent "must have placed the statutory or constitutional question beyond debate." *Id.*

The Deputy Defendants argue that "there is no authority on point that would have put [them] on notice that they were deliberately indifferent to Mr. NeSmith's serious medical needs." Mot. at 20; *see also* Reply at 5 ("Plaintiffs do not cite any *clearly established* authority, in existence at the time of Mr. NeSmith's suicide, which would preclude the application of qualified immunity") (emphasis in original). Plaintiffs cite to *Clouthier*, 591 F.3d 1232, and *Conn*, 591 F.3d 1081, arguing that qualified immunity has

been rejected where "the decedent had exhibited a specific suicide risk by threatening suicide, making suicidal statements or gestures, attempting suicide, engaging in self-harming behavior, or ha[ving] disclosed mental or emotional problems." *See* Opp'n at 44. The Deputy Defendants claim that "[t]he authority relied on by Plaintiff[s] where courts have declined to extend qualified immunity is distinguishable [and] does [not] prevent the application of qualified immunity here." Reply at 5.

The Ninth Circuit has held that "[i]t is clearly established that the Eighth Amendment protects against deliberate indifference to a detainee's serious risk of suicide." *Conn*, 591 F.3d at 1102 (citing *Cavalieri v. Shepard*, 321 F.3d 616, 621 (7th Cir. 2003); *Colburn v. Upper Darby Tp.*, 946 F.2d 1017, 1023 (3d Cir. 1991); *Cabrales v. Cnty. of Los Angeles*, 864 F.2d 1454 (9th Cir. 1988), *cert. granted and judgment vacated*, 490 U.S. 1087 (1989)). As discussed above, *see supra* Section II.A.1, a reasonable juror could conclude that Mr. NeSmith posed an objectively serious risk of suicide. On the current disputed record, however, "a grant of summary judgment . . . with regard to qualified immunity would be inappropriate." *Id.*; *see also Ortega v. O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998) ("Courts should decide issues of qualified immunity as early in the proceedings as possible, *but when the answer depends on genuinely disputed issues of material fact, the court must submit the fact-related issues to the jury*.") (emphasis added) (citing *Liston v. Cnty. of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997); *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)). Accordingly, the Court **DENIES** the Deputy Defendants' Motion as to Plaintiffs' Section 1983 cause of action.

### B. Negligence

"The elements of a cause of action for negligence are (1) a legal duty to use reasonable care, (2) breach of that duty, and (3) proximate cause between the breach and (4) the plaintiff's injury." *Mendoza v. City of Los Angeles*, 66 Cal. App. 4th 1333, 1339 (1998) (citing *Wattenbarger v. Cincinnati Reds, Inc.*, 28 Cal. App. 4th 746, 751 (1994)). "Under California tort law, '[t]he general rule is that a jailer is not liable to a prisoner in his keeping for injuries resulting from the prisoner's own intentional conduct.'" *Estate of*

*Vargas v. Binnewies*, No. 116CV01240DADEPG, 2018 WL 1518568, at *8 (E.D. Cal. Mar. 28, 2018) (quoting *Lucas v. City of Long Beach*, 60 Cal. App. 3d 341, 349 (1976)). "However, a jailer is not relieved of liability if the inmate's suicide 'was reasonably foreseeable or the failure to foresee such act was a factor in the original negligence.'" *Estate of Vargas*, 2018 WL 1518568, at *8 (quoting *Lucas*, 60 Cal. App. 3d at 351).

The Deputy Defendants contend that Plaintiffs cannot establish causation, *see* Mot. at 21–22, because they "testified that they did not observe . . . any . . . indicators that [Mr. NeSmith] was acutely suicidal during their shift before he took his life," *id.* at 22, and, even if they had, "Mr. NeSmith's act of taking his own life was both the 'superseding and the legal cause of his death.'" *Id.* (quoting *Lucas*, 60 Cal. App. 3d at 351). In so arguing, the Deputy Defendants misread *Lucas*, in which the California Court of Appeal found that a detainee's suicide was "superseding and the legal cause of his death" because the suicide "was highly unusual and was not foreseeable." *See* 60 Cal. App. 3d at 351. *Lucas* is of no benefit to the Deputy Defendants because if Mr. NeSmith's suicide was reasonably foreseeable, *i.e.*, if the Deputy Defendants were "on notice that [Mr. NeSmith] present[ed] a risk of harm to himself," then Mr. NeSmith's suicide was not the superseding and legal cause of his death. *Petrolino v. City & Cnty. of San Francisco*, No. 16-CV-02946-RS, 2016 WL 6160181, at *4 (N.D. Cal. Oct. 24, 2016) (citing *Lum v. Cnty. of San Joaquin*, 756 F. Supp. 2d 1243, 1254–55 (E.D. Cal. 2010)). As the California Court of Appeal has recognized, these issues often hinge on disputed facts that are not appropriate for summary adjudication:

> [I]t seems abundantly clear that the issues of . . . actual or constructive knowledge of an individual's immediate need for medical care and of the reasonable action . . . to provide such care are questions of fact. Although a situation identical to that presented in . . . *Lucas* might support a decision on this issue as a matter of law, the circumstances in the instant case do give rise to a triable issue of fact which should not . . . be[] decided on a motion for summary judgment.

*Zeilman v. Cnty. of Kern*, 168 Cal. App. 3d 1174, 1186 (1985).

15-CV-629 JLS (AGS)

As discussed above, *see supra* Section II.A.1, a reasonable juror could conclude that the Deputy Defendants knew that Mr. NeSmith was reasonably likely to commit suicide and failed to respond appropriately, thereby causing Mr. NeSmith's suicide. Consequently, the Court **DENIES** the Deputy Defendants' Motion as to Plaintiffs' negligence cause of action. *See, e.g.*, *Zeilman*, 168 Cal. App. 3d at 1186; *see also Estate of Vargas*, 2018 WL 1518568, at *8 ("[P]laintiffs have sufficiently alleged that negligent supervision by the county defendants was the actual cause of the suicide.").

### C.    *Wrongful Death*

"The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages." *Deen v. City of Redding*, No. CIV. S-13-1569 KJM C, 2014 WL 1513353, at *6 (E.D. Cal. Apr. 11, 2014) (quoting *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1263 (2006)). The Deputy Defendants argue that they are "entitled to immunity under" Government Code section 844.6, *see* Mot. at 23, and that the "only applicable exception," Government Code section 845.6, "for failure to summon medical care . . . does not apply where the injury is the result of diagnosing or failing to diagnose the person is afflicted with mental illness or failing to prescribe for mental illness." *Id.* at 23–24 (citing Gov't Code §§ 845.6, 855.8).

The Ninth Circuit recently rejected an argument similar to that advanced by the Deputy Defendants, clarifying that "[t]he scope of liability for the failure to summon medical care under § 845.6 is broader than the scope of immunity for the failure to diagnose, prescribe, or administer treatment under § 855.8." *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 606 (9th Cir. 2019). Indeed, here, "Plaintiffs do not allege [the Deputy Defendants] failed to diagnose or treat [Mr. NeSmith]; they allege [the Deputy Defendants] acted unreasonably in not taking [Mr. NeSmith] to [medical] for the opportunity to be diagnosed and treated." *See Petrolino v. City & Cnty. San Francisco*, No. 16-CV-02946-RS, 2016 WL 6160181, at *4 (N.D. Cal. Oct. 24, 2016).

Section 844.6 provides that, "[n]otwithstanding any other provision of this part, except as provided in this section and in Sections 814, 814.2, 845.4, and 845.6, or in Title

2.1 (commencing with Section 3500) of Part 3 of the Penal Code, a public entity is not liable for . . . [a]n injury to any prisoner." Cal. Gov't Code § 844.6(a)(2). But "[n]othing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission." Cal. Gov't Code § 844.6(d).

"The [Deputy] Defendants fail to recognize that Plaintiffs' wrongful death claim may be grounded in deliberate indifference to safety or to other tortious acts, apparently assuming that it is grounded in failure to furnish or obtain medical care for a prisoner under California Government Code § 845.6." *See Estate of Vela v. Cnty. of Monterey*, No. 16-CV-02375-BLF, 2018 WL 4076317, at *13 (N.D. Cal. Aug. 27, 2018). As discussed above, *see supra* Sections II.A, II.B, disputed issues of material fact preclude the Court from summarily adjudicating Plaintiffs' causes of action under Section 1983 and for negligence against the Deputy Defendants. Accordingly, because disputed issues of material fact remain as to whether Mr. NeSmith's death was caused by a negligent or wrongful act or omission of the Deputy Defendants, the Court **DENIES** the Deputy Defendants' Motion as to Plaintiffs' wrongful death cause of action. *See, e.g.*, *Estate of Vela*, 2018 WL 4076317, at *13 (denying summary adjudication of wrongful death cause of action where summary adjudication had been denied for Section 1983 action for deliberate indifference to serious medical needs).

## III. Claims Against the County

Ms. NeSmith, as successor-in-interest for Mr. NeSmith, asserts her second, third, and fourth causes of action under Section 1983 pertaining to the County's suicide prevention policy, psychiatric evaluation policy, and failure to train, respectively, against the County. *See* FAC ¶¶ 68–141. As successor-in-interest to Mr. NeSmith and on behalf of herself and as guardian ad litem to S.K.S.N., Ms. NeSmith also asserts a sixth cause of action against the County for wrongful death. *See id.* ¶¶ 145–47. The County moves for summary adjudication of all four causes of action. *See* Mot. at 13–21, 22–24.

/ / /

/ / /

### A. Section 1983

As the Court has previously explained, *see* ECF No. 18 at 17–18; ECF No. 25 at 8–10, to hold a government entity defendant liable under § 1983, a plaintiff must show that the government entity violated statutorily or constitutionally protected rights under color of state law. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978). The government entity may not be held vicariously liable for the actions of its employees, but instead is liable only for actions that may be attributed to the government entity itself. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). Because government entities can only act through individuals, to attribute actions of individuals to the government entity itself without imposing vicarious liability, the individual's actions must be performed "pursuant to official municipal policy" or according to "practices so persistent and widespread as to practically have the force of law." *Id.* at 61; *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) ("[I]t is only when execution of a government's policy or custom inflicts the injury that the municipality as an entity is responsible"). To hold the County liable, Plaintiffs must show (1) that a County employee violated Mr. NeSmith's constitutional rights, (2) "that the [C]ounty has customs or policies that amount to deliberate indifference," and (3) "that these customs or policies were the moving force behind the employee's violation of constitutional rights." *Long*, 442, F.3d at 1186.

Because it has concluded that Plaintiffs have shown a genuine issue of material fact as to whether the Deputy Defendants violated Mr. NeSmith's constitutional rights, *see supra* Section II.A.1, the Court examines only the second and third elements below.

### 1. Customs or Policies Amounting to Deliberate Indifference

The County first contends that Plaintiffs have not shown a deficient County policy or custom, *see* Mot. at 16–17, and cannot establish a pattern of similar constitutional violations.[20] *See id.* at 17–18. As explained in the Court's prior Orders, to be deliberately

---

[20] The Court again rejects, as before, *see* ECF No. 25 at 11 n.3; ECF No. 36 at 2–4, the argument that a pattern of constitutional violations requires "adjudicated fact[s]." *See* Mot. at 18. As explained before,

indifferent, a party must first know of the thing it chose to be indifferent about. *See Connick*, 563 U.S. at 61. To attribute deliberate indifference to a government entity, a plaintiff must show that "policymakers are on actual or constructive notice that a particular omission in their training program causes [the government entity's] employees to violate citizens' constitutional rights." *Id.* When a plaintiff alleges that failing properly to train employees is the moving force behind a constitutional violation, it is "ordinarily necessary" to show a "pattern of similar constitutional violations by untrained employees" to establish the requisite notice. *See id.* at 62–63 (concluding that four reversals in ten years for prosecutors' *Brady* violations was insufficient to provide notice of the need to train prosecutors about *Brady* requirements). A pattern of constitutional violations is also required when a plaintiff seeks to hold a government entity liable for failing to implement a policy. *See id.*; *Conn*, 658 F.3d 897 (leaving vacated the portions of its opinion pertaining to both failure to train and failure to implement policy based on *Connick*).

The legal sufficiency of Plaintiffs' Section 1983 causes of action against the County have been subjected to several rounds of vigorous motion practice. *See, e.g.*, ECF No. 18 (granting in part and denying in part first motion to dismiss); ECF No. 25 (denying second motion to dismiss); ECF No. 36 (denying motion for reconsideration of order denying second motion to dismiss). In denying the County's second motion to dismiss, the Court noted that "Plaintiffs' SAC describe[d] a number of previous suicides and events leading up to them in San Diego County jails, including VDF," ECF No. 25 at 11, and "[t]he SAC also incorporate[d] a series of news articles detailing instances of suicide in County jails and the County's overall high suicide rate." *Id.* at 12. "Taken as a whole, the SAC provide[d] sufficient detail of circumstances predating Kris's suicide that, if proven, could plausibly have given the County notice that, absent corrective action, it would continue to

---

*see* ECF No. 25 at 11 n.3; ECF No. 36 at 3, the authorities on which the County relies do not support this requirement, which subverts the premise of liability based on a pattern of similar constitutional violations.

inadvertently violate inmates' Eighth or Fourteenth Amendment rights by failing to provide adequate mental health care." *Id.*

The issue is now before the Court on summary judgment. At this time, the pertinent allegations in the SAC are backed by evidence, even if those facts are subject to disputes that must be resolved by the trier of fact. *See supra* pages 2–30. For example, the statistics concerning the high suicide rate among those housed in the County's jails are in the record, *see supra* pages 23–27; *see also* Pls.' Ex. 38, which Plaintiffs' expert testifies should have "r[ung] a bell to the providers, both the jail staff and the medical mental health staff and the administrators to do something to decrease [it]." Pls.' Ex. 11 at 147:12–15. Although the County takes the position that the numbers are exaggerated because a different methodology using the total number of bookings rather than the average daily population more accurately reflects those at risk, *see, e.g.*, Mot. at 12 (citing Declaration of Colleen Kelly, Ph.D., ECF No. 119-9), Plaintiffs' expert advocates that use of the average daily population is the proper—and accepted—metric. *See* Pls.' Ex. 4 at 87. The trier of fact must resolve which of these metrics is appropriate. Viewing these facts most favorably to Plaintiffs, as the Court must at this stage, *see Anderson*, 477 U.S. at 248, the Court must infer that the County was on notice that the suicide rate in its jails was abnormally high and that detainees at risk for suicide would continue to die should the County fail to take action.

Plaintiffs also have introduced records from six of the seven suicide investigations from 2012 and 2013. *See supra* pages 27–30; *see also* Opp'n at 28–32. Plaintiff contends that, "[c]onservatively speaking, five of these suicides were the result of obvious signs, behaviors, and risk factors that went ignored," meaning that, "[h]ad the county's suicide prevention program had an explicit directive to observe, identify, recognize, document, and address suicidal signs and behaviors, nearly all of these suicides could have been avoided." Opp'n at 31. The County contends that, unlike the detainees in these records, "Mr. NeSmith did not present as acutely suicidal before his death" and, in any event, "Deputies were trained to identify suicidal inmates, document their observations, and take the inmate to medical." Reply at 9. But, as discussed above, *see supra* Section II.A.1,

49

there exist material disputes of fact as to whether Mr. NeSmith exhibited an objectively significant risk of suicide. There also exist genuine issues of material fact concerning the training deputies received regarding the identification and mitigation of perceived suicide risks. For example, Deputy Dailly testified that he had not been "trained . . . on how to identify inmates with a present risk of suicide." Pls.' Ex. 35 at 48:22–49:5. Plaintiffs' expert, Dr. Daniels, also opined that "[t]he suicide policy at San Diego County Jail offers no guidance on identifying inmates who potentially would be suicidal, which may include anxiety, agitation, depression, self-isolation, sleep difficulties, refusing medication, change in eating habits, distressing or bad news from the family or court and phases in criminal proceedings," Pls.' Ex. 16 at 230, and "the San Diego County Jail d[id] not provide adequate and continuing training for its officers and mental health staff." *Id.* at 231. Viewing the facts most favorably to Plaintiffs, as the Court must, it concludes that a reasonable juror could conclude that a pattern of preventable suicides put the County on notice that its suicide prevention and training policies were constitutionally deficient and were likely to result in the death of additional at-risk detainees, including Mr. NeSmith.

The Court therefore concludes that Plaintiffs have introduced evidence creating a genuine issue of material fact as to whether the County had notice that, absent corrective action, it would continue to inadvertently violate inmates' Eighth or Fourteenth Amendment rights by failing to implement adequate mental health care policies and training.

### 2. *Causation*

The County also argues that "Plaintiffs do not identify what deficient policy or practice[] caused any violation nor what particular program remediation would have prevented a person, such as Mr. NeSmith, who was intent on committing suicide[,] from doing so when there was no[] information relayed to jail staff that should have warned that he was acutely suicidal." Mot. at 19. As mentioned in the Court's prior Order, *see* ECF No. 25 at 12–13, for an employee's deliberate indifference to a serious medical or mental health need to give rise to municipal liability based on the municipality's customs or

policies, the plaintiff must show that the customs or policies were the "moving force" precipitating the constitutional violation. *Long*, 442 F.3d at 1186. That means "the identified deficiency in the policy must be 'closely related to the ultimate injury.'" *Id.* at 1190. The plaintiff must show that "the injury would have been avoided" if proper policies had been implemented. *Id.*

In denying the County's second motion to dismiss, the Court concluded that "Plaintiffs adequately plead[ed] that the County's lack of training or the presence of a custom of indifference was the moving force in the alleged constitutional violation" because "[i]t is plausible that[,] if the County had reacted to the prior suicide incidents by implementing an appropriate suicide prevention policy or by remedying the alleged custom of indifference, Kris's suicidal ideations would not have been ignored, and Kris would have been placed in a setting where he could not harm himself." ECF No. 25 at 13. Plaintiffs flesh out the specific deficiencies and remediations in their Opposition, contending (among other things) that, "[h]ad the [C]ounty instituted affirmative prevention procedures, NeSmith would have been considered a high risk of suicide, particularly after his preliminary hearing, as he harbored several of the 'risk factors' associated with suicidal ideation." Opp'n at 35. Further, Plaintiffs argue, "under the new 2015 policy, he would have been 'REQUIRED' to undergo a suicide evaluation." *Id.*

The Court agrees that Plaintiffs have raised genuine issues of material fact as to causation, precluding the Court from summarily adjudicating their Section 1983 cause of action against the County. For example, the two-page "Inmate Suicide Prevention" policy in effect at the time of Mr. NeSmith's suicide provided that "[s]worn staff shall immediately notify medical staff and keep any inmate under close observation when that inmate presents a potential danger to self, danger to others or unable to care for self. The nature and extent of the problem shall be described and documented." Pls.' Ex. 3 at 1. It further provided that, after intake, "[a]ll reports of suicidal behavior shall be considered serious." *Id.* As Plaintiffs' expert notes, however, this policy "offer[ed] no guidance on identifying inmates who potentially would be suicidal, which may include anxiety,

agitation, depression, self-isolation, sleep difficulties, refusing medication, change in eating habits, distressing or bad news from the family or court and phases in criminal proceedings," Pls.' Ex. 16 at 230, unlike the revised version of the policy amended on November 20, 2015, which identified several risk factors that could warrant placing potentially suicidal detainees into Inmate Safety Program Housing, which was "for the purpose of providing proper intervention, continued observation, and assessment of inmates who may be an elevated risk of suicide." *See generally* Pls.' Ex. 19. Aside from the self-serving testimony of the Deputy Defendants and Commander Ingrassia, it is unclear to what extent Deputies employed by the County received training in suicide identification and prevention. Consequently, a reasonable juror could conclude that the County's suicide prevention policy was constitutionally deficient and that the County's failure to train the Deputy Defendants to identify detainees at an increased risk of suicide caused Mr. NeSmith to commit suicide. The Court therefore **DENIES** the County's Motion as to Plaintiffs' Section 1983 cause of action.

### B. *Wrongful Death*

Finally, the County contends that it is entitled to sovereign immunity from Plaintiffs' wrongful death cause of action. The County first cites California Government Code section 815(a), *see* Mot. at 23, which provides that, "[e]xcept as otherwise provided by statute . . . [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." Although Plaintiffs have failed to cite the applicable statute for their wrongful death cause of action, they—as Mr. NeSmith's surviving spouse and child—do have a statutory right to assert "[a] cause of action for the death of a person caused by the wrongful act or neglect of another." *See* Cal. Civ. Pro. Code § 377.60(a).

As did the Deputy Defendants, the County next asserts that it is immune pursuant to California Government Code section 844.6(a)(2), which provides that, "[n]otwithstanding any other provision of this part, except as provided in this section and in Sections 814, 814.2, 845.4, and 845.6, or in Title 2.1 (commencing with Section 3500) of Part 3 of

the Penal Code, a public entity is not liable for . . . an injury to any prisoner." *See* Mot. at 23. Further, the County maintains that "the only applicable exception to the blanket immunity provided by section 844.6 is liability under Government Code section 845.6, where a public employee knows or has reason to know that the prisoner is in need of *immediate* medical care and the employee fails to take reasonable action to summon such medical care," *id.*, and this provision "is qualified insofar as it does not apply where the injury is the result of diagnosing or failing to diagnose the person is afflicted with mental illness or failing to prescribe for mental illness." *Id.* at 24 (citing Cal. Gov't Code §§ 845.6, 855.8).

As above, the Court rejects the County's argument that Plaintiffs' cause of action is premised upon a failure to diagnose rather than a failure to summon medical care. *See supra* Section II.C. The question, therefore, is whether Plaintiffs have raised genuine issues of material fact as to the County's liability under Section 845.6. "[T]o state a claim under § 845.6, a [plaintiff] must establish three elements: (1) the public employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care." *M.H. v. Cnty. of Alameda*, 62 F. Supp. 3d 1049, 1099 (N.D. Cal. 2014) (quoting *Jett*, 439 F.3d at 1099). Plaintiffs contend that "there is ample evidence suggesting various county staff members knew of or had reason to know that NeSmith posed a high suicide risk," Opp'n at 38–39, and "[t]his is especially so of the deputies that saw the braided rope hanging from NeSmith's light fixture the night of the suicide." *Id.* at 39.

As the Court found above, Plaintiffs have raised genuine issues of material fact as to whether the Deputy Defendants knew that Mr. NeSmith posed a high risk for immediate suicide and failed to provide medical care in the form of escorting Mr. NeSmith to medical for further evaluation. *See supra* Section II.A.1. The Deputy Defendants are employees of the County and were acting within the scope of their employment while working the night shift on February 28 and March 1, 2014. *See* Olsen Decl. ¶¶ 2–4; Newlander Decl. ¶¶ 2–4. As such, Plaintiffs have raised genuine issues of material fact as to whether the

County is liable for Mr. NeSmith's wrongful death.  Cal. Gov't Code § 845.6 (imposing liability on both "a public employee, *and the public entity where the employee is acting within the scope of his employment*") (emphasis added).  Accordingly, the Court **DENIES** the County's Motion as to Plaintiffs' wrongful death cause of action.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' County of San Diego, Deputy Patrick Newlander, and Deputy Christopher Olsen's Motion for Summary Judgment (ECF No. 119).  The parties **SHALL CONFER** and **SHALL FILE** a proposed schedule of pretrial dates and deadlines within <u>seven (7) days</u> of the electronic docketing of this Order.

**IT IS SO ORDERED.**

Dated:  March 25, 2019

Hon. Janis L. Sammartino
United States District Judge