1   Christopher S. Morris, Esq., SBN 163188
    cmorris@morrislawfirmapc.com
2   Danielle R. Pena, Esq., SBN 286002
    dpena@morrislawfirmapc.com
3   MORRIS LAW FIRM, APC
    501 West Broadway, Suite 1480
4   San Diego, CA 92101
    Telephone:  (619) 826-8060
5   Facsimile:  (619) 826-8065

6   Attorneys for Plaintiffs

7

8                   UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10

11  CHASSIDY NeSMITH, individually          Case No. 15-cv-0629-JLS (AGS)
    and as Guardian ad Litem on behalf of
12  S.K.S.N., and as Successor in Interest   **OPPOSITION TO DEFENDANTS'**
    to KRISTOPHER SCOTT NeSMITH,            **MOTION IN LIMINE NO. 1 OF 6 FOR**
13                                           **THE EXCLUSION OF NEWS**
                    Plaintiffs,              **ARTICLES, POST INCIDENT**
14                                           **SUICIDES, AND POST INCIDENT**
          v.                                 **INVESTIGATIONS**
15
    COUNTY OF SAN DIEGO; et al.,             Date:       October 7, 2021
16                                           Time:       1:30 p.m.
                    Defendants.              Courtroom:  4A
17                                           Judge:      Hon. Janis L. Sammartino

18

19

20

21

22

23

24

25

26

27

28

                                    1

1

**TABLE OF CONTENTS**

2    I. INTRODUCTION TO THIS MOTION ...................................................5

3    II. THE NEWSPAPER ARTICLES PROVE NOTICE ...............................6

4    III. THE COUNTY'S RESPONSE TO THE GRAND JURY REPORT

5        CONTAINS SIGNIFICANT PARTY ADMISSIONS....................................11

6    IV. THE POST-INCIDENT GRAND JURY REPORT, THE COUNTY'S

7        RESPONSE, AND DRC REPORT ARE RELEVANT AND HIGHLY

8        PROBATIVE IN MUNICIPAL LIABILITY CLAIMS ..................................12

9    V. THE ARTICLES AND REPORTS ARE NOT SUBSEQUENT REMEDIAL

10       MEASURES.......................................................................................14

11   VI. THE ARTICLES AND REPORTS ARE NOT UNDULY PREJUDICIAL .....15

12   VII. CONCLUSION ...............................................................................15

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MIL #1 RE MEDIA, ETC.          15-CV-0629-JLS (AGS)

# TABLE OF AUTHORITIES

## CASES

*Black v. Stephens*

    662 F.2d 181 (3d Cir. 1981) ................................................................. 12

*Bordanaro v. McLeod*

    871 F.2d 1151 (1st Cir. 1989) ............................................................. 12

*City of Canton v. Harris*

    489 U.S. 378 (1989) ............................................................................... 6

*Connick v. Thompson*

    563 U.S. 51 (2011) ................................................................................. 6

*DeMier v. Gondles*

    676 F.2d 92 (4th Cir. 1982) ............................................................... 10

*Flores v. County of L.A.*

    758 F.3d 1154 (9th. Cir 2014) .............................................................. 6

*Fogleman v. Cty. of L.A.*

    2012 U.S. Dist. LEXIS 199922, *13-14 (Cal. C.D. 2012) ........................ 10, 13

*Grant v. City of Syracuse*

    2018 U.S. Dist. LEXIS 170469, *11 (N.Y.N.D. 2018) .................................. 12

*Henry v. County of Shasta*

    132 F.3d 512 (9th Cir. 1997) ............................................................. 12

*In re Aircrash in Bali, Indonesia*

    871 F.2d 812 (9th Cir. 1989) ............................................................. 14

*In re Century Aluminum Co. Sec. Litig.,* 749 F. Supp. 2d 964 (2010

    Cal. N.D.) ............................................................................................ 10

*Isom v. City of L.A.*

    2016 U.S. Dist. LEXIS 197175, *5 (Cal. C.D. 2016) ...................................... 12

*Jones v. City of Chicago*

    787 F.2d 200 (7th Cir. 1986) ............................................................. 12

OPPOSITION TO MIL #1 RE MEDIA, ETC.    15-CV-0629-JLS (AGS)

*Metropolitan Pittsburgh Crusade for Voters v. City of Pittsburgh*

    964 F.2d 244 (3rd Cir. 1992) ............................................................................ 10

*Phillips v. United States*

    356 F.2d 297 (9th Cir. 1965) ............................................................................ 10

*See United States v. Kutas*

    542 F.2d 527 (9th Cir. 1976) ............................................................................ 10

*Smith v. City of Los Angeles*

    2020 U.S. Dist. LEXIS 208449, *16-17 (C.D. Cal. 2020) ............................... 14

*Washburn v. Fagan*

    2006 U.S. Dist. LEXIS 22057, *18 (Cal. N.D. 2006) ..................................... 13

**RULES**

Federal Rule of Civil Procedure, Rule 801(d)(2)(A) ........................................... 10

Federal Rule of Evidence, Rule 801 .................................................................... 11

OPPOSITION TO MIL #1 RE MEDIA, ETC.      15-CV-0629-JLS (AGS)

# I.

## __INTRODUCTION TO THIS MOTION__[1]

The county seeks to preclude critical evidence in support of Plaintiffs' *Canton* allegation that the county knowingly maintained an inadequate suicide prevention program.  Specifically, the county requests this Court exclude reference and or evidence relating to CityBeat and other news articles, a 2017 Grand Jury report, the County's response to the Grand Jury report, and a 2018 DRC report. (Exhibits 1-4.)  Each article and report explicitly examines correctional suicides in San Diego county jails, through the lens of psychiatric health, as well as the jails' policies and training, and the county's shortcomings in preventing correctional suicides.

The county's responses to the deficiencies set forth in the news articles and Grand Jury/DRC report are highly probative.  The evidence is narrowly tailored to address Plaintiffs' *Canton* claims and is not considered "hearsay" because the responses to the news articles and Grand Jury report are party admissions and the articles and reports are not being offered for the truth of the matter asserted.

The pre-incident articles and reports are being offered to prove that the county was on *direct notice* that its suicide prevention policies and training were deficient and not in line with the relevant standards prior to Kris NeSmith's suicide. As for post-incident evidence, the county argues that post-incident articles and reports should be excluded because they are irrelevant and "include evidence of subsequent remedial measures." [Dkt. 187, 2:1-2.]  However, evidence of subsequent remedial measures to support a *Canton* claim is appropriate, as is evidence regarding feasibility of correcting deficiencies and implementing adequate training and procedures.

/ / /

---

[1] Defendants' motion does not seek to preclude pre-incident evidence, such as evidence of pre-incident suicides, other than unidentified new articles.

OPPOSITION TO MIL #1 RE MEDIA, ETC.          15-CV-0629-JLS (AGS)

Notably, the county fails to mention Plaintiffs' municipal claims in their Motion in Limine, however it is the municipal claims that require notice and a pattern of similar constitutional violations.  Accordingly, the county's motion to exclude relevant *Canton* evidence should be denied in its entirety.

## II.

## THE NEWSPAPER ARTICLES PROVE NOTICE

Plaintiffs' second, third, and fourth causes of action for unconstitutional policies and training regarding suicide prevention, psychiatric health, and training must meet the requirements of *City of Canton v. Harris*, 489 U.S. 378 (1989).  To properly hold a municipality liable for a *Canton* claim, Plaintiffs cannot merely prove that county officials violated Plaintiffs' constitutional rights.  Rather, Plaintiffs must prove that the county's failure amounted to "deliberate indifference to the constitutional rights" of Plaintiffs, and thus that the constitutional inadequacies can rightfully "be said to represent 'city policy.'"  *Id.* at 379. Plaintiffs can prove this deliberate indifference by showing the county policymakers were on "actual or constructive notice that a particular omission in their training program caused county employees to violate citizen's constitutional rights."  *Connick v. Thompson,* 563 U.S. 51, 61 (2011).  A "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Flores v. County of L.A*., 758 F.3d 1154, 1159 (9th. Cir 2014).  Accordingly, Plaintiffs rely on the CityBeat articles establish <u>notice</u> that the county was deliberately maintaining inadequate prevention policies and training.

Plaintiffs rely on the CityBeat news articles to establish actual notice alerting the public—and the county—to the jails' suicide crisis.  CityBeat started it series of investigations into San Diego jail suicides in 2007, well before Kris' suicide.  Since that time, it has published over a dozen articles highlighting the outrageous pattern of suicides in San Diego County jails.  Not only do the underlying deaths and

6

circumstances put the county and its policymakers on actual and constructive notice of a pattern of constitutional violations, but countless *CityBeat* publications–in which a County spokespersons comments in every article–admits the county was on notice of a pattern of constitutional violations.

Specifically, on March 27, 2013, a local San Diego news outlet, CityBeat, ran a publication entitled "How Many Inmate Deaths is too Many?" (Exhibit 1, pgs. 18-38.) The article was "part one" of an "investigative series." The article focused primarily on the county's overall mortality rate, but several portions of the article were dedicated to inmate suicides and recommendations from Citizens Law Enforcement Review Board ("CLERB") regarding modifications to the county's suicide prevention program. The article stated,

- "Briefings at shift changes in the detention facilities should routinely include information about inmates identified as suicide risks," wrote Robert Winston, CLERB's chair at the time, to then-Sheriff Bill Kolender." "A checklist that includes the status of at-risk inmates and the Department's response plan would enhance continuity of care, monitoring and housing," Winston wrote.

- The article also references specific suicides in the jail that could have been avoided had an adequate policy or training been incorporated. (Exhibit 1, pgs. 18-38.)

The article itself is proof the county had notice of these allegations because a county spokesperson commented in the article. In response to Winston's recommendation to maintain "a checklist that includes the status of at-risk inmates and the Department's response plan …" Dr. Earl Goldstein, the Sheriff's Medical Director, "thanked Winston for his letter but rejected the recommendation, saying that the jail's suicide rate was low—only four suicides total during the 2007-2008 and 2008-2009 fiscal years (July 1, 2007, through June 30, 2009)." Goldstein also commented, "Based on... the low incidences of completed suicides in our facilities, it is not practical to add these systems to the current program." The article corrected Dr. Goldstein in that six suicides had actually occurred during that time

/ / /

OPPOSITION TO MIL #1 RE MEDIA, ETC.                    15-CV-0629-JLS (AGS)

period, not four; and the seventh happened three days after the 2008-2009 fiscal year.  (Exhibit. 1, pg. 32.)

A month later, on April 24, 2013, CityBeat ran another article entitled, "Suicide in the Cell."  (Exhibit 1, pgs. 62-74.)  The sub-heading read "inmates kill themselves at a high rate after San Diego County Sheriff's Department refuses to revamp policies."  The article explicitly put the county on notice that:

- "Using the statistical method adopted by the U.S. Bureau of Justice Statistics (BJS) and the National Institute of Corrections—the number of deaths divided by each jail system's average daily population—CityBeat also found that San Diego had the second-highest suicide rate among the state's large jail systems: 54 suicides per 100,000 inmates, more than 60 percent higher than the average."

- "All counted, the San Diego County Sheriff's Department recorded 16 inmate suicides between 2007 and 2012.  Among California counties, only Los Angeles, whose jail system is roughly four times the size of San Diego's, recorded more suicides—24—during that period."

- "When I investigate a jail system that's had [16] suicides in a six-year period, I tend to find that there were either bad practices or preventable deaths in many of the cases," Hayes [a suicide prevention expert] says. "You normally come to the conclusion that not all of those 16 deaths were preventable, but many of them were."

- "The jail system's written suicide-prevention policies are brief.

- "CLERB's investigation identified significant gaps in how information regarding at-risk inmates is communicated between guards and support staff."

- "There is no written guidance on the type of information passed from deputy to supervisor, or from supervisor to supervisor."

Jan Caldwell, the Sheriff's Department spokesperson, responded to this article stating, "The sad reality is that a person who is determined to commit suicide will commit suicide, and by using the everyday objects within their reach."  She then describes the county's medical screening and care policies as "excellent." (Exhibit 1, pg. 63.)

Whether the county admitted to having an inadequate suicide prevention program is immaterial.  The concern is whether the county was on notice of such inadequacy—Plaintiffs argues, the articles and responses prove just that!  Looking

8

1    solely at CityBeat publications, almost a year prior to NeSmith's suicide, the county

2    was put on direct notice that it 1) had the highest suicide rate in California, and 2)

3    per CLERB recommendation, that it needed to change its program to include

4    suicide prevention mechanisms, such as a checklist that "identifies at-risk inmates."

5        Additionally, throughout CityBeat's articles, reference to the county's "rate

6    of suicide" occurred frequently.  In response, reluctant to expose its deficiencies in

7    the face of pending lawsuits, the county hid behind smoke and mirrors.  In

8    formulating a response to having the highest suicide rate – the county claimed that

9    the undisputed and universally-accepted method of calculating correctional suicide

10   rates – the ADP method – was wrong!  (Exhibit 1.)

11       The ADP method is tried and tested. It is the method used by the DOJ and

12   Bureau of Justice Statistics.  But because the ADP method showed San Diego

13   County had the highest in-custody suicide rate in the state, the county rebuked the

14   method and magically invented its own method of calculation, attempting to

15   deceitfully reduce its suicide rate by *eighteen* times.  (Exhibit 4.)  In fact,

16   Commander Ingrassia testified that he was the one who conceived and implemented

17   the newly devised "at-risk" calculation, which admittedly was not based on

18   research nor was it heard of or utilized in other counties or states.  (Exhibit 5,

19   81:18-82:13.)  The county's invention of the "at risk" calculation, a calculation

20   designed to conceal the truth, is evidence that the county was acutely aware of the

21   gravity of its suicide prevention and mental health shortcomings.

22       Accordingly, Plaintiffs do not offer these materials for the truth of the matter

23   asserted.  Rather, pre-incident articles and findings regarding the county's suicide

24   prevention failures is highly relevant to whether the county was on notice of its

25   policy and training failures and whether the county took timely and adequate steps

26   to address the known deficiencies.

27       As for the county's hearsay objections, the "notice or knowledge" exemption

28   to the hearsay rule is well-accepted law.  *See United States v. Kutas*, 542 F.2d 527,

9

528 (9th Cir. 1976) ("the statement was admitted as evidence from which it could be inferred that [defendant] knew . . . ."); *Phillips v. United States*, 356 F.2d 297, 301 (9th Cir. 1965) ("the documents in question were received . . . for the jury's consideration in determining whether one or more of the defendants knew . . . .").

More to the point is *In re Century Aluminum Co. Sec. Litig.,* 749 F. Supp. 2d 964, 980 (2010 Cal. N.D.). There, a Northern District Court admitted news articles into evidence in order to prove notice. In *In re Century,* plaintiffs objected that news articles should not be admitted into evidence because they were hearsay. However, the court held, "defendants have submitted those exhibits not for the truth of the matter asserted, but to show disclosure of information." *Id.* at 980.

Other Circuits have ruled in similar fashion. In *Metropolitan Pittsburgh Crusade for Voters v. City of Pittsburgh*, 964 F.2d 244, 246 n.3 (3rd Cir. 1992), the defendants argued that the news reports are hearsay and that the Magistrate Judge erred in considering them. The Third Circuit court disagreed. It held that the news articles are relevant to determining notice to legislators and the electorate of the lawsuit. *Id.* at 246 n.3., *Also see, e.g. DeMier v. Gondles*, 676 F.2d 92, 93 (4th Cir. 1982) (The articles are considered not for the truth of what they report but rather for the notice they provided.)

Furthermore, "newspaper articles that contain quoted statements from [the] Sheriff [], from any County official at a policy-making level, and from any of the named defendants in this case, may be admitted pursuant to Rule 801(d)(2)(A)." *Fogleman v. Cty. of L.A*., 2012 U.S. Dist. LEXIS 199922, *13-14 (Cal. C.D. 2012). Here, most of the identified articles have responses from Jan Caldwell, the former media relations director, the medical direction of the jails, and/or Sheriff Bill Gore. Those statements are party admissions and should be allowed into evidence.

Accordingly, the CityBeat articles are offered to establish that the county was on notice that it was maintaining inadequate suicide prevention polices and training which were causing preventable suicides to statistically occur more often than any

OPPOSITION TO MIL #1 RE MEDIA, ETC.                    15-CV-0629-JLS (AGS)

other California jail.  The articles also contain several party admissions regarding the same.  For these reasons, the articles should be admitted into evidence and Plaintiffs should be able to cross examine witnesses on the articles and admissions.

**III.**

**THE COUNTY'S RESPONSE TO THE GRAND JURY REPORT CONTAINS SIGNIFICANT PARTY ADMISSIONS**

In 2017, a San Diego Grand Jury issued a report finding the county's suicide prevention policies and training were deficient.  (Exhibit 2.)  Soon thereafter, the county published a response to the Grand Jury's report. (Exhibit 3.)  Though published in 2017, the Grand Jury report, and the county's response, is relevant in time because the Grand Jury reviewed the very version of the M.D.S. 10 and J.5 policies that are at-issue in this case.

Most importantly, San Diego County Sheriff, Bill Gore, responded to the Grand Jury's report on June 29, 2017.  His response is considered a party admission pursuant to Federal Rule of Evidence 801. Overall, by and through Sheriff Bill Gore, the county disagreed with many of the Grand Jury's recommendations.  For example, the county disagreed that its suicide prevention policy lacked inclusion of nationally recognized protocols or a clear policy statement for suicide prevention. The county disagreed that it needed a permanent mental health supervisor, and instead left that responsibility to a contracted agency. (Exhibit 3.)

The county's response also contains affirmative party admissions.  Such as, the county agreed with the recommendation that it needed to implement a change in policy that calls for "continuous oversight" of the suicide prevention plan.  This party admission is highly relevant.  The response also indicates that the county did not revamp its training program until September 2016, even though the county was on notice several years prior based on the CityBeat articles that it had the highest suicide rate prior to Kris' suicide.  (Exhibit 3.)

/ / /

11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.**

**THE POST-INCIDENT GRAND JURY REPORT, THE COUNTY'S**
**RESPONSE, AND DRC REPORT ARE RELEVANT AND HIGHLY**
**PROBATIVE IN MUNICIPAL LIABILITY CLAIMS**

The county argues that post-incident articles and reports should be excluded because they are irrelevant and "include evidence of subsequent remedial measures."  [Dkt.187, 2:1-2.]  However, "It is clear that, in general, 'post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.'"  *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997); *Isom v. City of L.A.*, 2016 U.S. Dist. LEXIS 197175, *5 (Cal. C.D. 2016); *Grant v. City of Syracuse*, 2018 U.S. Dist. LEXIS 170469, *11 (N.Y.N.D. 2018).[2]

Thus, the findings set forth in the 2017 Grand Jury report, the county's response thereto, and the DRC report are highly probative for two reasons.  First, in response to the deficiencies set forth in the Grand Jury and DRC report, the county's subsequent remedial measures are highly probative of a failing suicide prevention program.  Second, any subsequent measures taken to address the deficiencies is highly probative in regards to the feasibility of correcting the

---

[2] "Several circuits in addition to ours have adopted the *Grandstaff* approach.  In *Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989), for example, First Circuit noted at the outset that "the [Supreme] Court has never held that inferences about what customs or policies existed in a city before an event could not be drawn from subsequent actions." *Id.* at 1166-67. Quoting *Grandstaff* at length, it went on to conclude that such inferences were proper. *Id.* at 1167. See also *Black v. Stephens*, 662 U.S. 181, 190-91 (3d Cir. 1981) (police chief's failure to institute adequate investigatory procedures for determining when police officers should be disciplined constituted official policy encouraging excessive use of force); *Jones v. City of Chicago*, 787 F.2d 200, 207 (7th Cir. 1986) (had prior complaint in companion case not been thoroughly investigated by city, reasonable inference could be drawn regarding city's deliberate indifference to safety and well-being of patients at public health clinic).  *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th. Cir. 1999.)

12

1   policies and training shortcomings; meaning, the county could have, and should

2   have, fixed the issues prior to Kris NeSmith's suicide.

3       Other similar types of reports have been admitted into evidence.  For

4   example, in *Fogleman v. Cty. of L.A.,* 2012 U.S. Dist. LEXIS 199922, *13-14 (Cal.

5   C.D. 2012), the court admitted a Department of Justice report.  There, the court held

6   "subject to the presentation of a proper foundation,[3] which the Court assumes will

7   present no significant hurdle, the 2006 report by the Department of Justice is

8   admissible for the non-hearsay purpose of establishing notice on the part of policy-

9   making level officials of continuing constitutional violations in the operation of the

10   county jail facility.  Furthermore, the Court concludes that the report is admissible

11   under Rule 803(8) Fed. R. Evid." *Fogleman v. Cty. of L.A.*, 2012 U.S. Dist. LEXIS

12   199922, *13-14 (Cal. C.D. 2012); See *Washburn v. Fagan,* 2006 U.S. Dist. LEXIS

13   22057, *18 (Cal. N.D. 2006).

14       Lastly, the county offers this Court a red-herring arguing that any allegation

15   set forth in news articles or the Grand Jury/DRC report contain only *allegations* of

16   deficiencies (and preventable suicides) not *adjudicated constitutional violations*.

17   Based on that reasoning, without further consideration as to notice, the county

18   argues the evidence is entirely irrelevant.  [Dkt. 187, 3:15-28.]  However, the

19   county has twice in this case made that exact argument.  On both occasions, this

20   Court ruled that the county's interpretation of the Supreme Court precedent as

21   requiring "prior *adjudications*" is flawed.  [Dkt. 36, 2:16-5:17.]

22       Now, the county offers a more nuanced argument claiming "evidence that a

23   policymaker may have been aware of allegations—without showing that the

24   allegations were *true* does not make the articles probative on the issue of notice…"

25   [Dkt. 187, 12-23.]  However, that is exactly why Plaintiff should be able to cross

26   examine county witnesses!  Plus, additional evidence in the form of emails confirm

27

28   [3] Plaintiffs will be able to lay proper foundation of the documents, and its contents, during trial.

OPPOSITION TO MIL #1 RE MEDIA, ETC.         15-CV-0629-JLS (AGS)

1  that county officials received and circulated various CityBeat articles as referenced
2  in Plaintiff's opposition to summary judgment.  Also, additional evidence in the
3  form of emails and PowerPoint presentations confirmed the findings of the
4  CityBeat articles.[4]  Furthermore, the "allegations" set forth in articles and reports
5  will remain that way until a plaintiff is given the opportunity to examine county
6  officials on the issues in open court.  In sum, the determination as to whether there
7  exists a pattern of similar violations should be a jury's consideration based on all
8  the evidence Plaintiff has discovered.

9  <div align="center">**V.**</div>

10  <div align="center">**THE ARTICLES AND REPORTS ARE NOT SUBSEQUENT REMEDIAL**</div>
11  <div align="center">**MEASURES**</div>

12       Importantly, the county failed to identify what exact subsequent remedial
13  measures it wants excluded.  The county only moves to exclude the news articles
14  and reports; however those documents, by themselves, are not subsequent remedial
15  measures. See *In re Aircrash in Bali, Indonesia*, 871 F.2d 812, 816 n.2 (9th Cir.
16  1989) ("[S]ubsequent remedial measures include only the actual remedial measures
17  themselves and not the initial steps toward ascertaining whether any remedial
18  measures are called for." *Smith v. City of Los Angeles*, 2020 U.S. Dist. LEXIS
19  208449, *16-17 (C.D. Cal. 2020).  The only document that could be considered
20  referencing subsequent remedial measures is the county's response to the Grand
21  Jury report.  However, Sheriff Bill Gore's response is a party admission.

22       Accordingly, because the documents and findings set forth in the articles and
23  reports are highly relevant and not subsequent remedial measures, Defendants'
24  motion should be denied.

25  _____

26  [4] Notably, the county concedes to this issue stating "there is no evidence that the
majority of articles actually were provided to the County and officials were aware
of them (exceptions to this are articles referred to in email exhibits that are not the
27  subject of this MIL)." [Dkt. 3:10-14.]  This qualification requires Plaintiff to
speculate as to what exact articles the county is seeking to exclude.  Based on this
28  ambiguity alone, Defendants' motion should be denied.

<div align="center">14</div>

# VI.

## THE ARTICLES AND REPORTS ARE NOT UNDULY PREJUDICIAL

In light of the highly relevant nature of the articles and reports, any prejudicial effect can be adequately addressed by a proper limiting instruction. Conversely, if the requested evidence is excluded Plaintiff would be prejudiced by increasing the difficulty of establishing notice and a pattern.  As for running the risk of confusing the issues and creating a mini trial of the allegations, Plaintiff cannot help if the law requires them to establish a pattern of similar violations.

# VII.

## CONCLUSION

For the reasons set forth above, Plaintiffs should be able to rely on the articles and reports as actual notice of policy deficiencies and as proof of a failed program.  Accordingly, the county's motion should be denied.

Respectfully submitted,
**MORRIS LAW FIRM, APC**

Dated:  September 7, 2021       _s/ Danielle R. Pena_
Christopher S. Morris
cmorris@morrislawfirmapc.com
Danielle R. Pena
dpena@morrislawfirmapc.com
Attorneys for Plaintiffs
CHASSIDY NeSMITH, Individually and as
Guardian ad Litem on behalf of SKYLER
KRISTOPHER SCOTT NeSMITH, and as
Successor in Interest to KRISTOPHER SCOTT
NeSMITH

OPPOSITION TO MIL #1 RE MEDIA, ETC.                    15-CV-0629-JLS (AGS)

## **INDEX OF EXHIBITS TO OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO 1 OF 6 FOR THE EXCLUSION OF NEWS ARTICLES, POST INCIDENT SUICIDES, AND POST INCIDENT INVESTIGATIONS**

| Exhibit | Description | Pages |
|---|---|---|
| 1 | CityBeat Articles | 17-74 |
| 2 | Amended Grand Jury Report | 75-86 |
| 3 | San Diego Sheriff's Response to Grand Jury Report | 87-91 |
| 4 | DRC Report | 92-164 |
| 5 | Pertinent Portions of the Deposition of John Ingrassia | 165-170 |

OPPOSITION TO MIL #1 RE MEDIA, ETC.                15-CV-0629-JLS (AGS)

# EXHIBIT 1

Newsletter Signup    Submit Your Event    Find A Paper    Advertise    Contact Us

Custom Search



NEWS & OPINION      CULTURE      MUSIC      FOOD & DRINK      EVENTS      NEIGHBORHOODS

GALLERY      SPECIAL ISSUES      FREE STUFF      ARCHIVE

March 27, 2013 12:00 AM

# How many inmate deaths is too many?

Part one of our 60 Dead Inmates' investigative series: San Diego County's incarceration mortality rate leads California's largest jails

by Dave Maass, Kelly Davis


Print





Bernard Joseph Victorianne was a 28-year-old black male with a ticking time bomb in his stomach.

Victorianne was arrested on Sept. 12, 2012, less than two blocks from the San Diego Police Department's Mid-City station on suspicion of driving under the influence. A week later, he was found dead in his cell—the 60th inmate to die in the custody of the San Diego County jail system since 2007.

Immediately after his arrest, Victorianne was taken to Alvarado Hospital to be treated for alcohol intoxication. Even then, police and medical staff believed the suspect—who was on probation for a number of narcotics offenses—likely had swallowed a bindle of drugs. He was observed overnight, then transferred to the San Diego Central Jail. For the next several days, Victorianne was bounced between sobriety cells, secure units and administrative segregation (a normal housing unit reserved for problematic inmates who need to be separated from the general population) due to his lasting, agitated behavior. He was prescribed Haldol, a powerful anti-psychotic, and anti-anxiety medication.

According to the medical examiner's report, Sheriff's deputies couldn't say exactly when they last saw Victorianne alive. Deputies checked on him in the

http://sdcitybeat.com/news-and-opinion/news/many-inmate-deaths-many/

"early evening" of Sept. 18. He was left unmonitored through the night.

At 4:30 a.m., guards who brought breakfast into his cell found him lying on the floor, naked, but didn't check whether or not he was conscious. Two-and-a-half hours later, guards began their morning rounds and discovered that Victorianne hadn't moved. By the time they entered his cell, rigor mortis had begun in his lower extremities.

The official cause of death: methamphetamine toxicity—the baggie had busted in stomach.

Many questions remain unanswered: Why was Victorianne in an administrative-segregation cell rather than a cell where he could be more closely monitored? When exactly did deputies last check on his welfare? Why was he left unobserved overnight when he was suspected to have swallowed a potentially lethal amount of drugs? Why didn't guards check to see if he was OK when they first entered his cell that morning?

Perhaps most important of all: Did Sheriff's deputies bring Victorianne to the hospital for the visit scheduled the day before he died? The medical examiner's report states only that "it was unknown if he attended."

That information still isn't publicly known. The Sheriff's Department declined to answer *CityBeat's* questions about Victorianne's death.

What *is* known is that Victorianne was the latest casualty in a jail system with one of the highest mortality rates in California.

* * *

Between 2007 and 2012, 60 people died while wards of the San Diego County Sheriff's Department's five-jail detention system.

They were 56 men and four women. Thirty-six were white, 15 Hispanic, six African-American, one Korean-American, one Native American and one was a Chinese national. Most suffered from substance abuse and/or mental-health issues, and many were transient before their arrest.

Their average age was 46. The youngest was 18—Luis Manuel Lopez from Poway. He was arrested on felony vandalism charges in the fall of 2008, around the time other kids his age would've been going off to college. He was transferred from one jail to another, ending up at the George Bailey Detention Facility, where he started displaying symptoms of a cold that rapidly grew worse. When his temperature hit 102 and his heart began beating abnormally fast, Lopez was transferred to UCSD Medical Center. His health continued to decline. After almost two weeks in the hospital, he flat-lined and was resuscitated, but his condition continued to deteriorate; his family chose to withdraw care and ease his suffering with pain killers.

Doctors never determined precisely what killed Lopez. The medical examiner's report concluded it was "most likely" a bacterial infection that was masked by the antibiotics he received in jail. He death was classified as natural.

The oldest was Thomas Alexander Hough, a senile 72-year-old who was stopped by police for refusing to leave a bus station and then booked into jail for failing to register as a sex offender. Classified as "gravely disabled," he was first involuntarily committed to a psychiatric hospital before being transferred to the Vista Detention Center. Hough suffered from diabetes, dementia and alcohol dependency, which combined to leave him subject to periods of confusion, seizures and delirium tremens ("the shakes"). At the Vista jail, Hough was a basket case for three days. He nearly choked on a bologna sandwich, had frequent angry outbursts at staff and refused to go outside during his allotted recreation time. On his fourth evening in jail, he stopped breathing and couldn't be revived. The medical examiner classified his death as natural due to hypertensive cardiovascular disease.

Of the 60 deaths, 31 were classified as natural, which is consistent with national ratios for jail deaths. The other 48 percent were classified as suicides, homicides and accidents.

Of the 16 suicides, most inmates hanged themselves, including 38-year-old Sean Wallace, who'd been in and out of safety cells at the Central Jail because of numerous suicide threats, including an attempt to slice

http://sdcitybeat.com/news-and-opinion/news/many-inmate-deaths-many/

his wrists with a butter knife. On April 23, 2011, he was moved out of a psychiatric unit to a regular administrative-segregation cell; 47 minutes later, during medicine call, a nurse found Wallace hanging from a sheet tied to a bed bracket.

Others used less-conventional methods. In 2011, Abraham Clark, a 34-year-old man with a history of mental illness, ingested enough water in a short period of time to send his brain into anoxic shock. In 2009, John Kopkowski, an Ohio man accused of having child pornography on his computer, threw himself head first off the second tier of his unit at George Bailey. According to the medical examiner's report, inmates allegedly told Kopkowski he "should end his own life before somebody did it for him."

There were five homicides in the jail system. In 2010, Jeffrey Dunn, a 23-year-old murder suspect, died of an asthma attack during a fistfight. In 2010, Russell Hartsaw, a mentally ill 70-year-old arrested on a probation violation, was beaten to death by other inmates. Three inmates died at the hands of deputies: Two perished—Jeff Dewall in 2008 and Tommy Tucker in 2009—due to oxygen deprivation when guards attempted to restrain them, and a third, Anthony Dunton, was shot to death in September 2012 after breaking free from his restraints during an MRI examination at UCSD Medical Center.

Then there are the accidental deaths. In jail, accidental deaths aren't accidental like traffic collisions or slipping and breaking one's neck. All eight of the "accidental"

deaths in San Diego's jails were drug-related, either
overdoses or physical complications due to withdrawal.
Some inmates obtained drugs in jail or hoarded
medications, such as Mark Johnson. The 42-year-old,
who'd just been sentenced to 28 years under
California's Three Strikes law, told his cellmate he'd be
getting a "shipment of drugs." Richard Diaz, a 40-year-
old addict, died from a stomach obstruction after three
days of seizures and vomiting due to heroin
withdrawal.

*CityBeat* obtained and analyzed all 60 medical-
examiner investigations. We also compared those
narratives against findings by the county's Citizens Law
Enforcement Review Board and documents from
multiple wrongfuldeath lawsuits against the
county. Sheriff Bill Gore denied interview requests,
asking for questions in writing, most of which his office
did not answer.

In upcoming weeks, *CityBeat* will publish its findings,
which raise significant concerns over whether the San
Diego Sheriff's Department is doing enough to reduce
inmate deaths.

* * *



Sixty dead inmates. Is that low or high? How many
dead inmates is too many?

In 2000, Congress passed the Deaths in Custody
Reporting Act (DCRA) to help address increasing
reports of neglect and abuse in U.S. jails and prisons.
Under the act, the Bureau of Justice Statistics (BJS),
the research and analytical arm of the U.S. Department
of Justice, collects reports from correctional facilities
and employs a measurement called the mortality rate
to compare facilities. As a formula, it's the number of
deaths divided by a jail or prison system's average
daily population (ADP)—the average number of
prisoners in the facility on any given day in a year. This
formula allows researchers to accommodate for the
high turnover and daily fluctuation in local jail
populations. It's also the metric used by the National
Institute of Corrections.

"The reason why we use average daily population is
that we want to mirror the method that is
epidemiologically sound," BJS researcher Margaret
Noonan says.

In other words, since the Centers for Disease Control
and other health organizations use an equivalent
mortality rate to calculate deaths for large populations,
prison researchers can compare the mortality rates in
jails to that of society as a whole. Typically, the
mortality rate is expressed in number of deaths per
100,000 people.

For example, in 2010, the United States had a
mortality rate of 799 deaths per 100,000 people. Jails
in the U.S. had an average mortality rate of 125 deaths

per 100,000 inmates. Jails in California had a rate of 162 deaths per 100,000 inmates.

"Deaths occur far less in jail than in the general population," Noonan says. "It's because [jail] is a microcosm. It's a smaller subpopulation of the general population and people cycle in and out so quickly, they're really not in the population long enough to die."

The San Diego County jail system's 11 deaths in 2010 resulted in a mortality rate of 237 deaths per 100,000 inmates—90 percent higher than the national average for jails that year and 46 percent higher than the average for California jails. But, Noonan says, since the rate can fluctuate year to year, it's important to look at the mortality rate over a number of years.

"We don't want [the public] to look at a certain rate and say, Wow, that seems really high,' because what could happen is the following year, San Diego might only have four deaths and then, all of a sudden, their rate is right back to where you would expect it to be."

San Diego County hit its high in 2009 with 12 deaths, followed by two years each with 11 deaths, then dropping to eight deaths in 2012.

"Deaths can certainly vary dramatically from year to year," says Dr. Ronald Shansky, a jail health consultant and former medical director for the Illinois Department of Corrections. "Over time they tend to be fairly stable, and it does help to compare to other facilities."

Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4419   Page 27 of 170

But there hasn't been much variation for San Diego's jails. When the BJS released its statistics for 2000 through 2007, San Diego had the second highest death rate of California's large jail systems, with 195 deaths per 100,000 inmates. That rate has increased in the years since. Between 2000 and 2012, San Diego County's mortality rate was 218 deaths per 100,000, putting the county at the top of the list.

*CityBeat* independently collected six years' worth of data— 2007 to 2012—from California's 10 largest county jail systems and analyzed it using BJS's epidemiological model. Our intent was to compare the most recent data among facilities that are similar in size, population and institutional framework (in other words, the same state-level criminal statutes and similar funding relationships with the state government). Further, records indicated that 2006 was the last year the San Diego County jail system underwent changes to prevent deaths.

Of those 10 jail systems, over that period, San Diego County had the highest average mortality rate: 202 deaths per 100,000 inmates.

The next closest was Riverside County, with 198 deaths per 100,000 inmates and Alameda County with 173 deaths per 100,000 inmates.

How many dead inmates is too many? Here's one way to look at it:

If 17 fewer people died in San Diego County jails over the last six years, that would make the county about average among California's 10 largest jail systems (or 147 deaths per 100,000 inmates).

The San Diego County Sheriff's Department challenged the mortality-rate method of measuring deaths, specifically with suicides, claiming that it produces "mathematically exaggerated" numbers. Instead, the Sheriff's Department pointed to a less accepted method, the "at risk" rate. Instead of using the average daily population, the "at risk" rate divides the number of deaths by the total number of bookings. The theory behind this formula is that everyone who enters the facility is at risk of dying. However, very little research exists based on this type of measurement, and the Sheriff's Department did not provide scientific evidence to support its position.

It's easy to see why the department prefers this method. Using booking data from 2007 to 2011 (2012 has not yet been compiled), *CityBeat* found that San Diego County's inmate mortality rate was better than the average large jail system in California.

However, the more people who are booked and released, the better the rate looks, and San Diego County has a disproportionately large number of bookings for a jail system its size. The BJS doesn't use bookings-related data for this very reason—high turnover skews the data.

http://sdcitybeat.com/news-and-opinion/news/many-inmate-deaths-many/

"Obviously, there are other people that use admissions, and we wouldn't say that's wrong, per se—it's just not the way that we do it," Noonan says. "We want to follow a model that is more epidemiology based, because we are dealing with mortality data."

"The Bureau of Justice Statistics has been using the calculation of average daily population for 20 or 30 years or more, and no one complains about it unless they have a higher rate than the national average," says Lindsey Hayes, project director at the National Center on Institutions & Alternatives.

Numbers, however, offer only a bird's-eye view, and many experts are cautious to base criticism on numbers alone.

"Probably the most important thing to determine is: Do they have an effective review program," Shansky says. "Because that's the only thing that's going to impact the possibility of reducing deaths."

The Sheriff's Department did not express concern about the information we presented to them and did not recognize its validity even though the numbers were based on a model designed by the Department of Justice, the same branch where Sheriff Bill Gore previously worked as an FBI agent.

"You asked if we were aware of [your] statistics as presented," Sheriff's spokesperson Jan Caldwell, herself a former FBI agent, says via email. "Our Detentions Services Bureau regularly meets to examine and review

How many inmate deaths is too many? - San Diego CityBeat
Page 13 of 21
Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4422   Page 30 of 170

all inmate deaths to ascertain the circumstances of
death and ensure all of our policies and procedures
were followed. The objectives of this assessment are to
thoroughly review and learn from the events, make any
necessary changes based on these events and ascertain
if the events were preventable. The Sheriff's
Department takes each inmate death very seriously,
since we are responsible for their safety and well-
being."

* * *



Illustration by Adam Vieyra. Sources: Bureau of Justice
Statistics, San Diego County Sheriff's Department

Several agencies are tasked with overseeing jail
facilities in San Diego, but few have paid close
attention to the mortality rates.

The San Diego County Grand Jury, a body of citizens
who inspect the facilities annually, has rarely
mentioned jail deaths in its annual reports. The San
Diego County District Attorney reviews all officer-
involved deaths in custody, but found that the three
that occurred in the last six years were within policy.
The main body charged with investigating deaths is the
county's Citizens Law Enforcement Review Board
(CLERB), which examines allegations of abuse in
custody.

When an unnatural death occurs in jail, the Sheriff's
homicide division writes up an investigative report,
which is then reviewed by the Sheriff's internal Critical

http://sdcitybeat.com/news-and-opinion/news/many-inmate-deaths-many/

Incident Review Board. CLERB also receives a copy and decides whether to conduct its own investigation.

"We are finders of fact," Lt. Glenn Giannantonio of the homicide division tells *CityBeat*. "We don't make any policy-issue recommendations. We just say this is what happened and primarily this is why it happened."

Since 2007, CLERB has completed 24 in-custody-death investigations. Another seven cases are still under review, says Executive Director Patrick Hunter via email.

Hunter says that CLERB doesn't normally investigate deaths ruled as natural unless there are extenuating circumstances.

The publicly available results of each investigation are little more than a single paragraph; in no cases did CLERB find wrongdoing on the part of the Sheriff. However, CLERB has made a number of policy recommendations, several of which the sheriff has rejected.

In 2008, after the suicide of Adrian Correa, a 21-year-old paranoid schizophrenic who'd threatened to kill himself multiple times, CLERB expressed concern about a breakdown in communication during shift changes.

"Briefings at shift changes in the detention facilities should routinely include information about inmates identified as suicide risks," wrote Robert Winston, CLERB's chair at the time, to then-Sheriff Bill Kolender. "A checklist that includes the status of at-risk inmates

Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4424   Page 32 of 170

and the Department's response plan would enhance continuity of care, monitoring and housing," Winston wrote.

Earl Goldstein, the Sheriff's medical director, thanked Winston for his letter but rejected the recommendation, saying that the jail's suicide rate was low—only four suicides total during the 2007-2008 and 2008-2009 fiscal years (July 1, 2007, through June 30, 2009).

"Based on… the low incidences of completed suicides in our facilities, it is not practical to add these systems to the current program," Goldstein wrote.

But Goldstein's numbers were wrong. There were actually six suicides during that period, and a seventh that happened on July 3, 2009—three days into the next fiscal year.

When inmate Dewall died in 2008 due to excessive restraint, CLERB took nearly three years to issue policy recommendations. By then, another inmate, Tommy Tucker, had died due to similar excessive-restraint techniques. CLERB did not investigate Tucker's death.

In 2011, CLERB suggested that the Sheriff's Department review its training policies and have its tactical team wear numbers on their uniforms so they can be identified when investigators review videotapes. The sheriff conceded to those changes, but denied others.

In a March 2011 letter to the sheriff, CLERB expressed concern that the department did not have formal

32

Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4425   Page 33 of 170

policies regarding when it would alert CLERB of an inmate's death, despite county code endowing the board with clear oversight responsibilities. Per state code, CLERB's allowed one year to initiate an investigation; there were cases in 2009 and 2010 that the board didn't find out about in time, Hunter says. CLERB identified five areas where it wanted to be included in the notification process; the sheriff declined all of them.

"We strive to respond with professionalism and a spirit of cooperation to recommendations for improvement to the policies and procedures," Sheriff's Department Executive Manager John Madigan wrote in response. "CLERB has significantly contributed to the enhancement [of ] these important documents and we appreciate the Board's insight."

But, he concluded: "After due consideration, Sheriff Gore respectfully declines to modify the policies and procedures as suggested by CLERB."

The sheriff did, however, direct the department's Division of Inspectional Services to notify CLERB of all in-custody deaths.

In questions provided to the sheriff, *CityBeat* requested further explanation of this decision and how it bodes for transparency and accountability.

"While we appreciate CLERB's valuable review process, they are not part of the Sheriff Department's

investigatory process and therefore are not contacted," Caldwell wrote.

Even more inconsistent may be how families are notified of the circumstances of an inmate's death. When Tucker died in the hospital due to injuries sustained during physical restraint, it was not the Sheriff's Department that contacted the family; it was representatives of an organ-donation agency. Only after the family received a letter from another inmate describing the incident did they move to press further through a lawsuit. The family of Shane Hipfel, who drowned himself in his cell toilet in 2012, fought for more than a year for information; only after the threat of a lawsuit did the sheriff allow one of the family's attorneys to view the video tape of the incident.

"We made several verbal requests through various channels to get the video tape, which supposedly shows the incident, but the sheriff's office refuses to turn it over," attorney Vince Colella said in an interview in January. "They claimed it's not their jail policy to do so. If nothing was done wrong or improper, at least get the family the video so they have closure."

In mid-March, after *CityBeat* presented its research to the sheriff, a representative of the family finally was allowed to view the video. A lawsuit is forthcoming, Colella says.

\*\*\*

As our series continues, we'll drill down on the specifics of certain deaths to ask how many of the 60 were preventable.

"Oftentimes I will hear from sheriffs, We're scratching our head; we've had these deaths and we think we have good policies and we didn't violate our policies,'" says Hayes, a national expert on suicide prevention. "And then I go on-site, and I say, Well, you didn't violate your policies because you have really bad policies.'"

But, unlike the jurisdictions that invite Hayes in to assess their performance, the San Diego County Sheriff's Department has yet to acknowledge that its high mortality rate is a problem. True, inmates are a high-risk group: many are longtime addicts, for instance, with myriad health issues as a result of their addiction.

"The analogy is between jail and an emergency room, and a prison is like a doctors office," says Marc Stern, a correctional healthcare consultant and former Health Services Director for the Washington State Department of Corrections. "In jails, people are coming and going all the time; it's very difficult to operate a jail. It's hectic and it's high-risk."

But, Stern says, San Diego's high mortality rate is a red flag.

"The best news—if I were writing your article, or if I were investigating this—would be talking to the jail and

have them say, You know, we noticed the same thing
you did; there's an unexpectedly high number of
deaths and suicides compared to other places, and we
are investigating it," he says. "That would be kind of
the good-news story—to find out that they really are
addressing it."


*Correction: We stated that San Diego had 13
deaths in 2009, when in fact one of those deaths
occurred in 2008. The overall mortality rate is
unaffected. We also stated there were 15 suicides,
when in fact there were 16. We regret the errors.*


*Email kellyd@sdcitybeat.com or follow her on Twitter at
@citybeatkelly.*

*Email davem@sdcitybeat.com and follow him on Twitter
at @Maassive.*


NEWS   SAN DIEGO COUNTY SHERIFF\'S DEPA   INMATE DEATHS

by Dave Maass, Kelly Davis
March 27, 2013 12:00 AM

# RELATED



*Courtesy of SPRUNG*

## Making sense of the new homeless plans

RSS

## Comments

Type subject here...

Home    News & Opinion    Culture    Music    Food & Drink    Events    Neighborhoods    Gallery

Special Issues    Free Stuff    Archive

About Us    Contact Us    Advertise    Privacy Policy    Find a Paper

© San Diego CityBeat 2018. All Rights Reserved

Bu  t w th Metro Pub  sher™

http://sdcitybeat.com/news-and-opinion/news/many-inmate-deaths-many/

http://sdcitybeat.com/news-and-opinion/news/many-inmate-deaths-many/

NEWS & OPINION    CULTURE    MUSIC    FOOD & DRINK    EVENTS    NEIGHBORHOODS

Newsletter Signup    Submit Your Event    Find A Paper    Advertise    Contact Us    Custom Search

GALLERY    SPECIAL ISSUES    FREE STUFF    ARCHIVE



June 12, 2014 12:00 AM

# Law enforcement review board finds deputy error in inmate suicide

It's the second recent instance where procedural violation may have played a role

by Kelly Davis

Print

Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4432   Page 40 of 170



In the last nine months, the Citizens Law Enforcement Review Board (CLERB), the independent oversight body charged with investigating deaths-in-custody and allegations of law-enforcement misconduct, has twice found that San Diego County sheriff's deputies violated policy and procedure in instances of inmate suicides. ---

The most recent involves Jose Sierra, a 27-year-old Mexican citizen who'd been arrested for being under the influence of a controlled substance and was awaiting trial. On April 17, 2013, Sierra was found hanging in his cell in the county's Central Jail. A summary of the incident in CLERB's June agenda suggests that Sierra had hung himself with the help of an "unauthorized laundry line" that deputies noticed in his cell, but didn't order him to remove. Its removal, the summary says, "may have prevented Sierra from carrying out the suicide." Here's the full summary:

> During a security, check Deputies 1 and 2 discovered Sierra hanging from a bed-sheet in his single occupancy locked cell; he was transported to UCSD Medical Center where he was later pronounced dead. During the previous security check, Deputies 1 and 2 observed and unauthorized laundry line affixed to the top bunk in Sierra's cell, and failed to take corrective

> action per Sheriff's Polices & Procedures. Deputies 1 &
> 2 failed to remove the unauthorized laundry line or
> confront Sierra to direct its removal, actions which may
> have prevented Sierra from carrying out the suicide at
> that time. The Medical Examiner determined the cause
> of death was due to hanging, and the manner of death
> as suicide.

Inmates usually commit suicide by tying a bed sheet (torn
into strips) or a piece of clothing around a bunk post or
door handle and then lean forward to strangle
themselves. It's not clear how Sierra used the laundry line
in conjunction with the bed sheet, or whether the laundry
line was made from a torn bed sheet. The medical
examiner's report is light on details, saying only that
deputies "observed him hanging by the neck" and that the
detective assigned to the case "did not know where or how
the sheet was tied."

In October, CLERB found that a deputy violated policy and
procedure by logging a security check on a mentally ill
inmate, Anna Wade, that didn't actually happen. Checks
are supposed to happen hourly, but two hours passed
between when Wade was last seen alive and when she was
found hanging in her cell on April 28, 2013. CLERB
ultimately found that "there was insufficient evidence to
determine if a mandated security check… could have
precluded this suicide in any way." *CityBeat* reported on
Wade's death in October.

CLERB's not yet reviewed the case of Dervin Bowman, who
was found hanging in his Central Jail cell on Nov. 17, 2013.
A medical examiner's reported noted that Bowman, who
was able-bodied, had been placed in a cell for disabled
inmates that contained a movable chair. The report
suggests that, if not for the chair, Bowman wouldn't have
been able to tie the end of a torn bed sheet to an overhead
fire sprinkler. Bowman's case wasn't turned over to CLERB
for review until two months ago, when *CityBeat* asked
about it.

RSS

*Write to* *kellyd@sdcitybeat.com.*

LAST BLOG ON EARTH | NEWS    60 DEAD INMATES    CLERB

**by Kelly Davis**
June 12, 2014 12:00 AM

# Comments

Type subject here...

Home    News & Opinion    Culture    Music    Food & Drink    Events    Neighborhoods    Gallery
Special Issues    Free Stuff    Archive

About Us    Contact Us    Advertise    Privacy Policy    Find a Paper

© San Diego CityBeat 2018. All Rights Reserved

Bu  t w th Metro Pub  sher™

*San Diego*
**CityBeat**

October 16, 2013 12:00 AM

# 10 more dead inmates

## People are still losing and taking their lives in San Diego County jails

by Kelly Davis

 Print



Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4436   Page 44 of 170

When Robert Lubsen was booked into the Vista Detention Facility on the afternoon of Feb. 6, 2013, he was first placed in a lower-level cell but later moved to a cell on the jail's second floor. The next morning, after cell doors opened to allow inmates access to a common area, Lubsen climbed onto a walkway railing, leaned over and fell, headfirst, 9 feet to the concrete floor below. He was taken to Palomar Medical Center, where, on Feb. 12, his family decided to take him off life support.

Lubsen, who was 26, was the first inmate to die in San Diego County jails in 2013 and one of four suicides so far this year.

At booking, jail staff documented what looked like ligature marks on Lubsen's neck and, on the morning of his death, his cellmate reportedly tried to warn staff that the young man planned to harm himself but was deemed not credible. While the medical examiner's report says that Lubsen, during the intake process, didn't express an intent to kill himself—inmates are asked to answer "yes" or "no" to "Are you feeling suicidal?"—the jail system's own written policy says that after intake, "[a]ll reports of suicidal behavior shall be considered serious."

Lubsen's family filed a claim with the county on July 26, the first step in a lawsuit. The claim alleges that the Sheriff 's Department knew Lubsen was at risk of harming himself but did nothing about it.

His father, Paul, says his son had struggled with drug addiction for seven years. In 2012, it looked like he'd pulled his life together—he had a girlfriend, a job with a shoring and drilling company and his own apartment. But toward the end of the year, when work dried up, he fell back into addiction. He was arrested for burglary on Feb. 6.

"I always believed that when Rob was using, that the best thing for him was to be in jail and that he'd be safe there," his dad says. "I was wrong. I don't believe the Sheriff's Department took any steps to protect him."

In March, *CityBeat* reported that from 2007 to 2012, San Diego County had the highest average mortality rate among California's 10 largest county jail systems and the second-highest suicide rate—in all, 60 people died during that period. This followed a Bureau of Justice Statistics finding that from 2000 through 2007, San Diego had the second highest death rate of California's large jail systems.

As of Oct. 14, 10 people have died in jail custody this year, matching the 10-deaths-per-year average that pushed the county to the top of the list for 2007 through 2012. Of the six years *CityBeat* examined, the highest annual number of suicides was five, in 2011, and the six-year average was just under three per year.

Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4438   Page 46 of 170

"You don't have to average two or three suicides a year in your jail system," says Lindsay Hayes, a national expert on in-custody suicide prevention.

In addition to the four suicides this year, there were two drug-overdose deaths and two natural deaths, one of which was Alba Cornelio, who in February was found guilty of manslaughter after her two pit bulls attacked and killed her neighbor. Cornelio, who was battling leukemia, collapsed after the verdict and was taken to the hospital, where she died a month later. Though she wasn't incarcerated at the time of her death, because she was in Sheriff's custody—shackled to her bed—both the state Attorney General's office and the federal Department of Justice, which track jail deaths, consider Cornelio to have died in custody.

The remaining two deaths are still being investigated by the Medical Examiner's office. One of those is David Inge, whose daughter, Nichole Johnson, says a homicide detective told her that her father had complained about feeling ill when he was booked into the Vista Detention Facility on Aug. 9.

"But I guess they hear that a lot, because they didn't take it too seriously," she says.

Late on Aug. 9, Inge was found unresponsive in his cell. Johnson hopes her father's autopsy report will offer more information.

Of the 20 suicides in San Diego County jails since 2007, only two have been women, both of them

Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4439   Page 47 of 170

diagnosed with mental illness. Qiongxian Wang Wu
fashioned a noose out of a pair of socks and hanged
herself on Feb. 27, 2011, and 64-year-old Anna Wade
used a bed sheet to hang herself from her bunk on
April 28 of this year. Both were at Las Colinas Women's
Correctional Facility.

Wade, who was schizophrenic, had been in custody for
more than two years after being charged with stalking
for sending threatening letters to a former attorney
and a police officer who'd arrested her. The letters,
which are included in Wade's court file, are largely
nonsensical. Written in English, Spanish, Arabic and
gibberish, they're filled with anti-Semitic language and
references to the Old Testament and the occult. But
they were enough to prompt her former attorney to
move his family into a hotel.

In May 2012, after being declared incompetent to stand
trial, Wade was sent to Patton State Hospital for three
months. According to her court file, she'd done at least
three stints there since 2004. Back at Las Colinas, she
was put in administrative segregation and "green-
banded," meaning she wore a fluorescent-green
wristband to indicate she was prone to aggressive
behavior.

Cmdr. John Ingrassia, jail supervisor for the Sheriff's
Department, says Wade was being seen "at least twice
a month" by a psychiatrist; her next scheduled
evaluation would have been April 30.

Kristin Scogin, the deputy public defender who represented Wade after she was released from Patton, said that, by April, when jury selection began for her trial, Wade "seemed fine." Bailiffs who remembered Wade from previous cases would stop Scogin and tell her they thought Wade was doing really well.

But, on Friday, April 26, after returning from the second day of jury selection, Wade refused to shower or leave her cell for recreation time, according to the medical examiner's report. She remained in her cell on Saturday, too.

Sheriff's Department policy requires deputies to conduct security checks "on an hourly or more frequent basis"; they're supposed to "look in each cell, and observe each inmate for any obvious signs of medical distress, trauma, or criminal activity."

The medical examiner's report notes that at 12:16 p.m. on Sunday, April 28, Wade was observed in her cell during a routine security check. She wasn't checked on again for almost two hours, when she was found hanging from her bunk.

The report notes that Wade had no history of suicide attempts or threats and was given Zyprexa, an anti-psychotic medication, nightly. But the report also suggests that since returning from court on Friday, Wade had quickly gone downhill. In addition to refusing shower and rec time, she'd made a mess of her cell. Her things were scattered all over, she'd drawn a swastika on the wall and, according to the report,

"chronic urination was noted to her top bunk bed and the floor."

An investigation by the Citizens Law Enforcement Review Board, the oversight body that reviews jail deaths and officer-related misconduct, found that the deputy whose job it was to notify other deputies to perform a floor check had failed to do so, but there was "insufficient information to determine if a mandated security check that was not performed, could have precluded this suicide in any way."

*Email kellyd@sdcitybeat.com or follow her on Twitter at @citybeatkelly. Read the rest of our coverage on inmate deaths in San Diego County jails.*

NEWS   60 DEAD INMATES   INMATE DEATHS   SAN DIEGO PRISON
SAN DIEGO SHERIFF'S DEPARTMENT

by Kelly Davis
October 16, 2013 12:00 AM

# RELATED

http://sdcitybeat.com/news-and-opinion/news/10-dead-inmates/

RSS



*Courtesy of SPRUNG*

## Making sense of the new homeless plans

## Comments

Type subject here...

Home    News & Opinion    Culture    Music    Food & Drink    Events    Neighborhoods    Gallery
Special Issues    Free Stuff    Archive

About Us    Contact Us    Advertise    Privacy Policy    Find a Paper

© San Diego CityBeat 2018. All Rights Reserved

Bu  t w th Metro Pub  sher™

http://sdcitybeat.com/news-and-opinion/news/10-dead-inmates/

Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4443   Page 51 of 170

Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4444   Page 52 of 170

Newsletter Signup    Submit Your Event    Find A Paper    Advertise    Contact Us

Custom Search



### San Diego

NEWS & OPINION     CULTURE     MUSIC     FOOD & DRINK     EVENTS     NEIGHBORHOODS

GALLERY     SPECIAL ISSUES     FREE STUFF     ARCHIVE

December 22, 2014 12:00 AM

# San Diego County sets a dubious record for jail deaths

Will policy changes make a difference in 2015?

by Kelly Davis


Print



http://sdcitybeat.com/news-and-opinion/news/san-diego-county-sets-dubious-record-jail-deaths/



It's likely no one will ever know for sure what happened to Jerry Cochran the night before he died. On the evening of Sept. 15, 2014, his girlfriend, Vella Rhinehart, called an ambulance to take Cochran to the emergency room—she was concerned about some swollen spider bites on his neck. They were homeless, and Cochran had trouble walking without assistance.

The last time Rhinehart saw Cochran, he was in the back of the ambulance, his walker folded up next to him. He was wearing his medical-ID necklace that let folks know he was diabetic, she says. The EMT told her Cochran didn't need his wallet or medication; she told the EMT to tell the hospital to call her when Cochran was discharged—she'd find a way to come get him.

"Nobody ever called," she says. "I called and called and called, and walked and walked"—up and down Fourth and Fifth avenues the next day, the path Cochran might have taken on his way back to their camp. Wednesday night, after two days of searching, Rhinehart got a phone call from her sister telling her Cochran had been arrested and died in jail.

Case 3:15-cv-00629-JLS-AGS    Document 194    Filed 09/07/21    PageID.4446    Page 54 of 170

Since March 2013, CityBeat 's been reporting on deaths in San Diego County jails, a series prompted by our finding that the county had the highest inmate mortality rate of California's 10 largest jail systems between 2007 and 2012. During that period, the county averaged 10 deaths a year, with a high of 12 in 2009 and a low of eight in both 2007 and 2012. Twelve people died in 2013. This year, as of Dec. 19, 16 county-jail inmates have died.

"Sixteen deaths in a one year period is a concern to us," wrote Sheriff's Cmdr. John Ingrassia in an email to CityBeat . He noted that several of those inmates were terminally ill— CityBeat counted four based on medical examiner's reports. He also noted that the Sheriff's Department books more people into jail than similarly sized counties due to different booking acceptance criteria—a point the Sheriff's Department's has made to us in the past to challenge our reporting. But, Ingrassia added, "we don't hide behind this figure as an excuse or justification for the number of jail deaths."

"Our goal is to have zero inmate deaths," he wrote, "and we take each and every case very seriously."

****

Cochran didn't make it beyond a Central Jail holding cell. On the morning of Sept. 16, he was

arrested for trespassing only a few blocks from Scripps Mercy hospital, where Rinehart says he was taken ( CityBeat wasn't able to confirm this due to patient-privacy rules). He was wandering in and out of a chiropractor's office, "mumbling gibberish" about having lost his wallet, according to the medical examiner's report. At the jail's sally port, he refused to get out of the police car and had to be carried inside.

Rhinehart believes his behavior was the result of him being without his medication and food for possibly a dozen hours.

"He would have been like a 2-year-old," she says.

Rhinehart doesn't know if Cochran was coherent enough to let the jail's medical staff know during intake that he was diabetic. She doesn't know if he was still wearing his medical-ID necklace—it wasn't among the items inventoried by the medical examiner. At around 12:30 p.m., less than two hours after he'd arrived at the jail, he fell face-forward off a bench. Paramedics were called, and he was taken to UCSD Medical Center, where he was pronounced dead at 2:15. The cause of death was diabetic ketoacidosis, a condition caused by an insulin shortage that's rarely fatal if treated immediately.

Rhinehart says a sheriff's homicide detective told her that deputies "did nothing wrong." Ingrassia

told CityBeat that a review of Cochran's death is scheduled for next month.

Rhinehart's back in North Carolina, where she and Cochran are from, living with her sister. "I don't go out of my bedroom," she says. "I don't leave my bed. He was my life."

****

During the six-year period CityBeat examined for its initial story, three lawsuits had been filed against the county over inmate deaths. By comparison, there have been three lawsuits filed in 2014 alone; last week, CityBeat confirmed that a claim's been filed in a fourth case, the precursor to a lawsuit. And, in November, a jury found the county liable in the death of Daniel Sisson, a 21-year-old who was found dead in his jail cell on June 25, 2011, from an acute asthma attack made worse by heroin withdrawal. The county is appealing the $3-million verdict.

One of the cases filed this year was by Anna Sandoval, whose husband, Ronnie Sandoval, died in the Central Jail on Feb. 23, the result of a drug overdose. He'd been arrested on Feb. 22 for methamphetamine possession. The medical examiner's report notes that during intake, Sandoval was observed to be sweating profusely. The lawsuit argues that despite obvious signs he was in distress, he was deprived of "life-saving medical attention."

A response filed by the county argues, among other points, that Sandoval alone was responsible for his death. According to the medical examiner's report, during the intake screening, he denied ingesting drugs.

"We don't know what Ronnie told the nurses, at least not yet," says Diana Adjadj, Anna Sandoval's attorney. Regardless, "there were objective signs" of possible overdose, Adjadj says. The limited records she's been able to get say that in addition to Sandoval's profuse sweating, he struggled to respond to questions during intake. At some point, he was removed from a general-population holding cell and put in a single cell, where he remained for nearly eight hours, a possible violation of California's Minimum Standards for Local Detention Facilities, which says that an inmate who's placed in a sobering cell isn't to be left there for longer than six hours without being evaluated.

"They knew something was wrong with him," Adjadj says, "but instead of monitoring him, they isolated him in a holding cell."

According to the medical examiner's report, at close to 1 a.m., a guard saw Sandoval slump over and fall to the ground in a seizure. Emergency personnel showed up 20 minutes later but were unable to transport him; he was declared dead at 2:15 a.m.

****

In his email to CityBeat , Ingrassia noted that while there have been five suicides this year, none have happened since July, "which I believe is a positive sign that changes implemented by our new medical director, Dr. [Alfred] Joshua, and mandatory training received by our deputies are working."

Joshua was hired in January, and CityBeat spoke with him in July about policy changes he'd made and strategies he planned to implement to reduce the number of inmate deaths. He was looking to implement a "step-down unit" for inmates who'd been taken off suicide watch. He also said staff would be trained to be more attentive to signs that might indicate mental distress, like the condition of an inmate's cell or whether someone was refusing meals.

The two last suicides of 2014 highlight the need for these new approaches.

Hector Lleras, 36, the fifth suicide of the year, twice told jail staff—first a nurse, then a deputy—that he was going to kill himself. On July 1, he was put in a safety cell and then released 24 hours later. Almost exactly 24 hours after that, he was found hanging in his Central Jail cell.

Christopher Carroll, a mentally ill homeless man, was arrested on June 14 for disorderly conduct. A chronic alcoholic who, according to his family,

suffered from serious mental illness, Carroll was placed in administrative segregation because, during previous jail stays, he'd been unable to get along with other inmates. His segregated status meant he was allowed out of his cell for only one hour every 48 hours.

On June 18 at 11:45 a.m., Carroll inquired, via intercom, when he'd get his hour in the dayroom and was told it wasn't time yet. At 12:30, he was found with a noose around his neck, attached to the cell's top bunk.

According to the medical examiner's report, he'd smeared blood on the wall of his cell. He'd urinated on the floor and food and feces were stuck to the ceiling.

Carroll was only 5 feet tall and weighed 105 pounds. His family tried to help him, says his brother Ken, but he'd reject their offers. When he was lucid, he was funny and outgoing, "full of life," Ken says. "But mental illness just kept dragging him back in."

Ken says the family wasn't able to get much information about Christopher's death. They didn't know, for instance, that he'd scrawled a suicide note on his cell wall. When CityBeat told Ken that Christopher had been placed in solitary confinement, he wondered if that's what pushed his brother to kill himself.

"He just didn't like four walls," Ken said. "He couldn't stand four walls."     RSS

Email kellyd@sdcitybeat.com or follow her on Twitter at @citybeatkelly.

**NEWS    JAIL DEATHS**

by **Kelly Davis**
December 22, 2014 12:00 AM

# RELATED



*Courtesy of SPRUNG*

## Making sense of the new homeless plans

## Comments

| Type subject here... |
|---|

Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4453   Page 61 of 170

Home   News & Opinion   Culture   Music   Food & Drink   Events   Neighborhoods   Gallery
Special Issues   Free Stuff   Archive

About Us     Contact Us     Advertise     Privacy Policy     Find a Paper

© San Diego CityBeat 2018. All Rights Reserved

Bu  t w th Metro Pub  sher™

Newsletter Signup    Submit Your Event    Find A Paper    Advertise   Contact Us



NEWS & OPINION     CULTURE     MUSIC     FOOD & DRINK     EVENTS     NEIGHBORHOODS

GALLERY     SPECIAL ISSUES     FREE STUFF     ARCHIVE

April 24, 2013 12:00 AM

# Suicide in the cell

Inmates kill themselves at a high rate after San Diego County Sheriff's Department refuses to revamp policies

by Kelly Davis, Dave Maass

Print



http://sdcitybeat.com/news-and-opinion/news/suicide-cell/

Case 3:15-cv-00629-JLS-AGS    Document 194    Filed 09/07/21    PageID.4455    Page 63 of 170



Ten men and one woman hung themselves in San Diego County jails during the last six years. They used socks or sheets, stringing handmade nooses from sinks, doors and bunks.

One inmate flung himself headfirst over the second tier of his unit. Two men intentionally overdosed on prescription medication. One drowned himself in a toilet. Another purposefully ingested a large amount of water so quickly that he died from acute water intoxication.

All counted, the San Diego County Sheriff's Department recorded 16 inmate suicides between 2007 and 2012. Among California counties, only Los Angeles, whose jail system is roughly four times the size of San Diego's, recorded more suicides—24—during that period.

"The sad reality is that a person who is determined to commit suicide will commit suicide, and by using the everyday objects within their reach," Sheriff's Department spokesperson Jan Caldwell writes in an email. "We train our deputies to look for signs of distress. However, drinking water would not be a recognizable signal for anyone."

But for correctional health experts, the county's high suicide and mortality rates signal something could be wrong in San Diego's five jails.

As we reported in the first part of our investigative series "60 Dead Inmates," between 2007 and 2012, San Diego County had the highest mortality rate among California's 10 largest jail systems. Using the statistical method adopted by the U.S. Bureau of Justice Statistics (BJS) and the National Institute of Corrections—the number of deaths divided by each jail system's average daily population—*CityBeat* also found that San Diego had the second-highest suicide rate among the state's large jail systems: 54 suicides per 100,000 inmates, more than 60 percent higher than the average.

Caldwell described the BJS methodology as "mathematically exaggerated" and argued that it's more appropriate to compare the number of suicides with the total number of inmates who pass through the jail system annually. Using that method results in a rate of 2.8 suicides per 100,000 inmates.

"If San Diego County wants to calculate their suicide rate based upon yearly admissions, they're perfectly free to do so," says Lindsey Hayes, a suicide-prevention expert with the National Center on Institutions and Alternatives. "But then they cannot compare themselves to others because no one else calculates the rate like that. Clearly, the average daily population rate has its drawbacks, but it's the purest rate."

*CityBeat* obtained and analyzed medical-examiner reports, oversight-body findings and jail policies and

interviewed family members to put together a picture
of how suicides happen in jail.

"When I investigate a jail system that's had [16]
suicides in a six-year period, I tend to find that there
were either bad practices or preventable deaths in
many of the cases," Hayes says. "You normally come to
the conclusion that not all of those 16 deaths were
preventable, but many of them were."

Hayes says he looks for problems with training, intake
screening, inadequate medical and mental-health
staffing and whether there are enough officers to do
rounds at regular intervals.

"There are usually multiple reasons why these
problems exist," he says. "You don't have to average
two or three suicides a year in your jail system."

\* \* \*

Blame is a hard thing to place when an inmate commits
suicide. In a broad context, jail suicides can be viewed
as a product of history, with the de-institutionalization
of the mentally ill in the 1960s and '70s.

"A lot of people have made the observation or
argument that with that change in our mental-
healthcare system, a lot of the chronically mentally ill
who previously resided in state hospitals are now
circulating between the streets and correctional
settings," says Dr. Hal Wortzel, a University of
Colorado professor who's examined suicidal behavior
among inmates and recently released inmates. "That

may, in part, explain why we see so many suicides in
correctional settings."

Caldwell describes the department's medical screening
and care as "excellent."

She acknowledges the Sheriff's Department's role as
one of the county's largest mental-health service
providers—roughly a quarter to one-third of inmates
are on psychiatric medication, she points out.

For the parents of inmates, blame often turns inward.
Shane Hipfel had always been bipolar, but at the end of the
summer of 2011, the 39-year-old tutor was off his
medication and experiencing violent, paranoid-
schizophrenic episodes. In October, he was arrested after
attacking a gardener who was mowing the lawn near his
window.

Shane's parents, Wayne Hipfel and Peggy Leder, had
been flying back and forth from Michigan, where they
lived, staying for weeks at a time to check on their son.
They're haunted by their decision not to bail Shane out
of jail.

"I wish to heck I had," Wayne says. "I thought about it,
but I wasn't really ready to do it, either, because I
didn't know what we were going to do when we got him
out."

In jail, they thought he'd be protected from himself and
receive treatment. Shane was a "green-banded"
inmate, which meant he wore a fluorescent-green
wristband to indicate he was highly assaultive. When
his parents visited him, he was covered in bruises and

abrasions and expressed fear that someone was going to kill him.

"He would never say who," Wayne says. "We didn't know if schizophrenia was going on with him or if somebody was threatening him in jail."

Shane was sentenced to a three-year term at Patton State Hospital in San Bernardino County, but the transfer was weeks away, if not months. The paperwork allowing psychiatric treatment to begin at the jail also was delayed by a backlog at the court.

New Year's Day 2012 brought good news: Shane finally had been transferred to the jail's psychiatric security unit, where he could be medicated.

"Boy, that was the best call we got," Wayne says. "We were so happy about that."

The next day, another call came. Shane was on life support after attempting to drown himself in his toilet. He died five days later.

Wayne and Peggy have yet to find closure; there's just not enough certainty. They remember Shane's fear, his injuries and how an independent pathologist said his autopsy pointed to homicide. But the pathologist never saw the video that reportedly captured Shane's death.

A San Diego attorney watched a portion of the video on behalf of the family's lawyer and said it was clearly suicide, but Wayne wants to see it himself, even if it means going to court.

"If they do show me the video of him, I don't cherish

seeing that, but at least I'll know."

\* \* \*



In 2007, the Sheriff's Department—at the recommendation

of the county's Citizens Law Enforcement Review Board

(CLERB), the oversight body that reviews jail deaths and

officer-related misconduct—implemented a new suicide-

prevention training program to help staff better identify

suicidal inmates. An April 2008 letter from CLERB's then-

chair Robert Winston acknowledged the progress but

demanded more after 21-year-old Adrian Correa, a

schizophrenic who'd threatened suicide in the past,

fashioned a noose out of a blanket and hung himself from

the top corner of his bunk.

CLERB's investigation identified significant gaps in how

information regarding at-risk inmates is communicated

between guards and support staff. The board advised

the Sheriff's Department to include briefings during

shift changes and implement a checklist system so

deputies could better keep track of suicidal inmates.

"There is no written guidance on the type of

information passed from deputy to supervisor, or from

supervisor to supervisor," Winston wrote.

It took the Sheriff's Department nearly two years to

respond to Winston's letter.

In his response, Earl Goldstein, the jail system's

medical director, downplayed the problem of suicide in

county jails, saying that during a two-year period—July

1, 2007, through June 30, 2009—only four inmates had killed themselves.

His count, however, was off by two. Six inmates killed themselves during that period; a seventh committed suicide on July 3, 2009. In 2010, five people killed themselves in county jails—the most during the six-year period *CityBeat* reviewed.

The jail system's written suicide-prevention policies are brief. They state that, during intake, every inmate's to be asked whether they've considered suicide, attempted suicide or been hospitalized for suicidal thoughts. Inmates who answer "Yes" to "Are you feeling suicidal?" are either placed in a safety cell or refused entry to the jail and transported to the county's psychiatric hospital. After intake, "[a]ll reports of suicidal behavior shall be considered serious," the policy says.

"Once they're on suicide watch, rarely does an inmate commit suicide," Hayes says. "Suicides occur when they're not identified properly and they slip through the cracks or they're prematurely released from suicide watch and put back into the population, and then hours, days, weeks later, they commit suicide."

Sean Wallace is one such example. The 38-year-old had been moved back and forth from a safety cell to the general population several times, a medical examiner's report notes. He was bipolar and schizophrenic, had repeatedly said he planned to kill himself and had reportedly tried to slice his wrists with

69

a butter knife. On April 23, 2011, 48 minutes after he'd been moved back to the general population, he was found hanging from his bunk by a bed sheet torn into strips.

Hayes says the standard of care is to closely monitor suicidal inmates—every 15 minutes for inmates at moderate risk—keeping in mind how quickly someone can kill himself.

"Someone who is either threatening suicide and seemingly very serious about it, someone who has already attempted suicide—those are folks that almost everyone agrees are at high risk and you can't afford to put them on a 15-minute level of observation because it only takes three to five minutes to successfully commit suicide."

For some inmates, the warning signs aren't as clear. They won't admit suicidal thoughts to jail staff because they don't want to be placed in a safety cell, or there will be a triggering event—a bad day in court, an upsetting visit with family—that might push an inmate over the edge. Hayes says he'll do a "psychological autopsy"—go over an inmate's medical and psychiatric records, talk to jail staff and family members, basically do everything possible to try to get inside a person's head.

Connie Jones is trying to do that. She doesn't want to think her son, Christopher Blenderman, killed himself. The medical examiner categorized Blenderman's death

as an accident, not a suicide, concluding that the 40-year-old overdosed on drugs, but not intentionally.

This doesn't jibe for Jones. Her son always stuck to his drugs of choice, cocaine and alcohol, but it was the odd combination of meth and heroin that were found in his system. And though he was a longtime addict, "Chris never drugged when he was in jail," Jones says. "He always went to the top of the class, and I would say, Why can't you live like this on the outside?'"

Blenderman's criminal history was tied to his addiction— he'd steal, often from family and friends—to buy drugs.

At the time of his death, he'd been in jail for a year and was facing another year, his mother says. The last time she talked to him, he "sounded forlorn." She wrote him a letter via the jail's email system, but it didn't arrive until the day he died.

Prior to his last jail stint, Blenderman, who was bipolar, had been in Tri-City hospital's psychiatric ward at least twice, Jones says. The medical examiner's report says he'd tried to commit suicide in the past; another part of the report says he admitted to jail staff that he'd thought about killing himself. Early on Sept. 7, 2012, he was found dead from a lethal combination of meth, heroin and antidepressants and anti-anxiety medication, some of which had been prescribed to him, some of which hadn't. His cellmate told a deputy that Blenderman had been "hoarding" medication.

In its September 2009 review of the death of James Phillips, a sex offender who took a lethal dose of the anti-depressant Doxepin, CLERB noted that other inmates had helped Phillips hoard the medication "in defiance of the jail's watch take' program, in which medical staff members watch inmates take their prescribed medication." The review board didn't, however, offer any policy recommendations.

Jones wants to find her son's cellmate, to see what exactly he knew. Like other parents *CityBeat's* talked to for this series, Jones has had trouble getting basic information from the Sheriff's Department.

She says her son "should have been on watch. They knew he'd been in the psych ward. He was on psych meds. So, if he stopped taking those meds on their watch, and if he used something on their watch, then that is their responsibility."

*Email kellyd@sdcitybeat.com or follow her on Twitter at @citybeatkelly.*

*Email davem@sdcitybeat.com or follow him on Twitter @Maassive.*

NEWS   SAN DIEGO INMATE DEATHS
SAN DIEGO COUNTY SHERIFFI'S DEPA   CLERB

by Kelly Davis, Dave Maass
April 24, 2013 12:00 AM

RSS

# RELATED



*Courtesy of SPRUNG*

## Making sense of the new homeless plans

## Comments

Type subject here...

Home    News & Opinion    Culture    Music    Food & Drink    Events    Neighborhoods    Gallery
Special Issues    Free Stuff    Archive

About Us    Contact Us    Advertise    Privacy Policy    Find a Paper

© San Diego CityBeat 2018. All Rights Reserved

http://sdcitybeat.com/news-and-opinion/news/suicide-cell/

Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4466   Page 74 of 170

Bu  t w th Metro Pub  sher™

# EXHIBIT 2

# AMENDED GRAND JURY REPORT
# EXAMINING THE ISSUE OF SUICIDES IN SAN DIEGO JAILS

## SUMMARY

The suicide rate in San Diego County jails is the highest in all of California's large county jail systems. According to the San Diego County Sheriff's Department (Sheriff's Department), 46 people have committed suicide in San Diego County jails in the past 12 years. The 2016/2017 San Diego County Grand Jury (Grand Jury), responding to public concern, investigated why the number of suicides in San Diego County jails is so high.

The Grand Jury noted during its detention facilities inspections that, in an attempt to reduce suicides in the jails, the Sheriff's Department has recently added enhanced observation housing modules, new safety cells, and medical isolation cells. In March 2016, the Sheriff's Departments Detention Services Bureau updated its Policy and Procedures Manual (P&PM) to include procedures for the use of these units. In spite of these efforts, the suicide rate remains high.

The Grand Jury found that the P&PM lacks detailed training procedures required for correctional officers to effectively reduce suicides and believes that training must address the specialized communication skills required to be effective. Further, the P&PM does not clearly show the inclusion of nationally recognized protocols or a clear policy statement for suicide prevention.

The Grand Jury also learned that the Sheriff Department's Chief Medical Officer does not employ an in-house staff supervisor for the contract mental health workers and instead relies on contracted supervision.

Finally, the Grand Jury did not find a process that calls for continuous oversight as part of a suicide-prevention policy. In light of these findings, the Grand Jury recommends an update to the Policy and Procedures Manual, the hiring of a full-time professional mental health staff member to supervise all professional mental health workers, and the establishment of a suicide-prevention oversight group.

## INTRODUCTION

California Penal Code §919b mandates that the Grand Jury annually inquire into the condition and management of all public jails within the county. As part of its inquiry, the Grand Jury paid particular attention to the number and frequency of suicides within the jails and examined the policies and procedures the Sheriff's Department employs as preventive measures. The Grand Jury's intent was to identify the reasons that San Diego County's jails are experiencing a higher suicide rate than jails in other California counties.

## *PROCEDURE*

The Grand Jury examined a large volume of jail suicide-prevention research, including published policies, procedures, and recommendations, including the following:

- The San Diego County Sheriff's Department Detention Services Bureau Policy and Procedures Manual
- The San Diego County Sheriff's Department Medical Services Divisions Policy and Procedures Manual.

The Grand Jury also interviewed officials from the San Diego Sheriff's Department medical staff and re-entry services and asked many questions of detention officers during visits to all detention facilities.

## *DISCUSSION*

The suicide rate in San Diego County jails is the highest in all of California's large county jail systems. Data from the U.S. Bureau of Justice Statistics show five suicides in San Diego County jails in 2013, six in 2014, seven in 2015, and the San Diego County Sheriff's Department confirmed five in 2016. By contrast, since 2014, San Bernardino County has had three jail suicides; Los Angeles and Santa Clara counties have had one each. Orange and Sacramento counties have had none.[1,2]

During the last several years, media sources have focused intently on the number of suicides in San Diego jails. All of these news reports have an effect on what the community thinks about the correctional staff's ability to control suicides and keep inmates safe. According to numerous news stories, a 21-year-old Marine in 2014 hanged himself in the Vista Detention Facility despite jail officials' knowledge of numerous previous suicide threats. Other news stories reported that, in 2015, another inmate's family repeatedly cautioned jail officials that their relative was suicidal, yet the inmate did not receive the necessary oversight to prevent him from hanging himself in his cell.

In order to clarify and understand the issue of suicides in the San Diego County jails, the Grand Jury investigated the issue. The Grand Jury's goal in its investigation was to identify and recommend tested, successful methods for preventing jail suicides not fully implemented in our jails.

The Grand Jury acknowledges that the Sheriff's Department is experiencing unprecedented challenges in accommodating and treating inmates with mental health problems. Estimates by recognized experts suggest about 15 percent to 20 percent of jail

---

[1] Bruno, Bianca, "Jail Death Cases Pile Up in San Diego County," *Courthouse News Service.* August 10, 2016. http://www.courthousenews.com/2016/08/10/jail-death-cases-pile-up-in-san-diego-county.htm
[2] Davis, Kelly, "Suicides still plague county jail," *San Diego Union-Tribune.* December 16, 2015.

2

inmates nationwide may be suffering from serious mental illness.[3] With an average daily population of about 5,000, that means approximately 800 inmates with serious mental illness could be in San Diego County jails at any given time.

Clearly, dealing with mental illness and suicide prevention within the county jails is an ongoing concern. According to the National Institute of Corrections, properly trained correctional staff is essential. Just having adequate mental health, medical, or other professional staff available seldom prevents suicides because suicides typically take place in inmate housing units. Furthermore, suicides commonly occur at night or on weekends, when mental health staff may not be readily available or on-site. Therefore, guards and correctional staff trained in suicide-prevention techniques and who have subsequently developed an intuitive sense about the inmates under their care must be counted on to prevent these incidents.

"The greatest challenge for those who work in the correctional system is to view the issue as one that requires a continuum of comprehensive suicide-prevention services aimed at the collaborative identification, continued assessment, and safe management of inmates at risk for self-harm."[4] The Grand Jury believes this statement indicates that all corrections staff must be focused on suicide prevention at all times.

Recognized experts say that, to be effective, suicide-prevention training must include consistent and thorough communication among all jail staff. They recommend suicide-prevention efforts start at the point of arrest and continue until the inmate is released. During this time, inmates may exhibit certain behaviors that indicate a risk of suicide. If these behaviors are detected and communicated to others, the likelihood of a completed suicide will be reduced. Additionally, corrections staff, with proper training, can prevent suicide by establishing trust and communication with inmates in order to observe their actions and pass along what they hear and see to other corrections staff.

The Grand Jury believes that effective communication must exist in several areas and that this is key in suicide prevention. These areas include the following:
- Communication between people who come in contact with the inmate before booking (arresting officer and transport officers) and the people receiving the inmate (nurses and gatekeepers) at the jail during intake
- Communication between intake personnel and the internal correctional staff, including professional staff (medical and mental health personnel)
- Communication between all staff and the potentially suicidal inmate in order to ensure the safety of all involved

---

[3] "More Mentally Ill Persons Are in Jails and Prisons than Hospitals: A Survey of the States," Treatment Advocacy Center, May 2010,
http://www.treatmentadvocacycenter.org/storage/documents/final_jails_v_hospitals_study.pdf (accessed August 2016).
[4] "National Study of Jail Suicide: 20 Years Later," National Institute of Corrections (U.S. Department of Justice), 2010, http://static.nicic.gov/Library/024308.pdf (accessed September 2016).

3

**SAN DIEGO COUNTY GRAND JURY 2016/2017 (filed May 4, 2017)**

In addition to saving lives, the County avoids unnecessary human suffering and liability when an effective training program is in place.

In studying the P&PM, the Grand Jury concentrated on the policies and procedures pertaining to suicide-prevention training. The Grand Jury then examined national jail suicide data because it provided more research reports. The increased number of suicide victims studied allowed the demographic data to be more comprehensive.

The findings in the documentation for jail suicides and the training to prevent jail suicides were similar in content. Table 1 summarizes the reports:

| **Published Protocols Related to Jail Suicides** | National Study of Jail Suicides: 20 Years Later[5] | Writing a Suicide Prevention Policy[6] | Prison Suicide: An Overview & Guide to Prevention[7] | Developing & Revising Suicide Prevention Protocols within Jails & Prisons[8] | Preventing Suicide in Jails & Prisons[9] |
|---|---|---|---|---|---|
| Training in suicide prevention | X | X | X | X | X |
| Identification of suicide risk | X | X | X | X | X |
| Communication needed between all staff and inmate | X | X | X | X | X |
| Housing for safety of suicidal inmate | X | X | X | X | X |
| Observation plan | X | X | X | X | X |
| Evaluation by mental health staff | X | X | X | X | |
| Referral by mental health staff | X | X | X | X | |
| Reporting, all staff to submit statements | X | X | X | X | |
| Mortality-morbidity review to look at facts and make recommendations | X | X | X | X | |
| Notification to all appropriate staff | X | X | X | | |
| Critical Incident Stress Debriefing (CISD): talk to involved staff within 72 hours | X | X | | | |
| Treatment plan | X | | | | X |
| Social intervention: do not cut off social contacts | | | | | X |
| Intervention by trained staff with first aid knowledge and assume inmate is alive | | X | X | X | |

Table 1

[5] "National Study of Jail Suicide: 20 Years Later," National Institute of Corrections (U.S. Department of Justice), 2010.

[6] Marty Drapkin, "Writing a Suicide Prevention Policy," *CorrectionsOne*, October 20, 2007.

[7] Lindsay M. Hayes, "Prison Suicide," An Overview and Guide to Prevention, National Institute of Corrections, June 1995.

[8] Lindsay M. Hayes, "Guide to Developing and Revising Suicide Prevention Protocols within Jails and Prisons," National Center on Institutions and Alternatives, 2011.

[9] "Preventing Suicide in Jails and Prisons," World Health Organization, Department of Mental Health and Substance Abuse, 2007.

In Section A.1, the Sheriff's Department's P&PM states, "The Sheriff's detention facilities shall be operated in accordance with established Department Policy and Procedures, California State Law, applicable case law and acceptable professional standards."[10]

The Grand Jury believes that Table 1 highlights the minimum protocols required for a detention facility's policy and procedures manual. Each report lists the protocols needed for a comprehensive suicide-prevention program. Five of the protocols were used in all five reports, four of the protocols were used in four, and three of the protocols were used in two or fewer of the reports. (Because these three protocols are not unique to suicide prevention, they could have been included in another section of the policy and procedures manual.)

The Grand Jury believes that the San Diego Sheriff's Department P&PM does not include adequate policy regarding suicide prevention, and there is no discussion on protocols to be used or how compliance will be ensured. The Grand Jury believes the suicide-prevention policy should be clearly stated for the P&PM users to know what attitude to have and what actions to take. The policy should state the attitude of management toward suicide prevention, the protocols to be used, and how oversight will be enforced.

The Grand Jury also noted that the assumed triggers for suicide varied. Experts claim that two main causes exist for suicide in jail: First, the jail's environment itself contributes to suicidal tendencies. Second, the inmate is in a crisis situation, a condition that jail staff repeatedly verified during the Grand Jury's visits to detention facilities. Inmates are fearful of the immediate future and the consequences of their crime, they have lost control over their lives, and they are isolated from family and friends. The psychological effect of incarceration, combined with drug and alcohol use and withdrawal, exacerbate mental illness symptoms and can lead to suicide. Incarceration is stressful on every level, and that alone is enough to provoke suicide ideation.[11]

One study showed that 65 percent of suicides occur in the first 30 days of incarceration and 85 percent in the first four months, but it also shows suicide can occur at any time.

The Grand Jury believes increased efforts in suicide prevention are required. The Grand Jury understands that the P&PM contains documentation that outlines procedures that are formulated to direct the staff on the process to carry out a desired objective. However, these standalone procedures are not a suicide-prevention plan. A suicide-prevention plan incorporates training, intervention, communications, and supervision in a dynamic way

---

[10] Policy and Procedure Manual, Detention Services Bureau, San Diego County Sheriff's Department, https://www.sdsheriff.net/documents/pp/dsb-20160310.pdf, (accessed October 2016).
[11] "National Study of Jail Suicid: 20 Years Later," National Institute of Corrections (U.S. Department of Justice), 2010.

Case 3:15-cv-00629-JLS-AGS   Document 194   Filed 09/07/21   PageID.4473   Page 81 of 170

that will ensure the correctional officers are focused on seeing the triggers that alert them of a possible suicide.

According to the P&PM, Section D.1, "The Detention Facility Training Program will have policies and procedures to ensure training programs for all employees are specifically planned, coordinated, supervised, and evaluated."[12]

The Grand Jury believes that suicide-prevention training should not be just a scheduled class. Instead, it should be a continuous charge to be mindful of suicide characteristics. Effective suicide-prevention communication should not be just a comment posted to the Jail Information Management System (JIMS). It should also be the mental health nurse talking to the on-duty jail staff about the condition of an inmate. A suicide plan should foster the belief by all workers that "a suicide will not happen on my watch."

The National Institute of Corrections strongly recommends that all correctional, medical, and mental health personnel receive eight hours of initial suicide-prevention training and two hours of refresher training in subsequent years.

"The initial training should include instruction regarding administrator and staff attitudes about suicide and how negative attitudes impede suicide-prevention efforts, why correctional facilities' environments are conducive to suicidal behavior, potential predisposing factors to suicide, high-risk suicide periods, warning signs and symptoms, how to identify suicidal inmates despite a denial of risk, components of the facility's suicide-prevention policy, and liability issues associated with inmate suicide. The two-hour refresher training should review the topics discussed during the initial training and also describe any changes to the facility's suicide prevention plan. The annual training should also include a general discussion of any recent suicides and/or suicide attempts in the facility."[13]

On several occasions, the San Diego County jail staff stated that they visited the Texas prison system to discover lessons learned in lowering its suicide rates. A *Dallas Morning News* article cited changes made to mental health training for Texas prison system officers: "This year, the criminal justice department beefed up mental health training for officers. New cadets receive more than 33 hours of mental health training, and those already on the job get monthly sessions . . . The training is designed to help officers recognize signs of a mental health crisis."[14]

---

[12] Policy and Procedure Manual, Detention Services Bureau, San Diego County Sheriff's Department, https://www.sdsheriff.net/documents/pp/dsb-20160310.pdf, (accessed October 2016).
[13] "National Study of Jail Suicide: 20 Years Later," National Institute of Corrections (U.S. Department of Justice), 2010, http://static.nicic.gov/Library/024308.pdf (accessed September 2016).
[14] Brandi Grissom, "Suicides and Attempts on the Rise in Texas Prisons," *Dallas Morning News*, August 29, 2016, http://www.dallasnews.com/news/texas/2015/11/28/suicides-and-attempts-on-the-rise-in-texas-prisons (accessed September 2016).

6

**SAN DIEGO COUNTY GRAND JURY 2016/2017 (filed May 4, 2017)**

The Grand Jury concurs with the *Dallas Morning News* article and believes annual training of two hours may be inadequate. (However, after the correctional staff has been trained in constant awareness of the signs of potential suicide risk and regular, periodic on-the-job training is in place, then two hours of formal training per year may be adequate.) In order to keep suicide-prevention skills fresh, the training must be timely. In fact, the Grand Jury believes the training could include a brief reminder every week by the watch captain about suicide-prevention skills.

The Grand Jury reviewed a Sheriff's Department training document containing a detailed list of factors indicating a risk for inmate suicide, along with possible characteristics of a suicidal inmate. The list was good, but the document did not state how often the training might take place.

There are at least three different stages where at-risk suicidal inmates can be identified: at the time of arrest and intake, at the time the inmate is housed in a secure cell, and at the time the inmate is in mainline housing. The requirements for safety cell use in the P&PM, Section J, clearly state that the safety cell is temporary housing, typically lasting for only a few hours. This is a clear suggestion that inmates should remain in suicide counseling and observation as they are moved to more appropriate housing. The Grand Jury recognizes that these three different stages call for three training scenarios that require different training for each one, but it would support a consistent suicide-prevention plan.

In San Diego County jails under the jurisdiction of the San Diego County Sheriff's Department, those working in suicide prevention include private contract personnel and jail staff. The Grand Jury believes it is important that they are working from the same plan; therefore, it is important they receive the same training. The training period is when all suicide-prevention workers will learn about the jail staff's attitude about enforcement of the suicide policy.

The Grand Jury found that most County health departments use private contract personnel as their mental health workers. In the jails, psychiatrists are contract workers, including the supervisor, who reports to the Chief Medical Officer. The jail has responsibility for all services for all inmates with mental health problems (including drug and alcohol abuse), suicide prevention, and inmates in the re-entry facility. The Grand Jury believes coordinating these functions should be the responsibility of a full-time employee, specifically, a mental health professional.

The P&PM in Section M.7 states that after an inmate death in the detention facility, "A meeting shall be held after all autopsy and other pertinent reports have been received to discuss findings with the Detention Services Bureau and facility command staff, Sheriff's legal counsel, and medical services administration. As appropriate, the detention facility

7

supervising nurse, psychiatric director, and other staff who are relevant to the incident, as deemed appropriate by the medical services administrator, shall also be included."[15]

Section M.7 does not appear to provide for any input regarding the policies and procedures or training group, nor does it provide for any real-time monitoring or updating of the suicide plan, which the Grand Jury believes is a necessary component of suicide-prevention efforts.

The Grand Jury noted that the Sheriff's Department instituted new protocols in early 2015 to reduce suicides in the jails. These new protocols affected various procedures and resulted in changes to the facilities. The Grand Jury does not believe these changes were an indication of operational problems in the jails; on the contrary, a new emphasis was instituted. In the same manner, the Grand Jury's recommendations merely suggest a change in emphasis is needed.

The 2015 changes did coincide with a seven-month period with no suicides. Yet, after that seven-month period, suicides returned to previous levels. The Grand Jury believes that the new protocols showed that management placed an increased importance on suicide prevention, which could have motivated the jail staff to increase attention to suicide prevention. But because there was no sustained effort to maintain that motivation, the number of suicides returned to previous levels.

As the Grand Jury conducted research to find an approach for suicide prevention that was not in use at the jails, a scheduled inspection by the Grand Jury took place at one of the San Diego jails. Near the end of the inspection, a correctional officer was asked if a suicide had occurred in that facility. The answer was no, then a pause, and then "No, there have been no suicides in this facility. You are not allowed to die in this facility." This was the only time the Grand Jury heard a correctional officer with the attitude that suicides are not acceptable in jail. As a result, the Grand Jury looked for a way to instill in the minds of all correctional staff the attitude that suicides are unacceptable. During this process, the Grand Jury concluded that procedures alone would not change attitudes, but policy could, and continuing training on multiple levels is necessary to change attitudes.

The Grand Jury offers three simple recommendations:

- Senior management needs to adopt a clear policy stating the attitude and protocols needed to minimize suicides in the jails.
- The training needs to include ongoing instruction for all staff and mental health personnel working with at-risk inmates.
- Supervisors need to oversee the training to ensure compliance with the policy.

---

[15] Policy and Procedure Manual, Detention Services Bureau, San Diego County Sheriff's Department, https://www.sdsheriff.net/documents/pp/dsb-20160310.pdf, (accessed October 2016).

8

**SAN DIEGO COUNTY GRAND JURY 2016/2017 (filed May 4, 2017)**

The Grand Jury believes these recommendations can be implemented quickly at low cost and will reduce suicides.

## FACTS AND FINDINGS

*Fact:* The Sheriff's Department P&PM, Section A.1, Purpose, states that operation of detention facilities shall comply with its own policy and procedures, state law, case law, and professional standards.

*Fact:* The Sheriff's Department P&PM states that inmates who are recognized and observed as being a potential suicide risk shall be assessed for consideration of placement into an Inmate Safety Program housing option. Sworn staff shall immediately notify medical staff and the watch commander of any inmate that presents a potential danger to self, danger to others, or unable to care for self.

**Finding 01:** The Policy and Procedures Manual does not contain a comprehensive overall suicide-prevention plan with a policy statement listing the protocols (professional standards) to be used, nor does it clearly state that suicide-prevention principles must be in effect at all times.

*Fact:* The Sheriff's Department P&PM requires training programs for all employees.

*Fact:* The Sheriff's Department P&PM states that training is defined as an organized, planned, and evaluated activity designed to achieve specific learning objectives through classroom studies and closely supervised on-the-job training.

*Fact:* The Sheriff's Department P&PM states that staff development is defined as an organized, planned, and evaluated activity designed to further increase the staff members' level of competence, which enables them to function more effectively.

**Finding 02:** The P&PM shows provisions for various training and development but does not show adequate and sustained training programs to ensure a continuum of comprehensive suicide-prevention services.

*Fact:* The Sheriff's Chief Medical Officer does not have a full-time Mental Health Officer on staff.

**Finding 03:** There is a need great enough for mental health services supervision in the Detention Services Bureau that a full-time Mental Health Officer for the jails should be a requirement.

*Fact:* The P&PM requires a post-suicide meeting of all appropriate staff to discuss findings.

9

**SAN DIEGO COUNTY GRAND JURY 2016/2017 (filed May 4, 2017)**

*Fact:* In the P&PM, none of the procedures pertain to the oversight of the suicide-prevention plan.

**Finding 04:** A continuous oversight of the suicide-prevention plan is needed in order to ensure that the suicide-prevention plan, the P&PM, and the facilities' physical features are kept current with suicide methods used by the inmates.

### *RECOMMENDATIONS*
**The 2016/2017 San Diego County Grand Jury recommends the San Diego County Sheriff's Department:**

17-24:     **Update the Policy and Procedures Manual to include a detailed suicide-prevention policy noting the nationally recognized protocols used in the jails for suicide prevention.**

17-25:     **Update the Policy and Procedure Manual to include appropriate and ongoing training for all staff and mental health personnel who observe or counsel suicide-risk inmates.**

17-26:     **Create and fill the position of a full-time Mental Health Director for the County jails.**

17-27:     **Create a suicide-prevention oversight group that recommends changes to the P&PM, verifies that suicide-prevention training is taking place, and implements any changes needed to keep the facilities as suicide-proof as possible.**

### *REQUIREMENTS AND INSTRUCTIONS*
The California Penal Code §933(c) requires any public agency which the Grand Jury has reviewed, and about which it has issued a final report, to comment to the Presiding Judge of the Superior Court on the findings and recommendations pertaining to matters under the control of the agency. Such comment shall be made *no later than 90 days* after the Grand Jury publishes its report (filed with the Clerk of the Court); except that in the case of a report containing findings and recommendations pertaining to a department or agency headed by an elected County official (e.g. District Attorney, Sheriff, etc.), such comment shall be made *within 60 days* to the Presiding Judge with an information copy sent to the Board of Supervisors.

Furthermore, California Penal Code §933.05(a), (b), (c), details, as follows, the manner in which such comment(s) are to be made:
      (a) As to each grand jury finding, the responding person or entity shall indicate
            one of the following:
                  (1) The respondent agrees with the finding

10

(2) The respondent disagrees wholly or partially with the finding, in which case the response shall specify the portion of the finding that is disputed and shall include an explanation of the reasons therefor.

(b) As to each grand jury recommendation, the responding person or entity shall report one of the following actions:

(1) The recommendation has been implemented, with a summary regarding the implemented action.

(2) The recommendation has not yet been implemented, but will be implemented in the future, with a time frame for implementation.

(3) The recommendation requires further analysis, with an explanation and the scope and parameters of an analysis or study, and a time frame for the matter to be prepared for discussion by the officer or head of the agency or department being investigated or reviewed, including the governing body of the public agency when applicable. This time frame shall not exceed six months from the date of publication of the grand jury report.

(4) The recommendation will not be implemented because it is not warranted or is not reasonable, with an explanation therefor.

(c) If a finding or recommendation of the grand jury addresses budgetary or personnel matters of a county agency or department headed by an elected officer, both the agency or department head and the Board of Supervisors shall respond if requested by the grand jury, but the response of the Board of Supervisors shall address only those budgetary or personnel matters over which it has some decision making authority. The response of the elected agency or department head shall address all aspects of the findings or recommendations affecting his or her agency or department.

Comments to the Presiding Judge of the Superior Court in compliance with the Penal Code §933.05 are required from the:

| Responding Agency | Recommendations | Date |
|---|---|---|
| San Diego County Sheriff's Department | 17-24 through 17-27 | 07/03/17 |

11

# EXHIBIT 3



# San Diego County Sheriff's Department

Post Office Box 939062   •   San Diego, California 92193-9062

### *William D. Gore, Sheriff*



RECEIVED

JUL 05 2017

SAN DIEGO
COUNTY GRAND JURY

June 29, 2017

Honorable Jeffrey B. Barton
Presiding Judge of the Superior Court
County Courthouse
220 West Broadway
San Diego, CA 92101

Dear Judge Barton:

**Response to the San Diego County Grand Jury Report: "Suicides in San Diego Jails"**
**Dated May 4, 2017.**

Pursuant to California Penal Code Section 933(c), the following is my response to the Grand
Jury's Findings and Recommendations 17-24 through 17-27.

## SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

**Grand Jury Finding 01:**

The Policy and Procedures Manual does not contain a comprehensive overall suicide-prevention
plan with a policy statement listing the protocols (professional standards) to be used, nor does it
clearly state that suicide-prevention principles must be in effect at all times.

*Response:*

The Sheriff's Department disagrees in part with this finding. The San Diego County Sheriff's
Department Medical Services Division Policy & Procedure does contain suicide prevention
policies and procedures. Those polices include the inmate safety program and enhanced
observation housing and training. The Department recognizes the Grand Jury's concern that all
suicide prevention policies and procedures are not located in one comprehensive format and has
taken steps to remedy the situation.

## RECOMMENDATION 17-24:

Update the Policy and Procedures Manual (P&PM) to include a detailed suicide-prevention
policy noting the nationally recognized protocols used in the jails for suicide prevention.

*Keeping the Peace Since 1850*

SDSO 000561

**Response:**

The recommendation has not yet been implemented. A comprehensive suicide prevention policy, which incorporates national suicide prevention standards, has been drafted for review. Approval of the policy should be completed by September 30, 2017.

**Grand Jury Finding 02:**

The Sheriff's P&PM shows provisions for various training and development but does not show adequate and sustained training programs to ensure a continuum of comprehensive suicide-prevention services.

**Response:**

The Sheriff's Department disagrees in part with the finding. The Department believes that its training and development is adequate to ensure comprehensive suicide prevention training. However, the Department is continually evaluating the training provided to all of its employees in order to find ways to decrease suicide risk.

**RECOMMENDATION 17-25:**

Update the Policy and Procedure Manual to include appropriate and ongoing training for all staff and mental health personnel who observe or counsel suicide-risk inmates.

**Response:**

The recommendation has been partially implemented. An 8-hour initial mental health illness training is held at least once a month for both sworn and medical staff. The training was implemented in September 2016 and is ongoing. A second phase of training is in the process of development. It is comprised of 2-4 hours of annual training. The San Diego Sheriff's Department will also collaborate with PERT (Psychiatric Emergency Response Team) to develop a training lab and curriculum that will include specialized training for sworn and medical staff on suicide risks and prevention. A draft of the training plan will be completed on September 30, 2017 to coincide with the completion of the comprehensive Suicide Prevention Policy & Procedures.

**Grand Jury Finding 03:**

There is a need great enough for mental health services supervision in the Detention Services Bureau that a full-time Mental Health Officer for the jails should be a requirement.

**Response:**

The Sheriff's Department disagrees with the finding.

SDSO 000562

Grand Jury 2016/2017 Suicides in San Diego Jails
June 29, 2017
Page 3 of 4

**RECOMMENDATION 17-26:**

Create and fill the position of a full-time Mental Health Director for the County jails.

*Response:*

The recommendation will not be implemented because it is not warranted. Liberty Healthcare provides the Department with three mental health professionals in key leadership positions dedicated to overseeing the delivery of services and quality of care of mental health in our jails. These positions are Regional Program Director, Medical Director, and Program Administrator. In addition, the Sheriff's Department employs a Chief Licensed Mental Health Clinician who has program oversight for the Inmate Safety Program and Suicide Prevention. As a result, the Department believes that a full time Mental Health Officer is not a great need at this time.

**Grand Jury Finding 04:**

A continuous oversight of the suicide-prevention plan is needed in order to ensure that the suicide-prevention plan, the P&PM, and the facilities' physical features are kept current with suicide methods used by the inmates.

*Response:*

The Sheriff's Department agrees with the finding.

**RECOMMENDATION 17-27:**

Create a suicide-prevention oversight group that recommends changes to the P&PM, verifies that suicide-prevention training is taking place, and implements any changes needed to keep the facilities as suicide-proof as possible.

*Response:*

The recommendation has been implemented. A Suicide Prevention Response & Improvement Team has been formed and is working collaboratively to update policy and procedures to reflect the Grand Jury's recommendations. The Team will also be responsible for the oversight of all staff training related to suicide prevention.

In closing, I would like to thank the Grand Jury for their efforts in working with the Sheriffs Department through this investigation.

SDSO 000563

Grand Jury 2016/2017 Suicides in San Diego Jails
June 29, 2017
Page 4 of 4

If further clarification or additional discussion is needed, please feel free to contact Lieutenant
Esther MacLyman of the Detention Support Division at (858) 974-2023.

Sincerely,

*William W. Gore*

William D. Gore, Sheriff

WDG:em

cc:     Members, Board of Supervisors
        Helen Robbins-Meyer, CAO
        David Hall, Director, Clerk of the Board
        Alan I. Baskin, Foreman, San Diego County Grand Jury

SDSO 000564

# EXHIBIT 4

# SUICIDES IN SAN DIEGO COUNTY JAIL
## A System Failing People with Mental Illness



April 2018
A Disability Rights California Investigation Report

**Report prepared by:**
Aaron J. Fischer, Litigation Counsel
Rebecca Cervenak, Staff  Attorney
Kim Swain, Managing Attorney

With special thanks to: Hayley Jones, DRC Legal Secretary

**DRC Subject Matter Experts**
Karen Higgins, M.D. Robert Canning, Ph.D., CCHP

An accessible electronic version of this report is available at:
http://www.disabilityrightsca.org/JailsReports/SDsuicideReportAccessible.pdf
A print copy of this report is available at:
http://www.disabilityrightsca.org/JailsReports/SDsuicideReport.pdf
For more information about Disability Rights California, visit our website at:
www.disabilityrightsca.org

Cover Photo: Mental Health Enhanced Observation Housing (EOH) Unit at
the Las Colinas Detention and Reentry Facility

# TABLE OF CONTENTS

I. EXECUTIVE SUMMARY ............................................................................................ 4

II. A TROUBLED HISTORY OF SUICIDES IN THE COUNTY JAILS .......................... 6

    A. Inmate Suicides: A Crisis by Any Measure ............................................................... 6

    B. Repeated Calls for Action........................................................................................... 9

III. SCOPE OF DRC INVESTIGATION AND EXPERTS ........................................... 10

    A. DRC Investigation Process ...................................................................................... 10

    B. Expert Analysis on San Diego Jails' Suicide Crisis.................................................. 10

IV. DRC FINDINGS AND RECOMMENDATIONS ...................................................... 12

    A. San Diego County Should End Its Over-Incarceration of People with Mental
    Illness and Improve Its System of Community-Based Mental Health Services........ 12

    B. San Diego County Should Address Systemic Deficiencies Illustrated by the
    High Rate of Inmate Suicides. .................................................................................... 15

        1.   Screening for Suicide Risk and Related Mental Health Needs .................... 15

        2.   Clinical Assessment and  Intervention........................................................ 16

        3.   Staff  Communication ................................................................................... 16

        4.   Addressing the Heightened Risks of Restrictive Housing ............................. 17

        5.   Supervision of At-Risk Inmates .................................................................... 18

        6.   Timely Emergency Response....................................................................... 19

        7.   Suicide Prevention Training........................................................................... 19

        8.   Internal Review of Inmate Suicides............................................................... 19

        9.   Quality Improvement Program ..................................................................... 20

    C. San Diego County Should Provide Adequate Treatment and Services to
    Inmates with Mental Health Needs............................................................................ 20

        1.   Overview of San Diego County's Jail Mental Health System....................... 21

        2.   Safety Cells.................................................................................................. 22

        3.   Psychiatric Security Units (PSU)................................................................. 23

        4.   Enhanced Observation Housing (EOH) Units ............................................. 25

        5.   Lack of Mental Health Treatment Programs ............................................... 26

        6.   Undue and Excessive Solitary Confinement............................................... 28

    D. San Diego County Should Establish Meaningful Independent Oversight of Jail
    Conditions and Treatment of Inmates........................................................................ 31

V. SUMMARY OF RECOMMENDATIONS ................................................................. 34

ENDNOTES................................................................................................................. 37

DRC Experts' Report on Suicides at San Diego County Jail ........................ Appendix A

    -Karen Higgins, M.D., Robert Canning, Ph.D., CCHP

# I. EXECUTIVE SUMMARY

San Diego County faces a crisis in its jail system. It has the highest reported number of suicides in a California jail system over several years – more than 30 suicide deaths since 2010. The inmate suicide rate has been many times higher than the rate in similarly sized county jails in California, the State prison system, and jails nationally. This is a crisis demanding meaningful action.

While the County reported just one inmate suicide in 2017, which is a welcome decrease compared to previous years, the system remains deeply challenged. The incidence of inmate suicide attempts and serious self-harm remains extremely high - a rate of approximately two (2) per week. The frequency of suicide attempts indicates that the County must improve its treatment of people with mental health needs.

Recognition that San Diego County has a problem with suicides and other deaths at the jail is not new. There has been a steady drumbeat of calls to action, from the County's grand juries, the media, and people who have been incarcerated at the jail and their loved ones.

As the designated protection and advocacy system charged with protecting the rights of people with disabilities in California, Disability Rights California (DRC) opened an investigation into conditions at the San Diego County jails in 2015. We conducted tours of the County's jail facilities, and completed extensive interviews with Sheriff's Department leadership, jail staff, and jail inmates. We have reviewed thousands of pages of relevant policies and procedures, Sheriff's Department records, and individual inmate records.

Our investigation focuses on four interconnected aspects of San Diego's County jail and mental health systems. We provide specific Recommendations regarding each.

**Over-Incarceration of People with Mental Health Needs.** First, we found that there is an extremely high number of jail inmates with significant mental health treatment needs. The County's mental health care system, both inside and outside of the jail, has long operated in a way that leads to the dangerous, costly, and counter-productive over-incarceration of people with mental health-related disabilities. This includes a historical failure to provide sufficient community-based mental health services and supports that help individuals with mental health needs to thrive and avoid entanglement with the criminal justice system and incarceration. There is an urgent need for a better approach. We found that the County's recently developed Mental Health Services Act Plan and related initiatives – including increased community based-services and diversion/reentry efforts – provide a reason for optimism. Of course, the County's efforts will be

judged on outcomes in the months and years ahead.

**Deficiencies in Suicide Prevention.** Second, our two subject matter experts, who reviewed inmate suicide cases as well as relevant policies, identified significant deficiencies in the County's suicide prevention practices. These experts, Karen Higgins, M.D., and Robert Canning, Ph.D., CCHP, have considerable expertise in suicide prevention and mental health treatment in detention facilities. They have completed a detailed written report (Appendix A), which identifies twenty-four Key Deficiencies in the County's system and provides forty-six (46) Recommendations to address those deficiencies. While we are convinced that the Sheriff's Department has begun to take the issue of suicide prevention seriously, there remain many aspects of the system's treatment of people at risk of suicide that require urgent action.

**Failure to Provide Adequate Mental Health Treatment.** Third, we found that the County's jail system subjects inmates with mental health needs to a grave risk of psychological and other harms by failing to provide adequate mental health treatment. Making matters worse, the County subjects inmates to dangerous solitary confinement conditions that take an enormous toll on individuals' mental health and well-being. A substantial number of the suicides in San Diego County's jails have occurred in designated segregation units and other units with solitary confinement conditions. Even with committed jail leadership and staff efforts to reduce solitary confinement and improve conditions, insufficient staffing and lack of other critical resources have caused these problems to persist.

**Lack of Meaningful, Independent Oversight.** Fourth, we found that the existing systems of jail oversight have failed. The time has come for the County to create an independent and professional oversight entity to monitor jail conditions, suicide prevention and mental health treatment practices, and other jail operations. A truly effective independent oversight entity, building on the models developed in Los Angeles County, Santa Clara County, Sonoma County, and other jurisdictions across the country, would enhance the County's efforts to address its historical challenges in its jails, help to achieve and solidify system improvements, and strengthen the trust of the community through greater transparency.

We have found that the County's jails have the great advantage of committed mental health staff and a number of strong leaders within the Sheriff's Department. They will need sustained investment and support from the County – along with true transparency and accountability – to achieve a durable solution to the inmate suicide crisis, the deficiencies in mental health treatment inside the jail, and the over-incarceration of people with mental health needs.

## II. A TROUBLED HISTORY OF SUICIDES IN THE COUNTY JAILS

### A. Inmate Suicides: A Crisis by Any Measure

San Diego County Jail has had one of the highest incidences of suicides in a California county jail system over several years – more than 30 suicide deaths since 2010.[1] By any measure, the number of suicide deaths in San Diego County's jails over a period of many years indicates a crisis demanding meaningful action.

DRC investigated inmate suicides during the three-year period from 2014 to 2016. Seventeen (17) people died by suicide in a San Diego County Jail facility during this time period. Among those deaths:

- Fourteen (14) people (82.3%) had a clear history and indication of mental health needs. Several had attempted suicide in the past, sometimes while in the community and often during earlier periods of incarceration.
- Nine (9) people (52.9%) were in jail on non-violent charges, including several cases involving only drug-related offenses.
- Fifteen (15) people (88.2%) were in jail awaiting trial. (One other was in jail for a brief "flash incarceration" related to a probation violation.) These individuals were not in jail because of a criminal conviction at the time of their death. They maintained the presumption of innocence embedded in our laws.
- At least six (6) people (35.3%) were housed in designated solitary confinement housing at the time of their suicide. Several more were in units that we observed to have solitary confinement conditions.
- At least four (4) people (23.5%) had one or more serious medical conditions at the time of their suicide death.
- San Diego County's inmate suicide rate has been staggeringly high compared with national, statewide, and local data. In 2016, the County's jail inmate suicide rate was approximately 93.8 per 100,000, similar to the rates for 2015 and 2014 (120.3 and 106.2 per 100,000, respectively).[2] The average annual inmate suicide rate for San Diego County during this three-year period (107 per 100,000) is more than double the jail inmate suicide rate nationally for 2014 (50 per 100,000), the last year for which complete data is available.[3]



From 2014 to 2016,

the seventeen (17) inmate suicide deaths in San Diego County far outpaced other large California county jail systems. For example, the Orange County Jail system had one suicide and the Riverside and Sacramento County Jail systems each had three (3) suicides during this three-year period.[4]

Even the Los Angeles County Jail system, which has an inmate population more than three (3) times larger than the San Diego County Jail population and a history of significant problems related to inadequate suicide prevention and treatment of people with mental health needs, had eight (8) suicide deaths during this three-year period, less than half as many as San Diego County.[5]

San Diego County's jail inmate suicide rate has also vastly exceeded (by a factor of 5) the annual inmate suicide rate in California's State prison system (21.8 per 100,000 from 2013 to 2016).[6] While local jails generally have higher inmate suicide rates than state prisons, we note that California's prison system has itself been under federal court supervision based in part on the prevalence of inmate suicides.

Detention in San Diego County Jail facilities appears to increase the risk of suicide significantly for San Diego County residents. The jail system's inmate suicide rate has been nearly eight (8) times higher than the overall suicide rate for San Diego County (13.1 out of 100,000).[7]

As of this writing, San Diego County has reported one jail inmate suicide during 2017. Another inmate suicide reportedly occurred in March 2018. While this is a decrease in the number of suicide deaths compared to previous years, it does not establish that the County has achieved an enduring solution. Suicide rates are most meaningful when viewed over a sustained period of time. Although the number of inmate suicides in a given year is no doubt an important indicator as to the adequacy of a system's policies and practices, it is not the sole barometer by which a system's adequacy should be measured.

There are additional reasons for caution with respect to the reported decrease in inmate suicides. First, the County has had other periods with few or no suicides, only to see a return to previous levels. For example, a seven-and-one-half month period without a San Diego jail inmate suicide death (January 2015 - August 2015) was followed



**Suicide Rates in San Diego Jails, Other Jails, State Prison, and the Community**
(Annual Rate per 100,000)

by a spate of suicide deaths in late 2015 and into 2016. Second, our investigation revealed that there continue to be a significant number of inmate suicide attempts and serious acts of self-harm. We reviewed 73 San Diego County Sheriff's Department incident reports that document distinct "Suicide Attempts" which occurred between the beginning of January 2017 and September 11, 2017. Many of these incidents were very serious and required emergency medical care. They include dozens of attempted hangings and self-strangulations, many jumps off the top tiers of jail housing units, and attempted overdoses. Such incidents occurred at a rate of approximately two (2) per week, which is consistent with the rate of "suicide attempts" reported for previous years – 107 in 2016, and 82 in 2015.

The County has stated to DRC that it began utilizing new definitions for "Suicide Attempt" and "Non-Suicidal Self Injury" in 2017. Under these definitions, the County determined that just 10 of the 73 incidents reported as "Suicide Attempts" were in fact suicide attempts under the new definition.

However such incidents are categorized, the continued frequency of inmate suicide attempts and serious acts of self-harm indicates that the treatment of people with mental health needs requires significant improvement.

## Suicide Rate Calculations

In examining suicide rates, DRC follows the methodology for calculating annual mortality rates, per 100,000 inmates, which is used by the United States Department of Justice. Experts in the field have found that this methodology is useful and "enhances our understanding of the jail suicide problem."[8]

The County has suggested an alternative method of calculating inmate suicide rate, which considers the estimated "racial distribution" of the inmate population in San Diego County's jails and in other county jail systems. The basis for this methodology is that San Diego County has an uncommonly high percentage of white inmates, who are statistically at higher risk of suicide compared to African American and Latino inmates.

The fact that San Diego County may have a higher-than-average number of inmates at elevated risk of suicide only *adds* urgency to the need for action. As Raymond F. Patterson, M.D., a national expert in forensic psychiatry and correctional suicide prevention, has written:

> "If [a detention system] do[es] in fact house groups of persons who tend to have higher rates of suicide, [the system] is therefore on notice of this elevated suicide risk factor and has a duty to address that risk in its suicide prevention efforts. Awareness of a higher propensity to suicide among certain groups requires greater vigilance on the part of [the system], not a reason for acquiescence."[9]

Whatever the methodology for evaluating suicide rates, the number of suicides in San Diego County's jails in recent years is a cause for extreme concern.

## B. Repeated Calls for Action

Local advocates and media have called attention to the dangerous conditions and large number of suicides and other deaths in San Diego County Jail facilities. There is an extensive public record documenting the tragic loss of lives, systemic failures, and inadequacy of oversight.[10] Families of those who have died have filed lawsuits alleging that the County and jail staff acted with deliberate indifference to inmates' serious mental health, medical, and related needs.[11]

Under the leadership of Dr. Alfred Joshua, the chief medical officer, the Sheriff's Department implemented a new Inmate Safety Program in 2015. This program included a number of changes to policy and training, and created new "Enhanced Observation Housing" (EOH) units for individuals meeting criteria indicating possible suicide risk. In spite of these efforts, the number of suicides remained high through 2016. (As discussed in Section IV.C.4, we have serious concerns regarding the harsh conditions and lack of mental health treatment in the EOH units.)

In Spring 2017, a San Diego Grand Jury issued a report regarding the alarmingly high inmate suicide rate. The Grand Jury found that "46 people have committed suicide in San Diego County jails in the past 12 years," noting that the County's inmate suicide rate is "the highest in all of California's large county jail systems."[12]

The Grand Jury recognized a number of steps the Sheriff's Department has taken in response to the inmate suicide crisis, including the addition of EOH units, Safety Cells (which, as we discuss later, are essentially small, empty padded rooms), and medical isolation cells, with related updates to policies and procedures.[13]

At the same time, the Grand Jury found that the Sheriff's Department continues to have inadequate suicide prevention training for jail staff, problematic gaps in personnel, and deficiencies in oversight. The Grand Jury concluded that "increased efforts in suicide prevention are required."[14]

On June 29, 2017, Sheriff Gore filed a Response to the Grand Jury's report. He promised a comprehensive suicide prevention policy, additional suicide prevention training, and formation of a Suicide Prevention Response & Improvement Team (SPRIT) to update policies and oversee staff training.[15]

Through our investigation, we are convinced that the Sheriff's Department has begun to take the issue of suicide prevention seriously. However, there remain many aspects of the system's treatment of people who have mental health needs, or who are at risk of suicide, that require urgent action. Individuals with mental health needs continue to suffer in San Diego County's jails, and remain at extraordinary risk of harm.

## III.    SCOPE OF DRC INVESTIGATION AND EXPERTS

### A. DRC Investigation Process

Disability Rights California (DRC) is the state's designated protection and advocacy system, charged with protecting the rights of people with disabilities in California.[16] DRC has the legal authority to inspect and monitor conditions in any facility that holds people with disabilities.[17]

Pursuant to this authority, DRC opened its investigation into San Diego County Jail based on reports from advocacy groups and community members, individuals with disabilities who have been incarcerated in the County's jails, as well as public and media reports regarding conditions in the County's jail system.

DRC toured four San Diego County Jail facilities that contain units designated for inmates with mental illness: (1) Central Jail, (2) George F. Bailey Detention Facility, (3) Vista Detention Facility, and (4) Las Colinas Detention and Reentry Facility. We toured facilities on May 5 and 6, 2015 and returned for follow-up inspections on November 2 and 3, 2016. We viewed areas accessible to inmates, including the booking/intake area, holding cells, sobering cells, safety cells, health care treatment areas, recreational and program areas, visitation areas, and housing units. During the tour, staff provided information and answered questions about the facilities and programs. We spoke with scores of inmates in the housing units, either at cell-front or face-to-face in common areas. We also conducted confidential interviews with numerous inmates throughout our investigation.

DRC reviewed publicly available documents and obtained records from the Sheriff's Department through California Public Records Act requests, DRC's access authority[18], and signed releases from inmates. We reviewed thousands of pages of relevant policies and procedures, Sheriff's Department records, and individual inmate records.

Based on our initial inspection of the facilities, and pursuant to our protection and advocacy system authority, we found probable cause to conclude that prisoners with disabilities are subjected to abuse and/or neglect in the San Diego County Jail.[19] We continued our investigation, leading to this report.

### B. Expert Analysis on San Diego Jails' Suicide Crisis

While the recent investigation efforts of the Grand Jury and other entities have been admirable and provide important recommendations, we determined that the County's inmate suicide crisis and related issues with inadequate mental health treatment warranted an independent, in-depth expert assessment.

DRC retained two subject matter experts to review inmate suicide cases going back to 2014 as well as relevant policies and procedures. These experts, Karen Higgins, M.D., and Robert Canning, Ph.D., CCHP ("DRC Experts"), have considerable experience and expertise in mental health treatment and suicide prevention in detention facilities.

Dr. Higgins served as the lead psychiatrist for the Denver City and County Jail system. She has also served as the statewide Chief Psychiatrist for the California Department of Corrections and Rehabilitation (CDCR). She has played leading roles in the development of policies related to correctional mental health care and suicide prevention.

Dr. Canning served as CDCR's statewide Suicide Prevention Coordinator for more than a decade, chairing the statewide suicide prevention committee, designing mental health and suicide prevention trainings, leading suicide prevention policy reforms, and building CDCR's quality improvement systems.

Dr. Higgins and Dr. Canning offer an important and independent perspective on San Diego County Jail's system. Their report (Appendix A) identifies twenty- four (24) Key Deficiencies and provides forty-six (46) Recommendations to address those deficiencies. See Section IV.B, below.

Dr. Higgins and Dr. Canning also completed two detailed reports on recent individual inmate suicides. These two reports, provided confidentially to the County, offer a model structure for the County to use to strengthen its own internal critical incident and suicide review processes for the future.

## IV.    DRC FINDINGS AND RECOMMENDATIONS

### A. San Diego County Should End Its Over-Incarceration of People with Mental Illness and Improve Its System of Community-Based Mental Health Services.

As is the case in many counties, the jail facilities in San Diego County were not designed to provide adequate treatment to inmates with mental health needs.[20]

Yet, San Diego County incarcerates an enormous number of people with mental illness. The Sheriff's Department has reported that approximately 40% of the jail population has a mental illness.[21] That means there are some 2,000 people with mental illness in the County's jails at any one time, many of whom have very significant treatment needs.

The disproportionately high number inmates with mental health needs is of a problem that begins outside the jail system. Far too many people with serious mental health needs are ending up in San Diego County's jails. The County's recent planning and funding priorities for mental health services appear to take this challenge head-on, after years of lack of attention and investment. Of course, the County's efforts will be judged on outcomes.

By providing appropriate mental health services and taking proactive steps to keep people with mental health needs out of jail, communities can lower incarceration and recidivism rates and improve people's lives. When effective, such efforts are good for families, constitute smart utilization of public monies, and in fact enhance public safety.

*DRC emphasizes three strategies for counties to end the* dangerous*, costly, and counter-productive over- incarceration of individuals with mental health needs:*

*1.    Ensure a robust community mental health system that supports people with mental illness in ways that keep them out of the criminal justice system in the first place.*

*2.    Divert individuals with mental illness who come into contact with law enforcement away from jail and into appropriate placements with services.*

*3.    Help individuals with mental illness safely and successfully reenter their communities after being incarcerated, with effective continuity-of-care and services to assist with housing, food, and other basic needs.*

In 2017, the County created a jail-based mental competency *restoration* program at the Central Jail, to provide restoration of competency services to inmates with pending criminal charges who are found "Incompetent to Stand Trial" (IST). The new program is a response to the lack of available beds in the state hospital system and resulting delays in providing court-ordered treatment to the IST population.

The County has not, however, taken similar steps to create capacity for a community-based restoration of competency program. Jail-based programs are compromised by their non-therapeutic carceral setting, and can themselves be dangerous places.[22] In contrast, community-based programs offer a cost- efficient, effective means of restoring IST patients to competency, while reducing unnecessary incarceration and improving mental health outcomes.[23]

Historically, San Diego County's efforts with respect to community-based mental health services have fallen short. The County failed to invest available state funding for mental health services, including over $100 million of Mental Health Services Act (MHSA) funding in 2017, with an additional $42 million in reserves.[24]

In June 2016, a Grand Jury documented the County's under-utilization of MHSA monies. The Grand Jury recommended that the County "appropriate a larger percentage of MHSA funds each year in order to improve services to a larger number of seriously mentally ill and at-risk county residents."[25]

The last few months have shown some reason for optimism, with the County taking steps to substantially increase investment. In October 2017, the County approved its Mental Health Services Act Three-Year Program and Expenditure Plan: Fiscal Years 2017-18 through 2019-20 ("San Diego MHSA Plan").[26] This plan would represent a major investment, nearly $570 million, in community- based mental health services and housing.[27] It includes over $33 million for mental health programs targeted to help youth and adults entangled in the criminal justice system.[28] The plan marks an important step toward addressing the overrepresentation of people with mental health needs in the criminal justice system and subjected to incarceration.

The San Diego MHSA Plan provides for increased outreach to people with mental health needs in jail and links to community-based services, including Full Service Partnership (FSP)[29] and Assertive Community Treatment (ACT)[30] programs, mental health and substance abuse treatment, health care, and housing. Additional programs are aimed at diversion from jail, reducing recidivism, and court-sponsored alternatives to incarceration. Examples include the Collaborative Behavioral Health Court and ACT program, the Psychiatric Emergency Response Team (PERT), the Serial Inebriate Program (SIP), and Courage to Call, a veteran peer support program.[31]

The County appears to be exploring other programs to decrease the number of people with mental health needs in jail. In July 2017, the Board funded an alternative custody and community transition pilot program designed for people with mental health needs and co-occurring substance abuse disorders incarcerated for non-violent misdemeanor offenses. The program is designed to link participants with community-based mental

health treatment and reentry services, with the goal of reducing recidivism. The pilot program is funded to serve 24 individuals at a time.[32]

The County's plans also recognize the importance of better data collection and outcome-based program evaluation. For example, the County recently passed a resolution supporting *Stepping Up: A National Initiative to Reduce the Number of People with Mental Illness in Jails,* which encourages development of a data-driven plan to achieve reductions in the number of people with mental illness in jail.[33]

Implementation of the *Stepping Up* Initiative and programs included in the MHSA Plan remain in the early stages, and should move forward expeditiously. These efforts will require sustained funding in the months and years to come, adequate transparency, and self-critical analysis of progress and of where additional resources may be needed.

## RECOMMENDATIONS

### Ending Over-Incarceration of People with Mental Illness and Strengthening Community-Based Mental Health Services

**Recommendation 1.**   Fully implement the County's three-year Mental Health Services Act (MHSA) Plan, with adequate transparency as to spending and program outcomes.

**Recommendation 2.**   Focus investment on community-based services and treatment programming that help individuals with mental health needs to thrive and to avoid incarceration and entanglement with the criminal justice system.

**Recommendation 3.**   Develop capacity for community-based competency restoration programs for individuals found Incompetent to Stand Trial (IST), so they can receive treatment in the least restrictive setting appropriate and do not languish unnecessarily in jail.

**Recommendation 4.**   Strengthen reentry programming for individuals with disabilities to ensure continuity of care, including with respect to medication and other treatment, and access to job opportunities, housing, food, and other basic needs for successful reintegration into the community.

**Recommendation 5.**   Ensure that the County's mental health programs are subject to rigorous data collection and self-critical analysis of progress and where additional resources may be needed.

## B. San Diego County Should Address Systemic Deficiencies Illustrated by the High Rate of Inmate Suicides.

The DRC Experts, Dr. Higgins and Dr. Canning, reviewed jail policies as well as individual records for all suicides that occurred between December 2014 and the end of 2016. They identified twenty-four (24) "Key Deficiencies" in San Diego County Jail's system, covering nine (9) components of an effective correctional suicide prevention program. They provide forty-six (46) Recommendations to improve the County's suicide prevention and related mental health treatment delivery efforts. Their full Report is attached as Appendix A.

The DRC Experts found that San Diego County must improve its Jail Suicide Prevention efforts in nine (9) areas:

1. Screening for Suicide Risk and Related Mental Health Needs
2. Clinical Assessment and Intervention
3. Staff Communication
4. Addressing the Heightened Risks of Restrictive Housing
5. Supervision of At-Risk Inmates
6. Timely Emergency Response
7. Suicide Prevention Training
8. Internal Review of Inmate Suicides
9. Quality Improvement Program

The DRC Experts commended the County for some of its recent efforts to revamp its mental health and suicide prevention policies and practices. They have encouraged the County to continue to strengthen those efforts, while taking steps to address the identified Key Deficiencies, summarized here.

### 1. Screening for Suicide Risk and Related Mental Health Needs

Screening for suicide risk and related mental health needs is a critically important part of any suicide prevention program. Effective screening to determine if a person might be at risk of suicide is essential at the time of jail booking, as the initial period of detention carries heightened risk of suicide. Screening is also necessary at particular high-risk moments during a person's incarceration.

The DRC Experts identified problems with the County's suicide risk screening procedures at booking, at key transition events that carry elevated risk (e.g., placement in solitary confinement), and at other high-stress, high-risk moments (e.g., inmates receiving "bad news" about their criminal court case, moving to prison, or being extradited).



In one tragic and illustrative case reviewed by the DRC experts, an inmate arrived at the jail with symptoms of florid psychosis and mania.  He was not referred for admission to the Psychiatric Security Unit. He was instead placed in an Administrative Segregation unit. He died by suicide a few days later without receiving an adequate screening for suicide risk.

## 2.  Clinical Assessment and  Intervention

Jails must effectively identify and monitor inmates' mental health needs and timely provide clinically indicated treatment, both in the event of an acute psychiatric episode and on an ongoing basis.

The DRC Experts identified several deficiencies in San Diego County's clinical referral and evaluation practices.

The experts also found that San Diego County Jail inmates do not receive an adequate individualized mental health treatment plan, a violation of state law[34], and do not have access to care that can prevent decompensation and reduce the risk of suicidal thinking and behavior.

## 3.  Staff  Communication

Communication between and among custodial staff and health care professionals working in the jail is another important aspect of suicide prevention. The DRC Experts found that San Diego County has lacked an effective system for custodial staff, mental health staff, and other health care staff to communicate about an inmate's decompensating condition, potential risk of suicide or self-harm, and mental health treatment needs.

In one case, a man died by suicide the day before his transfer to another state to face criminal charges. The DRC Experts found that custody staff knew he had made a credible suicide attempt a few weeks earlier, and that he was experiencing considerable stress about being extradited. Yet the inmate's treatment record did not reflect any sense of heightened risk requiring closer observation, monitoring, and clinical follow-up. The DRC Experts determined that this suicide death may have been preventable had there been better communication among custody and mental health staff

about the inmate's situation.

### 4.  Addressing the Heightened Risks of Restrictive Housing

The placement of inmates, particularly those with mental health needs, in segregated or restrictive housing increases the risk of suicidal and self-harming behavior, isolates individuals, and impedes normal interpersonal interactions that are essential to psychological health and adequate treatment.[35] At least six (6) inmates died by suicide in the last four years were housed in designated solitary confinement units in San Diego County Jail, and several more were housed in units with solitary confinement conditions.




The experts found that San Diego County Jail lacks an adequate process to screen inmates for increased suicide risk prior to and during placement in solitary confinement. This means that jail staff may be placing inmates who are at greatest risk of suicide in solitary confinement without identifying and considering those risks.

In one case, an inmate was housed in Administrative Segregation for over four months. The DRC Experts found that this inmate appeared to suffer the ill effects of prolonged isolation and had significant symptoms of mental illness that were not detected by staff. After a series of emergency placements in the jail's "Safety Cell," the inmate was again placed in Administrative Segregation, where he spent the last six weeks of his life before hanging himself.

The DRC Experts also identified problems with custodial practices in monitoring inmates in solitary confinement to ensure that those inmates are safe and not engaging in self-harming behavior. They found failures to monitor inmates' safety and cases of malfunctioning communication equipment in the segregation units. In some cases, the result was delays in discovering and

responding to inmates' ultimately fatal suicide attempts.

DRC observed video footage of one troubling suicide attempt in an Enhanced Observation Housing (EOH) Unit, which houses inmates at risk of suicide with solitary confinement conditions (as discussed in Section IV.C.4). Inmates are monitored by overhead video camera and per Department policy, should receive in-person checks at least once every 15 minutes. The video shows the inmate standing naked on the cell's desk, praying and preparing to jump, for over 14 minutes. He then dove head-first onto the floor. Four more minutes passed before custody staff appeared and summoned emergency medical care. Had the policy regarding in-person checks been followed, or the surveillance video been monitored, staff could have intervened prior to the inmate's jumping, and there would likely have been a more timely discovery and emergency response.

The extreme isolation and deprivations of solitary confinement increase suicidal ideation and self-harming behavior. Records indicate that such conditions contributed to inmates attempting suicide. In one suicide case, an inmate housed alone in Administrative Segregation was allowed just one hour out of his cell every 48 hours. He requested psychiatric services but two days later, he still had not been seen by mental health staff. He asked a deputy through the cell's intercom when he would get out of his cell and into the dayroom. He was told that he must remain in his cell. Forty-five minutes later, he was found hanging in his cell. Prior to hanging himself, he had urinated on the floor, stuck food and feces on the ceiling, and scrawled a suicide note on the cell walls using his own blood.

## 5. Supervision of At-Risk Inmates

When an inmate has suicidal thoughts, or engages in suicidal or self-harming behavior, staff must adequately supervise the inmate to ensure that the individual is safe.

The DRC Experts found several deficiencies regarding supervision of such inmates. For example, the experts found problematic the County's policies directing that custodial staff, rather than clinical staff, have final decision-making authority about where to house inmates identified as at risk of suicide.

Custody staff too often interfere with clinical decision-making regarding inmates with acute mental health needs. In one case, an inmate was booked while having acutely manic and psychotic symptoms. He had been hospitalized twice shortly before his incarceration and had been off his medications for several days prior to arrest. There was a two-day delay before he received a psychiatric evaluation and medications. The inmate made repeated statements about hurting himself, and he refused to take medications when they were finally ordered. A nurse practitioner

recommended that the inmate be placed in a Safety Cell based on his condition. However, a sergeant refused to move him. He remained in an Administrative Segregation cell, where he died by suicide that evening.

### 6. Timely Emergency Response

When an inmate engages in a serious suicide attempt, the facility staff's emergency response will often determine if the person lives or dies. The DRC Experts found, in nearly half the emergency responses to lethal suicide attempts they reviewed, poor coordination of lifesaving efforts, delays in starting CPR, and/ or malfunctioning medical equipment. They cited several troubling examples among recent suicide deaths.

In one case, medical staff were unable to initiate life-saving efforts due to malfunctioning automated external defibrillator (AED) equipment.

In a second suicide case, deputies waited seven minutes after discovering an inmate hanging in his cell, and then prevented nursing staff from evaluating the inmate's condition or using the AED.

In yet another case, the DRC Experts observed video of approximately 11 deputies standing at the scene of a suicide attempt for several minutes without initiating life-saving measures.

The DRC Experts also found that San Diego County Jail lacks an adequate program of drills for medical emergencies, including those stemming from serious suicide attempts.

### 7. Suicide Prevention Training

Custodial, medical, nursing, and mental health staff need strong training on the signs of mental illness and suicide risk, and on responding to inmates who are potentially at risk of suicide.

While the County has in recent months taken affirmative steps to enhance its suicide prevention training program in the wake of the Grand Jury's 2017 findings, the DRC Experts found that the County's training program is not well coordinated, tracked, or evaluated.

The DRC Experts found additional deficiencies with respect to the training of mental health clinicians. For example, records indicate that clinicians frequently use "contracts for safety," which ask patients to agree verbally or in writing that they will not engage in self-harm. According to suicide prevention experts, this practice has not been shown to decrease the risk of suicide attempts or to provide protection for clinicians. In fact, San Diego County Jail clinicians used these "contracts for safety" with multiple inmates who subsequently died by suicide while in custody.

### 8. Internal Review of Inmate Suicides

All inmate suicide deaths and medically serious suicide attempts should

be subject to a rigorous review process, with the objective of identifying necessary improvements that can be made to enhance suicide prevention and inmate safety moving  forward.

The DRC Experts found that the County's internal suicide review process, including as proposed in its recently revised Suicide Prevention Policy, is inadequate. They found that the policy does not sufficiently outline an internal review process, and that it fails to identify how findings and corrective action plans will be acted upon.

It is problematic that the Sheriff's Department Critical Incident Review Board does not conduct a formal review of all serious suicide attempts. This is a missed opportunity to learn from experience and to strengthen policy, procedure, and training moving forward.

The DRC Experts also expressed concerns about the San Diego County Citizens' Law Enforcement Review Board (CLERB), finding that it does not serve a meaningful or sufficient role in the provision of external, independent oversight with respect to suicide prevention. (We strongly agree with this finding, and recommend a new model of independent oversight. See Section IV.D.)

### 9. Quality Improvement Program

Jail systems with a robust continuous quality improvement (CQI) program will be in the best position to identify problems and implement effective solutions, including with respect to suicide prevention. The DRC Experts found that the County has begun to take positive steps in this area, but that important work remains.

### RECOMMENDATIONS

#### Improving Suicide Prevention in Jails

**Recommendation 6.**   Develop a plan for timely implementation of the DRC Experts' forty-six (46) Recommendations to address deficiencies in San Diego County Jail's suicide prevention policies, practices, and training.

**Recommendation 7.**   Strengthen the County's internal review process and quality improvement program to ensure implementation of necessary changes to enhance suicide prevention and inmate safety.

## C. San Diego County Should Provide Adequate Treatment and Services to Inmates with Mental Health Needs.

Our investigation found that there are a large number of San Diego County Jail inmates with significant mental health needs. With few exceptions,

enhanced mental health treatment programming is provided only to those with critically acute needs. In many cases, inmates remain in harsh, non-therapeutic settings without adequate treatment until their condition deteriorates. Only when they reach the point of engaging in acts of self-harm or having an acute breakdown do they receive an enhanced level of care. Such a system is cruel and counterproductive, and does not meet constitutional and legal requirements.

The County must take reasonable steps to ensure that it safeguards the rights of inmates with mental illness under the United States Constitution, the Americans with Disabilities Act, and other relevant laws. The County's compliance with state regulations – including Title 15 of the California Code of Regulations regarding jail operations – is important, but it does not demonstrate compliance with Constitutional and other legal requirements.[36]

### 1. Overview of San Diego County's Jail Mental Health System

The Sheriff's Department utilizes a partnership of County staff and contract health professionals to provide mental health services. Liberty Healthcare Corporation, a private contractor, assists in the hiring of staff and management of the mental health programs. Of course, it remains the County's responsibility to ensure that inmates are provided adequate care based on individual clinical needs.

The jail system has two units, called Psychiatric Security Units, that have on-site mental health clinicians and daily treatment programming, serving up to thirty (30) men and thirty-two (32) women with the most critically acute mental health conditions.

The County's jails also rely heavily on Safety Cells and Enhanced Observation Housing (EOH) units to manage inmates identified as acting out or at risk of self-harm or suicide. These are severe and punitive-feeling placements, without meaningful treatment. They raise serious concerns.

There are other designated mental health "cluster" units that house people with mental illness. In general, these units do not provide meaningful treatment programming.

A Jail-Based Mental Competency Program, a 25-bed program at the Central Jail for inmates deemed Incompetent to Stand Trial (IST), opened in March 2017. DRC did not tour or assess this program.




## 2. Safety Cells

We have significant concerns about the County's placement of large numbers of inmates in the jails' "Safety Cells."

By policy, Safety Cells are used for people who: (1) verbalize suicidal ideation or make suicidal gestures and are belligerent or intoxicated; (2) are combative or violent to a point that they may injure themselves, other patients or staff; or (3) are unable to function in the regular or specialized housing areas due to behavior which jeopardizes their  safety.

These Safety Cells are extraordinarily harsh settings. They are small, windowless rooms with rubberized walls. There is no furniture or bedding, leaving the individual to sit or lie on the floor. Safety Cell doors contain a food slot and a small viewing window that faces a hallway. Cells have a ceiling light that is illuminated 24/7, and a camera for remote observation by custody staff.

The cells are completely barren, with no sink, toilet, or running water. Inmates defecate and urinate in a grate on the ground. In June 2017, a Grand Jury evaluation of jail conditions found a "very strong" smell of urine surrounding the Safety Cells.[37]

Inmates placed in these Safety Cells are stripped naked and given only a "safety smock" made from heavy tear-free material fastened with straps or Velcro. The garment is open at the bottom, and no underwear is provided. Inmates receive no books or any other personal property while in a Safety Cell.

Placements in a Safety Cell are approved by the Watch Commander, in consultation with medical staff. An initial medical assessment must be done within 30 minutes after medical staff is notified. Department policies require observation of inmates placed in Safety Cells by custody staff at least twice

every 30-minute period and by medical staff every four (4) hours. The jail's policy is for a mental health consultation to occur within 12 hours of placement, and a medical evaluation every 24 hours.

There is no time limit for how long an inmate may be kept in a Safety Cell. Record reviews show that many inmates are held in Safety Cells for much longer than 24 hours, and in some cases up to four days. Many inmates cycle in and out of Safety Cell placement multiple times. In 2017, inmates were placed in a Safety Cell more than 6,700 times.

### 3. Psychiatric Security Units (PSU)

The County has two jail-based inpatient mental health units, known as Psychiatric Security Units (PSU), at the Central Jail (30 beds for men, including four beds in "observation cells") and at the Las Colinas Detention and Reentry Facility (32 beds for women, plus six nearby beds in "observation cells"). Strikingly, these two units make the Sheriff's Department the County's largest provider of inpatient psychiatric services.

We observed a high level of acuity among the patients in these inpatient units, with some placed in troubling solitary confinement conditions.

At the same time, we found that the PSUs do have some positive treatment programming. For example, at Central Jail, the PSU has clinical staff on-site, along with deputy staff that receive specialized mental health training. The PSU has operated weekly "Love on a Leash" therapeutic programs with specially trained dogs.



At Las Colinas, the PSU has considerable treatment and programming space. Therapeutic programming has included yoga and arts/crafts. Patients receive weekly multi-disciplinary treatment group meetings and regular clinical contact.

The County Jail's PSUs are the only units we observed that provide enhanced mental health treatment to inmates. They are available only to

inmates demonstrating an extremely high level of acuity.




A deeply problematic practice impacting access to treatment in the PSU is the inappropriate influence of custody staff, often contrary to mental health providers' clinical recommendations. For example, we received multiple reports that custody staff unilaterally place patients in the PSU's "observation units," which amount to a solitary confinement setting without access to the PSU's treatment programming. Inmates in these cells have been observed, by us and by others, smearing food, feces, and urine on the walls and floor.

Custody staff have in some cases prevented PSU patients from having social visits or accessing the outdoor area for recreational activity, overruling clinicians' judgment as to what is safe and clinically appropriate based on the




patient's individual circumstances. Such disregard of clinical judgment is deeply counterproductive to treatment efforts.

The DRC Experts also found problematic the number of inmates in mental health crisis who are not referred for placement in the PSU. There are large numbers of inmates cycling in and out of Safety Cells, many remaining in those cells for extended periods of time. But Safety Cells are harsh, barren, and isolating. They are not designed to provide clinical evaluation or treatment.

Inmates exhibiting suicidal or self-harming behavior, or other manifestations of acute mental illness, should be timely assessed for placement in the PSUs.

The County should ensure that these units are being fully and appropriately utilized, and that all patients in the PSU receive meaningful, clinically-driven treatment.

## 4. Enhanced Observation Housing (EOH) Units

With the County's development of the Inmate Safety Program in 2015 came the creation of Enhanced Observation Housing (EOH) units. These units, located at four jail facilities (Central, Las Colinas, George Bailey, Vista), are designated for observation and assessment of inmates who may be at elevated risk for suicide. Even though EOH inmates, in contrast to inmates in Safety Cells, generally have access to a toilet, they too endure conditions of extreme isolation and deprivation.

We observed and met with several inmates in EOH units. Consistent with County policy, all clothes and underwear are taken away, and inmates receive a safety smock, two blankets, and shower shoes. However, we reviewed multiple records documenting that EOH inmates were left naked, with no safety smock, and in some cases not even provided a blanket.  Some are forced to sleep on a thin mat placed on the floor. Many inmates complained about being cold, even with the smock and blankets.

Inmates have no access to personal property, television, recreation yard time, or visits from family. Inmates in the EOH units eat from paper trays and a paper safety spoon, and in some cases are restricted to eating without any utensil.

Inmates in the EOH units with individual cells complained about extremely



limited time outside their cell and excessive isolation. Mental health staff appear to recognize the extreme conditions in the EOH units. In one inmate's chart we reviewed, a psychiatrist recommended that the facility "discontinue  EOH as the isolation is inhumane and likely to compromise [this inmate] psychologically." We learned that some inmates deny having suicidal thoughts so they can get out of the EOH unit, or avoid placement there, given the harsh conditions.

The number of inmates who  pass through the EOH unit, with all its deprivations, is remarkable and far beyond

what we have observed in other jails. In 2016, the County logged 5,269 EOH placements. The rate was similar in 2017, based on partial data provided to us. In hundreds of cases, the inmate spent three days or more in the EOH unit, including a substantial number with lengths of stay of one week or more.

Inmates in EOH units are given a risk designation of either "high" or "low." When we toured the facility in November 2016, mental health clinicians evaluated inmates every 24 hours if they were designated as "low" risk. We were alarmed to see that for inmates designated as "high" risk, clinicians would evaluate them only every 48 hours, on the purported basis that they needed more time to "cool down." We understand that the Department recently updated their policies to ensure that all inmates are seen at least every 24 hours.

Still, there is no limit as to how long an inmate can be held in EOH housing. Frequently, the inmate charts we reviewed simply noted "Continue to Observe (CTO)," with no clinical justification or plan for treatment. Mental health staff who cover the EOH units spend their time evaluating and re-evaluating potential suicide risk, but little to no time engaging with inmates to reduce that risk.

We are well aware of the County's important objective to prevent inmate suicide deaths, and that removal of clothing, property, and privileges can reduce the opportunities that an inmate may have to engage in self- harming behavior. That being said, we found extremely disturbing the levels of deprivation and isolation for so many individuals, without access to any therapeutic or recreational activities. These individuals, remember, have been specifically identified as having potential mental health needs. They require frequent assessment and sustained therapeutic intervention. While the County has taken steps to better assess inmates' suicide risk, more must be done to provide necessary treatment.

### 5. <u>Lack of Mental Health Treatment Programs</u>

Through our investigation, a major theme that emerged was that inmates do not have timely access to adequate mental health care, including counseling, psychiatric medications, and other treatment programming.

The County has recently created designated mental health "cluster" units, which seem to provide some benefit to inmates with mental health needs who may be vulnerable to abuse or exploitation in general population units.

However, these designated mental health units lack formal treatment programming. Written guidelines for the largest such unit, at Central Jail, confirmed these limitations, stating that it "had no additional staff, doesn't provide additional treatment, or different follow-up guidelines. . . . [The unit] is simply psychiatric housing where inmates are less subjected to stigma if

acting in a manner that would reveal their thought process impairments."

Mental health staff leadership shared with us that increased access to structured individual and group treatment activities would be beneficial to their patients, but that there is insufficient mental health staffing and related resources to deliver such a program.

Access to mental health treatment remains extremely limited outside the inpatient PSUs. It generally consists of medication management and brief, non-confidential "check-ins" with mental health staff, often through a cell door. Non-confidential clinical contacts undermine treatment, as prisoners are reluctant to disclose sensitive information about their mental health history or current situation. What is more, effective communication through the thick metal cell doors is extremely difficult – people must speak very loudly to be heard at all. (We observed psychiatrists meeting with some patients privately outside of their cell, which is a positive practice.)

Many inmates on the jail's mental health caseload expressed to us an interest in group or individual out-of-cell therapeutic activities. In one case, a patient's record documented that he requested to discontinue his antidepressant medication and try counseling. Instead, mental health staff increased his medication dosage and ignored his request for counseling.

The lack of access to mental health treatment activities and appropriate levels of care violates minimum standards of care for inmates with mental health needs.[38] The National Commission on Correctional Health Care has adopted a standard requiring that "[r]egardless of facility size or type, basic on-site outpatient [mental health] services include, at a minimum, individual counseling, group counseling and psychosocial/psychoeducational programs."[39]

The County has reported that the jail system has recently increased mental health staffing. Any increase is a step in the right direction. It is clear that a significant increase in staffing and related resources is necessary to deliver meaningful treatment, including structured individual and group treatment programming, to the approximately 2,000 people with mental health needs inside the jails.

## The Veterans Moving Forward Program

One notable exception to the lack of mental health programming in the San Diego County jails is the Veterans Moving Forward Program at Vista. The unit is decorated with artwork and displays flags representing each branch of service. Up to 64 inmates who are veterans participate in the program, which covers substance abuse, stress management, yoga, career planning, mentoring, financial planning, and journalism. A counselor from the Veterans Administration is assigned to the unit.

The Veterans Moving Forward Program excludes inmates with serious medical conditions and non-veterans. Many inmates, both veterans and non-veterans, would benefit from this sort of program but are unable to participate due to the lack

of capacity and restrictive criteria.

We also found that inmates have faced significant delays in receiving prescribed psychiatric medications. Such delays can be dangerous and lead to mental health decompensation. The jail adopted a new pharmacy system in the summer of 2017. We received reports, confirmed by the County, of problematic delays between prescription and arrival of a medication for patients. The County has indicated that such problems have been addressed through the use of local pharmacies, particularly for urgent prescriptions. However, we continue to receive reports that medications are delayed.

Overall, the DRC Experts found that the County's jail mental health program "remains fragmented and without good continuity of care." They recommend development of a consolidated mental health treatment program that offers an appropriate spectrum of levels of care.

Specifically, the DRC Experts recommend creation of an "intermediate" level of mental health care, with sufficient capacity to ensure timely access for those individuals who need enhanced treatment programming. The program would serve patients "stepping down" from Safety Cell, EOH, or PSU admissions, as well as patients with a mental health condition that makes it difficult for them to function in a general population jail setting. The program would require a substantial increase in mental health clinician staffing to provide a structured treatment program that includes individual and group therapy to meet the clinical needs of the inmate population. Treatment must be provided pursuant to individualized treatment plans, as required by Title 15 of the California Code of Regulations (Section 1210). The DRC Experts found the jail's treatment plans to be consistently inadequate. This was consistent with our review of dozens of inmates' jail mental health records.

DRC strongly encourages the County to implement an enhanced and structured outpatient treatment program. It would have enormous benefit with respect to the safety and well-being of inmates, jail operations, and reentry efforts. The Intensive Outpatient Program at Sacramento County Jail offers one useful model.[40]

### 6. Undue and Excessive Solitary Confinement

Our investigation uncovered significant problems regarding the use of solitary confinement, particularly for inmates with mental health needs. Solitary confinement is generally defined as a placement in which inmates are held in their cells, alone or with a cellmate, for 22 to 24 hours per day.[41] San Diego County Jail inmates may be held in these conditions, for example, in maximum security units, Administrative Segregation units, "Keep Separate All" units, EOH units, or disciplinary units.

There is growing consensus that the isolation of prisoners with mental

illness should be avoided due to serious psychological and physical risks of harm.[42] Solitary confinement is an extremely dangerous place for someone with mental health needs. At least six (6) jail inmates died by suicide in segregation units in recent years, a group that includes individuals with a known history of mental illness and suicide attempts. Several other inmates died in units with solitary confinement conditions.

Jail staff report that their goal is to meet the requirements of Title 15, a state regulation that mandates at least three (3) hours per week of exercise time in a space designed for recreation.[43] Segregated inmates are also typically scheduled to receive 50-60 minutes per day out of their cells to shower and use the phone. They spend the remaining 1,380-1,390 minutes of their days inside their cell. This is an extreme level of isolation.

We found that "lockdowns" are remarkably common in San Diego County's jails. During lockdowns, inmates in an entire unit or portion of a facility can be confined to their cells. The number of inmates reporting extended periods of cell confinement during lockdowns was astonishing. We saw multiple records showing inmates subjected to long-term lockdown conditions.

### The Experience of Being on "Lockdown"

*One inmate filed a grievance after her unit faced the tenth lockdown in two weeks. She wrote:*

> This treatment is worse than people treat…animals. You guys are messing with our mental state… We are on lockdown with no explanation as to why. We barely get to come out as is and to be completely locked away and ignored by officers is unnerving. Being locked in jail inside a box inside of another box can do things to a person's mental state.

We also received information regarding a problematic practice that staff referred to as "Bypass." Under this practice, jail staff would not document the lockdown of individual inmates – including many with mental illness. In other words, people outside of designated segregation units were held in solitary confinement conditions without it being tracked anywhere in the system. The County has indicated that this practice has been ended.

One positive practice we learned about was a segregation placement email alert system, which notifies mental health staff when any inmate is placed in a segregation unit or individual cell lockdown. We urge the County to build on this practice, which started in September 2017. There should be a documented process for mental health staff to recommend against segregation placements for inmates at risk of psychological harm or suicide in such conditions, and for such a recommendation to be followed absent a specific security risk. Jail leadership has indicated that such a process occurs on an *ad hoc* basis, and that they would consider formalizing it with proper

documentation.

Jail leadership shared with us their perspective that the creation of the mental health "cluster" units has helped to reduce the number of people with mental illness in segregation units. We have not seen data to support this statement. And we remain deeply concerned about the lack of treatment, recreation, and other programming provided to inmates in the mental health "cluster" units.

We urge the County to continue to take affirmative steps to reduce the use of solitary confinement, and to eliminate the practice for inmates with mental illness. The County should track and analyze data on segregation placements, lengths of stay, and outcomes for inmates – particularly those with mental illness.

## RECOMMENDATIONS
### Improving Mental Health Treatment and Ending Harmful Use of Solitary Confinement

**Recommendation 8.**   Substantially increase mental health staffing and related resources to ensure that individuals with mental illness in the jail receive clinically indicated treatment.

**Recommendation 9.**   Ensure that the inpatient Psychiatric Security Units (PSUs) are fully and appropriately utilized, and that all patients in the PSU receive meaningful, clinically- driven treatment.

**Recommendation 10.**  Greatly reduce the use of "Safety Cells" for individuals with mental health needs. Inmates placed in Safety Cells as a result of behaviors related to mental health symptoms should not be housed there for longer than six (6) hours. At that point, if there is no less restrictive housing appropriate, they should be considered for placement in inpatient care (including the PSU).

**Recommendation 11.**  Revise policies and practices for the Enhanced Observation Housing (EOH) units to make them less harsh and inhumane, with a greater focus on delivery of treatment designed to reduce the risk of suicide and mental health decompensation.

**Recommendation 12.**  Revise policies to allow individuals in EOH to have access to social visits, increased out-of-cell time, and recreational activities, and to possess clothes and certain personal property, based on individualized clinical assessments of their condition and safety needs.

**Recommendation 13.**  Implement a consolidated mental health treatment program that offers a spectrum of levels of care. The program should include the creation of an "intermediate" level of mental health care for individuals who need enhanced treatment programming. The Intensive Outpatient Program at Sacramento County Jail offers one useful model.

**Recommendation 14.** Provide a written individualized treatment plan for each person requiring mental health services at the jail, as required by Title 15, Section 1210 of the California Code of Regulations. Ensure that clinically indicated treatment prescribed in the treatment plan is provided.

**Recommendation 15.** Reduce the use of solitary confinement segregation housing, and take affirmative steps to eliminate solitary confinement placements for individuals with mental illness at risk of harm in such a setting, absent exceptional and exigent circumstances.

**Recommendation 16.** Track and analyze data on all segregation housing placements and lockdowns, including lengths of stay and outcomes for inmates – particularly those with mental illness. Take corrective action to eliminate unnecessary segregation placements and lockdowns as part of ongoing quality improvement efforts.

**Recommendation 17.** Reduce the harsh isolation conditions in segregation and other restrictive housing units. Provide individuals in such units a minimum of four (4) hours per day of out-of-cell time, along with access to treatment, recreation, and other activities necessary to ensure their health and well-being.

## D. San Diego County Should Establish Meaningful Independent Oversight of Jail Conditions and Treatment of Inmates.

The time has come for San Diego County to create a meaningful, professional, and independent oversight entity to monitor and report on jail conditions, including as to mental health care and suicide prevention.

Even as San Diego County has begun to tackle the challenges of reducing the number of suicides in its jails and addressing the mental health treatment of people in the community and those who end up in jail, such efforts are unlikely to lead to a durable solution on their own.

The need for stronger independent oversight is clear.

**First, the sheer number of people dying in San Diego jails demands better oversight**. The County's recent track record includes an extraordinarily high number of deaths – more than 30 inmate suicides since 2010, and many other inmate deaths. Several inmate deaths (suicide and non-suicide) have led to lawsuits costing the County millions of dollars. The situation has led to a lack of trust in the jail system across the community.[44]

**Second, even with the efforts by Dr. Joshua and others in the Sheriff's Department, there remain significant challenges regarding jail suicide prevention and mental health care.** Among those challenges, the DRC Experts found that the County's internal suicide review process is undeveloped. Independent oversight can play an important and complementary role in strengthening internal review efforts, identifying the Department's need for

additional resources, and helping the County achieve and solidify progress.

**Third, the County's Citizens' Law Enforcement Review Board (CLERB) does not provide adequate or effective oversight**. The County's citizenry has long recognized the value of independent oversight of the jail system. The public voted to establish the Citizens' Law Enforcement Review Board (CLERB) in 1990 to independently investigate citizen complaints against Sheriff's deputies and probation officers, as well as deaths of jail inmates.[45]

But the CLERB has proven ineffective. The CLERB is sparsely staffed, with just three employees: an executive officer, an investigator, and an administrative assistant.[46] The CLERB is composed of eleven volunteers, who are not required to have previous special training or experience in investigations or other relevant topics.[47] The CLERB does not control its budget. It cannot hire additional investigative staff itself, even if needed to complete its work.

The CLERB has failed to keep up with the demands of its mission. Despite its authority to "annually inspect county adult detention facilities and annually file a report of such visitations together with pertinent recommendations" on issues that include "detention, care, custody, training, and treatment" of inmates,[48] the CLERB has *never* inspected the County's jail facilities in its more than 25 years.

The CLERB has also proven unable to complete its individual case investigations. At the beginning of 2011, the CLERB had six open death investigations.[49] That number grew to 19 by the end of 2014,[50] then to 35 in December 2015,[51] and to 46 by the end of 2016.[52] By October 2017, the CLERB had 59 open death investigations – including one dating back six years. Many of these long-delayed and unfinished death investigations are inmate suicides.

Given its tremendous backlog, the CLERB announced on November 11, 2017, that it was summarily dismissing eight (8) suicide death cases and fourteen (14) other cases of people dying in detention or while being taken into custody. The CLERB's stated reason for this action was that the investigation was not completed within the statutory one-year time limitation for imposing officer discipline for misconduct.[53] The CLERB asserted that this meant it lacked jurisdiction and could not complete its investigation.[54] (Oddly, the County's own web site for CLERB states that "death cases and other complex investigations often take more than one year to complete."[55])

In any event, CLERB's failure to complete its investigations means that these deaths will not face independent scrutiny.

The community response has been one of severe disapproval. One local editorial board called the CLERB's decision to summarily dismiss these cases "outrageous" and "insulting to victims' family members," noting that it "only reduces the likelihood of improved responses and practices" in the future.[56]

Even with the reported addition of a newly funded CLERB Investigator

position as of March 2018, it is DRC's assessment that the CLERB will not be able to adequately fulfill its mission as the County Jail system's sole oversight entity.

### **Benefits of Effective Independent Oversight:**

- *Public identification of problems with conditions and operations and timely solutions, resulting in jail facilities that are safer, operated in conformance with the Constitution, other laws, and up-to-date correctional practices.*
- *Early detection of issues that may have been overlooked inside jail facilities before they become major problems.*
- *Cost-effective and proactive means to avert lawsuits challenging the legality of conditions of confinement or the treatment of prisoners.*
- *Independent input on the need for funds requested by Sheriff's Department and other public officials.*
- *Better-informed policy decisions.*[57]

California counties like Los Angeles, Santa Clara, and Sonoma, the California State prison system, the City and County of Denver, and King County (Washington State) have implemented or are implementing a professional entity that provides independent oversight of jail operations. The Los Angeles County Office of Inspector General, created in 2014, provides an especially useful model.[58] Santa Clara County recently approved the creation of a county Office of Correction and Law Enforcement Monitoring, along with an accompanying community advisory committee,[59] based on expert recommendations.[60]

A professional, independent oversight entity would offer a critical benefit that CLERB has not – a proactive method to evaluate and improve systemwide practices in the County's jails, going beyond a mere after-the-fact investigation of individual deaths.

It may be that the CLERB can play some positive and important role in monitoring the San Diego County Jail system moving forward. It can enhance the work of a professional oversight entity, similar to other systems like Denver's, which provides for complementary roles by the Office of the Independent Monitor and a Citizen Oversight Board. But on its own, the CLERB cannot provide adequate oversight that ensures effectiveness, transparency, and accountability in the operation of San Diego County's jails, or pave the way for necessary systemic improvements.

Meaningful, professional, and independent oversight would enhance the County's efforts to address its historical weaknesses and challenges in its jails, help to achieve and solidify improvements, and strengthen the trust of the community through greater transparency. This, more than anything, may be the key to achieving a system that meets legal and constitutional standards, and that properly cares for people with mental health needs.

## RECOMMENDATION
### Meaningful, Independent Oversight of Jail System

**Recommendation 18.**    The County should establish a professional independent oversight entity that has the authority and duty to monitor the treatment of inmates with mental health needs, suicide prevention, and other aspects of jail operations affecting inmates with disabilities, with periodic reporting to the Board of Supervisors and regular outreach to the public.

## V. SUMMARY OF RECOMMENDATIONS

### 1. End Over-Incarceration of People with Mental Illness, Strengthen Community-Based Mental Health Services

**Recommendation 1.** Fully implement the County's three-year Mental Health Services Act (MHSA) Plan, with adequate transparency as to spending and program outcomes.

**Recommendation 2.** Focus investment on community-based services and treatment programming that help individuals with mental health needs to thrive and to avoid incarceration and entanglement with the criminal justice system.

**Recommendation 3.** Develop capacity for community-based competency restoration programs for individuals found Incompetent to Stand Trial (IST), so that they can receive treatment in the least restrictive setting appropriate and do not languish unnecessarily in jail.

**Recommendation 4.** Strengthen reentry programming for individuals with disabilities to ensure continuity of care, including with respect to medication and other treatment, and access to job opportunities,

housing, food, and other basic needs for successful reintegration into the community.

**Recommendation 5.** Ensure that the County's mental health programs are subject to rigorous data collection and self-critical analysis of progress and where additional resources may be needed.

### 2. Improve Suicide Prevention Practices

**Recommendation 6.** Develop a plan for timely implementation of the DRC Experts' forty-six (46) Recommendations to address deficiencies in San Diego County Jail's suicide prevention policies, practices, and training.

**Recommendation 7.** Strengthen the County's internal review process and quality improvement program to ensure implementation of necessary changes to enhance suicide prevention and inmate safety.

### 3. Improve Mental Health Treatment, End the Harmful Use of Solitary Confinement

**Recommendation 8.** Substantially increase mental health staffing and

related resources to ensure that individuals with mental illness in the jail receive clinically indicated treatment.

**Recommendation 9.** Ensure that the inpatient Psychiatric Security Units (PSUs) are fully and appropriately utilized, and that all patients in the PSU receive meaningful, clinically-driven treatment.

**Recommendation 10.** Greatly reduce the use of "Safety Cells" for individuals with mental health needs. Inmates placed in Safety Cells as a result of behaviors related to mental health symptoms should not be housed there for longer than six (6) hours. At that point, if there is no less restrictive housing appropriate, they should be considered for placement in inpatient care (including the PSU).

**Recommendation 11.** Revise policies and practices for the Enhanced Observation Housing (EOH) units to make them less harsh and inhumane, with a greater focus on delivery of treatment designed to reduce the risk of suicide and mental health decompensation.

**Recommendation 12.** Revise policies to allow individuals in EOH to have access to social visits, increased out-of-cell time, and recreational activities, and to possess clothes and certain personal property, based on individualized clinical assessments of their condition and safety needs.

**Recommendation 13.** Implement a consolidated mental health treatment program that offers a spectrum of levels of care. The program should include the creation of an "intermediate" level of mental health care for individuals who need enhanced treatment programming. The Intensive Outpatient Program at Sacramento County Jail offers one useful model.

**Recommendation 14.** Provide a written individualized treatment plan for each person requiring mental health services at the jail, as required by Title 15, Section 1210 of the California Code of Regulations. Ensure that clinically indicated treatment prescribed in the treatment plan is provided.

**Recommendation 15.** Reduce the use of solitary confinement segregation housing, and take affirmative steps to eliminate solitary confinement placements for individuals with mental illness at risk of harm in such a setting, absent exceptional and exigent circumstances.

**Recommendation 16.** Track and analyze data on all segregation housing placements and lockdowns, including lengths of stay and outcomes for inmates – particularly those with mental illness. Take corrective action to eliminate unnecessary segregation placements and lockdowns as part of ongoing quality improvement efforts.

**Recommendation 17.** Reduce the harsh isolation conditions in segregation and other restrictive housing units. Provide individuals in such units a minimum of four (4) hours per day of out-of-cell time, along with access to treatment, recreation, and other activities necessary to ensure their health and well-being.

## 4. Ensure Meaningful Independent Oversight of Jail System

**Recommendation 18.** The County should establish a professional independent oversight entity that has the authority and duty to monitor the treatment of inmates with mental health needs, suicide prevention, and other aspects of jail operations affecting inmates with disabilities, with periodic reporting to the Board of Supervisors and regular outreach to the public.

# ENDNOTES

1 State of California, Department of Justice, Death in Custody & Arrest-Related Deaths Data, 2005-2016 (April 2017), **https://openjustice.doj.ca.gov/data** [hereinafter "Cal. DOJ Death Data"]; San Diego County Grand Jury 2016/2017, *Amended Grand Jury Report, Examining the Issue of Suicides in San Diego Jails*, at 1, (May 4, 2017), **https:// www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2016-2017/ SuicidesinSanDiegoJails.pdf** [hereinafter "Grand Jury 2017 Suicide Report"].  **"Return to Main Document"**

2 Suicide rates calculated using the average daily population as reported in: Jail Profile Survey, January 2002–December 2016, Board of State and Community Corrections, **http://www. bscc.ca.gov/s_fsojailprofilesurvey.php**; Cal. Board of State and Community Corrections (BSCC), Jail Population Trends, **https://public.tableau.com/profile/kstevens#!/vizhome/ ACJROctober2013/ADPRatedCapacity**.  **"Return to Main Document"**

3 Margaret E. Noonan, Bureau of Justice Statistics United States Department of Justice, *Mortality in State Prisons, 2001-2014 - Statistical Tables* (Dec. 15, 2016), **https://www.bjs. gov/index.cfm?ty=pbdetail&iid=5866. "Return to Main Document"**

4 Cal. DOJ Death Data.  **"Return to Main Document"**

5 Id.  **"Return to Main Document"**

6 Coleman v. Brown, Case No. 2:90-cv-0520-KJM-DB, *The Second Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation at 21*, Lindsay M. Hayes, M.S., Docket No. 5672, Sept. 7, 2017. **"Return to Main Document"**

7 Kenny Goldberg, Following 2014 Decline, Suicide Rate In San Diego County Holds Steady, KPBS (Sept. 7, 2016), **http://www.kpbs.org/news/2016/sep/07/suicides-san-diego- county-so-help-seeking-behavior/**, citing *San Diego County Suicide Prevention Council, Annual Report to the Community 2017 at 1* (Sept. 1, 2017), **http://www.sdchip.org/wp- content/uploads/2015/12/SPC-Report-Card-2017-FINAL_9-1-17.pdf. "Return to Main Document"**

8 Lindsay Hayes, *National Study of Jail Suicides: 20 Years Later at 46*, National

Center on Institutions and Alternatives (2010).  **"Return to Main Document"**

9 See Coleman v. Brown, Case No. 2:90-cv-00520-LKK-JFM, *Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2012 - June 30, 2012 at 15, Docket No. 4376, Mar. 13, 2013.* The federal court in the Coleman case agreed: "Where, as here, defendants know that they house prison inmates at risk for suicide, they are required to take all reasonable steps to prevent the harm of suicide." Coleman v. Brown, 938 F.Supp.2d 955, 975 (E.D. Cal. 2013).  **"Return to Main Document"**

10 Kelly Davis & Dave Maass, *Suicide in the cell*, San Diego City Beat (Apr. 24, 2013), **http:// sdcitybeat.com/news-and-opinion/news/suicide-cell/**; Dave Maass & Kelly Davis, *How many inmate deaths is too many*, San Diego City Beat (Mar. 27, 2013), **http://sdcitybeat. com/news-and-opinion/news/many-inmate-deaths-many/**; Editorial: *Too many dead inmates in San Diego jails*, San Diego City Beat (May 8, 2013), **http://sdcitybeat.com/ news-and-opinion/many-dead-inmates-san-diego-jails/**; Kelly Davis & Dave Maass, *Death's in the Details*, San Diego City Beat (June 12, 2013), **http://sdcitybeat.com/news- and-opinion/news/death-s-details/**; Kelly Davis, *Watchdog weighs in, sort of*, San Diego City Beat (July 31, 2013), **http://sdcitybeat.com/news-and-opinion/news/watchdog-weighs-in-sort/**; Kelly Davis, *10 more dead inmates*, San Diego City Beat (Oct. 16, 2013), **http://sdcitybeat.com/news-and-opinion/news/10-dead-inmates/**; Kelly Davis, *An interview with the sheriff's chief medical officer,* San Diego City Beat (July 16, 2014), **http://sdcitybeat.com/news-and-opinion/news/interview-sheriff-s-chief-medical- officer/**; Kelly Davis, *San Diego County sets a dubious record for jail deaths*, San Diego City Beat (Dec. 22, 2014), **http://sdcitybeat.com/news-and-opinion/news/san-diego-county-sets-dubious-record-jail-deaths/**; Tom Jones, *Families Struggle to Get Information After Loved Ones Die In Jail*, NBC San Diego (May 14, 2015), **https://www. nbcsandiego.com/news/local/Families-Struggle-to-Get-Information-After-Loved-Ones- Die-In-Jail-303822051.html**; Kelly Davis, *Solitary in California Jails Still Hellish Despite State Reform*, The Intercept (Oct. 29, 2015) **https://theintercept.com/2015/10/29/ solitary-in-california-jails-still-hellish-despite-state-reforms/**; Kelly Davis, *Suicides still plague the county jails*, San Diego Union Tribune (Dec. 16, 2015), **http://www. sandiegouniontribune.com/news/watchdog/sdut-jail-suicides-2015dec16-htmlstory. html**; Kelly Davis, *Jail death from excess water drinking raises questions*, San Diego Union Tribune (May 23, 2016), **http://www.sandiegouniontribune.com/news/watchdog/ sdut-nunez-**

**water-death-2016may23-story.html**; Lisa Pickoff-White & Julie Small, *When Jail Becomes a Death Sentence*, KQED News (Aug. 22, 2016), **https://ww2.kqed. org/news/2016/08/22/when-jail-becomes-a-death-sentence/**; Kenny Goldberg, *Following 2014 Decline, Suicide Rate In San Diego County Holds Steady*, KPBS (Sept. 7, 2016), **www.kpbs.org/news/2016/sep/07/suicides-san-diego-county-so-help-seeking-behavior/**; Kelly Davis, *People are still dying in the San Diego county jails*, San Diego City Beat (Nov.14, 2016); Rebekah Kearn, **http://sdcitybeat.com/news-and- opinion/news/people-still-dying-san-diego-county-jails/**; *San Diego County Lashed for Jail Suicides*, Courthouse News Service (Nov. 15, 2016), **https://www.courthousenews. com/san-diego-county-lashed-for-jail-suicides/**; Kelly Davis, *Two Men at Obvious Risk of Suicide, Two Deaths – and Investigators Just Cleared Both Cases*, Voice of San Diego (Mar. 27, 2017), **https://www.voiceofsandiego.org/topics/public-safety/two-men-at-obvious- risk-of-suicide-two-deaths-and-investigators-just-cleared-both-cases/**; Dana Littlefield, *San Diego County jails make changes to treat mentally ill inmates, curb suicides*, San Diego Union Tribune (Apr. 29, 2017), **http://www.sandiegouniontribune.com/news/ public-safety/sd-me-jail-health-20170429-story.html**; Doug Porter, *County Jail Deaths Don't Matter in San Diego*, San Diego Free Press (Nov. 16,  2017).  **"Return to Main Document"**

11 Kelly Davis, Marine's widow sues over jail death, San Diego Union Tribune (Apr. 13, 2015), **http://www.sandiegouniontribune.com/news/watchdog/sdut-lawsuit-jail-should-have-prevented-suicide-2015apr13-htmlstory.html**; Tom Jones, *Families Struggle to Get Information After Loved Ones Die In Jail*, NBC San Diego, (May 14, 2015), **https:// www.nbcsandiego.com/news/local/Families-Struggle-to-Get-Information-After-Loved- Ones-Die-In-Jail-303822051.html**.  **"Return to Main Document"**

12 Grand Jury 2017 *Suicide Report at 1*.  **"Return to Main Document"**

13 Id. at 2.  **"Return to Main Document"**

14 Id. at 5. **"Return to Main Document"**

15 San Diego County Sheriff's Department, *Response to the San Diego County Grand Jury Report: "Suicides in San Diego Jails"* Dated May 4, 2017 (June 29, 2017), **http://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/201**

**6-2017/ SuicidesinSanDiegoJails_response1.pdf**. **"Return to Main Document"**

16 42 U.S.C. § 10801, et seq.; 42 C.F.R. § 51; Cal. Welf. & Inst. Code § 4900 et seq. **"Return to Main Document"**

17 42 U.S.C. § 10805(a)(3); 42 C.F.R. § 51.42 (b); Cal. Welf. & Inst. Code § 4902(b)(2). **"Return to Main Document"**

18 42 U.S.C. § 10805(a)(4)(B)(iii). **"Return to Main Document"**

19 Cal. Welf. & Inst. Code § 4900(h); 42 U.S.C. §§ 10802(1) & (5); 42 C.F.R. § 51.2; Cal. Welf. & Inst. Code §§ 4900 & 15610.07. **"Return to Main Document"**

20 Mental Health Services Oversight & Accountability Commission (MHSOAC), *Together We Can, Reducing Criminal Justice Involvement for People with Mental Illness at 2* (Nov. 2017), **http://mhsoac.ca.gov/document/2017-12/criminal-justice-and-mental-health- project-report** [hereinafter "MHSOAC Report"]. **"Return to Main Document"**

21 See also Dana Littlefield, *Back Story: How San Diego County treats mentally ill inmates in jail*, San Diego Union Tribune (Apr. 19, 2017), **http://www.sandiegouniontribune.com/ news/public-safety/sd-me-jails-backstory-20170429-story.html**. **"Return to Main Document"**

22 *Inmate found dead of apparent suicide at West Valley Detention Center*, Inland Valley Daily Bulletin, (Feb. 27, 2017), **https://www.dailybulletin.com/2017/02/27/inmate-found- dead-of-apparent-suicide-at-west-valley-detention-center/** (suicide of inmate while in San Bernardino County Jail's competency restoration program). **"Return to Main Document"**

23 Disability Rights California, *Placement of Individuals Found Incompetent to Stand Trial: A review of competency programs and recommendations*, **http://www.disabilityrightsca. org/pubs/CM5201.pdf**; Nicole R. Johnson, et al., *Outpatient Competence Restoration: A Model and Outcomes, 5 World J. Psychiatry 2 at 229* (July 22, 2015), **http://www. wjgnet.com/2220-3206/full/v5/i2/228.htm**; W. Neil Gowensmith, et al., *Lookin' for Beds in All the Wrong Places: Outpatient Competency Restoration as a Promising Approach to Modern Challenges, Psychology, Public Policy, and Law at 9* (June 6, 2016), **http://dx.doi.org/10.1037/law0000088**. **"Return to Main Document"**

[24] Lisa Halverstadt, Fact Check: *More than $100M for Mental Health is Sitting in the Bank,* Voice of San Diego (Nov. 3, 2017), **https://www.voiceofsandiego.org/topics/ government/fact-check-100m-mental**; Lisa Halverstadt, *County Finds Early Struggles as it Tackles the Hardest Problem in Homelessness*, Voice of San Diego (Jan. 31, 2017), **https://www.voiceofsandiego.org/topics/government/county-finds-early-struggles- tackles-hardest-problem-homelessness/**. **"Return to Main Document"**

[25] San Diego Grand Jury 2015/2016, *The Mental Health Services Act in San Diego County, Unspent Funds, Ongoing Needs* (June 9, 2016), **http://www.sandiegocounty.gov/ content/dam/sdc/grandjury/reports/2015-2016/MHSAinSanDiegoCountyReport.pdf**. **"Return to Main Document"**

[26] County of San Diego MHSA *Three-Year Program and Expenditure Plan: Fiscal Years 2017-18 through 2019-20* (Oct. 10, 2017), **https://www.sandiegocounty.gov/content/dam/sdc/ hhsa/programs/bhs/homepage/MHSA/MHSA%20CERTIFIED%203% 20Year%20 Plan%20FY%2017_20%20.pdf** [hereinafter "San Diego MHSA Plan"]. **"Return to Main Document"**

[27] Id. at 8. **"Return to Main Document"**

[28] Id. at 22. **"Return to Main Document"**

[29] *Full Service Partnership (FSP) programs advance goals to reduce institutionalization and incarceration, reduce homelessness, and provide timely access to help by providing intensive wraparound treatment, rehabilitation, and case management services. Services provided may include mental health treatment, housing, medical care, and job- or life- skills training. San Diego MHSA Plan at 20*; see also Cal. Code Regs., tit. 9, § 3200.130 ("Full Service Partnership"). **"Return to Main Document"**

[30] *Assertive Community Treatment (ACT) programs provide an array of services to individuals in the community that include intensive case management, mental health services, vocational services, integrated services for mental health and substance abuse issues, peer counseling/support, and housing services.* **"Return to Main Document"**

[31] San Diego MHSA Plan at 444. **"Return to Main Document"**

[32] *Addressing Mental Health Needs of Offenders With an Alternative*

*Custody and Reentry Pilot Program, County of San Diego Board of Supervisors, July 18, 2017 Meeting Agenda at 2* (July 18, 2017), **https://content.govdelivery.com/attachments/ CASAND/2017/07/12/file_attachments/845965/18%2BJul%2B2017 _Regular_agenda. pdf**. **"Return to Main Document"**

33 *The Stepping Up Initiative, Fact Sheet*, **http://www.counties.org/sites/main/files/file-attachments/stepping_up_two-pager_final.pdf**; see also National Association of Counties (NACO), *Stepping Up Initiative Overview and Resources*, **http://www.naco.org/resources/signature-projects/stepping-initiative**; Risë Haneberg, et al., *Reducing the Number of People with Mental Illnesses in Jail, Six Questions County Leaders Need to Ask* (Jan. 2017), **https://stepuptogether.org/wp-content/uploads/2017/01/Reducing- the-Number-of-People-with-Mental-Illnesses-in-Jail_Six-Questions.pdf**; *Stepping Up Initiative, Resources Toolkit*, **https://stepuptogether.org/toolkit**. **"Return to Main Document"**

34 Cal. Code Regs, tit. 15, § 1210. **"Return to Main Document"**

35 National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences at 183-87* (2014). Washington, DC: The National Academies Press, **https://doi.org/10.17226/18613**. **"Return to Main Document"**

36 See, e.g., Hernandez v. County of Monterey, 110 F.Supp.3d 929, 945 (N.D. Cal. 2015) (holding that compliance with California's Title 15 regulations does not prevent finding of constitutional violations in jail system: "[T]he Supremacy Clause makes it very simple: the Constitution controls."). **"Return to Main Document"**

37 San Diego County Grand Jury, *Adult Detention Facilities at 2* (June 1, 2017), **http:// www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/ 2016-2017/ AdultDetentionFacilitiesReport.pdf.** **"Return to Main Document"**

38 Brown v. Plata, 563 U.S. 493, 516 (2011); Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982). **"Return to Main Document"**

39 National Commission on Correctional Health Care (NCCHC), *Standards for Health Services in Jails (2014), Standard J-G-04*. **"Return to Main Document"**

40 Ellen Garrison, *As Need Skyrockets, Sacramento Jail to Expand Aid to*

*Mentally Ill*, Sacramento Bee (Mar. 23, 2017), http://www.sacbee.com/news/local/crime/ article140363113.html. **"Return to Main Document"**

41  See, e.g., United States Department of Justice, *Investigation of State Correctional Institution at Cresson at 5* (May 13, 2013), http://www.justice.gov/crt/about/spl/ documents/cresson_findings_5-31-13.pdf ("[T]erms 'isolation' or 'solitary confinement' mean the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others. … An isolation unit means a unit where either all or most of those housed in the unit are subjected to isolation."); Wilkinson v. Austin, 545 U.S. 209, 214, 224 (2005) (describing solitary confinement as limiting human contact for 23 hours per day); Tillery v. Owens, 907 F.2d 418, 422 (3d Cir. 1990) (21 to 22 hours per day).  **"Return to Main Document"**

42  United States Department of Justice, *Reports and Recommendations Concerning the Use of Restrictive Housing – Final Report at 99* (January 2016); National Commission on Correctional Health Care, *Position Statement - Solitary Confinement (Isolation)* (2016); American Bar Association, *Standards for Criminal Justice: Treatment of Prisoners* (3d ed. 2011), Standard 23-2.8 *Segregated Housing and Mental Health*; American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness*  (2012).

43  Cal. Code Regs., tit. 15, § 1065.  **"Return to Main Document"**

44  Doug Porter, *County Jail Deaths Don't Matter in San Diego*, San Diego Free Press (Nov. 16, 2017) (since March 2015, San Diego County has paid more than $6 million in settlements relating to fatalities while in custody), https://sandiegofreepress. org/2017/11/county-jail-deaths-dont-matter-in-san-diego/; Kelly Davis, *County settles jail meth death for $2.3 million*, San Diego Union Tribune (Aug. 30, 2016), www. sandiegouniontribune.com/news/watchdog/sdut-bernard-victorianne-settlement- 2016aug30-story.html; Kelly Davis, *Two Men at Obvious Risk of Suicide, Two Deaths – and Investigators Just Cleared Both Cases*, Voice of San Diego (Mar. 27, 2017); Tom Jones, *Families Struggle to Get Information After Loved Ones Die In Jail*, NBC San Diego (May 14, 2015), https://www.nbcsandiego.com/news/local/Families-Struggle-to-Get- Information-After-Loved-Ones-Die-In-Jail-303822051.html. **"Return to Main Document"**

45 San Diego County Charter, Section 606,
**http://www.sandiegocounty.gov/clerb/docs/ Section606.pdf**.
**"Return to Main Document"**

46 Citizen's Law Enforcement Review Board (CLERB), Frequently Asked
Questions, *CLERB FAQs: What is the Review Board?*,
**http://www.sandiegocounty.gov/content/sdc/clerb/
faqs/faqs_page.html.** **"Return to Main Document"**

47 CLERB FAQs: *What is the Review Board?*; CLERB FAQs: *How can I
become a Review Board Member?* **"Return to Main Document"**

48 CLERB *Rules and Regulations*, Section 4.7(d). **"Return to Main Document"**

49 Kelly Davis, *Police Oversight Group is Drowning in Death cases*, Voice
of San Diego (Jan. 30, 2017),
**https://www.voiceofsandiego.org/topics/public-safety/police-
oversight-group- is-drowning-in-death-cases/**. **"Return to Main
Document"**

50 CLERB, *Investigation Workload and Classification Report* (Dec. 2014),
**https://www.
sandiegocounty.gov/content/dam/sdc/clerb/docs/workloads/2014/
1214workload.pdf**. **"Return to Main Document"**

51 CLERB, *Investigation Workload and Classification Report* (Dec. 2015),
**https://www.
sandiegocounty.gov/content/dam/sdc/clerb/docs/workloads/2015/
1215workload.pdf**. **"Return to Main Document"**

52 CLERB, *Investigation Workload & Classification Report* (Dec. 2016),
**https://www.
sandiegocounty.gov/content/dam/sdc/clerb/docs/workloads/2016/
1216workload.pdf**. **"Return to Main Document"**

53 CLERB *Findings* (Nov. 2017),
**https://www.sandiegocounty.gov/content/dam/sdc/clerb/
docs/findings/2017/1117findings.pdf** (citing Cal. Gov't Code §
3304(d)). **"Return to Main Document"**

54 Id.; Editorial: *San Diego County panel's dismissal of death
investigations an outrage*, San Diego Union Tribune (Nov. 15, 2017),
**www.sandiegouniontribune.com/opinion/ editorials/sd-law-
enforcement-review-board-death-investigations-20171115-story.
html**. **"Return to Main Document"**

55 CLERB, Frequently Asked Questions, *How long does an investigation take to
complete?*
**https://www.sandiegocounty.gov/content/sdc/clerb/faqs/faqs_page.html**.

**"Return to Main Document"**

56 Editorial: *San Diego County panel's dismissal of death investigations an outrage*, San Diego Union Tribune (Nov. 15, 2017), **www.sandiegouniontribune.com/opinion/editorials/sd- law-enforcement-review-board-death-investigations-20171115-story.html**. **"Return to Main Document"**

57 American Bar Association, Resolution 104B, *Effective Monitoring of Correctional and Detention Facilities* (2008), **https://www.americanbar.org/content/dam/aba/directories/ policy/2008_am_104b.authcheckdam.pdf**. **"Return to Main Document"**

58 L.A. County Ordinance 2014-0034, **https://oig.lacount y.gov/Portals/OIG/Reports/ Certified%20OIG%20Ordinance.pdf**. **"Return to Main Document"**

59 Robert Salonga, *Reform-inspired jail oversight, building plan approved in Santa Clara County*, San Jose Mercury (Jan. 23, 2018), **https://www.mercurynews.com/2018/01/23/ reform-inspired-jail-oversight-building-plan-approved-in-santa-clara-county**. **"Return to Main Document"**

60 Memorandum *Re: Final Recommendations of the Blue Ribbon Commission on Improving Custody Operations* (Apr. 12, 2016), **http://sccgov.iqm2.com/Citizens/Detail_Meeting. aspx?ID=7189**; Aaron B. Zisser, *Santa Clara County Jail Grievance and Complaint Process: Expert Consultant's Review and Recommendations for the Blue Ribbon Commission on Improving Custody Operations at 34-38* (Finding 9: Independent Oversight) (Feb. 27, 2016), **http://www.sanjoseinside.com/wp-content/uploads/2016/02/Zisser-Final- Report.pdf**. **"Return to Main Document"**

# Appendix A

**DRC EXPERTS' FINDINGS AND RECOMMENDATIONS REGARDING SUICIDES IN SAN DIEGO COUNTY JAIL FACILITIES, MENTAL HEALTH AND SUICIDE PREVENTION POLICIES AND PROGRAMS**

Karen Higgins, M.D.

Robert D. Canning, Ph.D., CCHP

## I. INTRODUCTION

Suicide among persons held in correctional facilities is a significant public health problem which is complicated by the legal constraints placed upon correctional systems nationally. Although significant progress has been made in the last forty years, suicide remains the number one cause of death in American jails. Improvements in jail mental health service delivery systems continue to be needed to further decrease the rate of jail suicide deaths. In addition, changes in the conditions of confinement for inmates with mental health disabilities and needs, improved staff training, and facilities improvements can also contribute to reducing the suicide rate in jails.

DRC engaged us to review suicide deaths in the San Diego County Jail system from December 2014 through 2016, and to evaluate the adequacy of mental health services, emergency responses, and the system's overall suicide prevention program. Our review found that disjointed policies addressing suicidal inmates, lapses in continuity of mental health care, poor emergency response, inconsistent monitoring, and some physical plant issues contributed to the suicide deaths we reviewed.

Spurred by the high number of suicide deaths and the scrutiny they brought, the San Diego County Sheriff's Department ("Department") has made significant efforts to revamp its mental health policies and practices to allow consistency in treatment and better coordination between custodial and medical/mental health staff. These efforts should continue and be strengthened, to address the historically high number of inmates who make serious suicide attempts in the County's jails.

## II. BACKGROUND

The San Diego County Jail system has seven facilities. From 2010 to the end of 2016, the average daily population of the jail system rose from 4,646 inmates to 5,362, an increase of 15 percent. The County's Grand Jury found that the jail system has had 46 inmate suicide deaths in the 12 years ending in 2016, with almost 50 percent occurring from 2013 through 2016. The recent spike in inmate suicide deaths has brought increased scrutiny to the jail system's procedures and particularly its mental health system. It is important to understand why rates have increased so dramatically over this

period and to take proactive steps to prevent future suicides.

Taking a broad view, after the California legislature enacted Criminal Justice Realignment (AB109) in 2011, the state transferred jurisdiction for many inmates from state prisons to county jails. San Diego has seen a relatively small net increase in average daily population in its jail facilities: from 5,087 inmates in 2012, the first full year after AB109 took effect, to 5,362 inmates in 2016.

Jail suicide deaths typically occur soon after an individual's entry into the jail system. San Diego County Jail's experience appears to be no exception. Of the 17 suicides occurring in the San Diego Jail system from the beginning of 2014 through the end of 2016, 11 occurred within six days of the inmate's entry.

All suicide deaths since 2014 were of male inmates and occurred in three facilities: Central Jail (seven), Vista Detention Facility (six), and George Bailey Detention Facility (four). One inmate died by suffocation, three jumped from a second tier and died from massive head injuries, and the remaining 13 died of asphyxiation by ligature hanging. Eight of the inmates were housed in dormitories or multiple-person cells, and eight were housed in single cells.

One inmate died in a holding cell.

Four inmates who died by suicide were housed in segregated housing (including one who was housed as psychiatric "overflow" in a segregated housing unit).

We understand that, as of this writing, there was one confirmed suicide death in San Diego County Jail facilities in 2017. This is a decrease from recent years, which is a positive development. Nevertheless, it is important for the system to engage in a meaningful analysis of its policies, to learn from the suicides that have occurred in recent years, and to continue to take proactive steps where necessary.

## III.  QUALIFICATION OF EXPERTS

### Karen Higgins, M.D.

Dr. Higgins is a board-certified, General and Forensic psychiatrist who has been involved with correctional care services since 2001. From 2001 to 2004, she served as the lead psychiatrist for the Denver City and County jail systems. Within that time, she was a key participant in their mental health system, including suicide prevention. In addition, for more than six years, Dr. Higgins served as both the Statewide Senior Supervising Psychiatrist, and then the Statewide Chief Psychiatrist for the California Department of Corrections and Rehabilitation (CDCR). During this time, Dr. Higgins

oversaw for program development at 33 prisons serving 150,000 inmates; acted as the subject matter expert for the Department on psychiatric and mental health related issues; played a key role in the development of Departmental policies and procedures related to mental health care and suicide prevention; was a member of the Departmental suicide prevention committee, which involved review of many psychological autopsies of inmate suicide deaths; worked with the California Attorney General on legal matters related to inmate care; and supported numerous Departmental quality of care improvement initiatives.

### Robert D. Canning, Ph.D., CCHP

Dr. Canning has been involved in correctional suicide prevention work for more than 12 years. From 2005 to 2015, he was the suicide prevention coordinator for the CDCR. He was the Department's subject matter expert on correctional suicide prevention and in this role contributed to the Department's ongoing mental health litigation. He chaired the statewide suicide prevention committee, designed trainings for clinicians, wrote and oversaw the implementation of many policies and procedures about suicide prevention, and conducted quality improvement programs to improve screening of inmates. He redesigned the Department's suicide risk assessment documentation and designed and implemented a self-harm surveillance system that has received national attention. As part of his work for CDCR, Dr. Canning has conducted over 35 psychological autopsies of inmate suicide deaths.

Dr. Canning has made presentations on suicide prevention in correctional settings at national meetings of the National Commission on Correctional Health Care (NCCHC) and the American Association of Suicidology (AAS). He recently co-authored a chapter on suicide prevention in correctional settings for the *Oxford Handbook of Prisons and Imprisonment*. He is an active member of the AAS and is one of five instructors of its two-day course on suicide risk assessment and management, entitled Recognizing and Responding to Suicide Risk (RRSR). Dr. Canning has taught the RRSR course to over 1,000 clinicians in both the U.S. and Canada. Finally, he has acted as a forensic expert on jail suicide to Los Angeles County.

Dr. Canning received his doctorate in Clinical Psychology in 1993 and completed a National Institute of Mental Health fellowship in psychiatric epidemiology in 1995. He has been licensed to practice in California since 1997 and prior to joining the CDCR worked for the Veterans Administration Northern California Health Care System and the U.C. Davis Medical Center.

## IV.   EXPERTS' ASSIGNMENT AND SCOPE OF REVIEW

DRC engaged us to review and analyze (1) individual suicide cases at the San Diego County Jail, with a focus on suicide deaths since December 2014, and (2) the jail's policies and procedures related to mental health care and suicide prevention. Our task was to prepare a report identifying systemic deficiencies in the provision of mental health care and suicide prevention, with recommendations for improvements.

We reviewed medical, mental health, and custodial records of all San Diego County Jail inmates who died by suicide since December 2014. Video of inmate housing units was viewed to observe the circumstances of the suicides, including emergency response and custodial welfare checks. Coroner reports, homicide investigation reports, and other documents (such as court proceedings and police reports for each inmate) were also reviewed. The suicide deaths served as an important starting point for our findings and recommendations throughout the report.

In addition to the records of the inmates who died by suicide during the review period, we reviewed policies and procedures of the Medical Services Division (MSD) and the Detention Services Bureau (DSB). Through DRC, we requested from the Sheriff's Department updated policies and procedures regarding mental health care and suicide prevention, and we have reviewed all materials that were provided. "Green sheets" (facility-specific procedures) were reviewed, as were a variety of training documents pertaining to suicide prevention. We have also reviewed relevant media reports, San Diego County Grand Jury reports (and the County's response), and Citizens' Law Enforcement Review Board (CLERB) reports.

On September 29, 2017, we participated in a two-hour conference call with custodial, mental health and medical staff from San Diego County (and its contractor Liberty Health), legal counsel for the County, and DRC, to discuss aspects of mental health care and suicide prevention in the jails and to clarify particular policies and practices. We did not conduct a site visit as part of this review.

All of the suicide deaths reviewed were of male inmates. Although the context of many findings and recommendations applies to issues identified in the male facilities, they should be applied equally to the treatment of female inmates in the San Diego County Jail system.

## V. EXPERTS' ANALYSIS

Our findings and recommendations are based on materials received as of November 2017. Policy changes occurring after that date will not be reflected in our report.

Our analysis is divided into nine requisite components of a successful

comprehensive correctional suicide prevention program,[1] and contains findings and recommendations to improve the Department's suicide prevention and mental health treatment delivery efforts. The components covered by this review are:

1. Screening for Suicide Risk and Related Mental Health Needs
2. Clinical Assessment and Interventions
3. Communication
4. Restrictive Housing and Monitoring of Inmates
5. Levels of Supervision of At-Risk Inmates
6. Emergency Response
7. Staff Training
8. Review of Suicide Deaths and Serious Suicide Attempts
9. Quality Improvement

   Below, we provide our analysis. For each review component, we identify Key Deficiencies that were apparent through our review of suicides and relevant policies. We then provide specific Findings and Recommendations for systemic improvements addressing Key Deficiency areas.[2] In addition, we have completed two detailed individual reviews of recent suicides at the San Diego County Jail, to be provided directly to the County. These individual reviews may serve as models for the County's own quality improvement efforts moving forward.

---

[1]   Hayes, Lindsay. (2017). *Guide to Developing and Revising Suicide Prevention Protocols within Jails and Prisons*. National Commission on Correctional Health Care, http://www.ncchc.org/other-resources. Accessed October 21, 2017, and Canning, R.D. & Dvoskin, J.A. (2017). Preventing Suicide in Detention and Correctional Facilities. In J. Wooldredge and P. Smith (Eds.) *The Oxford Handbook of Prisons and Imprisonment*. New York City: Oxford University Press. "Return to Main Document"

[2]   Inmate names are not provided in this report. References to specific cases will be identified in a separate version of this report that is provided to the County. "Return to Main Document"

**1.   SCREENING FOR SUICIDE RISK AND RELATED MENTAL HEALTH NEEDS**

Screening for suicide risk and related mental health needs is an important part of any suicide prevention program. In jails, thorough screening upon entry ("booking") is extremely important. Research shows that almost one-quarter of jail suicides occur in the first 24 hours of incarceration and an additional quarter within 14 days.[3] Of the 12 suicide deaths that occurred at San Diego County Jail from December 2014 through 2016, eight (67%) occurred within 10 ten days of booking.

In addition to screening at the time of booking, screening should be administered for all inmates at important transition moments throughout their confinement. Screening should be administered by medical or mental health staff. (Trained custody staff can effectively administer appropriate initial booking screening with standard scoring that provide clear guidance for referral and further assessment.)

For many inmates, the initial period of incarceration is a period of extremely high risk. As time passes in jail, the risk of suicidal behavior tends to decrease but may rise quickly and suddenly due to transitions that inmates encounter – court dates, visits, receipt of bad news, transfers to other housing units or facilities, and placement in segregated settings. Thus, screening should occur at significant transition moments, the results of which should be available to clinical staff to track changes over time. A process for recurrent screening based on individual circumstances and events is important because research suggests that many individuals who die by suicide communicate their intent in the period before their deaths.[4] That is to say, warning signs of suicide risk and related psychiatric distress are often identifiable with effective screening.

Screening should be systematic and use standardized questionnaires. They should be short, valid, and target psychological symptoms and risk factors most appropriate for the correctional settings in which they are used.[5] Staff should be trained to ask questions clearly and uniformly, and forms should be available in English, Spanish, and other languages. Staff should not rely only on verbal responses, but should be trained to document contextual factors such as behavior and appearance, the inmate's attention to the questions, information from arresting officers, family members, friends,

---

3     Hayes, Lindsay M. (2010). National study of jail suicide: 20 years later. *Journal of Correctional Health Care, 18*, 233-245. "Return to Main Document"

4     Ibid. "Return to Main Document"

5     Maloney, M.P., Dvoskin, J., and Metzner, J.L. (2015). Mental health screening and brief assessments. In R.L. Trestman, K.L. Appelbaum, and J.L. Metzner (Eds.) *Oxford Textbook of Correctional Psychiatry*. New York: Oxford University Press. "Return to Main Document"

or other individuals associated with the inmate, and other factors that provide important information about suicide risk. Finally, documentation of adequate screening is also legal documentation for the protection of both the facility and staff.

## KEY DEFICIENCIES: SCREENING

1. The initial booking screening questions are poorly worded, are not designed in a way that effectively elicits important information, and lack important elements, such as inquiry regarding history of psychiatric hospitalization.
2. The system has lacked an adequate policy or procedure for conducting a suicide risk/ mental health screening for individuals at transition events that carry elevated risk, such as when they are placed in segregation or moved to a new facility.
3. The system has lacked an adequate procedure for screening inmates returning from court (where they may have received bad news), moving to prison, or being extradited. These are events that may elevate an inmate's risk of suicide.

## FINDINGS AND RECOMMENDATIONS: SCREENING

**FINDING 1.1.** Of the twelve (12) San Diego County Jail inmates who died by suicide from December 2014 through 2016, we identified a number of problems with the initial suicide risk screening and referral process. For example, one had a 24-hour delay before his initial screening. Of the six inmates who screened positive for mental health problems during their initial screening, one had no referral for further evaluation.

Six inmates denied any mental health problems during their initial screening. Among this group, one inmate had indicators that would have warranted a mental health referral, yet we found no record of a referral being made.

One particularly troubling case stood out. The inmate had a diagnosis of bipolar disorder and was screened, but even though he demonstrated signs and symptoms of florid psychosis and mania, he was not referred for evaluation and admission to the Psychiatric Security Unit. He was placed in a Safety Cell, was later released to general population, and died on Day Six of his confinement while still floridly psychotic and manic, despite a request to custodial staff earlier in the day for safety cell placement. Jail staff did not complete a separate assessment of suicide risk despite this inmate's extreme mental state and need for evaluation and treatment. Individuals suffering from bipolar disorder have some of the highest rates of suicide compared to other mental disorders. The inmate's documented mental health history and his symptomology at the jail were such that he should have received urgent psychiatric attention and been referred for inpatient care.

*RECOMMENDATION: The Department should adopt a standardized screening measure such as the Brief Jail Mental Health Screen[6] and augment it with a suicide risk screening measure such as the Columbia-Suicide Severity Rating Scale[7] or a series of suicide-specific questions (current suicidality, past attempts, etc.).*

*RECOMMENDATION: Suicide prevention policies and procedures should contain a specific section devoted to screening – including guidance on measures, locations, and times. The section should explain when and who administers screening in the range of potential situations. This section will guide staff actions and decrease the number of "false negative" screenings, which are the ones most costly to a system.[8] The policies should include a checklist with criteria that guides staff when to refer for evaluation by the jail's designated "Gatekeeper" (generally, a Registered Nurse or mental health clinician) and guides Gatekeepers on when to refer for further evaluation by the mental health program.*

**FINDING 1.2.** We identified four suicide deaths for which the inmates screened positive for drug and/or alcohol withdrawal but were not targeted for a more comprehensive suicide risk assessment. There is evidence showing that such inmates are at increased risk of suicide and self-harm. These individuals should have been further assessed.[9]

*RECOMMENDATION: New arrivals withdrawing from alcohol and/or drugs should be specifically assessed for psychiatric disorders and suicide risk. While the Jail's policy (MSD.S.10) lists "Intoxication/Withdrawal Symptoms" as among "Other Risk Factors That Could Cause Circumstantial Concerns," review of the jail's recent suicide deaths indicate the need for revision of this policy to ensure that such symptoms trigger a comprehensive suicide risk assessment.*

**FINDING 1.3.** The San Diego County Jail system lacks an effective quality improvement program with respect to mental health/suicide risk screening.

*RECOMMENDATION: Because mental health and suicide risk screening is a component of effective quality improvement programs in health care settings,*

---

6      The screener can be obtained from: https://www.prainc.com/?product=brief-jail-mental-health-screen. "Return to Main Document"

7      The C-SSRS can be obtained from http://cssrs.columbia.edu/the-columbia-scale-c-ssrs/cssrs-for-communities-and-healthcare/#filter=.general-use.english. "Return to Main Document"

8      In general, screening measures should err on the side of false positives since it is less costly to complete an extra evaluation than deal with the aftermath of a preventable suicide death. Canning, R.D. & Dvoskin, J.A. (2017). Preventing Suicide in Detention and Correctional Facilities. In J. Wooldredge and P. Smith (Eds.) The Oxford Handbook of Prisons and Imprisonment. New York City: Oxford University Press. "Return to Main Document"

9      Rivlin, A., Ferris, R., Marzano, L., Fazel, S., and Hawton, K. (2013). A typology of male prisoners making near- lethal suicide attempts. Crisis, 13, 335-347. "Return to Main Document"

*procedures should be developed to track both when screening occurs and the results of the screening. Rates of screening and referrals should be a key indicator in the Department's quality improvement program.*

## 2. CLINICAL ASSESSMENT AND INTERVENTION

Treatment planning and management of prisoners potentially at risk of suicide relies on effective clinical assessment. Effective clinical assessment of suicide risk requires clinicians to 1) gather data on risk and protective factors and warning signs; 2) perform a suicide inquiry in which they ascertain the extent of planning, intent, and the quality and character of suicidal ideation, if present; 3) come to a judgment of risk with a rationale for this level; and 4) develop a treatment plan for management of the suicidal patient. Each assessment (especially those conducted in response to a crisis evaluation) should include a short-term "safety plan" that emphasizes enhancement of protective factors, reduction of acute and/ or modifiable risk factors (possibly housing issues or issues involving recent transfers), and treatment of current distress and agitation. These safety plans can be modeled after brief interventions used in emergency departments in the community[10], but should be specifically tailored to correctional settings. Treatment planning should include specific timeframes for review and updating. Referrals for mental health treatment should have specific timeframes for response by mental health staff.

It is important for jail staff – custodial, mental health, and medical – to monitor and treat identified mental health problems. This requires staff to provide clinically indicated treatment and to respond quickly and effectively to crises as they arise. Even after an inmate's crisis subsides, there is a continued need to address mental health treatment needs. An inmate should be transitioned into a structured mental health program that addresses their level of symptoms and functioning in the correctional environment. In addition, if an inmate is assessed to be at elevated suicide risk, they should continue to be evaluated for this risk as they continue in confinement, with an individualized treatment plan and safety plan.

## KEY DEFICIENCIES: CLINICAL ASSESSMENT AND INTERVENTION

1. Although inmates are often referred for further mental health and suicide risk evaluations after positive screening results, it is not clear from the records or the County's policies and procedures what (if any) criteria have been used or what timeframes have been required for referrals and  evaluations.
2. The documentation of risk evaluations has been poor and inconsistent, hindering effective treatment and continuity of care among providers and between jail facilities.
3. Mental health staff do not adequately consider previous risk evaluations and changes to inmates' conditions during the course of confinement.
4. Inmates who have required mental health treatment and remained in custody

---

10    Stanley, Barbara and Brown, Gregory K. (2012). Safety Planning Intervention: A Brief Intervention to Mitigate Suicide Risk. *Cognitive and Behavioral Practice 19.* 256-264.
"Return to Main Document"

for significant periods do not have individualized mental health treatment plans in their charts or access to an adequate level of mental health care programming.

## FINDINGS AND RECOMMENDATIONS: CLINICAL ASSESSMENT AND INTERVENTION

**FINDING 2.1.** The San Diego County Jail policies do not provide adequate guidance, including clear timelines, regarding the evaluation process for inmates who screen positive for mental health needs or suicide risk at booking. For example, in one case reviewed, the inmate was brought to the jail after a serious suicide attempt. Though he was seen for further evaluation after the initial screening, it was unclear who performed the evaluation or what the rationale for it was.

*RECOMMENDATION: Policies and procedures should provide specific timelines for referral and completion of evaluations after referral. For instance, the policy should establish timelines for response to referrals – standard guidelines, for example, may be for evaluations that are "emergent" to be completed within four hours, "urgent" within 24 hours, and "routine" referrals within five business days. Data about these referral timelines and completion rates should be reviewed regularly to gauge access to care as part of a quality improvement program.*

**FINDING 2.2.** The quality of suicide risk evaluations varied among the records reviewed. Although the policies provide criteria for categorizing an inmate as "High" risk for suicidal behavior, we found that risk factors were not adequately documented, even as several inmates had a clear history of suicidal behavior and/or a known psychiatric history.

*RECOMMENDATION: To improve the quality of suicide risk evaluations, the Department should create a standardized suicide risk evaluation form or template in the electronic record. This would facilitate improved documentation by mental health clinicians with respect to their risk assessments. This form or template should include the following sections:*

1. *The reason for evaluation along with time, date, and location*

2. *Sources of information*

3. *Discrete sections for Warning Signs such as the AAS' IS PATH WARM, and acute and chronic (or static) risk factors*

4. *Protective factors*

5. *Questions about planning or a desire for death*

6. *A mental status exam*

7. *Judgment of risk and a rationale for the judgment*

8. *A safety plan that addresses modifiable risk factors and warning signs.*

**FINDING 2.3.** Mental health staff do not clearly or adequately document inmates' suicide risk levels. In some cases, the assigned suicide risk levels were problematic. For example, one inmate was incorrectly rated as "Low" risk just two days after a serious suicide attempt. In addition, the jail system's two-level stratification of risk ("High" or "Low" risk) is inconsistent with common practice. Many healthcare systems (e.g., California Department of Corrections and Rehabilitation, United States Department of Defense, U.S. Department of Veterans Affairs) use at least a three-level stratification – such as Low, Medium, High – or four-part – such as Low, Medium, High, Extreme.

*RECOMMENDATION: Because a judgment of risk drives treatment decisions (i.e. what to do), the County should utilize a three-level rating system that more realistically describes the continuum of risk and will allow clinicians to devise treatments that better fit the needs of the patient. The addition of a "Medium" risk level will alert other staff that a patient's risk for suicidal behavior is significant and requires more attention and alertness.*

**FINDING 2.4.** We could identify no standardized procedure for placing, monitoring, and releasing inmates from various levels of suicide monitoring. For instance, one inmate who died by suicide had four Safety Cell placements based on suicide risk over a period of four months. Each time, he was released without adequate documentation of the clinician's judgment of risk and the rationale for the decision. The situation for another inmate's two Safety Cell placements prior to his suicide was similar.

*RECOMMENDATION: The Department should ensure adequate and consistent documentation of suicide risk assessments when adjusting an inmate's level of observation.*

**FINDING 2.5.** The San Diego County Jail's policies for addressing inmate medication refusals are vague and inadequate. In at least one reviewed case, the inmate's refusal of psychiatric medication was not addressed in a timely fashion.

*RECOMMENDATION: The Department should implement procedures, with specific timelines, for when an inmate refuses prescribed psychiatric medications.*

**FINDING 2.6.** We identified deficiencies with the process and setting of clinical contacts for prisoners at risk of suicide. Although a number of inmates we reviewed were seen by mental health staff, it was unclear if there was a standard interval between mental health visits, or if they were done on an ad hoc basis, or if they were simply up to the individual clinician's discretion. A substantial number of mental health clinical visits appear to have been conducted inside the housing units, including at cell-front. This setting does not provide adequate auditory and visual privacy and confidentiality necessary for meaningful clinical interactions.

*RECOMMENDATION: The Department should establish standard intervals for mental health visits, which can be made more frequent pursuant to individual clinical*

*need.*

**RECOMMENDATION:** *Because interviewing inmates at cell-front decreases the chance for a frank and open conversation with a patient, the Department should provide confidential treatment space for inmates being followed by mental health.*

**FINDING 2.7.** We have significant concern about the lack of required follow-up for prisoners identified as at risk of suicide after they are discharged from the San Diego County Jail's Inmate Safety Program (ISP), including from the Psychiatric Security Unit, Safety Cells, and Enhanced Observation Housing (EOH). The use of specific risk factors to determine follow-up processes for such inmates is questionable in our estimation. Although we understand the rationale, we believe that the program runs the risk of false negatives, which are much costlier than false positives when it comes to suicide attempts and deaths. Prisoners who have required placement in the Inmate Safety Program based on an identified risk of self-harm should, as a rule, be provided clinical follow-up and, as appropriate, clinically indicated treatment interventions.

**RECOMMENDATION:** *The ISP Follow Up Protocol should provide that all inmates released from EOH should be seen by a mental health clinician within 24 hours of release and have their safety plan reviewed and updated if necessary.*

**RECOMMENDATION:** *Decisions regarding clinical follow-up after release from the Inmate Safety Program (including EOH) should not be left to a "clinician's discretion." We believe a best practice is to have a specific follow-up schedule that all clinicians follow, e.g. daily clinical "check-ins" for five days after a housing change, followed by weekly check-ins for two weeks.*

**RECOMMENDATION:** *Inmates who are being followed by the mental health program after release from the Inmate Safety Program (including EOH) should have specific timeframes for clinical contacts outside the specific follow-up procedure. This would allow for a more in-depth interview to cover treatment plans and medication compliance, for instance.*

**FINDING 2.8.** Four inmates who died by suicide suffered differing levels of drug/alcohol withdrawal symptoms, but only two inmates were housed in Medical Observation Beds (MOB). The policy on MOB placement for patients "experiencing severe symptoms" of drug withdrawal does not mention concurrent treatment by psychiatry except in passing. The section notes that these inmates "should be considered a high risk for suicide" but notes only that nurses will round "once a shift" on the MOB. That is, there is a significant gap in the provision of mental health treatment and suicide prevention monitoring for prisoners at risk who are also experiencing withdrawal symptoms.

**RECOMMENDATION:** *We recommend a higher level of observation, including clinically indicated mental health treatment, for inmates experiencing both mental health problems and withdrawal symptoms.*

**FINDING 2.9.** The Inmate Safety Program policies lack sufficient direction regarding the timeframes for assessment and release from the Enhanced Observation Housing (EOH) units. It is essential that inmates placed in EOH be reviewed and transferred to less restrictive settings at the earliest time appropriate based on their condition.

*RECOMMENDATION: Policies should give specific direction to staff about the criteria for placing and assessing inmates in EOH units. For instance, we believe this type of housing is appropriate for inmates voicing suicidal thoughts and deemed at medium or high risk of acting on these thoughts in the very short-term (minutes to hours). We recommend that the schedule for re-assessment of inmates in EOH should not be categorical, but based on evaluations conducted by mental health professionals at regular intervals. While we commend the Jail for recently modifying its policy to ensure that all EOH prisoners are re-assessed for suicide risk, at a minimum, at least once in each 24-hour period, when clinical presentation dictates closer monitoring, clinicians must make a judgment of current risk including any changes since the last assessment. Decisions to transfer an EOH inmate to either general population or a mental health housing unit must take into account past behavior, current symptoms, and the context of confinement (charges, court date, pending transfer, etc.), and must include a written safety plan.*

*RECOMMENDATION: Stays in the EOH should not exceed 48 hours. If the inmate is not stabilized within that time period, they should be evaluated for referral to inpatient psychiatric treatment (i.e., the Psychiatric Security Unit). However, if the placement in EOH housing extends beyond 48 hours, the withholding of out-of-cell time, personal property, social visits, and clothing should be based on individualized clinical assessment and safety concerns.*

**FINDING 2.10.** Inmates who have required mental health treatment and remained in custody for significant periods did not have documented, individualized mental health treatment plans in their charts or access to an adequate level of mental health care programming.

The Department is making efforts to improve how inmates are evaluated and at elevated risk for suicide are monitored, but overall the mental health program remains fragmented and without good continuity of care, which can lead to poor outcomes. For instance, as noted above, it was unclear to us why some inmates would be placed in Safety Cells and some in EOH. Further, based on our experience with suicidal inmates in correctional settings, we did not understand why inmates deemed at high risk of suicide were not more often evaluated for placement in the Jail's inpatient level of care unit.

*RECOMMENDATION: The Department should take steps towards development of a consolidated mental health treatment environment which combines the Safety Cell program, Enhanced Observation Housing, and an enhanced outpatient mental health program.*

*Many systems have adopted a "level of care" system to provide mental health services and to clarify hand-offs and treatment programs. The Department appears*

*to have created categories of mental health needs, but without formalizing a system in policy and procedure that provides for an appropriate spectrum of levels of care. The PSU is the highest level of care. There are mental health "cluster" units, as on the sixth floor at the Central Jail, but without formal treatment programming. There is also the Detention Outpatient Psychiatric Services (DOPS), which appears to include the lion's share of inmates requiring some level of ongoing mental health attention.*

*It would be useful and important to create an "intermediate" level of care, located in enough San Diego County Jail facilities to ensure timely access for those with mental health needs that warrant enhanced treatment programming. The program would serve as a "step-down" for people with recent Safety Cell, EOH, or PSU admissions, as well as for people with a serious mental illness that makes it difficult for them to function in a general population jail setting. The program would have sufficient mental health staffing to provide a structured treatment program that includes individual and group therapy, guided by individualized treatment plans (as required by Title 15, Sec. 1210 of the California Code of Regulations) that identify mental health problems, treatment goals, and a plan to accomplish those goals.*

## 3.   COMMUNICATION

Communication between and among correctional staff and other professionals working in the jail environment is an important aspect of suicide prevention. Suicide prevention expert Lindsay Hayes lists three categories of communication: (1) getting information about the inmate's behavior at the time of arrest and transport; (2) communication between correctional staff and clinical staff about changes in an inmate's status and condition; and communication between all staff and inmates who may be suicidal. Poor communication practices can result in poor outcomes. Hayes recommends a multidisciplinary approach to working with suicidal individuals that notes:

> Poor communication between and among correctional, medical, and mental health personnel, as outside entities…is a common factor found in the reviews of many custodial suicides. Communication problems are often caused by lack of respect, personality conflicts, and boundary issues. Simply stated, facilities that maintain a multidisciplinary approach avoid preventable suicides.[11]

## KEY DEFICIENCIES: COMMUNICATION

1. The San Diego County Jail system has lacked an effective way for custodial staff and mental health staff to communicate about important changes in an inmate's status (e.g. results of court proceedings, "bad news," impending transfers, etc.).

2. The lack of standardization in clinical documentation has hampered effective communication between treating clinicians and other health

[11]   Hayes, L. (2017). *Guide to Developing and Revising Suicide Prevention Protocols within Jails and Prisons.* National Commission on Correctional Health Care, http://www.ncchc.org/other-resources. Accessed October 21, 2017. "Return to Main Document"

care staff.

## FINDINGS AND RECOMMENDATIONS: COMMUNICATION

**FINDING 3.1.** Several inmates who died by suicide in jail had significant events ("bad news") during their incarceration that may have significantly increased their suicide risk. Inmates may have multiple court dates with mixed results and many are sentenced to terms either locally or in state prisons. These developments can have a significant impact on an inmate's psychological state and contribute to elevated risk of suicide or self-harm. For instance, one hanged himself a few days before he was to transfer to state prison. Another committed suicide the day before his transfer to another state to face criminal charges. This case was particularly egregious because it was known among staff that he had made a credible suicide attempt in a similar manner just two weeks earlier, and that he was experiencing considerable stress about being extradited to another state to face criminal charges. Yet, as the date of his extradition approached, the clinical record did not reflect any sense that this could be a period of heightened risk requiring closer observation, monitoring, and clinical follow-up. From our review, this was a suicide death that with adequate communication was preventable. Our review of San Diego County Jail policies and procedures found no specific mechanism for communication in these kinds of situations.

*RECOMMENDATION: Communication and coordination among custodial staff and health care staff regarding inmates at risk of suicide and psychiatric decompensation need improvement. Custodial staff must maintain awareness, share information, and make appropriate referrals to mental health and medical staff. Multidisciplinary teams should meet on a regular basis to discuss the status of inmates with significant mental health needs or who demonstrate significant suicide risk factors.*

**FINDING 3.2.** Mention of significant events was scant in the treatment records we reviewed. Given the vulnerability to external events that many inmates experience (and their inability to control many of them), evaluations of risk should include information about such events and how they may impact the inmate's risk.

*RECOMMENDATION: Treatment plans should include substantive discussion, including potentially a specific section, regarding significant events that could affect the inmate's treatment needs and/or risk of suicide.*

## 4.  RESTRICTIVE HOUSING AND MONITORING OF INMATES

The housing placement of inmates can have profound impacts on their mental well-being and produce changes in their risk of self-injury and suicide. Our experience with jail and prison facilities, along with extensive research, has shown that placement in segregated housing increases the risk of suicidal and self-harming behavior, isolates individuals, and impedes normal interpersonal interactions that are essential to psychological health and adequate treatment.

Policies and procedures should take this known risk into account and include mental health and suicide risk information when housing decisions are made. Housing inmates in isolated settings may increase their sense of hopelessness and desperation, increasing the potential for suicidal thinking and behavior. In addition, the housing of individuals with intellectual disabilities in such settings can trigger suicidal thoughts and behavior. Placing inmates with mental illness in solitary confinement-type housing (i.e. housing situations where an inmate is limited to a few hours of out-of-cell time or less per day, has reduced privileges, and has minimal opportunity for normal social interactions) can exacerbate symptoms and lead to negative outcomes. The placement of inmates with mental illness or elevated suicide risk in solitary confinement settings should be avoided whenever possible. When such placements are deemed necessary, adequate monitoring and enhanced mental health treatment are essential.

In addition, the monitoring of inmates in housing units, particularly units with solitary confinement-type conditions, is a standard custodial practice. Adequate welfare and/ or safety checks involve observing inmates and noting their status and welfare. Inmates housed in segregated housing are often monitored at more frequent intervals than those in general population settings.

The construction of jail cells in segregation units should account for the risk presented by attachment points – such as ventilation grates and bed frames – that are commonly used for hanging attempts.

## KEY DEFICIENCIES: RESTRICTIVE  HOUSING

1. San Diego County Jail lacks an adequate process to screen inmates for increased suicide risk prior to placement into Administrative Segregation (AdSeg) or Keep Separate All (KSA) housing.

2. Security/welfare checks of inmates in housing units were observed to be inadequate. In several cases, they were poorly performed and in others they were not completed in a timely fashion.

3. San Diego County Jail lacks an effective system to monitor and to provide necessary treatment of inmates on the mental health caseload who are housed in AdSeg or  KSA housing, increasing the risk of suicide and psychological deterioration in these settings.

## FINDINGS AND RECOMMENDATIONS: RESTRICTIVE HOUSING

**FINDING 4.1.** There is not an adequate process for mental health screening before inmates are placed into AdSeg or KSA housing, which are known to carry significant risks for people with mental illness.

*RECOMMENDATION: Given the harsh setting and restrictions inherent in restrictive housing units and the impact this may have on inmates, the Jail should institute screening of all inmates prior to their placement in such units. This screening could be included with a medical screening completed by nursing staff. The screening would ask simple questions addressing current distress and thoughts of suicide, and*

*provide an opportunity for mental health staff to identify treatment needs and to provide input into housing decisions.*

**FINDING 4.2.** Inadequate security/welfare checks (also known as "proof of life checks") were observed via video review in a number of cases in which inmates died by suicide. In at least one case, hourly safety checks were not completed pursuant to Jail policy during the time period the inmate died by suicide. In video and record reviews of at least three inmates who died, checks were completed inadequately – either not completed timely or in manner that failed to meaningfully assess the welfare of the inmate. For instance, in one case, the video showed two deputies enter the housing unit and separate to allow one to check the upper tier and one the lower. The deputies completed their checks of 40 cells in 17 seconds, far too quickly to complete meaningful checks. The deputy checking the upper tier did not stop except at the first cell and did not appear to take enough time to establish that the inmates in each cell were alive and safe.

*RECOMMENDATION: The Department should provide annual training for sworn staff that includes reminders about the requirement for assuring the welfare of inmates during security/welfare checks.*

*RECOMMENDATION: The Department should implement a method to track and audit the timeliness and adequacy of security/welfare checks, such as reviewing videos.*

**FINDING 4.3.** The San Diego County Jail lacks adequate policies or procedures for monitoring and treatment of inmates with mental illness in restrictive housing. Policies lack direction regarding how mental health information should be incorporated into housing decisions. For example, one inmate was housed in AdSeg for over four months, but his segregated housing status was not mentioned in his clinical documentation. This inmate, who appeared to suffer the ill effects of prolonged isolation, had significant symptoms of mental illness that were not detected by staff until he voiced suicidal ideation two months after his incarceration. After several more Safety Cell placements and adjudication of his criminal charges, he professed to have safety concerns and was housed in AdSeg for the last six weeks of his incarceration and life. He hanged himself several days before he was to be transferred to state prison.

*RECOMMENDATION: The Department should implement procedures that ensure appropriate monitoring of inmates in segregated housing units to timely identify inmates with deteriorating mental health, and implement a program that delivers necessary treatment for inmates on the mental health caseload in restrictive housing units.*

**FINDING 4.4.** The suicide death of one inmate revealed that monitoring panels in control booths were at times set to mute and staff did not adequately monitor alert lights in the control booths. In this case and others, such practices can result in staff missing emergencies and calls for help from

inmates.

**RECOMMENDATION:** *The Jail should train all housing staff to properly maintain alert systems and monitors in housing unit control booths, and to respond appropriately when alerted.*

**FINDING 4.5.** Eight inmates died by hanging from December 2014 through 2016. In all of these cases, ligatures were attached to ventilation grills or looped around beds that had a separation from the cell wall.

**RECOMMENDATION:** *The Department should take affirmative steps to address the known risk of suicide attempts associated with the presence of attachment points in cells, particularly in segregated housing. This may include retrofitting cell ventilation grates and beds (so that the bed is flush against the cell wall) and avoiding attachment points in future construction, such that ligature material cannot be passed through gaps for suicide attempts by hanging.*

## 5. LEVELS OF SUPERVISION OF AT-RISK INMATES

Adequate monitoring of suicidal inmates is a crucial component of a comprehensive suicide prevention program. As the World Health Organization has recognized: "The level of monitoring should match the level of risk. Inmates judged to be actively suicidal require constant supervision. Inmates who have raised staff suspicions of suicide but who do not admit to being actively suicidal, may not require constant supervision but will need to be observed more frequently."[12]

### KEY DEFICIENCIES: SUPERVISION

1. The Department's policies lack sufficient clarity about the levels of risk and the levels of observation specified for each level of risk. The policy should provide for constant observation of inmates at high risk whenever clinically indicated.

2. The Department's policies and procedures for monitoring inmates in Safety Cells and EOH are unclear and at times give conflicting guidance for staff, which can lead to poor decision-making and poor continuity of care for at-risk inmates.

3. Monitoring schedules for the County's jail facilities do not match the system-wide policies and procedures manual, which creates confusion and inconsistency in practices.

4. The Department's policy and practices do not ensure that health care staff have authority to determine the appropriate level of care and observation (absent clear and documented security concerns), with custodial staff primarily authorized to make such decisions. This is problematic. Decision-making regarding the level

---

[12] World Health Organization. (2007). Preventing Suicide in Jails and Prisons. World Health Organization & International Association for Suicide Prevention. Geneva, Switzerland. "Return to Main Document"

of suicide risk for inmates is the responsibility of the mental health and medical programs. Although safety and security need to be taken into account, the welfare of inmates is a top priority.

## **FINDINGS AND RECOMMENDATIONS: SUPERVISION**

**FINDING 5.1.** The Department's policies lack sufficient clarity about the levels of risk and the levels of observation specified for each level of risk.

*RECOMMENDATION: Levels of observation for suicidal inmates should progress from the highest level of observation – constant, direct, visual observation (also called 1:1 or Suicide Watch) – and be stepped down from that level. Inmates requiring 1:1 observation are inmates who are currently attempting to harm themselves, or who express suicidal thoughts with a well-developed plan and available means, and continue to espouse the intent to carry out their plan. This most intense level of observation is reserved for those inmates who are at the gravest risk and need immediate psychiatric inpatient care (either in the PSU or offsite inpatient facility).*

*RECOMMENDATION: Inmates requiring a less stringent level of observation are those inmates who may have stated suicidal thoughts and/or intentions but do not have the means or well-developed plan, but are agitated and in great distress. These inmates, still at high risk, should be placed on Suicide Precaution, which requires staggered 15-minute checks (rather than "twice in every 30 minute period" as appears to have been the practice at some San Diego County jail facilities).13 Staggered 15 minute checks means that an inmate must be observed at least once in every 15-minute interval and there should never be more than 15 minutes between observations. In practice, inmates housed in Safety Cells or the EOH for suicidal thinking or behavior should always be placed on Suicide Precaution status unless they are being evaluated for referral to the PSU, in which case they should be placed on continuous visual observation until transferred.*

*RECOMMENDATION: Decisions to move an inmate from a higher level of observation to a lower one should always require a clinical assessment of current risk and a justification by a mental health clinician.*

**FINDING 5.2.** Recent proposed changes to the suicide prevention policy specifying three levels of Suicide Watch and certain frequencies of monitoring/observation represent a positive step by the Department. The policy should continue to be refined to provide adequate clarity regarding applicable criteria for the levels of risk and observation.

*RECOMMENDATION: Policy should provide clear guidance regarding the criteria for levels of risk and observation. Policy should also provide for constant, visual observation (also called 1:1 observation) when clinically indicated. For instance, in the proposed policy we reviewed, the observation schedules for inmates identified as "Level I" is the same as that for inmates identified as "Level II," and neither provide for constant visual observation. The policy should specify observation levels based*

*on risk and housing (e.g., inmates who are voicing suicidal thoughts and intention to act, and are housed in Safety Cells, should be on 1:1 Observation, while inmates housed in EOH and having intermittent suicidal thoughts should be on Suicide Precaution).*

**RECOMMENDATION:** *Inmates placed in safety cells should be re-evaluated for stepdown or inpatient placement no more than 12 hours after placement.*

**FINDING 5.3.** Individual facility policies regarding monitoring of inmates at elevated risk of suicide are in some cases inconsistent with the Department's system-wide policies. For example, the Department's policies specify that sworn staff will monitor inmates in Safety Cells a minimum of twice per 30 minutes, yet the "Green Sheets" for the Las Colinas Detention and Reentry Facility and the Vista Detention Facility do not.

**RECOMMENDATION:** *The Department must ensure that all facilities' Green Sheets are consistent with system-wide policies and procedures for monitoring inmates housed in Safety Cells and EOH.*

**FINDING 5.4.** The Department's policies do not provide health care staff a sufficient role in some decisions regarding release from EOH or Safety Cell Housing of inmates evaluated for increased risk of self-injury. DSB Policy Section J.1 states that "[e]very four hours, the watch commander or designee will evaluate the inmate for continued retention in a safety cell." In another section regarding removal of inmates from Safety Cells, the watch commander is to consult with a mental health provider "to determine whether the inmate, if removed from the safety cell, is likely to pose a threat to himself/herself or others." Additionally, Sections J.4 (Enhanced Observation Housing) and J.5 (Inmate Safety Program) note that custodial personnel make the decision about housing inmates in either setting – albeit with input from a Gatekeeper.

**RECOMMENDATION:** *Decisions regarding housing of inmates at elevated risk for suicidal behavior should primarily be the responsibility of medical and mental health staff, unless safety and security override these concerns (e.g., an agitated, violent, and suicidal patient). Where such safety and security concerns exist, custodial staff should consult with medical/mental health staff when making housing decisions.*

## 6.   EMERGENCY RESPONSE

When a medical emergency occurs inside a jail, the level of training and response of custodial and medical staff will often determine if an inmate lives or dies. National correctional standards acknowledge that a facility's policy regarding intervention should be threefold. First, all staff who come in contact with inmates should be trained in standard first aid procedures and CPR. Second, any staff member who discovers an inmate attempting suicide should immediately survey the scene to ensure the emergency is genuine, alert other staff to call for medical personnel, and begin standard first aid and/or CPR. Third, staff should never presume that the inmate is dead but rather should initiate and continue life-saving

measures until relieved by medical personnel.[13]

## KEY DEFICIENCIES: EMERGENCY  RESPONSE

1. Almost half of the emergency responses to lethal suicide attempts from December 2014 through 2016 featured poor coordination of lifesaving efforts, delays in starting CPR, or malfunctioning equipment.

2. The Department does not appear to have a program of drills to improve readiness and response in the case of medical  emergencies.

## FINDINGS AND RECOMMENDATIONS: EMERGENCY RESPONSE

**FINDING 6.1.** Review of records and video footage of suicide deaths of seven inmates (58.3% of those reviewed) demonstrated serious problems with emergency response. In one case, health care staff were unable to utilize the automated electronic defibrillator (AED) due to malfunctioning equipment. In another case, there was a nearly seven-minute delay in using the AED prior to the arrival of the paramedics. Deputies discovered one inmate hanging in his cell but waited seven minutes to cut the inmate down and then prevented nursing staff from evaluating the inmate's condition or using the AED. There were two cases involving a delay in starting cardiopulmonary resuscitation (CPR), in one case for several minutes while approximately 11 deputies stood around without initiating life-saving measures.

Good coordination between custodial and medical staff is important because brain damage from asphyxiation can occur within 4 minutes, with death often resulting within 5-6 minutes. Timely initiation of effective life-saving measures can save lives. This did not occur in many San Diego jail suicide cases.

Our review found that not all staff understand their role in emergency responses to suicide attempts. Language in the Department's policies for Medical Emergencies is not clear. For example, it states that medical personnel "may assist or take over CPR responsibilities" (emphasis added). The policy language should be changed to give medical personnel the responsibility of emergency response when they arrive on scene.

*RECOMMENDATION: All staff should be thoroughly trained, including periodic refresher training, in their specific emergency response roles:*

> *a. Sworn staff should not assume an inmate is dead, but should start lifesaving measures except in well-delineated circumstances (electrocution, etc.)*

---

[13]    Hayes, L. (1995). *Prison Suicide: An Overview and Guide to Prevention.* United States Department of Justice, National Institute of Corrections. Washington, DC. "Return to Main Document"

    *b. Any staff member should sound the alarm and notify 911.*

    *c. Sworn staff should be trained on how to use emergency equipment such as AEDs and cut down tools.*

    *d. Sworn staff should continue lifesaving measures until relieved and/or directed by medical staff.*

    *e. Medical staff should assume control of the emergency response as soon as they arrive on the scene.*

    *f. Declaration of death is the responsibility of a licensed physician.*

**RECOMMENDATION:** *Multi-disciplinary drills should be regularly conducted in housing units to assure that emergency response readiness is maintained and that staff understand their roles.*

**RECOMMENDATION:** *Emergency response equipment should be audited regularly and maintained in working condition.*

### 7.    STAFF TRAINING

   "The framework for a comprehensive suicide prevention program includes substantial staff training."[14] All custodial, medical, nursing, and mental health staff should undergo systematic and ongoing training on the signs of mental illness and elevated suicide risk. All staff who have significant contact with inmates "should be trained to recognize verbal and behavioral cues that indicate potential suicide."[15]

   We reviewed numerous San Diego County Jail materials related to suicide prevention, including PowerPoint presentations, handouts, brief trainings, scenarios, lesson plan, and booklets.

### KEY DEFICIENCIES: STAFF TRAINING

1. The Department's training programs for custodial and medical/mental health staff is not well coordinated. It is not clear what the training schedule is, what the training requirements are, how training records are kept, and how trainings should be evaluated.

2. Training for mental health clinicians on principles of suicide risk assessment and treatment should adhere to accepted clinical standards, with reference to the professional literature about risk assessment and the treatment of suicidal patients.

### FINDINGS AND RECOMMENDATIONS: STAFF TRAINING

**FINDING 7.1.** Currently there is no consolidated training program that encompasses all aspects of suicide prevention, including suicide warning

---

[14]   Metzner, J. and Hughes, K. (2015). Suicide risk management. In R.L. Trestman, K.L. Appelbaum, and J.L. Metzner (Eds.) *Oxford Textbook of Correctional Psychiatry*. New York: Oxford University Press. "Return to Main Document"

[15]   Ibid. "Return to Main Document"

sign awareness, how to work with inmates with mental illness, principles of suicide risk assessment, correctional suicide prevention, treatment of suicidal inmates, and emergency response.

***RECOMMENDATION:*** *The Department should implement a training program that includes modules for custody cadets, custodial staff, and medical/mental health staff (including contract staff). Policies should be written that cover training for all staff and that includes timeframes, content requirements, and evaluation strategies. In addition, a system should be put in place that tracks trainings and ensures that all staff are current on required trainings.*

**FINDING 7.2.** Generally, the training materials we reviewed indicate that there are gaps in the training for medical and mental health staff, who must be prepared to assess suicide risk and identify appropriate interventions.

***RECOMMENDATION:*** *The Department's training unit should be charged with developing a set of curricula covering all aspects of mental health treatment and suicide risk assessment and treatment.*

***RECOMMENDATION:*** *All staff who have regular contact with inmates should be required to have standard first aid cardiopulmonary resuscitation (CPR) training and be trained in the use of various emergency equipment (cut down tools, automated external defibrillators (AEDs), etc.). This will help ensure that staff understand their roles in emergency response and can respond appropriately.*

***RECOMMENDATION:*** *The Department should use a standardized and best practice training protocol for sworn staff, such as that developed by Lindsay Hayes.*[16]

**FINDING 7.3.** Review of the suicides between December 2014 and 2016 revealed both strengths and weaknesses in clinical documentation, which could be improved with training and the use of guidelines for documentation. Risk assessments were often brief and did not include important information about the inmates, such as history of suicidal behavior or protective factors, and were often shortened to "Denies SI."

The records of multiple inmates revealed poor staff practices, such as the use of "contracting for safety." This practice has not been shown to decrease the risk of suicide attempts or to provide any protection for clinicians and should be discouraged by medical and mental health staff.

***RECOMMENDATION:*** *Mental health staff should have specific suicide risk assessment training that adopts best practices in training, such as the Recognizing and Responding to Suicide Risk course from the American Association for*

[16] Hayes, L. (2016). Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities. Available from the National Center on Institutions and Alternatives. http://www.ncianet.org/criminal-justice- services/suicide-prevention-in-custody/publications/training-curriculum-and-program-guide-2016. "Return to Main Document"

*Suicidology.[17] The training should be included in onboarding for new employees and should be required periodically for current staff.*

## 8. REVIEW OF SUICIDE DEATHS AND SERIOUS SUICIDE ATTEMPTS

All suicide deaths and medically serious suicide attempts should be subject to a rigorous review process to identify any improvements that can be made to suicide prevention and patient safety. Review should cover medical and custodial procedures, training protocols and records, and mental health treatment (if any), and should lead to recommendations for changes in policy, procedure, and training. The review should be grounded in the principles of a "just culture" – a review that "balances the need for an open and honest reporting environment with the end of a quality learning environment and culture… Just culture requires a change in focus from errors and outcomes to system design and management of the behavioral choices of all employees."[18]

### KEY DEFICIENCIES: REVIEW OF SUICIDES

1. The existing suicide review process as proposed in the recently developed Suicide Prevention Policy is incomplete and requires improvement.

2. The reports issued by the San Diego County Citizens' Law Enforcement Review Board (CLERB) do not serve a meaningful or sufficient role in reviewing suicide deaths and serious suicide attempts at the Jail. The CLERB has a narrow mandate for investigation and can, at best, only provide limited insight to problems of patient care and emergency response.

3. We identified a number of problems with respect to the accuracy and quality of CLERB reports regarding suicide deaths at the Jail.

### FINDINGS AND RECOMMENDATIONS: REVIEW OF SUICIDES

**FINDING 8.1.** The proposed suicide review process is inadequate. It does not address what elements of the death will be examined and by whom. In addition, although the proposal designates the organizational bodies who are to review the death, it does not identify how any findings and corrective action plans will be acted upon and how proposed corrective actions will be enforced.

*RECOMMENDATION: The suicide review process should be designed to include all stakeholders and fit within the Department's quality improvement program. It should have a mechanism to make sure suggested improvements are completed, and lay out in detail the structure of the review (content, timeline for review, and approval).*

*RECOMMENDATION: The policy should lengthen the preliminary review period from*

---

17    See Recognizing and Responding to Suicide Risk for Correctional Clinicians. American Association for Suicidology. http://www.suicidology.org/training-accreditation/rrsr-c. "Return to Main Document"

18    Boysen, P.G. (2013). Just culture: A foundation for balanced accountability and patient safety. *The Ochsner Journal, 13*: 400-4006. "Return to Main Document"

*24 to 72 hours to provide sufficient opportunity to address the complexity of these incidents and the organization in which they occur.*

**FINDING 8.2.** The CLERB reports provide limited utility in reviewing suicide deaths and guiding corrective action to avoid repeated problems. The CLERB does not adequately address the appropriateness of mental health treatment and suicide prevention policy or practices. This is a role that the Department must take on itself.

*RECOMMENDATION: The Department should implement a robust process for review of suicide deaths and serious suicide attempts that involves a generally accepted methodology (e.g. psychological autopsy or root cause analysis). Both the psychological autopsy and root cause analysis have substantial support for their use in quality improvement and as responses to suicide deaths in custody. (The Department has indicated that a psychological autopsy was completed for at least one recent suicide, but we were not provided a copy of that report.)*

## 9.   QUALITY IMPROVEMENT

The purpose of continuous quality improvement (CQI) programs is to improve health care by identifying problems, implementing and monitoring corrective action, and studying its effectiveness. Key components of CQI include identification of key indicators and processes, a system to collect data about these components, an analytical strategy for the data, and a way to feed the findings back into everyday practice to improve care. The CQI program must be systematic and include all aspects of care.

## KEY DEFICIENCIES: QUALITY IMPROVEMENT

1. The Department has taken some positive steps regarding quality improvement but does not yet have a fully functioning or effective quality improvement program.

## FINDINGS AND RECOMMENDATIONS: QUALITY IMPROVEMENT

**FINDING 9.1.** The Department does not have a functioning quality improvement program. As discussed in this report, there is a need for improved quality improvement processes regarding mental health/suicide risk screening, clinical assessments, individual suicide and suicide attempt reviews, and other aspects of a correctional mental health care and suicide prevention program.

*RECOMMENDATION: The Department should ensure that it has an effective system to track clinical data within the mental health and medical systems in the jail system. In addition, the Department should develop a system to track important custodial indicators related to suicide prevention. This tracking should be part of a larger quality improvement program.*[19]

---

[19]   See Section IV.B.3 in Canning, R.D. & Dvoskin, J.A. (2017). Preventing Suicide in Detention and Correctional Facilities. In J. Wooldredge and P. Smith (Eds.) *The Oxford*

**FINDING 9.2.** We were encouraged to see that the Department is taking steps to implement and enhance its Suicide Prevention Response & Improvement Team (SPRIT) to monitor suicide attempts and also evaluate suicide deaths.

***RECOMMENDATION:*** *The policy should describe the composition of the SPRIT and its responsibilities and reporting structure. The SPRIT should be part of the Department's larger quality improvement program and should have primary responsibility for the oversight of the Department's programs to prevent suicide.*[20]

## 10.   CONCLUSION

The San Diego County Jail has made notable improvements in its suicide prevention program in the last two years. We believe the recommendations we have outlined will solidify these gains and go a long way to prevent more suicides in San Diego County Jail facilities.

Respectfully submitted,

Karen Higgins, M.D.
Robert Canning, Ph.D., CCHP

April, 2018

*Handbook of Prisons and Imprisonment*. New York City: Oxford University Press. "Return to Main Document"

[20]     Ibid. Section IV.B.2. "Return to Main Document"

164

# EXHIBIT 5

John Ingrassia  2/20/2018

```
 1                  UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   CHASSIDY NeSMITH, individually and   )
     as Guardian ad Litem on behalf of    )
 5   SKYLER KRISTOPHER SCOTT NeSMITH, and )
     as Successor in Interest to          )
 6   KRISTOPHER SCOTT NeSMITH,            )
                                          )
 7                  Plaintiffs,           )
                                          )
 8        vs.                             )Case No.:
                                          )15-cv-0629-JLS (AGS)
 9   COUNTY OF SAN DIEGO; et al.,         )
                                          )
10                  Defendants.           )
     _____)
11

12

13             DEPOSITION OF JOHN INGRASSIA

14                 SAN DIEGO, CALIFORNIA

15                  FEBRUARY 20, 2018

16

17

18

19

20

21
            REPORTED BY AMANDA NOEL MARCOS, CSR NO. 13965
22

23

24

25
```

John Ingrassia  2/20/2018

1    that as far as the calculation methods used.  And then

2    validating the numbers.  Some discussions about looking

3    at other counties as well.

4    BY MR. MORRIS:

5        **Q    Did you ever tell -- or to the best of your**

6    **recollection, did anybody direct these reporters to look**

7    **at more accurate information regarding other county**

8    **suicide rates?**

9            MS. HOLMES:  Objection.  Vague.  Calls for

10   speculation.

11           THE WITNESS:  I would be speculating.  I know

12   that we were just looking at the calculation formula

13   itself.

14   BY MR. MORRIS:

15       **Q    And that would have been the ADP?**

16       A    That's part of it, yeah.  It's ADP divided by

17   number of suicides times 100,000.

18       **Q    Correct.  Who -- if you can recall, who was the**

19   **first person to talk about, well, we should take into**

20   **account the total number of bookings?  Was that**

21   **something that -- how did that come up into the mix?**

22       A    Most likely that was me.

23       **Q    Had you seen the total number of bookings**

24   **matrix used in other publications?**

25           MS. HOLMES:  Objection.  Vague.  Lacks

John Ingrassia  2/20/2018

1    foundation.

2            THE WITNESS:   Again, I'm not aware of any

3    published formula that takes that into account when it

4    comes to suicide or death rates.

5    BY MR. MORRIS:

6        Q    **Are you aware of the total number of bookings**

7    **being an accepted published rate for any other reason as**

8    **far as mortality or suicide rates are concerned?**

9            MS. HOLMES:  Objection.  Compound.  Vague.

10   Lacks foundation.  Calls for expert opinion.

11           THE WITNESS:  I haven't looked to see.  Like I

12   said, I'm aware of the rates in the BJS and I haven't

13   seen any other formulas.

14   BY MR. MORRIS:

15       Q    Okay.  So I guess the question I have, what I'm

16   trying to get at is, this total number of bookings as

17   far as a matrix or paradigm, was it like you borrowed

18   it, hey, they look at total number of bookings for,

19   like, murders or total number of bookings for another

20   thing that happens in the jail?  Are you aware of using

21   the total number of bookings matrix for any other ratio

22   that's -- any publication that uses the total number of

23   bookings for any other comparative ratio?

24           MS. HOLMES:  Objection.  Calls for expert

25   opinion.  Lacks foundation.  Vague.  Compound.

John Ingrassia  2/20/2018

1    I, JOHN INGRASSIA, declare under penalty of perjury

2    under the laws of the State of California that the

3    foregoing is true and correct; that I have read my

4    deposition and have made the necessary corrections,

5    additions or changes to my answers I deem necessary.

6

7        Executed on this_____day of_____,

8    2018.

9                              _____

10                              JOHN INGRASSIA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John Ingrassia  2/20/2018

```
 1                  C E R T I F I C A T E

 2

 3  I, AMANDA NOEL MARCOS, Certified Shorthand Reporter for

 4  the State of California, do hereby certify:

 5

 6  That the witness in the foregoing deposition was by me

 7  first duly sworn to testify to the truth, the whole

 8  truth and nothing but the truth in the foregoing cause;

 9  that the deposition was taken by me in machine shorthand

10  and later transcribed into typewriting, under my

11  direction, and that the foregoing contains a true record

12  of the testimony of the witness.

13

14  Dated:  This      day of            , 2018,

15  at San Diego, California.

16

17

18

19            _____

20                    AMANDA NOEL MARCOS
                       C.S.R. NO. 13965
21

22

23

24

25
```