By MELISSA M. HOLMES, Senior Deputy (SBN 220961)
    ROBERT A. ORTIZ, Senior Deputy (SBN 246849)
    JENNIFER M. MARTIN, Deputy (SBN 32048)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531- 5836
E-mail: melissa.holmes@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Patrick Newlander and
Christopher Olsen

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASSIDY NeSMITH, individually and as Guardian ad Litem on behalf of SKYLER KRISTOPHER SCOTT NeSMITH, and as Successor in Interest to THE ESTATE OF KRISTOPHER SCOTT NeSMITH,<br><br>        Plaintiffs,<br><br>    v.<br><br>COUNTY OF SAN DIEGO, SAN DIEGO COUNTY SHERIFF'S DEPARTMENT; WILLIAM D. GORE, SAN DIEGO COUNTY SHERIFF; VISTA DETENTION FACILITY; and DOES 1 – 100 inclusive,<br><br>        Defendants. | No. 15cv00629-JLS (AGS)<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 9 TO EXCLUDE STATEMENTS AND TESTIMONY BY DEFENSE EXPERTS**<br><br>Date: October 7, 2021<br>Time: 1:30p.m.<br>Courtroom:4D<br>Judge: Hon. Janis L. Sammartino |

## I.    INTRODUCTION

Plaintiffs bring this catch all motion seeking to exclude testimony appropriate expert testimony without meeting the *Daubert* requirements for excluding expert opinion or when they dislike the experts' opinions.  Of great concern, Plaintiffs elected not to depose the experts at issue to establish that their opinions are not appropriate expert testimony. Alternatively, Plaintiffs move to bifurcate damages.  Defendants respectfully request that the Court deny Plaintiffs' motion.  Much of the evidence they seek to exclude can be refuted on cross examination and any prejudice can be addressed by a limiting

instruction.  Bifurcation is not appropriate because many of the facts at issue as to liability also involve issues of damages.

Defendants do not oppose the motion to the extent Plaintiffs seek to limit nursing expert Royanne Schissel, RN as the propriety of Deputies Olsen and Newlander's actions.

## II.   AUTHORITY

To exclude evidence on a motion in limine, the evidence must be "clearly inadmissible on **_all_** potential grounds." *Ind. Ins. Co. v. Gen Elec. Co.*, 326 F. Supp. 2d 844,846 (N.D. Ohio 2004) (*emphasis added*). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT&T Tech, Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). This rule exists because, though rulings on motions in limine save "time, cost, effort and preparation," courts are "almost always better situated during the actual trial to assess the value and utility of evidence." *Wilkins v. Kmart Corp.*, 487 F.Supp.2d 1216, 1218 (D.Kan. 2007); see also *Colton Crane Co., LLC v. Terex CranesWilmington, Inc.*, 2010 U.S. Dist. LEXIS 141013, at * 3, 2010 WL 2035800 (C.D. Cal. May 19, 2010) "[M]otions in limine should rarely seek to exclude broad categories of evidence, as the court is almost always better situated to rule on evidentiary issues in their factual context during trial.").

Federal Rule of Evidence 702 provides that:
"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

While Plaintiffs do not identify their motion in limine as a *Daubert* motion, they are seeking to prevent Defendants from providing relevant expert testimony.  As the

2

"gatekeeper", the Court "determines the relevance and reliability of expert testimony and its subsequent admission or exclusion." *Barabin v. AstenJohnson, Inc*., 700 F.3d 428, 431 (9th Cir. 2012)*, on reh'g en banc sub nom. Est. of Barabin v. AstenJohnson,* Inc., 740 F.3d 457 (9th Cir. 2014). "Admission or exclusion under *Daubert* rests on the scientific reliability and relevance of the expert testimony. [] The expert's opinion must be deduced from a 'scientific method' to be admissible." *Id*. (*citations omitted*). "The test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology...." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.2010), *as amended (footnote reference and alteration omitted)*.

Expert opinion in areas where specialized knowledge is necessary is liberally permitted  *Jinro Am. Inc. v. Secure Invs., Inc.,* 266 F.3d 993, 1004 (9th Cir.) ("First, Rule 702 is applied consistent with "the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'" *Id. citing Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 588 (1993).)  "*Daubert 's* principles apply to "technical and other specialized knowledge" as well." *Jinro*, 266 F.3d at 1004. "An expert witness—unlike other witnesses—is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation, so long as the expert's opinion [has] a reliable basis in the knowledge and experience of his discipline." *Id*. (*citations omitted*).

### III. ANALYSIS

#### A. Bethany Payton-O'Brien's Opinions Are Relevant and Not Unduly Prejudicial.

Plaintiffs request that Defendants' expert on military issues should not be permitted to testify because it would unduly prejudicial and was meant to paint decedent as a "bad person."  Plaintiffs suggest that the jury be instructed that Mr. NeSmith was merely "discharged" from the military.

As set forth in Defendants' opposition to Plaintiffs' motion in limine numbers 3, 5, 6, and 8 information regarding Mr. NeSmith's pending discharge from the military after

1  he pled guilty to numerous crimes including going AWOL, assault, use of drugs, and
2  destruction of property are relevant to Mr. NeSmith's motive for hiding his intent to
3  commit suicide so he could secure military benefits for his family as well as damages.
4  *Boyd v. City and County of San Francisco*, 576 F.3d 938, 944 (9th Cir. 2009) ("In a case
5  such as this, where what the officer perceived just prior to the use of force is in dispute,
6  evidence that may support one version of events over another is relevant and
7  admissible."); *Est. of Casillas v. City of Fresno*, No. 1:16-CV-1042 AWI-SAB, 2019 WL
8  586747, at *4 (E.D. Cal. Feb. 13, 2019) ("the jury must be allowed to hear competing
9  evidence of [decedent's] motive and intent on that day.").

10  Mr. NeSmith's actions while in the military are relevant to his mental state, his
11  capriciousness (going AWOL, taking out a payday loan with no intention to pay back,
12  getting married after a gambling winning), the likelihood that he would have been able to
13  support Plaintiffs if he ever was released from jail, his repeated drug use goes to the
14  support he would have provided financially and emotionally as well as his life
15  expectancy (caught several times using methamphetamine and ecstasy in violation of
16  Marine rules); his violent temper goes to the quality of the relationship Plaintiffs would
17  have had with him (destroyed water fountain when he was denied visitors, assaulted
18  fellow Marine and breaking the couple's car windows with his fist because he thought he
19  was flirting with Mrs. NeSmith).

20  Mr. NeSmith's actions in the military also go to Mrs. NeSmith's truth and veracity.
21  (While in the military, Mr. NeSmith received a new cell phone in the mail, he couldn't
22  get his Google account to work and he subsequently threw it across the room and broke
23  the phone. Mrs. and Mr. NeSmith hatched and executed a plan where they went to the
24  Verizon phone and lied, saying they received a broken phone, and both Mr. and Mrs.
25  made a scene in the store until they received a new cell phone. *See* **Exhibit A**, excerpts
26  from Deposition of Chassidy NeSmith at 170:7 -172:21.

27  As set forth in Defendants' previous oppositions, information regarding the quality
28  of their relationship, likelihood of financial support, Mr. NeSmith's drug use, and his

prior assaults of Mrs. NeSmith by Mr. NeSmith are admissible and can be addressed with a limiting instruction.  *See Mahach-Watkins v. Depee*, 2007 WL 3238691, at \*1-2 (N.D. Cal. 2007)("Here, evidence of [decedent's] criminal history was relevant to the nature and degree of emotional comfort and companionship that plaintiff had received from her son."). Indeed, the jury will necessarily be instructed on what damages are recoverable in a wrongful death claim, which include '[t]he loss of [decedent's] love, companionship, comfort, care, assistance, protection, affection, society, moral support." Judicial Council of California Civil Jury Instruction 3921.

Therefore, in order to claim damages, "wrongful death" Plaintiffs are required to put on "such evidence as the closeness of the family unit (*Griott v. Gamblin,* 194 Cal.App.2d 577, 578-579 (1961)), the warmth of feeling between family members (*Benwell v. Dean*, 249 Cal.App.2d 345, 349 (1967)), and the character of the deceased as 'kind and attentive' or 'kind and loving' (*Cook v. Clay Street Hill R. R. Co.,* 60 Cal. 604, 609 (1882)." *Krouse v. Graham*, 19 Cal. 3d 59, 68 (1977). A decedent's criminal conduct, drug use, and abuse of family members – are all common sense factors when determining wrongful death damages.  See CACI 3921 ("No fixed standard exists for deciding the amount of [wrongful death] damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense."). Indeed, it is difficult to conceive of anything that could cause more strain on a personal or familial relationship than one party's criminal misconduct. *See Benwell v. Dean*, 249 Cal.App.2d 345, 353 (1967) ("'It is always proper to make proof of the relations of the decedent to the person for whose benefit the action is being maintained, because such proof has a bearing upon the pecuniary loss suffered by the person entitled to recovery....'").

## B. Similarly, Dr. Addario's Opinions Are Appropriate and Scientifically Based.

Plaintiffs also seek to limit opinions without basis.  Plaintiffs failed to depose Dr. Addario about his scientific basis for his opinions or why he didn't place more weight on certain evidence.

No. 15cv0629-JLS (AGS)

1    Plaintiffs contend that Dr. Addario does not have the scientific basis to opine as to
2  Mr. NeSmith's mental injuries and the cause of his suicide.  Plaintiffs claim Dr. Addario
3  would have to conduct psychological testing to make sure determinations but fail to cite
4  to any authority for such a position.  Plaintiffs argue that Mr. NeSmith was not under the
5  care of a psychiatrist even though there are numerous psychotherapy notes contained in
6  Mr. NeSmith's jail medical records.  Moreover, as set forth in his report attached as
7  Exhibit 2 to Plaintiff's motion, Dr. Addario sets forth in great detail the basis for his
8  opinions.  To make matters worse, Plaintiffs own psychiatric expert, Dr. Daniel opines as
9  to Mr. NeSmith mental injuries and causation even though he did not examine Mr.
10 NeSmith.  *See* **Exhibit B**, Dr. Daniel's Report at pp. 7 (headings 1 – 4) and 8 (heading
11 14.)
12    The remainder of Plaintiffs' issues with Dr. Addario's opinions are based on their
13 dissatisfaction of his interpretation of the value of certain evidence:
14        -   That Mr. and Mrs. NeSmith had a turbulent, difficult, and destructive
15            relationship because of Mr. NeSmith's drug use and violence;
16        -   That there was not sufficient warning that Mr. NeSmith was acutely
17            suicidal (again – Plaintiff's own expert opines there was sufficient
18            warning);
19        -   That if Mr. NeSmith remained in custody, they would have likely split
20            up;
21        -   The reduction of Mr. NeSmith's life expectancy[1];  and
22        -   That Mr. NeSmith would have continued to use drugs.
23 Plaintiffs contend that his report is not based on scientific data ignoring that.  Again,
24 Plaintiffs could have deposed Dr. Addario to inquire as to his scientific data.  Moreover,
25 Dr. Addario can base his opinions on his specialized knowledge.  *Jinro*, 266 F.3d at 1004.
26 ///
27
28        [1] Plaintiffs contend that Dr. Addario should have used specific language in his
report, but fail to cite to any authority requiring such language.

6

## C. Dr. Chaing's Opinions Are Appropriate and Should be Permitted.

Plaintiffs contend that Dr. Chaing should not be permitted to testify about the actions of the individual deputies because he was disclosed to testify about the County's suicide prevention policies, procedures, and trainings.  It is illogical to assume that suicide prevention policies, procedures, and trainings would not include the role of the line deputies who interact with deputies on a daily basis.  Moreover, Plaintiffs fail to identify what information in Dr. Chaing's report is not appropriate based on the disclosure.  As such, the request to limit his testimony should be denied.

Plaintiffs also take issue with the fact that Dr. Chaing included the unsubstantiated statement by Mr. Berumen that an unidentified deputy allegedly saw the rope made out of sheet tied to Mr. NeSmith's light fixture a day or two before the incident.  Again, Plaintiffs could have deposed Dr. Chaing on the validity of his opinion but they chose not to.   The correctness of his opinion is appropriate for cross examination and whether Mr. Berumen's claim affects his opinion can be addressed at that time.

## D. Defendants' Economist and Vocational Rehabilitation Experts' Opinions Are Appropriate.

Plaintiffs contend that it would be too prejudicial to include Defendants' DA expert's opinions regarding the likelihood of criminal conviction and sentence of Mr. NeSmith and based on that, Laura Fuchs Dolan (Defendants' economist) and Dr. Benhush Mortimer (Defendants' vocation rehabilitation expert should not be able to rely on her opinions.  As set forth in Defendants' opposition to Plaintiffs' motion in limine number 7, there is a sufficient basis for the DA expert's opinions and Plaintiff chose not to present their own expert or evidence to refute that Mr. NeSmith would have remained in custody for the rest of his life.  Rather, Plaintiffs own economist arbitrarily opines that Mr. NeSmith would have been released from prison at some point between 5 and 10 years.  Plaintiffs have failed to show how these expert opinions are lacking in scientific basis or the knowledge and experience of their professions.  As such, they should be permitted to testify about Mr. NeSmith's earning potential.

7

1    Plaintiffs also object to Dr. Mortimer's opinions based on his polysubstance abuse

2    alleging that there is insufficient evidence of such drug use.  Again, Plaintiffs appear to

3    be wishing the evidence was different.  Disregarding the multiple positive drug tests and

4    Mr. NeSmith's testimony under oath in the military case that he repeatedly traveled to

5    Los Angeles to purchase and use methamphetamines (ECF No. 185 at ECF at p. 20, fn 5),

6    Plaintiffs own expert opines that Mr. NeSmith suffered from substance abuse including

7    methamphetamine and marijuana (**Exhibit B**, Dr. Daniel's Report at p. 7 heading 3.)

8    **E.  Avoiding Painting a Rosy Picture and Bifurcation Are Not Warranted.**

9    Plaintiffs suggest that if they avoid making arguments that Mr. and Mrs. NeSmith

10   had a model marriage, it will be sufficient to exclude relevant evidence.  Plaintiffs fail to

11   set forth authority to support such a claim and as set for *supra* and in Defendants'

12   previous oppositions to Plaintiffs' motions in limine, evidence regarding the quality of

13   the loss of care, comfort, and support Plaintiffs' lost when Mr. NeSmith took his life is

14   admissible.  It would be unduly prejudicial to exclude evidence regarding Mr. NeSmith's

15   abusive, capricious, and addiction marred relationship with Mrs. NeSmith and the abuse

16   she endured at his hands.  Jurors will assume that their relationship was typical when, it

17   was far from typical – Mrs. NeSmith's own expert opined that she was safer if Mr.

18   NeSmith remained incarcerated.

19   Bifurcation is also not appropriate because it will be difficult to tease out issues of

20   motive to hide that he was going to take his own life, Mrs. NeSmith's knowledge of Mr.

21   NeSmith's mental state, Mr. NeSmith's capricious and manipulative behavior that

22   precluded his threat when he was first incarcerated that he would kill himself if his father

23   did not post bail, and issues regarding Mrs. NeSmith's credibility if damages are

24   bifurcated.  Under Federal Rule of Civil Procedure 42, however, the court may bifurcate

25   a trial for the 1) convenience of the court and the parties, 2) to avoid prejudice, or 3) to

26   expedite and economize the trial process.  *SilverWing at Sandpoint, LLC v. Bonner Cty.*,

27   No. 2:12-CV-00287-EJL, 2014 WL 6629600, at *14 (D. Idaho Nov. 21, 2014) (noting

28   bifurcations should not be routinely ordered).  Plaintiffs have not met their burden of

proof showing there would not be overlap between the two phases of trial.  *Webb v. Ackerman*, No. CV 13-9112-PLA, 2017 WL 5665000, at *2 (C.D. Cal. Feb. 15, 2017) (declining bifurcation when the plaintiffs did not meet their burden).

## IV. CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' motion.

DATED: September 7, 2021                Office of County Counsel

By: s/MELISSA M. HOLMES, Senior Deputy
Attorneys for Defendants County of San Diego,
Patrick Newlander and Christopher Olsen

EXHIBIT "A"

Chassidy NeSmith  11/28/2017

1                  IN THE UNITED STATES DISTRICT COURT

2               FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    CHASSIDY NeSMITH, individually  )
     and as Guardian ad Litem on     )
5    behalf of SKYLER KRISTOPHER     )
     SCOTT NeSMITH, and as Successor )
6    in Interest to THE ESTATE OF    )
     KRISTOPHER SCOTT NeSMITH,       )
7                                    )
                  Plaintiffs,        )
8                                    )
          v.                         ) Case No.: 15-cv-00629-JLS (AGS)
9                                    )
     COUNTY OF SAN DIEGO, SAN DIEGO  )
10   COUNTY SHERIFF'S DEPARTMENT;    )
     WILLIAM D. GORE, SAN DIEGO      )
11   COUNTY SHERIFF; VISTA DETENTION )
     FACILITY; and DOES 1 - 100      )
12   inclusive,                      )
                                     )
13                Defendants.        )
     _____)

14

15

16           VIDEOTAPED DEPOSITION OF CHASSIDY NeSMITH

17               VOLUME I, PAGES 1 THROUGH 338

18                   SAN DIEGO, CALIFORNIA

19                    NOVEMBER 28, 2017

20

21

22   REPORTED BY CARLINE A. FONSECA, CSR NO. 8068

23

24

25

Peterson Reporting Video & Litigation Services            1

EXHIBIT A

Chassidy NeSmith  11/28/2017

1     over, you know, not make him mad or -- you know, just

2     try to deal with the situation in the least hectic way

3     as possible.

4             I don't -- I didn't like the drama.  I just

5     wanted to be -- you know, be normal, if that makes any

6     sense.

7        Q    So there were times when he would yell at you

8     in public?

9        A    Well, he would yell -- like, he -- so his cell

10    phone broke one time, and he went into the Verizon store

11    and caused a huge scene, like, almost got arrested at

12    the Verizon store.  So I know he is not able to handle

13    interaction with people maybe as well as I am to be able

14    to get his cell phone replaced, you know.  I mean, it

15    just depends on the situation.

16       Q    When did this occur, a scene at the Verizon

17    store?

18       A    Oh, I'm not -- sometime when we were at my

19    mom's.

20       Q    Was this before you traveled together or after

21    you traveled?

22       A    After.

23       Q    So was this after he was in the brig, but

24    before he came into custody with the County of

25    San Diego?

EXHIBIT A

Chassidy NeSmith  11/28/2017

1      A    Before that.

2      Q    **So was it some point after you traveled when he**

3  **was in the military before he got put in the brig?**

4      A    I want to say yes, but I think it was before

5  that.  Like, it was at some point when he had his

6  Verizon account.

7      Q    **So was that before you traveled together?**

8      A    Yeah, I think it was before that.  I think it

9  was before that.

10     Q    **Okay.**

11     A    Because I just remember we weren't living at my

12  mom's.  We were just hanging out there one day, and the

13  phone was getting delivered there.  And so when it came,

14  he couldn't get his Google account on the phone, so he

15  threw the phone and it broke.

16          So I was, like, "Great idea.  Let's take it to

17  Verizon and say we got it like that so we can get the

18  phone replaced."  That's how that went down.

19     Q    **So did he agree to take it to the Verizon store**

20  **and say that the phone had been damaged during shipment?**

21     A    Yes.

22     Q    **And is that what he did?**

23     A    Yes.

24     Q    **And that was your idea?**

25     A    Yes.

EXHIBIT A

Chassidy NeSmith  11/28/2017

1      Q     **And did Verizon replace the phone?**

2      A     Yes.

3      Q     **And how did he cause a scene in the Verizon**

4   **store?**

5      A     Because they weren't initially going to replace

6   the phone, and I kind of made a little bit of a stink

7   about it.  I mean -- so they -- they did replace it

8   towards the end, once, you know, I was apologizing,

9   like, "I'm so sorry," like --

10     Q     **How did you make a stink?**

11     A     I was just, like, "The phone came like this.

12  Like, you can't ship stuff without having insurance on

13  it."  You know, I just went into the whole spiel about

14  it.

15     Q     **But you were lying to them, right?**

16     A     I definitely was lying.

17     Q     **And how did Kris cause a scene in the Verizon**

18  **store?**

19     A     When they told him no, he would get angry.  He

20  would just be mad and start talking louder.  You know,

21  people would start to look at him.

22     Q     **Were the police called?**

23     A     No.

24     Q     **And after that, you knew that you needed to be**

25  **careful around Kris?**

EXHIBIT A

1          I, Carline A. Fonseca, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken before me

4     at the time and place herein set forth; that any

5     witnesses in the foregoing proceedings, prior to

6     testifying, were placed under oath; that a verbatim

7     record of the proceedings was made by me using machine

8     shorthand which was thereafter transcribed under my

9     direction; further, that the foregoing is an accurate

10    transcription thereof.

11

12

13    Dated:   This _____ day of __December__, 2017,

14          at San Diego, California.

15

16

17

18

19

20              __Carline A. Fonseca__

21              Carline A. Fonseca
                CSR No. 8068

22

23

24

25

EXHIBIT A

EXHIBIT "B"

01/18/2018  12:54    5738754272          DANIELPSYCH                    PAGE  03/14

# DANIEL FORENSIC PSYCHIATRIC SERVICES

33 East Broadway, Suite 115
Columbia, MO 65203
Telephone: (573) 443-6930  Fax: (573) 875-4272
aedaniel@aol.com
www.danielforensic.com

## PROFESSIONAL OPINIONS AND CONCLUSIONS

Regarding:

United States District, Southern District California
Chassidy NeSmith, individually and as Guardian Ad Litem on behalf
of Skyler Kristopher Scott NeSmith, and as successor in interest to Kristopher Scott NeSmith

Plaintiffs

v.

County of San Diego; William D. Gore, individually and DOES 1-100, Inclusive

Defendants

Case No: 15 cv 0629-JLS (JMA)

Qualifications:

This is a report of my professional opinions and conclusions regarding the above-titled matter in accordance with Rule 26(a)(2) (B) of the Federal Rules of Civil Procedure, prepared at the request of Christopher S. Morris, an attorney at law from San Diego, California who represents the plaintiffs.

My opinions and conclusions are based on a review of the records provided to me and my experience, training, and expertise which are briefly outlined below, and the details are included in the attached Curriculum Vitae. The professional opinions and conclusions are provided with a reasonable degree of medical certainty.

I, A. E. Daniel, M.D., am a physician specializing in psychiatry licensed to practice medicine in the State of Missouri. I am certified in Adult General Psychiatry by the American Board of Psychiatry and Neurology. I have significant clinical, forensic, academic and administrative experience in correctional mental health and correctional psychiatry.

I have authored and co-authored several peer-reviewed articles in correctional mental health and particularly on risk identification, prevention and risk management strategies relating to suicide in jails and prisons. Specifically, I am one of the co-authors who updated the World Health Organization Resource Guide: Preventing Suicide in Jails and Prisons [2007]. I am an invited reviewer on related topics for the American Journal of Psychiatry.

I have conducted seminars and in-service training on suicide prevention and interventional strategies to mental health staff working in prisons and jails.

Professional Opinions and Conclusions
Page Two


I was the Director of Psychiatric Services by contract for the Missouri Department of Corrections between 2001 and 2007 and in this position, I directed, managed and supervised services provided by psychiatrists working in all prisons in Missouri.  During part of this period, I was administratively responsible for all mental health services provided by the mental health staff.  Additionally, I have significant experience interacting with correctional staff that provided direct one-to-one services to inmates on suicide watch and attending to their needs.

I have considerable experience in providing direct psychiatric services to jail and prison inmates in various correctional institutions.

I have studied, analyzed and published risk factors and profiles of over 112 inmates who committed suicide.  As a medical director and administrator, I have participated in numerous mortality and morbidity reviews as well as debriefing conferences where medical, mental health and correctional staff participated. I have also trained medical, mental health and jail staff regarding risk factors, prevention strategies, applicable medical, mental health and correctional policies and implementation of such policies, officers' responsibilities and duties and their pivotal frontline role in preventing suicide in jails and prisons. By my research, clinical and administrative experience and expertise, I have established myself as an expert in suicide in jails and prisons and correctional mental health services.

Records Reviewed:

1.    Declaration of Chassidy NeSmith under California Code of Civil Procedure

2.    Death Certificate of Kristopher NeSmith

3.    City Beat editorial articles and KPBS (Exhibits)

4.    Second Amended Complaint

5.    Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint and Defendants' Motion to Strike

6.    Reply memorandum of points and authorities in support of motion to dismiss second amended complaint, and in opposition to request for judicial notice of editorial article

7.    Plaintiff's request for judicial notice

8.    Notice of motion and motion to dismiss amended complaint

9.    Memorandum of points and authorities in support of motion to dismiss amended complaint

10.    Deposition of Chassidy Ne Smith dated November 28, 2017 and November 29, 2017

11.    Deposition of Perry Scott NeSmith dated November 29, 2017

12.    Deposition of Richard Anthony Berumen dated October 5, 2017

13.    Grand Jury Reports on suicide in San Diego County Jail

01/18/2018   12:54    5738754272               DANIELPSYCH                              PAGE   05/14

Professional Opinions and Conclusions
Page Three


14.    Documents provided by the defendants to include the following:

       SDSO Homicide in Custody Death Investigation – Kristopher Scott NeSmith
       03/01/14

       A.    Case Synopsis by Detective Buckley

       B.    Reports by VDF Deputies\

              a)    Deputy Cerda (Crime Report)
              b)    Deputy Delira
              c)    Deputy Iwatsu
              d)    Deputy Negron
              e)    Deputy Newlander
              f)    Deputy Newman
              g)    Deputy Park
              h)    Deputy Perez
              i)    Deputy Prillman
              j)    Deputy Rosillo
              k)    Deputy Vallejo + Crime Scene Log
              l)    Deputy Vollmar
              m)    Sergeant Jackson
              n)    Sergeant Snyder

       C.    Scene Report/Investigation by Detective Buckley

       D.    Investigative Reports

              Homicide

              a)    Detective Brayman follow-up
              b)    Detective DuGal follow-up
              c)    Detective Hubbert follow-up
              d)    Detective Licudine follow-up

              Detentions Investigations Unit

              a)    Detective Binsfield
              b)    Detective Brown
              c)    Detective Taylor
              d)    Detective Williamson

       E.    Statement Reports

              a)    Inmate Anthony Lamoureux
              b)    Inmate Mighael Hodson
              c)    Inmate Steven Walters
              d)    Perry & Chassidy NeSmith
              e)    RN Mark Samson
              f)    RN Mary Abario
              g)    RN Vicky Felizardo
              h)    RN Yolanda Sabas

01/18/2018  12:54    5738754272          DANIELPSYCH                                    PAGE  06/14

Professional Opinions and Conclusions
Page Four

     F.      Crime Laboratory Reports

     G.     Medical Examiner Reports

     H.     Jail Medical Records

     I.      Marine Corps Records

     J.      Orange County Sheriff's Dept. Reports

     K.     Jail Information

     L.      Victim Information

     M.    Evidence Forms

     N.     Miscellaneous

     O.     Photos

     P.     Audio

     Q.     Video

15.     San Diego County Jail policies on Housing Unit Area Activity Log, Safety Cells: Definition and Use, and Inmate Suicide Prevention Practices and Inmate Safety Program

Case Details

Kristopher Scott NeSmith, a 21-year-old white male, Marine killed himself by hanging in his cell at Vista Detention Facility (VDF) on March 1, 2014, using a bedsheet anchored to a light fixture.

Mr. NeSmith joined the US Marines in 2010.  He began to experience severe mental illness after he was nearly shot in the head during training at Camp Horno Rifle Range in April 2013. He had thoughts of suicide and hearing voices. He went Absence Without Leave (AWOL) and married his girlfriend Chassidy on June 23, 2013, in Las Vegas. During the honeymoon, he attempted suicide by using a dog leash, fearful that he would be taken back to Camp Pendleton.

Mr. NeSmith attempted suicide again by hanging himself in a closet on July 20, 2013, per the Information Report, warrant arrest, Orange County, Santa Ana dated July 22, 2013. The sheriff took him back to Camp Pendleton Marine Base.

While at the base, he erratically attacked a Regiment Officer. On August 6, 2013, he was taken to the brig on charges of AWOL and Assaulting a Regiment Officer. At the base, he attempted suicide by using a cell phone charger wire, and Chassidy NeSmith reportedly thwarted this attempt.

Mr. NeSmith was sentenced to four months in the brig where he spent 102 days in solitary confinement. While at the brig, he attempted suicide two more times and was under constant watch and regular mental health evaluation.  He was severely depressed with loss of weight. He was diagnosed with Mixed Personality Disorder (Borderline and Antisocial Features).

Professional Opinions and Conclusions
Page Five

Mr. NeSmith was released on November 19, 2013, on appellate leave. Chassidy noticed when she picked him up that he was malnourished and paranoid and apparently during that weekend, he drank heavily.

On November 27, 2013, he left home following an argument with Chassidy, and beat up and strangled an unknown stranger causing physical injuries to him. He then returned to his home.

On November 28, 2013, Mr. NeSmith left his residence at night and had an encounter with a neighbor causing life-threatening injuries to him. He then returned to his home.

The next day in a parking lot, he attempted to strangle his wife, calling her "Jennifer." The sheriff was called to the domestic violence scene.   Mr. NeSmith was identified as the person who was involved in the offenses during the previous nights.

Mr. NeSmith was taken into custody and detained at VDF and placed in the Upper West Wing housing module 1, cell 44.  He did not have a roommate. He was charged with domestic violence, attempted murder, mayhem and resisting arrest.

During his arraignment on December 3, 2013, he knew that he may be facing life in prison. He pleaded with his father, Scott NeSmith to bail him out, but his father told him that he could not afford a two-million-dollar bond. He became extremely distraught and again expressed suicidal ideation, telling his father that he would kill himself.

Mr. Scott NeSmith informed various county personnel including DA Tracy Pryor the fact that his son had made suicidal statements. The county officials assured the father that he (Kristopher NeSmith) would be taken care of (Ref. Scott NeSmith Deposition).

Mr. NeSmith had his preliminary hearing on February 26, 2014.  The night before he hung himself, an officer had observed a makeshift noose hanging from his light fixture.  The officer merely commented: "What are you doing? Kill yourself? Take that down." The officer did nothing further.

On Saturday, March 1, 2014, at about 0658 hours, Deputy Cerda found Mr. NeSmith motionless, wedged between the toilet and the bunk with a piece of torn white sheet wrapped around his neck. He was pronounced dead at 0735 hours.

The cause of his death was cited as hanging (Ref: Autopsy by Wilma Wooten, M. D.). The toxicology report showed that he did not have alcohol or drugs in his system.

VDF Medical/ Mental Health Records:

The Medical Intake at VDF on November 30, 2013, at 0143 by Rene Arce show that the questions concerning suicidal ideation, past and current psychiatric problems, use of street drugs, use of medications,  medical history and mental status findings were marked N. Interestingly the question, "Have you ever served in the US Military" was also marked N.

Limited medication prescription profile shows that Mr. Ne Smith was on: Desyrel [Trazodone] 50 mg a day on December 5, 2013 which was increased to 100 mg on December 12, 2013; Prozac 20 mg a day starting December 12, 2013; and Sinequan (Doxepin) 100 mg a day starting on January 9, 2014.

01/18/2018  12:54    5738754272          DANIELPSYCH                        PAGE  08/14

Professional Opinions and Conclusions
Page Six

A mental health note by JMAR2SH, Marquez (qualifications unidentified) dated December 4, 2013 indicates that "his father called the DA, who then called the sergeant" to inform that Ne Smith told his father that he would kill himself. This worker further noted that Mr. NeSmith denied any suicidal ideation and any psychiatric history.   Under the diagnosis section, it was noted "Persistent D/O and Cannabis Dependence." On December 5, 2013,  an entry by Venice Cercado (discipline unidentified) show that after a cursory "psych eval" he was started on Desyrel 50 mg a day.

On December 10, 2013, a note shows that Mr. NeSmith requested to see the "psych" for PTSD/Depression.

A note dated December 12, 2013 by Venice Cercado show that Mr. NeSmith complained of sleep difficulties, depression, nightmares, and worry.  On examination, it was noted that he "endorsed depression" but no psychotic symptoms or mania.  No entry regarding any self-injurious ideation was documented. His diagnoses included 309.81 (Post-Traumatic Stress Disorder) and 304.4 (Amphetamine and other Stimulant Dependence). He was started on Prozac 20 mg a day and Prazosin 1 mg at bedtime and the dose of Desyrel at night was increased to 100 mg.

On December 23 and 24, 2013, he refused his medication and did not show up for his medication. He reportedly asked to discontinue his medication.

On January 9, 2014, he complained of "trouble with Trazodone" because reportedly it caused anger problems. He was again seen by Venice Cercado who diagnosed him with Primary Insomnia (307.42). Trazodone was discontinued and Doxepin 100 mg was started.

As of January 20, 2014, Mr. NeSmith continued to refuse Doxepin. On January 21, 2014, Doxepin was discontinued.

The last time he was seen by "psych" was on February 2, 2014  for increasing anxiety, rumination that he let down his family, depression, trouble sleeping and increasing self-isolative behaviors.  He denied suicidal and homicidal ideation. He was assessed to be "not an acute risk of harm to self or others." The note further showed, "no indication for inpatient hospitalization or placement on 5150."

Mental Health Records from Camp Pendleton Marine Base:

Review of Mr. NeSmith's chronological record of medical care at Camp Pendleton Marine Base show that he was seen on August 8, 2013, August 13, 2013, September 13, 16, 19 and 26, 2013, and October 2 and 11, 2013. The attending psychiatrist, Izhak Fridman, M. D. noted on August 5, 2013, that Mr. NeSmith was unhappy and distraught.  Dr. Fridman determined that Mr. NeSmith was at low risk for suicide as he denied suicidal ideation.

On September 13, 2013, Mr. Ne Smith was seen at Camp Pendleton Naval Hospital Emergency Department after brig staff reported that he attempted to tie his shoelace around his neck. On September 16, 2013, he was evaluated by Janet Fagan, LCSW for suicide risk assessment and she found him at low risk. However, he was placed on 1:1 suicide watch.

Jennifer Gunther, M.D., psychiatrist assessed him on September 19, 2013 and determined him to be of moderate risk for suicide and continued him on 1:1 suicide watch.

Professional Opinions and Conclusions
Page Seven


The notes dated September 26, 2013, show that Dr. Fridman assessed him to have moderate to high acute risk for suicide due to his impulsive nature despite his denial of suicide ideation. He diagnosed him with Personality Disorder, Not Otherwise Specified with Borderline and Antisocial Features. Dr. Fridman further noted that he was in special brig quarters on maximum security.

Mr. NeSmith was again referred for mental health evaluation because he expressed suicidal ideation on October 2, 2013.  A note by John Bockman Weems, staff psychologist, show that Mr. NeSmith was seen in Mental Health due to a" provocative suicide gesture by tying his clothing to his cell in front of guards in the context of acute distress and poor ability to tolerate distress due to ongoing legal, occupational and marital stressors". He assessed him to be at acute moderately high risk for suicide.  Mr. NeSmith continued to be placed on suicide watch.

On October 3, 2013, Dr. Fridman assessed him again and found him to be of moderately high suicide risk and continued his suicide watch.

Professional Opinions and Conclusions:

Based on my review of the available records, I conclude with a reasonable degree of medical and psychiatric certainty that:

1.      Kristopher NeSmith posed significant suicide risk at the time he was booked and placed in the custody of Vista Detention Facility (VDF), given the history of multiple suicide attempts since May 2013;

2.      Mr. NeSmith's suicide risk remained high throughout his confinement at VDF, despite his denial of suicidal ideation.   Off and on, Mr. NeSmith refused his medications and isolated himself in the jail. He was anxious, agitated and ruminated on "letting down his family." He had significant problems with sleep, which was interrupted by nightmares;

3.      Mr. NeSmith had a significant prior mental health history including Depressive Disorder, possibly Post-Traumatic Stress Disorder (PTSD)  and Substance Abuse including methamphetamine and marijuana;

4.      Mr. NeSmith's history of suicide ideation and attempts, a critical piece of information in assessing his current suicide risk, was missed because of the county staff's failure to communicate the already available information from the Marine Base to the mental health and medical staff at the jail.  Past suicide attempt is a significant predictor of suicide;

5.      Mr. NeSmith was never given a psychiatric evaluation to establish proper diagnoses and treatment plan. Such an evaluation was warranted and medically necessary because of his history of depression, substance abuse, personality disorder and multiple suicide attempts. Healthcare standards applicable to correctional health care settings demand that a proper psychiatric evaluation is conducted within a reasonable period when inmates enter a jail or prison. Such reasonable period is within 72 hours to 7 days. However, it is expected that such evaluation is completed within 72 hours when an inmate has a known history of mental illness and recent suicide attempts;

Professional Opinions and Conclusions
Page Eight

6.      Mr. NeSmith' denial of suicide ideation was taken at face value by mental health workers at VDF;

7.      VDF should have known that Mr. NeSmith was of substantial suicide risk but placed him in the general population throughout his confinement instead of a suicide-resistant special cell;

8.      Mr. NeSmith specifically expressed a strong wish to die once he realized that he was facing a long sentence, possibly a life sentence. Also, he felt hopeless and distraught when his father told him that he could not afford a 2 million bond;

9.      Mr. NeSmith refused all treatment after January 21, 2014 and refused to eat.  He began to isolate himself during the weekend, yet another indicator of suicide risk. Interviews of several inmates housed in Upper West 1 indicated that Mr. Nesmith expressed several non-verbal warning signs of suicidal ideation in the days leading up to his suicide, i.e., depression, isolation and refusing to eat.  (CSD 51-52; 57-59; 60-61);

10.     The officer who saw him with a noose the night before did nothing except to comment, "What are you doing. Kill yourself? Take it down." The officer had the duty to place him on suicide watch immediately and inform the mental health staff. His failure to take Mr. NeSmith's suicidal behavior seriously was a reckless disregard of his serious psychiatric/medical need.

11      Communications between the County Officials and Jail staff and between Jail Staff and Mental Health Staff were egregiously absent to the detriment of Mr. NeSmith. The detective who had in his possession the mental health records from the Marine Base never provided the information to the jail staff;

12      Suicide prevention in a jail or prison is a collaborative responsibility of the mental health, medical and custodial staff (Ref: National Study of Jail Suicide: 20 years later, National Institute of Corrections; Preventing Suicide in Jails and prisons, WHO 2007; and Daniel, 2006). Communication is a key component of a comprehensive suicide prevention plan. In my opinion, the San Diego County Sheriff's Department Policy and Procedures do not assure such communications;

13      Training of the officers at the San Diego County Jail as to the policy and procedures concerning suicide prevention is a significant concern which has a major impact on suicides in the jail. San Diego County Jail has the highest incidence of suicide in the California jail system;

14.     I conclude with a reasonable degree of medical and psychiatric certainty that these failures, individually and collectively by the San Diego County officials and the jail staff, caused and/or contributed to the suicide of Mr. NeSmith.  The care, skill and knowledge exercised or exhibited during the incarceration of Mr. NeSmith at the San Diego County Jail from November 2013 to March 2014 fell outside the acceptable professional standards, and such conduct was a cause of bringing harm to Mr. NeSmith;

15.     Additionally, I conclude that the VDF staff knew that Mr. NeSmith was of obvious and substantial risk the night before his suicide and was Deliberately Indifferent to his serious need by failing to take appropriate and necessary action.

Professional Opinions and Conclusions
Page Nine

16.     The County officials also were Deliberately Indifferent when Mr. NeSmith's wishes to die were ignored even after his father told the county officials. This Deliberate Indifference directly caused and/or contributed to Mr. NeSmith's suicidal death on March 1, 2014.

<u>Opinions on Psychiatric/Mental Health Practice and Suicide Prevention Program at San Diego County Jail:</u>

1.     The psychiatric services at San Diego County Jail are poorly organized. They do not meet the mental health needs of its inmates as indicated by the haphazard nature of the limited services provided to Mr. NeSmith but also do not meet the national standards set by the National Commission on Correctional Health Care (NCCHC) and American Psychiatric Association Guidelines (APA). There is no coordination and direction as to the mental health treatment services provided under the direction of a mental health supervisor or Director of Mental Health. My opinion in this regard is consistent with the Amended Grand Jury Report: Examining the Issue of Suicide in San Diego Jails.

2.     Suicide is a sentinel event in a jail, and preventive efforts reflect the adequacy and comprehensiveness of mental health, psychiatric, custodial, and administrative services in a correctional system (Daniel, A, 2006).  A well-designed suicide-prevention program incorporates all aspects of identification, assessment, evaluation, treatment, preventive intervention and training of all medical, mental health and correctional staff (NCCHC, APA).

3.     A suicide prevention program typically consists of several key steps which would be reflected in the policies and procedures of the jail.

The suicide policy at San Diego County Jail offers no guidance on identifying inmates who potentially would be suicidal, which may include anxiety, agitation, depression, self-isolation, sleep difficulties, refusing medication, change in eating habits, distressing or bad news from the family or court and phases in criminal proceedings.

4.     The San Diego Jail does not have a formal policy or mechanism for the arresting or booking officers to provide their input as to their observations of the arrestee. As a matter of fact, some jails provide significant weight to the observations of the officers including behavioral observations and even their gut feeling of the arrestee's suicide risk. Suicide Screening Questionnaire completed by a booking officer and/or mental health provider is an effective tool.

5.     Classification of inmates as to their level of suicide risk and subsequent placement under appropriate levels of suicide watch is to be instituted to prevent suicide. Typically, a suicidal inmate/patient should be placed in a special cell. The San Diego Jail policy does not address different levels of suicide watch.

Typically, there are three levels of suicide watch: 1) Level I (Constant) Observation, which is reserved for actively suicidal inmates/patients. The staff shall observe such a patient/inmate on a continuous, uninterrupted basis and have a clear, unobstructed view of the inmate/patient always. Observation shall be documented at 15-minute staggered intervals. They are issued a suicide smock and suicide blanket.

Professional Opinions and Conclusions
Page Ten

Mr. NeSmith, who made an apparent attempt to kill himself the night before when he was observed with a noose, would have fallen in this category. The officer who saw him should have placed him on Level I suicide watch.

Level II Suicide Watch is reserved for those who have expressed suicidal ideation and/or have a plan to commit suicide.  They are considered medium to high risk of suicide. They are also issued a suicide smock and suicide blanket. The staff will observe the patient at random, staggered intervals, not to exceed 15 minutes by direct visual observation.

Level III Suicide Watch is a stepdown from Level II and is reserved for patients/inmates whose behavior warrants close observation. They are observed at intervals not to exceed 30 minutes on a staggered basis. They have all the rights and privileges of an inmate in general population.

When the officer observed NeSmith with a noose the night before he killed himself, the officer should have instituted an appropriate level of watch.

6.      Based on the available information, the San Diego County Jail does not provide adequate and continuing training for its officers and mental health staff.

Research and correctional experience have shown that training correctional officers and mental health and medical staff to deal with suicidal inmates is crucial.  I have pointed out the importance of training in a published article and I quote, "If the jail staff are given adequate training in recognizing, dealing with, and understanding the motivations behind suicidal behavior, they are less likely to feel that suicidal inmates are being manipulative. Training topics must include: (1) identification of high-risk offenders; (2) how to identify signs and symptoms of mental illness; and (3) how to handle communication of intent. Training must occur regularly. Any staff can be trained to spot certain "warning signs" of suicide. Correctional officers and clinicians may observe slightly different warning signs, simply because these two groups deal with the inmate in different situations. With regard to clinicians, the training must also include steps to complete the Multidimensional Risk Assessment Form, modalities of intervention, and referral to appropriate professionals including the psychiatrist. It is helpful for correctional officers and mental health professionals to be familiar with the general profile of a suicidal inmate, although there are exceptions to every situation and this "profile" should be used with discretion."

Typically, the training consists of a didactic course lasting 8 hours annually and a refresher course at least two hours annually thereafter for every employee.

7.      San Diego County Jail does not have a mechanism to handle and let other staff know the inmate's communication of intent.

Approximately 60 percent of inmates may communicate their intent to kill themselves either verbally or nonverbally. Verbal communication is either spoken or written but nonverbal communication can be much more ambiguous, such as giving away important possessions, refusing medication or asking for more medication and cutting off contact with family members.

8.      The jail policy does not have some key components to identify suicidal inmates and to institute preventive steps. They include: 1) lack of provision for obtaining and consulting prior mental health records and properly documenting and communicating to the mental health

Professional Opinions and Conclusions
Page Eleven

providers; 2) lack of guidance on intervention in potentially a suicidal inmate; 3) lack of risk management strategies; 4) documentation of all potential suicide risk factors; and 5) guidance to identify manipulative inmates/ patients.

     9.    Taking "no" as an answer to questions on suicidal ideation at face value is a significant flaw in the execution of a comprehensive suicide prevention program in a jail setting. Many seriously suicidal inmates hide their true intent to harm himself. It is the role of the custodial and mental health staff to consider all the factors in determining the risk of a given inmate.

Opinions Regarding Suicide Rate Calculation:

     It is generally accepted that the suicide rate in the general population is about 12/100,000. Suicide rate in jails and prisons are often compared to that of the general population. Studies have found that the suicide rate in jails and prisons have remained high, though the rate had come down during the last two decades with the implementation of comprehensive suicide prevention programs.

     The grand jury had found that the suicide rate in San Diego County Jail is the highest in California's large jail systems.

     The method adopted by the US Bureau of Justice Statistics (BJS) and the National Institute of Corrections calculates the rate by dividing the number of deaths in a jail system by the Average Daily Population (ADP), extrapolated to a census of 100,000. This method permits comparison between various jails and other correctional systems, allowing analysis of the effectiveness of the prevention programs.

     Without the actual number of deaths reported as suicide, and the average daily population in each year, I cannot provide an opinion regarding the actual suicide rate in San Diego County Jail. When such statistics become available, appropriate analysis will be performed.

     These opinions are based solely on the policy documentation. Once Rule 30 witnesses explain: 1) how to interpret the suicide policies and the intent behind each nuance of the polices; 2) any changes and amendments made to the policies over time; and 3) whether certain suicides caused the county to revisit its policies, I will be in a better position to critique each suicide-related policy and its shortcomings. When those material become available, I will supplement my report.

A. E. Daniel, M.D.

Report Date: January 18, 2018

EXHIBIT B