UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CHASSIDY NESMITH, et al.,

Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al.,

Defendants.

Case No.:  15-CV-629 JLS (AGS)

**ORDER ON MOTIONS *IN LIMINE* AND MOTION TO AMEND PRETRIAL ORDER**

(ECF Nos. 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193)

Presently before the Court are Plaintiffs' and Defendants' Motions *in Limine* (ECF Nos. 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192).  Also before the Court is Defendants' Motion to Amend Pretrial Order (ECF No. 193).   On December 16, 2021, the Court held a hearing on these motions and issued a tentative ruling. (ECF No. 216.)  Having considered the Parties' arguments in their moving papers, those made at the hearing, and the applicable law, the Court **GRANTS IN PART and DENIES IN PART** the Parties' motions as discussed below.  However, the Court emphasizes that, given the nature of motions *in limine*, the Court's rulings are necessarily tentative and may be revisited during trial.  *See United States v. Bensimon*, 172 F.3d 1121, 1127 (9th Cir. 1999) ("The district court may change its ruling at trial because testimony may bring facts to the district court's attention that it did not anticipate at the time of its initial ruling.").

## PLAINTIFFS' MOTIONS *IN LIMINE*

### 1.    Motion *in Limine* No. 1 to Exclude Statements Regarding Chassidy NeSmith's Relationship Status and Newborn Baby

Plaintiffs' first motion *in limine* seeks to exclude evidence of Ms. NeSmith's post-incident relationship status and newborn baby and questions that would open the door to these topics, such as:

> 1.    Have you been able to move on since [Decedent]'s suicide?
> 2.    Have you been able to recover since [Decedent]'s suicide?
> 3.    Have you been able to find happiness since [Decedent]'s suicide?
> 4.    Are you currently involved in a romantic/fulfilling relationship?
> 5.    Have you dated since [Decedent]'s suicide?
> 6.    How long after [Decedent]'s death did you wait to date?
> 7.    Does [S.K.S.N.] have any siblings?
> 8.    How many children do you have?

(ECF No. 177 at 3–5.) Plaintiffs argue that in California, "evidence of a surviving spouse's remarriage or dating life is inadmissible" for mitigation of damages in wrongful death cases. (*Id.* at 3 (first citing *Cherrigan v. City & County of San Francisco*, 262 Cal. App. 2d 646, 650 (1968); then citing *Benwell v. Dean*, 249 Cal. App. 2d 345 (1967); then citing *Wood v. Alves Serv. Trans., Inc.*, 191 Cal. App. 2d 723, 727–29 (1961); and then citing *Gallo v. S. Pac. Co.*, 43 Cal. App. 2d 339, 346–47 (1941)).  Plaintiffs further argue that even if this evidence is relevant in other respects, the probative value is substantially outweighed by a danger of unfair prejudice pursuant to Federal Rule of Evidence ("FRE") 403. (*Id.*)

Defendants oppose Plaintiffs' motion and argue that because Ms. NeSmith is seeking "extraordinary emotional distress damages," evidence of her current mental state is relevant to impeach her claims that she suffered from severe depressive disorder, PTSD,

///

and anxiety after Decedent's suicide and was "mistrustful of others," "isolating herself," and experiencing "severe difficulty coping with everyday life."  (ECF No. 200 at 3.)

Although not addressed by either party, district courts in the Ninth Circuit—including this Court—have held that emotional distress damages are not recoverable from wrongful death claims under California law and claims under § 1983.  *Chaudhry v. City of Los Angeles*, Case No. CV 09-01592-RGK (RZx), 2014 WL 12558777, at *3 (Dec. 18, 2014) ("California law does not allow a plaintiff bringing a claim for wrongful death to recover damages for 'mental and emotional distress, including grief and sorrow.' Therefore, unless California law is somehow inconsistent with [§] 1983, Plaintiffs may not recover such damages under their Fourteenth Amendment claim." (citation omitted) (quoting *Krouse v. Graham*, 19 Cal. 3d 59, 72 (1977))); *Lopez v. Aitken*, No. 07–CV–2028 JLS (WMC), 2011 WL 672798, *7 (Feb. 18, 2011) ("[D]amages for Plaintiff's and Cross-claimant's emotional distress are not recoverable under § 1983." (citing *T.D.W. v. Riverside County*, No. EDCV 08-232 CAS (JWJx), 2009 WL 2252072, at *7 (C.D. Cal. July 27, 2009))).  At the Hearing, the Court provided Plaintiffs with an opportunity to explain what claim or claims in the operative Complaint (ECF No. 111) entitled Ms. NeSmith to seek emotional distress damages, and Plaintiffs responded only that Ms. NeSmith's wrongful death and § 1983 claims of cruel and unusual punishment under the Fourteenth Amendment permit recovery for emotional distress damages without further explanation or argument. Because Plaintiffs have presented no authority or argument that emotional distress claims are available in this action and that precluding such damages would be inconsistent with their § 1983 claims, the Court finds that Plaintiffs are not permitted to seek damages for emotional distress.  *Cf. Cotton v. City of Eureka*, No. C 08–04386 SBA, 2010 WL 5154945, at *15 (N.D. Cal. 2010) (allowing the plaintiffs to seek emotional distress damages under § 1983 pursuant to a Fourteenth Amendment due process claim for state interference of familial relationship).

Accordingly, Plaintiffs' first motion *in limine* is **GRANTED**.  Because Plaintiffs will not be permitted to put on evidence of Ms. NeSmith's pain, suffering, or emotional

distress after Decedent's suicide for purposes of establishing emotional distress damages, evidence of Ms. NeSmith's current mental state is not needed for impeachment purposes. Additionally, the Court finds that evidence of Ms. NeSmith's current mental state is not relevant to any other aspect of the case, including the determination of noneconomic damages. *See Lopez*, 2011 WL 672798, *7 ("Plaintiff's and Cross-claimant's . . . emotional distress has no bearing on their claims for loss of society and companionship and loss of consortium; these are separate and distinct categories of damages." (citing Cal. Civ. Code § 1431.2(b)(2))); *see also Woods v. August*, Case No. 3:15-cv-05666-WHO, 2019 WL 8105898, at *9 (N.D. Cal. Mar. 14, 2019) ("Neither plaintiff nor her witnesses may testify about grief, sorrow, or emotional distress.  Instead, their testimony should be directed at loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.").

**2.     Motion *in Limine* No. 2 to Exclude Evidence of Chassidy NeSmith's Drug Use and Post-Incident Arrest**

Plaintiffs' second motion *in limine* seeks to exclude evidence of Ms. NeSmith's medicinal marijuana use and post-incident arrest.  (ECF No. 178.)  Plaintiffs argue that these topics are inadmissible because they are irrelevant, inflammatory, and highly prejudicial.  (*Id.* at 2.)  Defendants oppose Plaintiffs' motion only as to the request to exclude evidence of Ms. NeSmith's drug use, arguing that evidence of her medicinal marijuana consumption before and after Decedent's death is relevant to impeach her emotional distress claims and to the determination of noneconomic damages, as it is probative of her and Decedent's relationship.  (ECF No. 201 at 3.)

As stated above, Plaintiffs have not established that they are permitted to seek emotional distress damages, and therefore, Ms. NeSmith's use of medicinal marijuana has no impeachment value with respect to her claims of emotional distress.  Plaintiffs' motion is therefore **GRANTED** in this respect.  Additionally, because Defendants do not oppose Plaintiffs' request to exclude evidence of Ms. NeSmith's post-incident arrest, Plaintiffs' motion is **GRANTED** in this respect.

However, evidence concerning Ms. NeSmith's use of medicinal marijuana with Decedent that is probative of their relationship and the time they spent together is admissible for purposes of determining noneconomic damages.[1]   Recoverable damages under a wrongful death claim consist of both economic and noneconomic damages. *Mendoza v. City of West Covina*, 206 Cal. App. 4th 702, 720 (2012) ("Damages for wrongful death are measured by the financial benefits the heirs were receiving at the time of death, those reasonably to be expected in the future, and the monetary equivalent of loss of comfort, society, and protection." (citing *Corder v. Corder*, 41 Cal. 4th 644, 661 (2007))).   As described in Model Jury Instruction 3921 by the Judicial Counsel of California Advisory Committee on Civil Jury Instructions ("CACI 3921"), Plaintiffs may recover noneconomic damages for the loss of Decedent's "love companionship, comfort, care, assistance, protection, affection, society, [and] moral support."   Therefore, to the extent evidence of Ms. NeSmith's medicinal marijuana use with Decedent is probative of their relationship and Ms. NeSmith's loss of Decedent's companionship, the evidence is admissible.   Accordingly, Plaintiffs' motion is **DENIED** in this respect, and Plaintiffs' concerns of potential prejudice can be addressed by a limiting jury instruction.

**3.     Motion *in Limine* No. 3 to Exclude Evidence of Collateral Source Payments**

Plaintiffs' third motion *in limine* seeks to exclude evidence of the $250,000 military "death benefit pension" ("military death benefit"), "VA pension," and social security benefits that Ms. NeSmith received or continues to receive as a result of Decedent's death. (ECF No. 179 at 2.)   Plaintiffs argue that evidence of all three benefits is inadmissible under the collateral source rule.   (*Id.* at 3.)

In their opposition, Defendants acknowledge that the social security benefits are a collateral source, reasoning that Decedent actively contributed to social security while he

---

[1]     At her deposition, Ms. NeSmith testified that her and Decedent smoked "a blunt" "before [they] went anywhere" and that smoking medicinal marijuana was "kind of a hobby" they shared together. (ECF No. 184 at 10, 21–23.)

was alive. (ECF No. 202 at 6.) Defendants, however, contest that the military death benefit and VA pension are collateral sources because Decedent "did not 'actually or constructively pay for them.'" (*Id.* (quoting *Helfend v. S. Cal. Rapid Transit Dist.*, 2 Cal. 3d 1, 13–14 (1970)). Defendants further argue that, even if the military death benefit is a collateral source, evidence of the benefit is admissible because it is relevant to their theory of the case that Decedent had financial motivation to hide his intent to commit suicide.[2] (*Id.* at 3–5.)

"Under the collateral source rule, 'benefits received by the plaintiff from a source collateral to the defendant may not be used to reduce that defendant's liability for damages.'" *McLean v. Runyon*, 222 F.3d 1150, 1155–56 (9th Cir. 2000) (quoting 1 Dan B. Dobbs, Law of Remedies § 3.8(1) at 372–73 (2d ed. 1993)). In California, "the collateral source rule operates to prevent a defendant from reducing a plaintiff's damages with evidence that the plaintiff received compensation from a source independent from the defendant." *Mize-Kurzman v. Marin Cmty. College Dist.*, 202 Cal. App. 4th 832, 872 (2012).

Defendants here, citing to *Helfend v. Southern California Rapid Transit District*, contend that the collateral source rule in California only applies when the injured party made "actual or constructive payments" the independent collateral source. (ECF No. 202 at 6.) The Court does not share Defendants' reading of *Helfend*, for in *Helfend*, the California Supreme Court simply "reaffirm[ed] its adherence to the collateral source rule in tort cases in which the plaintiff has been compensated by an independent collateral source . . . . for which he had actively or constructively . . . paid . . . ." 2 Cal. 3d 1, 13–14

---

[2]    At the time of his death, Decedent was on appellate leave from the Marines while his court-martial case was on appeal. Defendants posit that Decedent committed suicide before the completion of the appeal to ensure that Ms. NeSmith and their then unborn child would receive the $250,000 military death benefit. (ECF No. 202 at 3.) Had the appellate process resulted with Decedent being dishonorably discharged from the Marines, he would not have been entitled to these benefits. (*Id.*)

(1970).  The *Helfend* Court did not limit the collateral source rule in this respect, and Defendants cite to no authority supporting their narrow reading of *Helfend*.  Contrary to Defendants' position, subsequent decisions by California appellate courts demonstrate that "courts do not consider the collateral source rule limited to those situations expressly set forth in *Helfend*."  *San Joaquin Valley Ins. Authority v. Gallagher Benefit Servs., Inc.*, 437 F. Supp. 3d 761, 770 (E.D. Cal. 2020).  For example, the appellate court in *Arambula v. Wells* disagreed that "*Helfend* limited the collateral source rule to instances where 'plaintiff incurred an expense, obligation, or liability in obtaining the services for which they seek compensation" and found that gratuitous payments could come within the scope of the collateral source rule.  72 Cal. App. 4th 1006, 1009–14 (1999) ("*Helfend* on its face says nothing about gratuitous . . . payments."); *see also Smock v. California*, 138 Cal. App. 4th 883, 887 (2006) ("The cases that discuss application the collateral source rule do not find critical distinction between situations where the victim receives a gratuitous payment or benefit and those where the benefit or payment arises from some obligation.  Under California law, it makes no difference."); 6 Witkin Summary of California Law, § 1808 (11th ed. 2021) ("There are numerous . . .  reasons for holding that *Helfend* is not authority for the position that the collateral source rule does not apply to gratuitous payments.").  Considering the line of California appellate cases interpreting *Helfend* broadly, the Court finds unpersuasive Defendants' reliance on *Helfend* for the proposition that the collateral source rule does not apply the military death benefit or VA pension.[3]

Accordingly, Plaintiffs' request to deem the military death benefit, VA pension, and social security payments as collateral sources and inadmissible for mitigation of damages is **GRANTED**.  However, Plaintiffs' request to exclude any "reference, evidence, or

---

[3]      Moreover, even if the Court found Defendants' interpretation of *Helfend* persuasive, Defendants have provided no support for their contention that Decedent did not "actively or constructively" pay for the military death benefit or VA pension, even when provided an opportunity to do so at the hearing.

testimony" to the military death benefit is **DENIED**, for evidence of the military death benefit is relevant to Defendants' theory of the case that Decedent had financial motivation to hide his intent to commit suicide.  Evidence of the military death benefit is therefore admissible for the limited purpose of explaining that theory and will be subject to an appropriate limiting instruction.

**4.     Motion *in Limine* No. 4 to Exclude Various Topics of Improper Questions**

Plaintiffs' fourth motion *in limine* seeks to exclude evidence of a variety of topics that Plaintiffs contend are irrelevant and "only being pursued to 'dirty up' Plaintiffs." (ECF No. 180 at 3.)  The Court **GRANTS in part and DENIES in part** Plaintiffs' motion as follows:

**Topic 1**: *Ms. NeSmith's comments or jokes about political posts, such as children being deported after Trump was elected.*  Because Defendants do not intend to raise evidence pertaining to this topic (ECF No. 203 at 2), the Court **GRANTS** Plaintiffs' request to exclude evidence of Topic 1.

**Topic 2**: *Ms. NeSmith's life as an army brat and her need to live in various places with various people.*  Because Defendants do not intend to raise evidence pertaining to this topic (*id.*), the Court **GRANTS** Plaintiffs' request to exclude evidence of this Topic 2.

**Topic 3**: *Ms. NeSmith's "hanging out" with Decedent at a bar while he was underage.*  The Court **GRANTS in part and DENIES in part** Plaintiffs' request to exclude evidence of Topic 3.  The Court finds that evidence of this topic is probative of Ms. NeSmith and Decedent's relationship and therefore relevant to the determination of noneconomic damages.  Additionally, evidence of Decedent's alcohol consumption and drinking habits, if not too remote in time, is likewise relevant to the determination of noneconomic damages, as well as economic damages.  Economic damages in this wrongful death action are based on "the financial support, if any, [Decedent] would have contributed to the family" during his life."  CACI 3921; *see also Allen v. Toledo*, 109 Cal. App. 3d 415, 424 (1980) ("The life expectancy of the deceased is a question of fact for the jury to decide . . . considering all the relevant factors including the deceased's health, lifestyle and

occupation.").  Accordingly, evidence of Topic 3 is admissible for the limited purpose of assessing damages and will be subject to an appropriate limiting instruction.  However, the Court finds that evidence of Decedent's *underage* alcohol consumption is inadmissible, for the probative value is substantially outweighed by a danger of unfair prejudice.  Fed. R. Evid. 403.

**Topic 4**:  *Ms. NeSmith's unauthorized overnight stays with Decedent on base*.  The Court **GRANTS in part and DENIES in part** Plaintiffs' request to exclude evidence of Topic 4.  The Court agrees with Defendants that the amount of time that Decedent and Ms. NeSmith spent together is admissible for the limited purpose of determining noneconomic damages.  *Mendoza*, 206 Cal. App. 4th at 721 ("Factors relevant when assessing a claimed loss of society, comfort, and affection may include the closeness of the family unit, the depth of their love and affection, and the character of the deceased as kind, attentive, and loving.").  However, reference to Ms. NeSmith's stays on base as "unauthorized" is of little probative value to this determination, and any probative value is substantially outweighed by a danger of unfair prejudice.  Fed. R. Evid. 403.  Therefore, when presenting evidence of Ms. NeSmith's stays on base with Decedent, Defendants shall not characterize her stays as either authorized or unauthorized.

**Topic 5**: *The $20,000 loan Decedent took out before marrying Ms. NeSmith*.  The Court **DENIES** Plaintiffs' request to exclude evidence of Topic 5, as it is relevant to Defendants' theory that Decedent was financially motivated to hide his intent to commit suicide.

**Topic 6**: *Decedent's loss of $3,000 while gambling in Las Vegas*.  The Court **GRANTS** Plaintiffs' request to exclude evidence of Topic 6.  Although it may be relevant to Defendants' theory of the case, the little probative value it has is substantially outweighed by a danger of unfair prejudice.  Fed. R. Evid. 403.

**Topic 7**: *Decedent's excessive drinking after being released from the military custody*.  The Court **DENIES** Plaintiffs' request to exclude evidence of Topic 7.  As with Topic 3, evidence of Decedent's alcohol consumption and drinking habits is admissible for

the limited purpose of determining economic and noneconomic damages and will be subject to an appropriate limiting instruction.

**Topic 8**: *Decedent's jealousy or concerns of infidelity.*   The Court **DENIES** Plaintiffs' request to exclude evidence of Topic 8.  To the extent evidence of Decedent's jealousy or concerns of infidelity relate to the determination of noneconomic damages, the evidence is admissible but will be subject to an appropriate limiting instruction.  *See Mendoza*, 206 Cal. App. 4th at 721 ("Factors relevant when assessing a claimed loss of society, comfort, and affection may include the closeness of the family unit, the depth of their love and affection, and the character of the deceased as kind, attentive, and loving."); *see also Nehad v. Browder*, Case No.: 15-CV-1386 WQH NLS, 2016 WL 1428069, at *4 (S.D. Cal. Apr. 11, 2016) ("[V]aluation [of the martial relationship] is not a one-way street. Defendants are entitled to test the validity of the value of that marriage . . . .").

**5.   Motion *in Limine* No. 5 to Exclude Evidence of Decedent's Previous Suicide Attempts**

Plaintiffs' fifth motion *in limine* seeks to exclude evidence of Decedent's prior suicide attempts.  (ECF No. 181.)  Because it is undisputed that Decedent's prior suicide attempts were not known to any Defendant or County personnel prior to Decedent's suicide, Plaintiffs argue that this evidence is irrelevant and would only serve to "dehumanize" Decedent to the jury.  (*Id.* at 2.)  Plaintiffs, however, acknowledge that evidence of Decedent's prior suicide attempts may be relevant to the determination of economic damages but argue that the "feeble" nature of the prior attempts render them of little probative value to Decedent's life expectancy.  (*Id.* at 3–4.)  In contrast, Plaintiffs maintain that the danger of unfair prejudice should this evidence be admitted high.  (*See id.* at 3.)

Defendants oppose Plaintiffs' motion and argue that Decedent used his prior suicide attempts as a form of manipulation against Ms. NeSmith and that evidence of them "provides context for the[ir] brief and volatile relationship."  (ECF No. 204 at 3–4.) ///

Defendants also contend that Decedent's prior suicide attempts are relevant to and directly impact the determination of economic damages and Decedent's life expectancy. (*Id.* at 4.)

The Court **DENIES** Plaintiffs' motion to exclude evidence of Decedent's prior suicide attempts and agrees with Defendants that this evidence is relevant to the determination of economic damages. Although the nature of Decedent's prior suicide attempts[4] may appropriately be characterized as feeble, Decedent's life expectancy "is a question of fact for the jury to decide." *Allen*, 109 Cal. App. 3d at 424. The jury may determine how much weight to give the prior attempts when determining Decedent's life expectancy. Additionally, to the extent evidence of Decedent's prior suicide attempts are probative of Decedent and Ms. NeSmith's relationship, it is relevant to the determination of noneconomic damages. The Court does not find that FRE 403 bars this evidence, and Plaintiffs concerns of prejudice can be appropriately addressed by a limiting jury instruction.

**6.    Motion *in Limine* No. 6 to Exclude Decedent's "Going AWOL" and Dishonorable Discharge**

Plaintiffs' sixth motion *in limine* seeks to exclude evidence of Decedent's "going AWOL" and his "dishonorable"[5] discharge from the Marines. (ECF No. 182.) Plaintiffs argue that the facts surrounding Decedent's discharge are irrelevant and any reference to

---

[4]    Per Ms. NeSmith's testimony at her deposition, one prior attempt occurred following a disagreement with Ms. NeSmith where Decedent tied a dog leash around his neck and attempted to hang himself from a coat hanger on the back of a door. (ECF No. 181 at 8–9.) Another incident occurred after Decedent learned he was going into military custody where he threatened to hang himself with a phone charging cable fastened to a ceiling tile. (*Id.* at 10–11.) It is also speculated that Decedent attempted to use his shoelaces to commit suicide while in military custody. (*Id.* at 12–13.) The Court notes, however, that this evidence is only admissible to the extent it is not inadmissible hearsay.

[5]    Per the expert report of Bethany Payton-O'Brien, at the time of Decedent's death, he was on appellate leave and facing a possible "bad conduct" discharge from the Marines. (ECF No. 202 at 18; 23.)

Decedent's military discharge as dishonorable is "inflammatory and highly prejudicial." (*Id.* at 2.)  Plaintiffs posit that stipulating that Decedent was merely "discharged" from the Marines, without any further information, is sufficient to address Defendants' position that evidence of Decedent's discharge from the military is relevant to economic damages.  (*Id.* at 2.)

In their opposition, Defendants "agree to not discuss the facts surrounding Decedent's discharge for going AWOL" but generally oppose Plaintiffs' motion and argue that Decedent's discharge status and inability to obtain future compensation and benefits from the military is highly relevant to damages.  (ECF No. 205 at 2.)  Specifically, Defendants "believe that . . . the limited fact that Decedent was set to be dishonorably discharged . . . and the fact that he attacked another person (who happened to be a Marine) because of uncontrollable jealousy of M[s]. NeSmith . . . goes directly to the couple's relationship and potential damages."  (*Id.* at 1–2.)

The Court agrees with Plaintiffs that evidence of Decedent's going AWOL is irrelevant; however, the time that Decedent spent with Ms. NeSmith while he was AWOL is relevant to the determination of noneconomic damages.  Defendants are therefore permitted to produce evidence of Decedent and Ms. NeSmith's relationship while Decedent was AWOL and may do so without addressing the fact that Decedent had left the Marines without official leave.  Additionally, the Court agrees with Defendants and finds that some of the charges Decedent pleaded guilty to in his court-martial case—specifically, the charges that relate to Decedent's drinking habits, drug use, and the assault and battery of another marine—are relevant to the determination of noneconomic damages.  Accordingly, Plaintiffs' request to exclude *any* evidence relating to the reasons why Decedent was discharged from the military is **DENIED**.

Further, the Court agrees with Defendants that a stipulation that Decedent was merely "discharged" from the Marines would be misleading to the jury.  Decedent's possible dishonorable discharge is relevant to Defendants' theory of the case that the pending appeal of Decedent's court-martial case, and opportunity to still receive military

benefits before possibly being dishonorably discharged, provided Decedent with financial motivation to hide his intent to commit suicide.  Additionally, the Court finds that the probative value it has to Defendants' theory is not substantially outweighed by a danger of unfair prejudice.  Accordingly, Plaintiffs' request to exclude reference to Decedent's discharge as potentially dishonorable **DENIED**.

**7.     Motion *in Limine* No. 7 to Exclude Evidence of Decedent's Pending Criminal Charges and Expert Opinion Regarding Decedent's Potential Conviction and Sentence**

Plaintiffs' seventh motion *in limine* seeks to exclude evidence of: (1) Decedent's pending criminal charges at the time of his death; (2) the facts underlying Decedent's pending criminal charges; and (3) Decedent's potential criminal sentence and likelihood of conviction.  (ECF No. 183.)  Plaintiffs argue that the probative value of this information to the determination of damages is substantially outweighed by the danger of unfair prejudice, for the jury may "render a defense verdict based on an improper belief that a 'bad person' should not be permitted to recover against a law enforcement officer." (*Id.* at 3.)  Plaintiffs also request that the Court find inadmissible the expert testimony of the Honorable Samantha Begovich,[6] whose expert report (the "Begovich Report") opines that Decedent would have been convicted of all charges against him and would have served two consecutive life terms in prison.  (*Id.* at 3.)  Plaintiffs argue that this information not only speculative, but highly prejudicial, and Defendants concerns regarding the determination of damages can be addressed "by instructing the jury that [Decedent] was in jail at the time of his death and was facing charges of assault." (*Id.* at 5–6.)

---

[6]     Defendants originally retained the Hon. Begovich, who at that time was a Deputy District Attorney, to opine on the Decedents' pending charges and potential conviction. However, the Hon. Begovich was appointed as an immigration judge after Defendants designated her as an expert and is no longer able to serve as an expert in light of her new role.  As addressed subsequently, Defendants propose substituting Deputy District Attorney Wendy Patrick for the Hon. Begovich. *See infra* p. 36.

13

Defendants oppose Plaintiffs' motion and argue that "[e]vidence regarding the likelihood that [Decedent] would never be released from prison . . . and provide financial support for Plaintiffs[] [and] the quality of emotional support and comfort Decedent would have provided Ms. NeSmith" if he were incarcerated, is relevant to the determination of damages. (ECF No. 206 at 2.)

Plaintiffs' request to limit the jury's knowledge of the criminal charges pending against Decedent at the time of his death and to instruct the jury that Decedent was facing "charges of assault" is **DENIED**. The Court will permit Defendants to inform the jury of the specific charges Decedent was facing at the time of his death and the possible sentence for each charge. The Court will also permit Defendants to introduce factual details of the incident underlying Decedent's domestic violence charges, for "prior instances of domestic violence [are] pertinent to the amount of pecuniary support, comfort, and society [Decedent] would have otherwise provided" Ms. NeSmith. *Lopez*, 2011 WL 672798, at *3. The Court, however, finds inadmissible the factual details[7] surrounding Decedent's

---

[7] Per the Begovich report, Decedent was facing charges for the following three incidents:

(1) Decedent allegedly "'coldcocked' the [51-year-old] victim[,] punching his face, got [the] victim on ground, and . . . held [the] victim's throat with one hand and punched him with his other hand." (ECF No. 183 at 10.)

(2) Decedent allegedly asked the 67-year-old victim for directions, so the victim "walked to the street to point out [a] route." (*Id.*) After the victim turned away from Decedent, he "felt [three] stab wounds to his back, side and head." (*Id.*) Decedent allegedly "went on to further stab/cut [the] victim in his nose by his right eye[ and] sliced two of his fingers off or to bone." (*Id.*) Decedent allegedly then "pushed [the] victim down to the ground and stabbed him [six] more times," in the left side of his head, right side of his neck, elbow, right rib, and right hand between finger and thumb. (*Id.*) The victim's small intestines and diaphragm were also cut. (*Id.*)

(3) At her deposition, Ms. NeSmith testified that Decedent "assaulted her" after she received a call from a male friend, "leaving marks on her neck and arms and smashing her cell phone." (*Id.* at 13.) When asked during her deposition, "So he was choking you and holding you down and punching you?" Ms. NeSmith answered, "Yes. . . . He almost killed me." (*id.*; see also ECF No. 206 at 21–25).

other charges, and Plaintiffs' motion is **GRANTED** in this respect.  Any probative value these charges have to the determination of either economic or noneconomic damages is substantially outweighed by a danger of unfair prejudice and confusion of the issues.  Fed. R. Evid. 403.

Plaintiffs' request to exclude the Begovich Report and related expert testimony is likewise **GRANTED**.   The Court agrees with Plaintiffs that the report, which opines that Decedent would have been convicted of all charges against him and sentenced to two consecutive life sentences,[8] is highly speculative.  As highlighted by Plaintiffs, regardless

---

[8]    Specifically, the Begovich Report opines that:

> [w]ithin a reasonable degree of certainty, [Decedent] would have been convicted of all the charges against him and enhancement would have been found true after a jury trial due to the overwhelming and uncontroverted evidence of identity, guilt, lack of provocation by victims and documented injuries.

(ECF No. 183 at 10.)  The report further opines that:

> [Decedent] upon conviction at trial would have been sentenced to [2] consecutive life terms in prison (for the attempted, premeditated murder plus aggravated mayhem or torture) plus 5 years (3 years on the corporal injury to spouse, plus 3 additional [8]-month prison terms on the false imprisonment of [one of the victims] and Ms. NeSmith and the dissuasion of Ms. NeSmith from reporting her victimization.)  Consecutive life terms were concluded to be almost certain for the following reasons: victim's two separate positions (standing and then prone), 20 approximate blows, three fatal versus several maiming injuries, length of attack, lack of self-defense or contributory criminal behavior by victim, use of a ruse and knife and relative vulnerability (victim turning away when first stabbed) and age of victim (67) versus [Decedent].

(*Id.* at 14.)

1   of the strength of the evidence against Decedent, "a plea deal or a cooperation agreement
2   could have affected the length of a sentence of whether [Decedent] would [have been]
3   convicted of all charged offenses." (ECF No. 183 at 4.) Given the highly speculative
4   nature of the report, it has marginal probative value to the determination of economic and
5   noneconomic damages, and any probative value the report does have is substantially
6   outweighed by a danger of unfair prejudice, as well as confusion of the issues. Fed. R.
7   Evid. 403.

8   **8.     Motion *in Limine* No. 8 to Exclude Evidence of Decedent's Prior Bad Acts**

9         Plaintiffs' eighth motion *in limine* seeks to exclude evidence of Decedent's use of
10   recreational, medicinal, or illicit drugs and prior acts of violence and aggression. (ECF No.
11   184.) Plaintiffs argue that Decedent "tested positive for methamphetamines on [only] three
12   occasions before and after going AWOL" and therefore, his methamphetamine use has
13   minimal probative value to the determination of damages. (*Id.* at 4.) Plaintiffs further
14   argue that the minimal probative value Decedent's medicinal marijuana and
15   methamphetamine use have to the determination of damages "does not outweigh the
16   prejudicial impact that a jury may conclude that [Decedent] is a no-good drug addict." (*Id.*
17   at 4.) Plaintiffs additionally argue that evidence of Decedent's prior acts of violence and
18   aggression offer little to no probative value to the determination of damages, and if
19   Decedent "is presented as a deranged and violent lunatic[,] there will be a substantial risk
20   that the jury will render a defense verdict based not on the evidence but on emotions or
21   other improper motives . . . ." (*Id.* at 5.)

22         Defendants oppose Plaintiffs' motion and argue that evidence of Decedent's "drug
23   use and violent behavior towards M[s]. NeSmith and those around her [is] relevant and
24   admissible," as it "goes directly to the issue of potential damages and the nature of the
25   couple's relationship." (ECF No. 207 at 1.) As to Decedent's drug use, Defendants
26   underscore that his methamphetamine use was a factor that led to his court-martial case
27   and "would undoubtedly [have] affect[ed] his ability to provide financial and emotional
28   support" for Plaintiffs. (*Id.* at 3.) Defendants further maintain that Decedent's "aggressive

and criminal conduct towards M[s]. NeSmith is critical to understanding the volatile nature of their relationship." (*Id.*)

Plaintiffs' request to exclude evidence of Decedent's drug use is **DENIED**.  As previously discussed, Decedent's use of medicinal marijuana, to the extent he did so with Ms. NeSmith, is relevant to their relationship and the determination of noneconomic damages. *See supra* p. 5.  Additionally, Decedent's use of methamphetamine is relevant, at minimum, to a determination of economic damages, as the jury will look to Decedent's "health, habits, occupation and activities" when determining his life expectancy.  *Allen*, 109 Cal. App. 3d 424.  Further, the Court disagrees with Plaintiffs that Decedent's use of "methamphetamine on three occasions cannot possibly impact" damages; although the frequency of Decedent's methamphetamine use impacts the probative value it has to damages, that does not render the evidence irrelevant, and the jury may appropriately decide what weight to give it when calculating damages.

Plaintiffs' request to exclude evidence of Decedent's prior acts of violence and aggression is **GRANTED** as to those prior bad acts that are not instances of domestic violence towards Ms. NeSmith or are not probative of Decedent and Ms. NeSmith's relationship.  However, Plaintiffs' request is **DENIED** as to Decedent's prior bad acts of domestic violence towards Ms. NeSmith or prior bad acts that are probative of Decedent and Ms. NeSmith's relationship.[9]

---

[9]     In their motion, Plaintiffs identify five incidents that Ms. NeSmith testified to during her deposition that Plaintiffs believe Defendants may introduce evidence of at trial: (1) a 2012 charge for vandalism at San Diego State University; (2) an incident involving Decedent "busting out" the couples' car windows; (3) an incident where Decedent pushed Ms. NeSmith during a disagreement; (4) an incident in Sacramento where a shotgun "was pulled" on Kris; and (5) Decedent's assault of another marine.  (ECF No. 184 at 5.) Incident three, as it is an act of domestic violence, is admissible.  Additionally, the Court has already ruled that incident five is admissible to the extent it is probative of Decedent and Ms. NeSmith's relationship.  The Court, however, finds that it does not have sufficient context to rule on the admissibility of the other three instances specifically.

**9.     Motion *in Limine* No. 9 to Exclude Opinions and Testimony by Defense Experts**

Plaintiffs' ninth motion *in limine* seeks to exclude opinions and testimony of various defense experts.  (ECF No. 185.)  As a preliminary matter, the Court finds that Plaintiffs' motion generally seeks to exclude expert testimony without meeting the requirements under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and Plaintiffs' concerns regarding the reliability of these expert opinions can be appropriately explored at trial on cross-examination.

**A.     *Bethany Payton-O'Brien: Military Litigation Expert***

Plaintiffs seek to exclude all the conclusions of Defendants' military litigation expert, Bethany Payton-O'Brien, on the basis that they are "inflammatory, prejudicial, and unnecessary to introduce" if it is stipulated that Decedent was "discharged" from the military.  (ECF No. 185 at 3.)  Ms. Payton-O'Brien provided the following conclusions in her expert report:

> Conclusion 1: It is highly unlikely that NeSmith would have prevailed on appeal of his military court-martial.  Thus, but for his death, NeSmith would have been discharged from the Marine Corps with a bad conduct discharge.
>
> . . .
>
> Conclusion 2: Based upon the processing times in this case and the normal times for processing appeals at the NMCCA, but for his death, NeSmith's 2013 USMC court-martial would have been finalized and he would have been discharged with a bad conduct discharged in the summer 2014.
>
> . . .
>
> Conclusion 3: During the pendency of NeSmith's court-martial appeal, at the time of his death and after his discharge, he would not be entitled to military pay or allowances.

(*Id.* at 25–26; 29.)

Plaintiffs' request to exclude Ms. Payton-O'Brien's conclusions and testimony is **DENIED**.  Ms. Payton-O'Brien's conclusions are relevant to Defendants' theory of the case that Decedent had financial motivation to hide his intent to commit suicide.  However, to the extent Ms. Payton-O'Brien will testify as to the charges which led to Decedent's court-martial case, she many only testify as to those charges related to Decedent's drinking habits, drug use, and assault of another marine.  *See supra* p. 12.

## B.   *Dr. Dominick Addario: Psychiatric Expert*

Plaintiffs seek to exclude several opinions of Defendants' psychiatric expert, Dr. Dominick Addario, on the grounds that Dr. Addario never evaluated or spoke to Decedent and that his opinions "ignore" other evidence.  (*Id.* at 3.)  Those opinions Plaintiffs seek to exclude include the following:

- "The cause and extent of [D]ecedent's alleged mental injuries and/or conditions and issues of causation . . . ."

- "[Decedent] and [Ms.] NeSmith had a most turbulent, difficult, and destructive relationship as a result of his drug abuse and violent behavior."

- "There were no warning signs to prevent [Decedent]'s suicide other than he had emotional problems and had a psychiatric history."

- "[Decedent]'s death during incarceration was without warning."

- "If imprisoned for many years, it would be highly unlikely that [Decedent and Ms. NeSmith] would have reinitiated their relationship.  Based on the absence of any signification employment before military service, [Decedent], facing dishonorable discharge, serious legal criminal problems, and the likelihood of continued drug use, his life expectancy would most likely have been five to ten years."

(*Id.* at 10.)

Plaintiffs' request to exclude these opinions is **DENIED**, except for Dr. Addario's opinion that predicts Decedent's life expectancy to "most likely have been five to ten

///

19

years." This specific opinion is highly speculative and therefore has little probative value, which is substantially outweighed by a danger of unfair prejudice. Fed. R. Evid. 403. However, Plaintiffs' concerns that Dr. Addario is not qualified to opine on Decedent's "mental injuries and/or medical conditions and issues of causation" and that Dr. Addario's opinions ignore other testimony can be addressed at trial on cross-examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### C.   *Dr. Hsien Chiang: Suicide Policies and Procedures Expert*

Plaintiffs seek to exclude two opinions from Defendants' suicide policies and procedures expert, Dr. Hsein Chiang, on the grounds that Dr. Chiang "has no experience as a deputy or training deputies" and his opinions "ignore[] the evidentiary record," including the testimony of Richard Beruman. (*Id.* at 4–5.) The two opinions of Dr. Chiang that Plaintiffs seek to exclude are as follows:

> [(1)] Based on my review of the documents provided, my education and training in primary care medicine, 18 years of clinical experience, of which over 11 years were spent in the correctional healthcare setting, it is my opinion that policies and procedures in place at SDSO addressing suicide prevention met the prevailing state and national standards for adult detention facilities and were not the cause of Mr. NeSmith's unfortunate suicide. [(2)] Furthermore, it is my opinion that SDSO's staff were not deliberately indifferent to Mr. NeSmith's medical or mental health needs. The SDSO staff acted appropriately base[d] upon the information they were provided.

(*Id.* at 129.)

Plaintiffs' request to exclude Opinion 1 is **DENIED**. The Court agrees with Defendants that the reliability of this opinion and Dr. Chiang's qualifications can be

///

addressed at trial on cross-examination.[10]   Plaintiffs' request to exclude Opinion 2, however, is **GRANTED**.  Although Plaintiffs make no such argument in their motion, the Court finds that Dr. Chiang's opinion that "SDSO's staff were not deliberately indifferent to [Decedent]'s medical or mental health needs" is an inadmissible legal conclusion.  *See Wiles v. Dep't of Educ.*, Civ. Nos. 04–00442 ACK–BMK, 05–00247 ACK–BMK, 2008 WL 4225846, at *1 (D. Haw. Sept. 11, 2008) ("The Ninth Circuit has held that 'an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.' . . .  In this case the Court finds that the term 'deliberate indifference' is such a judicially defined and/or legally specialized term.  Therefore, Plaintiffs' experts may not couch their opinions in terms of whether or not Defendant engaged in 'deliberate indifference' specifically." (quoting *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002), overruled on other grounds by *United States v. Bacon*, 979 F.3d 766 (2020))); *see also M.H. v. County of Alameda*, Case No. 11–cv–02868–JST, 2015 WL 54400, at *2 (N.D. Cal. Jan. 2, 2015) ("Defendants are correct that the expert testimony using the legally significant terms 'deliberate indifference' and 'objective reasonableness' should be excluded.").

### D.   *Laura Fauchs Dolan: Economic Loss Expert*

Plaintiffs seek to exclude those opinions by Defendants' economic loss expert, Laura Fauchs Dolan, that rely on the Begovich Report.  (ECF No. 185 at 6, 11.)  In light of the Court's previous finding that the probative value of the Begovich Report is substantially outweighed by a danger of unfair prejudice, *see supra* p. 15, the Court **GRANTS** Plaintiffs'

---

[10]   Plaintiffs also argue that the Court should find Dr. Chiang's opinions inadmissible because his opinions exceed the "scope" of Defendants' expert designation.  (ECF No. 185 at 5.)  However, Federal Rule of Civil Procedure 26(a)(2)(A) provides only that expert disclosures must contain "the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705," and Plaintiffs provide no support for their proposition that expert designations must contain not only the designation of the expert, but *all* topics to which the expert will opine in his disclosure.

request.  Those portions of Ms. Dolan's report, and anticipated testimony, that rely on or incorporate the Begovich Report are inadmissible pursuant to FRE 403.

### E.     Dr. Behnush Mortimer: Vocational Rehabilitation Expert

Plaintiffs seek to exclude three hypothetical scenarios in the report of Defendants' vocational rehabilitation expert, Dr. Behnush Mortimer, and argue that the scenarios are "entirely speculative and unsupported."  (ECF No. 185 at 7.)  Plaintiffs further argue that Dr. Mortimer "offered no reasoning or literature" to support Scenario 1, that there is no evidence that Decedent suffered from "polysubstance abuse," and that Scenario 2 relies on the Begovich Report, which is inadmissible.  (*Id.* at 7–8.)  Those scenarios Plaintiffs seek to exclude are as follows:

> Scenario 1 – But for his death, based on the consideration of Mr. NeSmith's polysubstance abuse, ADHD, and borderline personality disorder, Mr. NeSmith would not have been competitively employable once separated from the military.

> Scenario 2 – But for his death, in addition to the limitations stated above, Mr. NeSmith had pending a likely criminal conviction leading to two life term sentences.  Given this scenario, Mr. NeSmith would not have been competitively employable.

> Scenario 3 – In a best[-]case scenario, in the event Mr. NeSmith was released from felony custody and at some point sought treatment for his drug use and subsequent symptomatology, starting at age 40 he would have had capacity to earn at the minimum wage earing level subject to the loss of worklife described below given the combination of impairments (felony history, polysubstance abuse, borderline personality disorder, ADHD).

(*Id.* at 171.)

Plaintiffs' request to exclude Scenarios 1, 2, and 3 in Dr. Mortimer's report is **DENIED**.  Plaintiffs' concerns regarding the reliability of Dr. Mortimer's opinion as to

15-cv-00629-JLS-AGS

Scenario 1 can be addressed at trial on cross-examination.  Additionally, although the scenarios are speculative, the Court does not find that their probative value is outweighed by a danger of unfair prejudice, as the jury will know that Decedent was facing serious criminal charges at the time of his death.  However, the Court will preclude Dr. Mortimer from describing Decedents' criminal conviction as "likely" in Scenario 2 and from characterizing Scenario 3 as "a best[-]case scenario" pursuant to FRE 403.[11]

### F.   Royanne Schissel: Correctional Healthcare Expert

Plaintiffs seek to preclude Defendants' correctional healthcare expert, Royanne Schissel, from offering "[a]ny opinions regarding the nursing staff's reasonable conduct" as irrelevant because there are no remaining "medical" defendants in this case.  (*Id.* at 8.) Plaintiffs also seek to exclude Ms. Schissel from offering (1) "[a]ny opinions regarding a deputy's reasonable conduct" because she "is not qualified" to opine on such topics and (2) from "rendering an opinion regarding Deputy Olsen and Newlander's conduct" because she failed to consider Richard Beruman's testimony.  (*Id.*)

Plaintiffs did not attach Ms. Schissel's opinion to the instant motion for the Court's consideration.  However, Defendants do not oppose Plaintiffs' request to exclude Ms. Schissel's opinions or testimony regarding the conduct of nursing staff.  (ECF No. 208 at 2.)  Accordingly, Plaintiffs' motion is **GRANTED** in this respect.  However, Plaintiffs' request to exclude Ms. Schissel's opinion regarding the conduct of Deputies Olsen and

---

[11]   Plaintiffs also argue, in passing, that the Court should exclude Dr. Mortimer's "first, second, and fourth conclusions" because they are "a complete regurgitation of Bethany Payton-O'Brien's report, and [are] therefore outside the scope of Dr. Mortimer's experience."  (ECF No. 185 at 7.)  The "conclusions" that Plaintiffs contest are not Dr. Mortimer's own conclusions and appear in Dr. Mortimer's report under a heading of "Independent Vocational Evaluation and Research Summary."  (*Id.* at 161.)  Contrary to Plaintiffs' contentions, it does not appear to the Court that Dr. Mortimer offers the opinions of Ms. Payton-O'Brien's as her own, but instead, relied on them in reaching her own evaluation of Decedent's employability.

Newlander is **DENIED**.  Plaintiffs' concerns regarding the reliability of this opinion and Ms. Schissel's qualifications can be addressed at trial on cross-examination.

**10.    Motion *in Limine* No. 10 to Exclude Evidence of the Circumstances Surrounding the Retirement of Plaintiffs' Expert Richard Lichten**

Plaintiffs' tenth motion *in limine* seeks to exclude evidence of the circumstances surrounding the retirement of their correctional procedures expert, Richard Lichten.  (ECF No. 186.)  Plaintiffs contend that Mr. Lichten "is a 30-year law enforcement veteran with extensive experience in correctional procedures and conduct" who retired from the Los Angeles County Sheriff's Department ("LASD") in 2008 under "normal" circumstances.  (*Id.* at 3.)  Plaintiffs submit, however, that at the time of Mr. Lichten's retirement, "a civilian employee of the Sheriff's Department had accused him of engaging in an improper relationship with her."  (*Id.*)  Because there was never an investigation, and Mr. Lichten was never disciplined, Plaintiffs contend this information is irrelevant, has "nothing to do with his expert testimony," and "presents a high risk of prejudice."  (*Id.* at 3–4.)

Defendants oppose Plaintiffs' motion and assert that the circumstances surrounding Mr. Lichten's retirement were "anything but normal."  (ECF No. 209 at 1.)  According to Defendants, Mr. Lichten retired from LASD because "he masturbated multiple times in a female co-worker's workspace at the jail where he was a law enforcement officer in charge" and "lied about doing so."  (*Id.* at 2.)  Defendants submit evidence of this in the form of Mr. Lichten's own testimony from a deposition taken on January 9, 2019, in *Moriarty, et al. v. County of San Diego, et al.*, Case No. 17-cv-1154-LAB-AGS (S.D. Cal.):

> Q:    And you retired when you were found masturbating in the workplace, correct?
>
> A:    That's why I retired, in lieu of an investigation.
>
> Q:    And while you were masturbating in the workplace, you were on duty?
>
> A:    Yes.

Q:    You were masturbating in the office where a female secretary worked?

A:    Yes.  She was not in the facility.  Yes.

Q:    You left your semen in the secretary's work area?

A:    That was the allegation.  The answer is yes.

Q:    And then the woman came in earlier unexpectedly and saw that you were in her work area, right?

A:    Correct.

Q:    And you lied to her and said you were in there to use a phone?

A:    Right.  I said it was a spur of the moment comment.  To save her and me embarrassment, I said I was on the phone.

(*Id.* at 24–25.)  Defendants argue that the circumstances surrounding Mr. Lichten's retirement—to which he has testified to—are relevant to show his bias against law enforcement, as well as dishonesty and poor judgment.  (*See id.* at 2–5.)

The Court agrees with Defendants and finds that evidence of Mr. Lichten's retirement is admissible to show possible bias against law enforcement, as well as to attack his qualifications and credibility as an expert on correctional procedures.  As highlighted by Defendants in their opposition, the Central District of California previously addressed this exact issue—whether the circumstances surrounding Mr. Lichten's retirement are relevant and admissible evidence to show bias and attack credibility—in *Eliot v. County of Orange*, No. SACV1400893CJCRNBX, 2018 WL 5099709 (C.D. Cal. May 4, 2018).  In *Eliot*, the district court found that the defendants should be permitted to ask Mr. Lichten questions about the circumstances of his retirement on cross-examination, for "Mr. Lichten may harbor resentment about being compelled into retirement, and may have bias against

///

25

law enforcement agencies as a result." *Id.* at *2. The district court in *Eliot* further reasoned that evidence of Mr. Lichten's sexual misconduct in the workplace was also relevant because the plaintiff intended, as Plaintiffs intend here, "[t]o bolster Mr. Lichten's credibility and the reliability of his opinions" with evidence that "Mr. Lichten has had a long and successful career in law enforcement" and "has established himself as a leader in police conduct. *Id.* The district court also dismissed the plaintiff's concerns of prejudice, finding that "evidence of Mr. Lichten's sexual misconduct and forced retirement is certainly prejudicial" but nevertheless, "highly probative of potential bias." *Id.* This Court finds persuasive the district court's reasoning in *Eliot* and likewise finds that FRE 403 does not bar admissibility of evidence surrounding Mr. Lichten's retirement. Accordingly, Plaintiffs' motion is **DENIED**. However, Defendants must sanitize for the jury the misconduct which led to Mr. Lichten's retirement, and this evidence will be subject to an appropriate limiting instruction.

## DEFENDANTS' MOTIONS *IN LIMINE*

### 1. Motion *in Limine* No. 1 to Exclude News Articles, Post-Incident Suicides, and Post-Incident Investigations

Defendants' first motion *in limine* seeks to exclude news articles about "jail suicides" and evidence of post-incident jail suicides and investigative findings. (ECF No. 187.)

#### A. Articles Regarding Pre- and Post-Incident Jail Suicides

Defendants contend that Plaintiffs "seek to admit numerous news articles pertaining to inmate suicides that occurred" from 2007 to 2015 at trial, but these articles, which "describe pre[-] and post[-]incident suicides and unrelated litigation," are inadmissible hearsay and use "highly inflammatory language" that is unfairly prejudicial against Defendants. (*Id.* at 2.) Plaintiffs oppose Defendants' request and argue that their second, third, and fourth causes of action require them to prove that the County "was deliberately maintaining inadequate prevention policies and training" to prevent inmate suicides and that these articles are necessary to establish that the Count was on notice that these

inadequacies violated inmates' constitutional rights.   (ECF No. 194 at 6.)   As to Defendants' argument that these articles are hearsay, Plaintiffs contend that the articles contain quoted statements from the County regarding whether it was on notice that it was maintaining inadequate suicide prevention policies and training procedures, and these statements constitute non-hearsay party admissions.  (*See id.* at 10–11.)

Defendants' request to exclude all news articles concerning inmate suicides while in County custody is **DENIED** as to the specific statements in articles that predate Decedent's suicide that are attributable to a County official at a policy-making level that are probative of notice of policy and training failures.  The Court finds that these specific statements are relevant, are not hearsay pursuant to FRE 801(d)(2), and are not barred by FRE 403.  *E.g.*, *Fogleman v. County of Los Angeles*, Case No. CV 10–6793 GAF (SHx), 2012 WL 13005832, at *5 (C.D. Cal. July 25, 2012) ("Newspaper articles that contain quoted statements from Sheriff Baca, from any County official at a policy-making level, and from any of the named defendants in this case, may be admitted pursuant to Rule 801(d)(2)(A).").  As discussed at the hearing, the parties shall meet and confer before trial and identify the specific statements in pre-incident articles that are admissible based on this ruling.

However, the Court finds that post-incident statements that would otherwise qualify as opposing party statements under FRE 801(d)(2) are inadmissible pursuant to FRE 403.  Defendants' motion is therefore **GRANTED** in this respect.  Defendants' motion is further **GRANTED** as to the indiscriminate admission of pre- and post-incident articles generally, as the articles are hearsay without an exception.  Fed. R. Evid. 801(c).  Additionally, even if the articles could be offered not for the truth of the matter asserted but for notice to the County, the Court finds that their probative value to notice is substantially outweighed by a danger of unfair prejudice.  Fed. R. Evid. 403.

## B.   *Evidence of post-incident jail suicides and investigative findings*

Defendants also contend that Plaintiffs seek to admit other evidence of post-incident suicides, such as a Disability Rights Commission ("DRC") Investigation Report from 2018

1   and a Grand Jury Report from 2017 that "examines jail policies in effect in 2016–2017."

2   (ECF No. 187 at 7.)    Defendants argue that these post-incident investigations are

3   inadmissible because they post-date Decedent's suicide and therefore are irrelevant, are

4   "overly" prejudicial, and are evidence of subsequent remedial measures under FRE 407.

5           Plaintiffs oppose Defendants' request and cite to Ninth Circuit authority stating that

6   "in general, 'post-event evidence is not only admissible for proving the existence of a

7   municipal defendant's policy or custom, but is highly probative with respect to that

8   inquiry." (ECF No. 194 at 12 (quoting *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th

9   Cir. 1997)).)  Further, as to the 2017 Grand Jury Report specifically, Plaintiffs argue that,

10   although the report post-dates Decedent's suicide by three years, the report is relevant

11   because the grand jury "reviewed the very version of the M.D.S. 10 and J.5 policies that

12   are at[]issue in this case" and the report contains responses from Sheriff Bill Gore that

13   constitute opposing party statements under FRE 801(d)(2).  (ECF No. 194 at 11.)  As to

14   the DRC Investigation Report, Plaintiffs argue that the report is not hearsay if it is admitted

15   for purpose of establishing notice.  (*See id.* at 13.)

16           Defendants' request to exclude the 2007 Grand Jury Report and Sheriff Gore's

17   responses thereto in **GRANTED in part and DENIED in part**.  First, although Plaintiffs

18   make no such argument, the Court finds that the Grand Jury Report is hearsay but qualifies

19   for the public records exception under FRE 803(8)(A)(iii), as the report contains factual

20   findings from a legally authorized investigation.  *E.g.*, *McConnell v. Lassen County*, No.

21   CIV. S-05-0909 FCD DAD, 2008 WL 4482853, at *3 (Oct. 3, 2008) ("Pursuant to

22   California Penal Code [§] 933, county grand juries have the authority and duty to

23   investigate   appropriate   subjects   and   prepare   reports   including   findings   and

24   recommendations.  Such evaluative reports are based on a factual investigation and are thus

25   admissible subject to the trustworthiness requirement of Rule 803(8)(C).   Defendant

26   concedes the applicability of Rule 803(8)(C) . . . ."); *see also George v. Sonoma County

27   Sheriff's Dep't*, No. C–08–02675 EDL, 2010 WL 4117372, at *6 (N.D. Cal. Oct. 19, 2010)

28   (finding civil grand jury reports admissible pursuant to the public records exception to the

hearsay rule, FRE 803(8)).  However, the Court finds relevant and admissible only the portions of the Grand Jury Report that examine suicide prevention policies that were in place at the time of Decedent's suicide in 2014.[12]  Likewise, the Court finds that Sheriff Gore's responses to the Grand Jury Report are not hearsay, for they qualify as opposing party statements under FRE.  However, the Court finds relevant and admissible only those responses that were made in response to relevant findings, i.e., findings that examined suicide prevention policies that were in place at the time of Decedent's suicide in 2014.

Additionally, Defendants' request to exclude the DRC Investigation Report is **GRANTED**, for the Court finds that this report is hearsay without an exception.  Fed. R. Evid. 801.  Although Plaintiffs argue that the report is not hearsay if it is admitted for the purpose of establishing notice, they fail to explain *how* the report is probative of notice and what portions they seek to admit for purposes of establishing notice.

**2.    Motion *in Limine* No. 2 to Preclude Golden Rule Questioning and Argument**

Defendants' second motion *in limine* seeks to preclude "parties, counsel, or their witnesses[] from presenting any evidence or testimony [that] would encourage the jury to place themselves in Plaintiffs' or [D]ecedent's shoes."  (ECF No. 188 at 3.)  Because Plaintiffs do not oppose the motion and agree that they "will not present evidence or testimony encouraging the jury to place themselves in Plaintiffs' or [D]ecedent's shoes," Defendants' motion is **GRANTED**.  Accordingly, no party, counsel, or witness at trial shall engage in "golden rule" questioning or argument.

---

[12]    Defendants argue, and the Court understands that, the grand jury examined policies that were in effect in 2016–2017, but Decedent's suicide occurred in 2014.  However, at the hearing, Plaintiffs reiterated their position that, to the extent the Grand Jury Report analyzes policies that are identical to the policies in place in 2014, that information is relevant.  The Court finds Plaintiffs' argument persuasive.  Moreover, Defendants have not shown that there is affirmatively no overlap between the polices in place in 2014 and those in place in 2016–2017.

**3.      Motion *in Limine* No. 3 to Prevent Expert Opinion Without Basis or Hearsay Medical Testimony**

Defendants' third motion *in limine* seeks to preclude Plaintiffs from presenting: (1) evidence or testimony concerning Decedent's income before he joined the military; and (2) evidence or testimony that would necessitate an expert opinion about whether Decedent would have been criminally convicted, the potential length of Decedent's incarceration, or whether Decedent would have been dishonorably discharged from the military.  (ECF No. 189 at 1–2.)  Defendants argue that Plaintiffs "never produced documentation indicating [that Decedent] earned any income prior to his incarceration."  (*Id.* at 2.)  Defendants further argue that Plaintiffs did not disclose any expert opinions regarding the probability of Decedent's conviction and possible sentence pursuant to Federal Rule of Civil Procedure ("FRCP") 26(a)(2)(A) and are therefore precluded from rebutting Defendants' expert testimony regarding these issues at trial pursuant to FRCP 37(c)(1).  (*Id.* at 2–3.)

In their opposition, Plaintiffs oppose Defendants' motion only as to Defendants' request to preclude Plaintiffs from presenting evidence or testimony regarding Decedent's past income outside of the military.  (ECF No. 196 at 2.)  Plaintiffs argue that, contrary to Defendants' assertion that they did not produce any documentation concerning Decedent's income prior to incarceration, Plaintiffs produced written discovery "disclosing what jobs [Decedent] had prior to joining the Marines at the age of eighteen."  (*Id.* at 4.)  Plaintiffs also argue that they produced the expert report of economist Dr. Kaycea Campbell, and her report "accounted for [Decedent]'s work history prior to the Marines" and opined on "Plaintiffs' financial loss as a result of [Decedent]'s death."  (*Id.* at 5.)

Because Plaintiffs do not argue that they should be allowed to put on evidence of whether Decedent would have been dishonorably discharged or evidence concerning his likelihood of conviction or potential length of incarceration, the Court **GRANTS** Defendants' motion in this respect.  However, the Court **DENIES** Defendants' request to preclude Plaintiffs from presenting evidence of or testifying to Decedent's past income to the extent Defendants' request encompasses Dr. Campbell's expert report or testimony.

Defendants do not set forth any argument as to why Dr. Campbell's report should be excluded.

### 4.    Motion *in limine* No. 4 to Exclude Expert Opinions Set Forth in Untimely Reports

Defendants' fourth motion *in limine* seeks to exclude as untimely: (1) the supplemental report of Mr. Lichten; and (2) the supplemental report of Plaintiffs' psychiatric expert, A.E. Daniel.  (ECF No. 190 at 2.)  Defendants maintain that the "supplemental" report of Mr. Lichten should not be construed as a supplemental report because it contains a new opinion that Mr. Lichten could have opined to before the expert disclosure deadline, namely that the defendant deputies violated "policies by splitting up the conduct cell checks."  (*Id.* at 2.)  Defendants further maintain that the "supplemental" report of Mr. Daniel is actually a rebuttal report, as it "contains analysis of the County's expert statistical consultant's January 19, 2018 report."  (*Id.* at 3.)  Defendants argue that, because neither report is truly a supplemental disclosure, and Plaintiffs served both reports after the expert disclosures deadline, the Court should exclude both reports as untimely.

Plaintiffs oppose Defendants' motion and argue that Mr. Lichten's supplemental report is based on a site inspection of the Vista Detention Facility that did not occur until after the disclosure deadline because Defendants initially objected to the inspection, which was noticed before the deadline, and "demanded a long and drawn-out meet and confer process."  (ECF No. 197 at 2.)  Plaintiffs further argue that Dr. Daniel could not produce his supplemental report "regarding the statistical analysis of the [C]ounty's self-created suicide rate because the raw data necessary to calculate the suicide rate was not produced" until after the disclosure deadline.  (*Id.* at 2.)  Plaintiffs contend that, even if the Court finds that the reports are untimely, Defendants did not suffer any harm, for Defendants had the opportunity to question both Mr. Lichten and Dr. Daniel regarding these reports during their depositions.   (*See id.* at 3–4.)

Under FRCP 26(a), litigants must disclose all expert opinions and related materials that may be used at trial and make such disclosures at the times directed by the court.   Fed.

R. Civ. P. 26(a)(2)(C).  FRCP 26(e) further obligates parties to supplement an initial expert report "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties . . . ."  Fed. R. Civ. P. 26(e).  Pursuant to FRCP 37(c)(1), "if a party fails provide information or identify a witness as required by Rule 26(a) or (2), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

Defendants' motion is **DENIED**.  Regardless of whether Mr. Lichten's and Dr. Daniel's reports were untimely, or if their untimeliness was not substantially justified, the Court agrees with Plaintiffs and finds that the timing of Plaintiffs' disclosures have not caused Defendants any harm.  At the hearing, the Court inquired whether Defendants had the opportunity to question Mr. Lichten and Dr. Daniels about the reports in question during their depositions, and Defendants confirmed that they did.  The Court acknowledges that Plaintiffs produced Dr. Daniel's report the day before his deposition (ECF No. 197 at 2), but Defendants do not argue that they were harmed by this timing and were able to question Dr. Daniel about the report during his deposition.  Additionally, Defendants' concerns regarding Dr. Daniel's qualifications to opine on statistics or statistical data can appropriately be addressed at trial on cross-examination.

**5.    Motion *in Limine* No. 5 to Exclude Lay Opinions Regarding PTSD and Decedent's Pre-Incident Mental Health Treatment**

Defendants' fifth motion *in limine* seeks to exclude: (1) lay opinions regarding Decedent's "alleged PTSD from an alleged April 2013 training accident"; and (2) testimony regarding Decedent's mental health treatment for suicidal ideation while in military custody.  (ECF No. 191 at 1.)  Defendants argue that this evidence should be excluded because it is "speculative, involves improper lay opinion, contains hearsay without exception, confuses the issues, and is unduly prejudicial."  (*Id.* at 1–2.)  As to the training accident specifically, Defendants contend that the only evidence that the accident

happened is the testimony of Decedent's father.  (*Id.* at 3.)  At his deposition, Decedent's father testified that he "was provided an investigative report" regarding the incident, but this report "was never produced in discovery." (*Id.*)  Defendants additionally point out that none of Plaintiffs' experts provided an opinion "casually linking the April 2013 accident at Camp Heron to any PTSD diagnosis." (*Id.* at 2.)

Plaintiffs oppose only Defendants' request to exclude testimony regarding the alleged training accident and Decedent's subsequent PTSD and argue that Ms. NeSmith and Decedent's father "both observed that [Decedent] was psychologically impacted by the training incident" and should be allowed to testify as to their perceived changes in his behavior.  (ECF No. 198 at 2.)

Defendants' request to exclude lay testimony that Decedent suffered from PTSD due to a training accident that occurred in April 2013 is **GRANTED**.  Per FRE 701, lay witness opinion testimony cannot be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Ms. NeSmith and Decedent's father therefore may not appropriately diagnose Decedent with PTSD or casually link Decedent's PTSD to the alleged training accident. *See Lillie v. ManTech Int'l Corp.*, Case No. 2:17-cv-02538-CAS-SSx, 2018 WL 6323076, at *5 (C.D. Cal. Dec. 3, 2018) ("Rule 701 has been used to bar lay witnesses from testifying as to their opinion on causation where such a determination would require the experience of an expert. . . .  Thus, to the extent that defendant seeks to exclude medical opinions as to the causation of plaintiff's alleged emotional distress and any diagnoses, the Court [grants] defendant's motion [*in limine*].").  Additionally, to the extent the only evidence verifying that the April 2013 training accident occurred is Decedent's father's testimony that Decedent told him about the accident, Plaintiffs' witnesses are precluded from referencing the accident, for this evidence is inadmissible hearsay. Fed. R. Evid. 801.  However, Ms. Ne Smith and Decedent's father are permitted to testify as to Decedent's symptoms and behavioral changes that they personally observed during this time. *See* Fed. R. Evid. 701(a); *see also Burke v. City of Santa Monica*, No. CV-09 02259 MMM (PLAx), 2011 WL 13213593, at *20 (C.D. Cal. Jan. 10, 2011) ("Any

lay witness who is familiar with another person's general demeanor would be competent to testify regarding changes in that demeanor . . . .").

**6.      Motion *in limine* No. 6 to Exclude the Post-Incident E-mail from Barbara Lee**

Defendants' sixth motion *in limine* seeks to exclude evidence of a post-incident e-mail sent on March 1, 2014—the day of Decedent's suicide—that refers to the suicide. (ECF No. 192.)  Specifically, Ms. Lee received an e-mail at 8:42 AM from a San Diego Sheriff's Department employee with the following information:

> Received call from VDF @0742 today reporting I/P Nesmith, Kristopher #13784410 housed in Upper West (mainline; no roommate) paramedics pronounced death @0735.
>
> Demographics: 21 year old white male; booked 11/30/13;
> [C]harge: attempted murder;
> Court date[:] 3/13/14
> Medications: Desyrel 50 mg QHS
> Most recent appointment: psych sc 2/2/14
> Pending appointment: psych sc 3/2/14
> Dx: 307.42 Insomnia; 304.3 Cannabis Dependence
>
> During sworn's hourly rounds, I/P was found hanging with bed sheet between bed & commode.
>
> Phone notification made to MSD Administrator on call @0751.

(*Id.* at 5.)  Ms. Lee replied to this e-mail at 8:54 AM, stating, "This inmate fit the suicide profile – young, white male on serious criminal charges.  I'm wondering why he wasn't on our radar." (*Id.*)  Defendants maintain that Ms. Lee's response constitutes "classic hearsay without an exception," as Ms. Lee is not a party in this case.  (*Id.* at 2.)  Further, Defendants contend that Ms. Lee, as the Medical Services Administrator for the San Diego County Sheriff's Department, is not a medical professional and her e-mail constitutes improper lay opinion, for she made her response "without guidance or input from medical professionals" and without "adequate information."  (*See id.*)

///

Plaintiffs oppose Defendants' motion and argue that Ms. Lee's response is not hearsay because she was a County employee when she sent the reply e-mail, and thus, her response it is an opposing party's statement under FRE 801(d)(2)(D).  (ECF No. 199 at 3.)  Plaintiffs further argue that Ms. Lee's response is not improper lay opinion because, as the Medical Services Administrator, Ms. Lee has "hands-on involvement with the suicide prevention policies" and personal knowledge of "the known factors and triggers associated with an inmate's elevated risk of suicide."  (*Id.* at 4.)

Defendants' motion is **DENIED**.  Ms. Lee, as the Medical Services Administrator for the San Diego County Sheriff's Department, was a County employee acting within the scope of her employment when she sent the response, and therefore, the response is not hearsay under FRE 801(d)(2)(D).  In her declaration attached to the instant motion, Ms. Lee declares that she is "the Medical Services Administrator for the San Diego County Sheriff's Department," a position she has held since 2012.  (ECF No. 192 at 7.)  Ms. Lee further declares that, as Medical Services Administrator, she "oversee[s] the administration of the provision of medical services in all County detention facilities."  (*Id.*)  Notably, Defendants make no argument that Ms. Lee's response does not qualify as an opposing party's statement under FRE 801(d)(2)(D).  Instead, they argue that the statement is affirmatively hearsay without an exception.

Further, the Court does not find that Ms. Lee's response is improper lay witness testimony.  As Plaintiffs highlight, Ms. Lee's response is not medical opinion and appears to be based on her familiarity with the suicide warning signs as specified by the County's Suicide Prevention & Precaution Program in effect at the time of Decedent's death.  (*See* ECF No. 128 at 16.)  Additionally, the Court does not find that the probative value of Ms. Lee's response is substantially outweighed by a danger of *unfair* prejudice, and Defendants may cross-examine Ms. Lee as to why she made this statement and her knowledge of Decedent's medical treatment and history at the time.

///

///

**DEFENDANTS' MOTION TO AMEND PRETRIAL ORDER TO SUBSTITUTE EXPERT WITNESS**

Defendants move to substitute their expert, the Honorable Samantha Begovich, with Deputy District Attorney Wendy Patrick.  (ECF No. 193.)  As addressed *supra*, the Hon. Begovich was appointed as an immigration judge after Defendants designated her as an expert and is no longer able to serve as an expert in her new role.  (*Id.* at 2.)  Defendants state that "Ms. Patrick has reviewed [the Begovich report] . . . and completely adopts all the opinions expressed therein and has no change of opinion."  (*Id.*)

Because the Court has determined that the Begovich Report is inadmissible under FRE 403, Ms. Patrick's substitution is unnecessary.  Accordingly, Defendants' motion is **DENIED as moot**.

**IT IS SO ORDERED.**

Dated:  January 28, 2022

Hon. Janis L. Sammartino
United States District Judge